**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------ x

                                :

In re                          :        **Chapter 11**

                                  :

**RENTPATH HOLDINGS, INC.**, *et al.*,    :       **Case No. 20– _____ (      )**

                                  :

                Debtors.[1]      :       **(Joint Administration Requested)**

                                  :

------------------------------------------------------------ x

**DECLARATION OF RICHARD MARTIN IN SUPPORT OF**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

      I, Richard Martin, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

      1.      I am the Chief Financial Officer of RentPath Holdings, Inc. and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**," "**RentPath**," or the "**Company**").  In my capacity as Chief Financial Officer, I am generally familiar with RentPath's day-to-day operations, business and financial affairs, and books and records.  Prior to becoming Chief Financial Officer of RentPath in May 2019, I served as Chief Financial Officer of Symphony Health Solutions ("**Symphony**"), a privately owned data analytics company that provides applications, analytics, and consulting services to the health sciences industry.  At Symphony, I was responsible for accounting, financial planning and analysis, risk management, tax, and treasury.  Prior to joining Symphony, I served as Chief Financial Officer at Delta Career Education Corporation, a privately owned operator of post-secondary career technical

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: RentPath Holdings, Inc. (1735); RentPath, LLC (7573); Consumer Source Holdings LLC (8150); Discover Home Network, LLC (4311); Easy Media, LLC (5455); Electronic Lead Management, Inc. (4986); Electronic Lead Management MA, Inc. (3113); Electronic Lead Management VA, Inc. (7698); Live Response Solutions Holdings, LLC (0462); Live Response Solutions, LLC (5120); Viva Group Brokerage, Inc. (7156); and Viva Group, LLC (0789).  The Debtors' mailing address is 950 East Paces Ferry Road NE, Suite 2600, Atlanta, Georgia 30326.

colleges servicing 17,000 students.  I have also served as Chief Financial Officer of several other privately owned companies including DecisionOne Corporation, General Fiber Corporation, and Strategic Distribution, Inc., as well as Vice President Finance, Treasurer, and Principal Accounting Officer for Maxxim Medical, Inc. and Vice President Finance, Treasurer, Secretary, and Interim Chief Financial Officer for Pameco Corporation.  I received a B.S. in Accounting from the University of Connecticut and a Master of Science in Taxation from the University of Hartford.

2.      On the date hereof (the "**Petition Date**"), the Debtors each commenced with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  I am knowledgeable and familiar with the Debtors' day-to-day operations, books and records, and business and financial affairs, and the circumstances leading to the commencement of these chapter 11 cases.

3.      I submit this declaration (the "**Declaration**") to assist the Court and other parties in interest in understanding the circumstances and events that led to the commencement of these chapter 11 cases and in support of the motions and applications that the Debtors have filed with the Court, including the "first day" pleadings (the "**First Day Pleadings**").  Except as otherwise indicated herein, the facts in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.      This Declaration is divided into five sections.  Section I provides an overview of the Debtors and these chapter 11 cases, including a description of the Plan (as defined below).  Section II describes the Debtors' business.  Section III describes the Debtors' corporate

and capital structure.  Section IV describes the circumstances that led to the commencement of these chapter 11 cases.  Section V provides a summary of the First Day Pleadings and factual bases for the relief requested therein.

## I.    Overview

5.       RentPath is a digital marketing solutions company that maximizes the return on property managers' marketing spend by linking property managers with prospective renters and simplifying the residential rental experience.  Through its lead generation business, RentPath provides websites that feature an easy-to-use search experience for rental apartments and homes (the "**Internet Listing Services**").  RentPath also provides a full suite of products to help property management companies acquire, retain, and communicate with tenants (collectively, "**Digital Marketing Solutions**").  Headquartered in Atlanta, Georgia, RentPath employs approximately 770 people, including a sales force of approximately 300 with a presence in 47 states.  RentPath had EBITDA and revenue of $46.8 million and $226.7 million, respectively, for the 2019 fiscal year ("**Fiscal 2019**").

6.       In 2017 and 2018, a shifting competitive landscape and increased competition from numerous sources resulted in declining revenues and necessitated an increase in marketing spend and promotions to maintain the flow of leads, leaving RentPath with limited liquidity and at the risk of default under its debt documents by early 2020.  As of the Petition Date, RentPath's capital structure includes approximately $700 million in funded debt.  In Fiscal 2019, RentPath's cash interest expense totaled approximately $54.4 million.

7.       Accordingly, in 2019, the Company began its formal review of strategic alternatives with respect to its capital structure and diminishing near-term liquidity, exploring various ways to inject new capital into its business and restructure its debt obligations with minimal disruption to its day-to-day operations.  The Company began a robust sale process in July 2019

3

(the "**Prepetition Sale Process**"), pursuant to which the Company's advisors contacted forty-three (43) potential acquirers with the financial and operational wherewithal to complete a sale transaction of all or a portion of the Company's business.[2]  After several months of constructive dialogue and extensive negotiations, the Company received a cash bid from CoStar Group, Inc. ("**CoStar**"), a commercial real estate information company, and a credit bid of prepetition first lien claims from the Consenting Creditors (as defined below), for the going concern sale of substantially all of the Company's assets.

8.     The Debtors are pleased to report that, after considerable deliberation, further negotiations, and multiple rounds of revisions to the terms of CoStar's bid, the Company and the Board (as defined below), at the recommendation of the Special Committee (as defined below), determined that CoStar's bid presented the most value-maximizing transaction possible through the Prepetition Sale Process and entered into a stalking horse asset purchase agreement (the "**Stalking Horse APA**") with CSGP Holdings, LLC, an affiliate of CoStar.[3]  As set forth in the Stalking Horse APA, the stalking horse bid provides for the going concern sale of substantially all of the Company's assets for an aggregate purchase price equal to $587.5 million in cash, plus the assumption of certain liabilities (the "**Stalking Horse Bid**").

9.     Prior to the Petition Date, the Debtors also proactively engaged in constructive negotiations and discussions with an ad hoc committee of crossholder lenders holding First Lien Claims (as defined below) and Second Lien Claims (as defined below), an ad hoc group of lenders holding Second Lien Claims, and the Company's equity sponsors.  Following months

---

[2]     Additional details with respect to the Prepetition Sale Process will be set forth in a separate motion and declaration filed with the Court in connection with approval of bidding procedures (the "**Bidding Procedures Documents**").

[3]     A complete summary of the proposed sale, including the auction and sale process, the bidding procedures governing that process, and the Stalking Horse APA (as defined below) will be set forth in the Bidding Procedures Documents.

of good faith, arms'-length negotiations with such parties, on February 11, 2020, the Company executed a restructuring support agreement (the "**RSA**", a copy of which is annexed hereto as **Exhibit A**) with lenders holding approximately 72% of First Lien Claims and 45% of Second Lien Claims (collectively, the "**Crossholder Ad Hoc Committee**"), an ad hoc group of lenders holding approximately 39% of Second Lien Claims (the "**Second Lien Ad Hoc Committee**" and, together, with the Crossholder Ad Hoc Committee and other lenders that may sign joinders to the RSA, the "**Consenting Creditors**"), and the Company's equity sponsors, Regal Holdco LP (an affiliate of Providence Equity Partners LLC) and Pittsburgh Holdings, L.P. (an affiliate of TPG Partners VI, L.P.) (Regal Holdco LP and Pittsburgh Holdings, L.P., collectively, the "**Consenting Sponsors**", and together with the Consenting Creditors, the "**RSA Parties**"), each of which own or control approximately 49.7% of the outstanding equity interests in RentPath Holdings, Inc. (i.e., in the aggregate, approximately 99% of RentPath Holdings, Inc.) which directly or indirectly owns or controls 100% of the equity or membership interests, as applicable, in the other Debtors.

10.     Pursuant to the RSA, the RSA Parties agreed, as applicable, to vote in favor of and support confirmation of a chapter 11 plan (the "**Plan**") on the terms and conditions set forth in the term sheet annexed to the RSA which contemplates a sale of the Company.

11.     Specifically, the RSA provides for the postpetition continuation of the Debtors Prepetition Sale Process (together with the postpetition sale process, the "**Sale Process**"). Pursuant to the Sale Process, any and all bids for all or some portion of the Company's business will be evaluated as a precursor to confirmation of the Plan. The Sale Process will provide a public and competitive forum in which the Debtors will seek bids or proposals for potential transactions that, if representing a higher or otherwise better value for the Debtors' stakeholders than the Stalking Horse Bid, will be pursued in lieu of the Stalking Horse Bid.

12.     Importantly, pursuant to the RSA, the Crossholder Ad Hoc Committee has agreed to backstop the Sale Process by submitting a binding credit bid of prepetition first lien claims (the "**Credit Bid**") in the amount of $492.7 million.  The Credit Bid will serve as a back-up bid in the Sale Process, providing the Debtors with a path to emergence from chapter 11 while pursuing the Stalking Horse Bid or any other higher or otherwise better bid.

13.     In furtherance of the Company's objectives during its chapter 11 cases and to address the Company's liquidity constraints, the RSA provides for a fully-committed, proposed debtor-in-possession financing package in the approximate amount of $74.1 million to stabilize operations and provide the Company with much-needed liquidity, which commitments are backstopped by the Crossholder Ad Hoc Committee.  Such facility will ensure that the Debtors will continue to operate seamlessly in the ordinary course of business during these chapter 11 cases with minimal disruption to the business.  Moreover, in the event that the Credit Bid is the successful bid, the RSA provides for a new money exit financing package of approximately $71.0 million of new money term loans, which commitments are backstopped by the Crossholder Ad Hoc Committee.

14.     The broad support the Debtors have garnered pursuant to the RSA reflects the consensus among the Debtors' key constituents that the agreements embodied in the RSA represent real and significant value for the Debtors, their estates, and all of their stakeholders.

RLF1 22899844V.1

15.    <u>Proposed Timeline</u>.  An expeditious resolution of these chapter 11 cases is crucial to preserving and maximizing value of the Company for the benefit of all stakeholders. Accordingly, the Company has agreed to, among others, the following chapter 11 milestones in the RSA, the DIP Financing documents, and the Stalking Horse APA (subject to the Court's calendar):

| Event | Key Milestone |
|---|---|
| Commencement of the chapter 11 cases | February 15, 2020 |
| Entry of interim order approving debtor-in-possession financing | February 17, 2020 |
| Entry of order approving bidding procedures | March 23, 2020 |
| Entry of final order approving debtor-in-possession financing | March 23, 2020 |
| Entry of order approving disclosure statement | April 17, 2020 |
| Commencement of solicitation | 21 days from entry of order approving disclosure statement |
| Entry of order confirming the Plan | 65 days from entry of order approving disclosure statement |
| Outside date under the Stalking Horse APA | August 12, 2020 |
| DIP maturity date | Earlier of (a) August 31, 2020 and (b) the effective date under a chapter 11 plan |
| Outside effective date | If the Credit Bid is the successful bid, the later of (x) 14 days after entry of the order confirming the Plan and (y) August 31, 2020 (with the consent of the Consenting First Lien Creditors)<br><br>If a third-party bid is the successful bid, the later of (x) August 31, 2020 and (y) the successful bid outside date |

16.    The Debtors and the RSA Parties are aligned in their support of an efficient restructuring that minimizes the impact to the Company's operations, vendors, and employees. The proposed timeline for these chapter 11 cases appropriately balances the Debtors' need to complete their restructuring process quickly and their need to sufficiently test value in the market.

RLF1 22899844V.1

## II.    Debtors' Business

### A.    History and Formation

17.    RentPath's inception can be traced to the late 1970s as Haas Publishing Co. ("**Haas**"), one of the nation's largest publishers of printed apartment guides at the time.  Through a series of strategic acquisitions, Haas and other similar publications would eventually become known as Primedia Inc. ("**Primedia**").   In 2011, Primedia was sold to TPG Partners VI, L.P. ("**TPG**") in the midst of the transition of Primedia's business from print to digital apartment rental publications.  Following the transition to a fully-digital platform, the Company witnessed three (3) years of revenue growth.  In 2013, Primedia changed its name to RentPath to better reflect its business focus.   In 2014, through a series of transactions, Providence Equity Partners LLC ("**Providence**") acquired approximately half of the equity interests in the Company.

18.    In late 2015, the online rental space became increasingly saturated with competitors.   At the same time, property management companies were becoming more sophisticated about their marketing spend and increasing the marketing of their units directly to consumers through their own sites.  As a result, RentPath began losing organic consumer traffic, which translated into decreased leads and declining sales growth.  Moreover, a decline in apartment turnover resulted in increased occupancy rates and led many property management companies to cut marketing spending and/or to shift to lead generation options other than websites like the Debtors'.  To combat this reality, RentPath closed an unsuccessful division of its business, hired a new management team, significantly increased its investment in performance marketing to increase the flow of leads to customers, and developed a new business segment—Digital Marketing Solutions—to provide additional marketing services to property management companies.  Through its Digital Marketing Solutions segment, RentPath began providing a full

8

suite of products to help property management companies acquire, retain, and communicate with tenants.

### B.  Debtors' Current Business Operations

19.     As noted above, RentPath is a digital marketing solutions company that maximizes the return on property managers' marketing spend by cost-effectively linking property managers with prospective renters and simplifying the residential rental experience.  RentPath operates two primary product segments: (a) a lead generation business for property managers through its Internet Listing Services, which provide listings for residential renters, and (b) a marketing business for property managers through a variety of services, as part of its Digital Marketing Solutions.

### 1.  Lead Generation Business

20.     The Debtors' lead generation business is provided through a brand portfolio of four (4) Internet Listing Services websites, including *Rent.com*®, *Apartment Guide*®, *Rentals.com*®, and *Lovely*®.  Property managers have a wide variety of online and offline options to market their properties to prospective renters, including their own websites. Some property manages market their properties on the Debtors' websites, and assess the success of that marketing spend based on the rate of return to the property manager (including the number and quality of prospective renter leads generated).  With an eye toward the return on their marketing investment, property managers shift their marketing spend among various online and offline options.  Potential renters, who similarly have numerous online and offline options through which to discover rental properties, typically arrive at the Debtors' websites through a search engine query and its organic or paid results, and thereby access property managers' listings through a variety of search environments, both before and after arriving at the website.  Many property management companies pay a monthly subscription fee to list their properties on the Debtors' websites, which

generate prospective renter leads for the advertising property management customers, and ultimately leases, for such properties.    RentPath's lead generation business generated approximately $198 million in revenue in 2019.  The remainder of the Company's $226.7 million in total revenue was attributed to the Debtors' Digital Marketing Solutions segment.



Sample searches using each of the Debtors' four (4) Internet Listing Services platforms.

21.    <u>Traffic from Google and Other Search Engines</u>.    As noted above, prospective renters typically arrive at the Debtors' websites following a query on a search engine, such as Google or Bing.  In response to a Google search, such as "Apartments in Atlanta," Google displays a search results page, which includes all relevant search results.  The search results page also displays paid advertisements, which the Company utilizes to attempt to drive consumer internet traffic to its websites following a competitive bidding process orchestrated by the search engine platform.    The practice of bidding for and buying these advertisements is called "performance marketing."    Many companies, including property management companies themselves, either directly or through third parties, engage in performance marketing to compete for traffic from prospective renters.  From the search results page, a renter can click on numerous

RLF1 22899844V.1

options, including one of the Debtors' websites.  Each of the Debtors' websites provides renters

with a number of properties that are responsive to the search criteria.  A renter may submit a "lead"

either by phone or email through the Debtors' websites, indicating interest in a specific property.

Each lead is received by RentPath and forwarded to the applicable property site so that a property

manager may respond.  The Debtors' property management customers use the Debtors' websites,

and often many others, to supplement their own direct marketing efforts to generate leads, a portion

of which ultimately translate into leases for such property management companies.

      22.    <u>Organic Traffic</u>.  The Debtors generate organic traffic to their websites (as

opposed to traffic generated through paid advertising on Google or Bing), among other ways,

through the quality and scope of their listings, ease of use, features, and speed of their websites, as

well as through their investment in search engine optimization.  Search engine optimization largely

encompasses the Company's efforts to improve its performance among search engine relevancy

algorithms employed by Google and other search engines so that potential renters are exposed to

one of RentPath's websites through Google searches.  As a result of increased competition, as

described above, organic traffic to RentPath's websites began to decline in late 2015, accelerating

throughout 2016, 2017 and the first half of 2018.  Competition came from multiple angles,

including competing websites increasing their presence through marketing efforts and offering

unique, high quality content; search engines like Google shifting search page space from organic

results to paid results; companies in adjacent lead generation spaces investing in the rental space;

property management companies engaged in direct marketing efforts; well-funded startups

entering the industry; and an increased focus on pay-for-performance, among others.  In addition

to this increased competition from multiple sources, rental occupancy rates continued to rise (i.e.,

less unit turnover), leading some apartment owners and managers to cut marketing spending, while

others shifted to lead generation options other than websites like the Debtors'. In order to maintain the flow of leads in this environment, RentPath was forced to significantly increase its spending on performance marketing to generate paid traffic, particularly with Google, rather than rely on free organic traffic.

23.     To attempt to reverse this trend, the Debtors initiated a number of measures, including hiring website optimization professionals, which many property management companies were doing independently as well. Such professionals undertook intensive efforts between 2016 and 2017 to improve organic performance by rebuilding the Debtors' website architecture and link structure. The Company also optimized search and sort algorithms to benefit consumers and improve search engine relevancy ratings. These efforts began to bear fruit in the fall of 2018, when RentPath's organic traffic grew for the first time since early 2015. Despite the increase in organic traffic, organic leads remain negative and have been for at least 36 of the past 37 months. Nevertheless, as discussed below, the Company's marketing expenses, principally with Google, and leverage profile in the presence of strong competition from multiple sources across the lead generation space have resulted in softening revenues and a corresponding impact on liquidity.

24.     <u>Performance Marketing</u>. A significant component of the Company's operating expenses is marketing (which includes performance marketing, also referred to as digital advertising or search engine marketing). The Company's advertising efforts are exclusively focused on internet and social media and do not currently include television, print, and radio advertising, which also are used by many companies, including Debtors' own customers, for lead generation. As discussed above, search engine marketing encompasses the Company's paid digital and media advertising with vendors. The Company bids on certain key search terms and, upon

12

winning the auction, the Company receives advertising space on the search engine platform when the key words are searched.



An example of RentPath's performance marketing advertisements to generate traffic to its websites.

### 2. Digital Marketing Solutions

25.     Through their Digital Marketing Solutions, the Debtors facilitate the digitalization of multifamily leasing offices by providing advertising, communication, and reputation management services to property management companies.  As part of their advertising services, the Debtors (a) attempt to reach renters actively searching for apartments in a local area through social media ads known as their *Social Ads Express*™ product ("**Social Ads Express**"), (b) provide targeted email advertising to renters based on locations they are searching through their *LeadMail*™ product ("**Leadmail**"), and (c) manage online ad campaigns to drive leads through their *RentPath Search & Social*™ product ("**Search & Social**").  As part of their communication services, the Debtors provide (x) leasing support through 24/7 live call and email answering services, tour scheduling, and lead source tracking and recording through their *Live Response Solutions*™ product ("**Live Response Solutions**") and (y) seamless digital communications solutions, such as text messages managed from a single dashboard and mobile-optimized email templates, through their *Media Center PRO*™ product ("**Media Center Pro**").  As part of their

reputation services, known as *Community Reputation PRO*™ ("**Community Reputation Pro**"), the Debtors enable customers to improve their online ratings by responding to reviews of their properties, monitoring reviews and social media mentions of their properties to flag issues, and maintaining an ongoing social media presence for their properties by posting relevant localized content on major platforms.

26.    The Debtors employ a monthly recurring revenue model by which property management companies pay a fixed rate for Social Ads Express, Community Reputation Pro, Live Response Solutions, and Media Center Pro products.  Certain products, such as Leadmail and Search & Social are based on a usage revenue model.  The Digital Marketing Solutions business has been well received by customers and is growing.  Indeed, between 2018 and 2019, revenues related to the Digital Marketing Solutions business increased on average by 41.5%, though over a small base.



An example of the Company's Community Reputation Pro product, which, among other things, monitors and delivers custom responses to reviews managed through a customized portal.

## C.    Employees and Sales Force

27.    The Debtors employ approximately 770 full-time individuals.  None of the Debtors' workforce is unionized or subject to collective bargaining agreements or other similar labor contracts.  RentPath has a sales force of approximately 300 individuals in 47 states.

RLF1 22899844V.1

### III.    Debtors' Corporate and Capital Structure

**A.    Corporate Structure**

28.    As previously noted, RentPath was born from a series of strategic acquisitions.  RentPath Holdings, Inc. ("**RentPath Parent**") is the Company's ultimate parent through its 100% ownership of RentPath, LLC.  All of the Company's operations are conducted through RentPath, LLC, which enters into most lease, vendor, and other agreements on behalf of the Company.  All other Debtors perform specific functions that support the operations of RentPath, LLC, but do not otherwise have material roles in daily operations.  The Debtors' employees are employed by Consumer Source Holdings LLC, and payroll is administered through that entity.  The Company's real estate broker licenses are held by the following five entities:  Viva Group, LLC, Viva Group Brokerage, Inc., Electronic Lead Management, Inc., Electronic Lead Management MA, Inc., and Electronic Lead Management VA, Inc.  The remaining Debtor entities hold *de minimis* assets resulting from previous acquisitions.  Non-Debtor RentPath Gives Back Foundation, Inc. ("**RentPath Gives Back**") is a non-profit foundation through which RentPath employees may contribute to the Company's mission of eradicating homelessness.

29.    RentPath is a privately held company.  Affiliate entities of TPG and Providence collectively hold approximately 99% of the outstanding equity interests in RentPath Parent, with the remainder held by former and existing management members.  The Debtors' organizational structure, as of the Petition Date, is set forth below:



30.     The following table sets forth the names and positions of the Company's executive management team, including myself:

| Name | Position |
| --- | --- |
| Marc Lefar | Chief Executive Officer |
| Richard Martin | Chief Financial Officer |
| Marlon Starr | Senior Vice President, General Counsel |
| David Bell | Chief Strategy Officer and Vice President, Corporate Development and Transformation |
| Michael Child | Chief Technology Officer |
| Ryan Davis | Chief Product and Marketing Officer, Business |
| Juliet Johansson | Senior Vice President of Sales |
| William Lin | Chief Marketing Officer, Consumer |
| Krista Nordlund | Chief Product Officer, Consumer |
| Jackson Lynch | Senior Vice President and Chief Human Resources Officer |

31.     The following table sets forth the names of the members of RentPath Parent's current directors:

| Name | Position |
|------|----------|
| Marc Beilinson | Independent Director and Member of Special Committee |
| Michael Dominguez | Director |
| Dhiren Fonseca | Independent Director and Member of Special Committee |
| Marc Lefar | Director |
| Scott Marimow | Director |
| David Simpson | Director |

32.     Debtors RentPath, LLC, Consumer Source Holdings LLC, Easy Media, LLC, Viva Group, LLC, Discover Home Network, LLC, Live Response Solutions, LLC, and Live Response Solutions Holdings, LLC are limited liability companies that do not have boards of directors.  Instead, each of these entities is managed by its sole member.  RentPath Parent serves as the sole member of RentPath, LLC, RentPath, LLC serves as the sole member of Consumer source Holdings LLC, Easy Media, LLC, Viva Group, LLC, Discover Home Network, LLC, and Live Response Solutions Holdings, LLC, and Live Response Solutions Holdings, LLC serves at the sole member of Live Response Solutions, LLC.  Marc Lefar and Marlon Starr serve as directors of Electronic Lead Management, Inc., Electronic Lead Management MA, Inc., and Viva Group Brokerage, Inc.  Marlon Starr also serves as the sole director of Electronic Lead Management VA, Inc.

### B. Capital Structure

### 1.    Prepetition Funded Indebtedness

33.    The following table provides a summary of the Company's prepetition funded debt obligations:

|  | Outstanding Principal |
| --- | --- |
| First Lien Revolving Facility | $37.95 million |
| First Lien Term Loan | $479.75 million |
| **Total First Lien Debt** | **$517.70 million** |
| Second Lien Term Loan | $170.00 million |
| **Total Funded Debt** | **$687.70 million** |

### (i)    First Lien Credit Agreement

34.    The Debtors have outstanding first lien secured debt obligations under that certain First Lien Credit Agreement, dated as of December 17, 2014 (as amended, supplemented, amended and restated or modified from time to time, the "**First Lien Credit Agreement**" and the claims thereunder or related thereto, the "**First Lien Claims**"), among RentPath Parent, RentPath, LLC, as borrower, Royal Bank of Canada, as administrative agent (in such capacity, the "**First Lien Agent**"), and the lenders party thereto from time to time (the "**First Lien Lenders**").  As of the Petition Date, the aggregate principal amount outstanding under the First Lien Credit Agreement is approximately $517.70 million, which amount consists of the following, each secured by the same collateral with *pari passu* lien priority:  (a) approximately $479.75 million in term loans (the "**First Lien Term Loans**") and (b) approximately $37.95 million in revolving loans (the "**First Lien Revolving Loans**" or "**First Lien Revolving Facility**").  The First Lien Revolving Loans are comprised of three loans:  (a) a $2.2 million loan that matured on December 17, 2019, (b) a $27.3 million loan maturing on September 17, 2021, and (c) a $7.8 million loan maturing on December 17, 2020.  The First Lien Revolving Facility also includes letters of credit

expiring on January 15, 2021 in the amount of $600,000.  In addition, the Debtors have outstanding interest rate hedge agreements with certain of the First Lien Lenders.  As of the Petition Date, the aggregate mark-to-market value of the Company's obligations under such hedge agreements using standard industry valuation processes was approximately $4.7 million (the "**Secured Hedge Obligations**").  The Secured Hedge Obligations are secured *pari passu* with the Debtors' obligations under the First Lien Credit Agreement (the "**First Lien Credit Agreement Obligations**").  The First Lien Credit Agreement Obligations and the Secured Hedge Obligations are secured by a first lien on substantially all of the Debtors' tangible and intangible property (subject to certain specified liens in Section 7.01 of the First Lien Credit Agreement and certain excluded assets as set forth in the Loan Documents (as defined in the First Lien Credit Agreement)).

      **(ii)**    **Second Lien Credit Agreement**

      35.    The Debtors have outstanding second lien term loan obligations under that certain Second Lien Credit Agreement, dated as of December 17, 2014 (as amended, supplemented, amended and restated or modified from time to time, the "**Second Lien Credit Agreement**" and the claims thereunder or related thereto, the "**Second Lien Claims**"), among RentPath Parent, RentPath, LLC, as borrower, Wilmington Savings Fund Society, FSB (as successor to Royal Bank of Canada), as administrative agent, and the lenders party thereto from time to time.  As of the Petition Date, the aggregate principal amount outstanding under the Second Lien Credit Agreement is approximately $170.0 million.  Obligations under the Second Lien Credit Agreement are secured by a second lien on substantially all of the Debtors' tangible and intangible property, subject to the obligations under the First Lien Credit Agreement and certain specified liens in Section 7.01 of the Second Lien Credit Agreement and certain excluded assets as set forth in the Loan Documents (as defined in the Second Lien Credit Agreement).

(iii)    **Intercreditor Agreement**

36.    The relative contractual rights of the holders of First Lien Claims and Second Lien Claims (collectively, the "**Prepetition Secured Parties**") are governed by that certain Intercreditor Agreement, dated as of December 17, 2014 (as may be amended, restated, supplemented, or otherwise modified from time to time, the "**Intercreditor Agreement**"), among Royal Bank of Canada, in its capacity as the first lien representative, and Wilmington Savings Fund Society, FSB (as successor to Royal Bank of Canada), in its capacity as the second lien representative.  The Intercreditor Agreement governs the respective rights and obligations of the Prepetition Secured Parties with respect to, among other things, priority, matters of debtor-in-possession financing, the use of cash collateral, and adequate protection.

**2.  General Unsecured Claims**

37.    In the ordinary course of business, the Debtors incur trade credit on varying terms.  As of the Petition date, the Debtors estimate that there is approximately $17.1 million in general unsecured claims.

**3.  Equity Ownership**

38.    As discussed above, as of the Petition Date, affiliate entities of TPG and Providence collectively hold approximately 99% of outstanding shares in RentPath Parent, with the remainder held by former and existing management members.  All other Debtors are wholly-owned direct or indirect subsidiaries of RentPath Parent.

**IV.    Events Leading to Commencement of Chapter 11 Cases**

39.    Despite some turnaround in the Debtors' lead generation business and growth in their modest Digital Marketing Solutions business, the overall lead generation and digital marketing landscape remains challenging due to a number of factors, especially for a highly-levered company like RentPath.  For Fiscal 2019, the Debtors had approximately $226.7

million in revenue and $46.8 million in EBITDA, with implied leverage of approximately 14.7x

EBITDA.  As discussed throughout, the Debtors operate in a highly competitive marketplace in

which declining revenues mandated additional investments in paid search marketing, which has

had a corresponding impact on the Debtors' liquidity.

### A.   The Debtors are Highly Levered

40.    As noted above, RentPath is levered approximately 14.7x EBITDA as of

the end of Fiscal 2019.  The Debtors do not believe their current balance sheet is sustainable over

the long term.  Indeed, the Debtors have approximately $687.7 million in aggregate funded debt,

a portion of which will mature as early as this year.  Over the last three (3) years, the Debtors' cash

interest expense has averaged approximately $52 million per year and principal payments have

averaged approximately $5 million per year.  The costs of such debt service has, of course,

impacted the Debtors' ability to invest in product and growth initiatives and increase performance

marketing.

### B.   Increased Competition

41.    The digital marketing space for the residential rental industry is highly

competitive.  RentPath faces stiff competition across its platform from a variety of competitors,

including, property management companies that continue to enhance and optimize their own

listings for direct marketing to consumers, companies specializing in search engine optimization

services and search engine marketing specifically for apartment rentals, internet listing service

providers (many of which have entered the market over the past five (5) years with updated user

interfaces, improved user experience, and improved mobile apps), Google and other search engines

that compete for property manager marketing spend, and general classified advertisement sites,

among others.  Property management companies in particular have increased and continue to

increase the sophistication with which they market their own listings, including by working with

21

companies who specialize in providing search engine optimization services and performance marketing services for property management companies.  This, along with advertising directly on search engines, allows property management companies to bypass internet listing websites completely, placing further competitive pressure on RentPath to innovate and maximize the value it brings to its property management company customers and to renters.  Moreover, most renters begin their rental search on search engines, from which, because of changes in the nature of search listing presentations, they are increasingly likely to click-through directly to specific property management and apartment building leasing office websites rather than click-through to internet listing services.  The Debtors, given their ongoing financial limitations, have been at a disadvantage to other lead generation companies that have the financial flexibility to devote greater resources to marketing, which, in turn, increases traffic, lead generation value and revenues.

**C.      Prepetition Initiatives**

**1.    Operational Initiatives**

42.     In response to these pressures, RentPath implemented a number of initiatives in an attempt to improve its operational performance and drive growth.  This process has involved installing a new and highly experienced management team, with the Debtors engaging eight (8) of their ten (10) executives within the past four (4) years, including a new Chief Executive Officer in 2016 and my own engagement in 2019.  With new leadership, the Debtors have actively pursued growth opportunities.  For example, since 2017, the Debtors further developed their Digital Marketing Solutions business segment by launching two (2) additional product offerings, Search & Social (2017) and Social Ads Express (2019), and discontinuing unsuccessful products.  The Debtors' Digital Marketing Solutions filled a major capability gap for many property management companies.  The Debtors' management has also taken steps to improve search engine optimization and reorganize their sales force territories and management

structure to reduce spans and layers and cover unserved geographies and smaller properties.  As a result, in the past year, the Debtors have experienced some increased traffic that has resulted in better lead flow for some customers; however, this increase in leads has not resulted in any material changes to revenue that would impact liquidity.

### 2.    First Lien Revolving Facility Waiver

43.    On March 15, 2019, in light of the default risk under the First Lien Credit Agreement, the Debtors entered into a waiver (the "**First Lien Revolving Facility Waiver**") with the Royal Bank of Canada, as administrative agent, and each Revolving Credit Lender (as defined in the First Lien Credit Agreement).  Pursuant to the First Lien Revolving Facility Waiver, the Required Revolving Credit Lenders (as defined in the First Lien Credit Agreement) agreed to waive any financial covenant defaults for each test period beginning on March 31, 2019 through and including the test period ending on June 30, 2020.  The First Lien Revolving Facility Waiver automatically terminates if, among other termination events, the Debtors (a) fail to maintain liquidity of not less than $5 million or (b) have outstanding Revolving Loans (as defined therein) at any time when there is more than $10 million in cash on the Debtors' balance sheet.  In November 2019, the Company drew down the remainder of the First Lien Revolving Facility.[4]

### 3.    Forbearance Agreement

44.    In December 2019, in light of the Debtors' diminishing liquidity, following extensive discussions with the Crossholder Ad Hoc Committee and its advisors, the Debtors elected not to make the principal payment of approximately $2.2 million due on December 17, 2019 under their First Lien Revolving Facility (the "**Payment Default**").  Instead, on December

---

[4]    On the eve of commencing these chapter 11 cases, the Debtors fell below the minimum liquidity covenant in the First Lien Revolving Facility Waiver shortly before executing the RSA pursuant to which all Consenting Creditors have agreed to forbear from exercising remedies with respect thereto.

18, 2019, the Company and the members of the Crossholder Ad Hoc Committee collectively holding more than 50% of outstanding loans under the First Lien Credit Agreement (the "**Forbearing Lenders**"), entered into a forbearance agreement (the "**Forbearance Agreement**").  Pursuant to the Forbearance Agreement, the Forbearing Lenders agreed not to exercise any remedies under the First Lien Credit Agreement with respect to the Payment Default until January 31, 2020.  Prior to and following the execution of the Forbearance Agreement, the Company remained engaged in extensive discussions with the Crossholder Ad Hoc Committee and its advisors to build a path toward a consensual sale transaction.

### D.  Debtors' Prepetition Restructuring Efforts

#### 1.  Formation of Special Committee

45.    On July 11, 2019, in connection with the Company's evaluation of strategic alternatives, Marc Beilinson was appointed to the board of directors of RentPath Parent (the "**Board**").  Further, on August 13, 2019, the Board established an independent special committee (the "**Special Committee**") of the Board to, among other things, evaluate and negotiate potential sale, restructuring, or other strategic transactions for the Company (collectively, the "**Transaction**") and appointed Mr. Beilinson, Mr. Asiff Hirji, and Mr. Dhiren Fonseca (collectively, the "**Independent Directors**"), to serve on the Special Committee.[5]  On November 25, 2019, the Board expanded the Special Committee's authority to, among other things, approve any Transaction on behalf of the Board and oversee the investigation of any potential claims and causes of action belonging to the Company and determine whether to pursue or take other appropriate actions with respect to any such potential claims.

---

[5]    On December 16, 2019, Mr. Hirji resigned from the Board and the Special Committee.

### 2. Stakeholder Engagement

46.     As set forth above, prior to the commencement of these chapter 11 cases, RentPath, with the assistance of its restructuring advisors and the approval of the Special Committee, engaged with its stakeholders with the goal of building a consensus around a Transaction.  These stakeholder constituencies include the Crossholder Ad Hoc Committee, the Second Lien Ad Hoc Committee, and the Consenting Sponsors.  Engagement with these groups has involved, among other things, (a) the provision of a substantial amount of diligence to such groups and their advisors; (b) ongoing communication regarding RentPath, its operations, and prospects; (c) in-person meetings to discuss the Debtors' restructuring path; and (d) the Debtors' undertaking to pay fees and expenses incurred by such stakeholders in connection with the Debtors' restructuring process.  The Debtors' engagement with these stakeholders increased ahead of the December 17, 2019 maturity date for certain of the First Lien Revolving Loans.  As noted above, after the Payment Default, the Debtors entered into the Forbearance Agreement with the Forbearing Lenders.  On the eve of the commencement of these chapter 11 cases, the Debtors, the members of the Crossholder Ad Hoc Committee, the members of the Second Lien Ad Hoc Committee, and the Consenting Sponsors executed the RSA and paved the way for a baseline Transaction that will ensure the Company's business will be able to continue as a going concern during and after these chapter 11 cases.

### 3. DIP Financing and Use of Cash Collateral

47.     The Debtors have obtained debtor-in-possession financing (the "**DIP Financing**") in an aggregate principal amount of approximately $74.1 million (the "**DIP Facility**"), with $27.0 million available on an interim basis.  The DIP Facility is being provided by members of the Crossholder Ad Hoc Committee, as well as certain other First Lien Lenders (solely in such capacities, collectively, the "**DIP Lenders**"), and the members of the Crossholder

Ad Hoc Committee are backstopping the full approximately $74.1 million of commitments.  The

DIP Facility, together with the consensual use of the Prepetition Secured Parties' cash collateral

(the "**Cash Collateral**"), should provide the Debtors with sufficient liquidity to implement the

Sale Process and to administer these chapter 11 cases in an orderly and value-maximizing manner.

48.    As described in further detail below, due to rapidly diminishing liquidity,

the Debtors require immediate access to the DIP Financing.  The liquidity provided by the DIP

Financing and the ability to use cash collateral will provide the Debtors with, among other things,

(a) sufficient working capital to operate their business and to administer their estates, (b) the ability

to timely pay administrative expenses incurred during these chapter 11 cases, and (c) the flexibility

to continue to employ the performance-marketing spend necessary to keep pace in the current

highly competitive landscape.  The DIP Financing and the ability to use cash collateral are thus

vital to maintaining the Debtors' business as a going concern, for the benefit of all stakeholders.

## V.    First Day Pleadings

49.    Contemporaneously herewith, the Debtors have filed with the Court certain

First Day Pleadings seeking orders granting various forms of relief intended to stabilize the

Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and

expedite a swift and smooth restructuring of the Debtors' capital structure.

50.    The First Day Pleadings seek authority to, among other things, obtain

postpetition financing, honor wages and benefits obligations to their employees, pay claims of

certain vendors and suppliers critical to the Debtors' business operations, and ensure the

continuation of the Debtors' cash management system and other operations in the ordinary course

of business with as minimal interruption as possible on account of the commencement of these

chapter 11 cases.  I believe that the relief requested in the First Day Pleadings is necessary to give

the Debtors an opportunity to work toward a successful restructuring that will inure to the benefit of all of their stakeholders.

51.     Several of the First Day Pleadings request authority to pay certain prepetition claims against the Debtors.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, except to the extent relief is necessary to avoid immediate and irreparable harm.  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those instances where the failure to pay would cause immediate and irreparable harm to the Debtors and their estates.  The Debtors will defer seeking other relief to subsequent hearings before the Court.

52.     I am familiar with the content and substance of each of the First Day Pleadings.  I believe approval of the relief sought in each of the First Day Pleadings is critical to the Debtors' ability to successfully implement their chapter 11 strategy, with minimal disruption to their business operations.  Obtaining the relief sought in the First Day Pleadings will permit the Debtors to preserve and maximize the value of their estates for the benefit of all of their stakeholders.[6]  The First Day Pleadings include the following:

**A.  Administrative Motions and Applications**

**1.  Joint Administration**

53.     Pursuant to the *Motion of Debtors for Entry of Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* (the "**Joint Administration Motion**"), the Debtors request entry of an order directing consolidation of their chapter 11 cases

---

[6]  Capitalized terms used but not defined in the First Day Pleadings section have the meanings ascribed to such term in the applicable First Day Pleading.

for procedural purposes only.  There are twelve (12) Debtors, and I have been informed that there are approximately 5,000–10,000 parties in interest in these cases.  I believe that joint administration of these cases will save the Debtors and their estates substantial time and expense because it would remove the need to prepare, replicate, file, and serve duplicative notices, applications, and orders.  Joint administration will also relieve the Court from entering duplicative orders and maintaining duplicative files and dockets.  Importantly, I do not believe that joint administration will adversely affect the substantive rights of any parties in interest because the administrative consolidation of the estates would only be for procedural purposes.  Based on the foregoing, I believe that the relief requested in the Joint Administration Motion should be approved

### 2. Prime Clerk Retention Application

54.    Pursuant to the *Application of Debtors Pursuant to 11 U.S.C. § 105(a) and 28 U.S.C. § 156(c) for Appointment of Prime Clerk LLC as Claims and Noticing Agent Effective as of the Petition Date* (the "**Prime Clerk Retention Application**"), the Debtors request entry of an order appointing Prime Clerk LLC ("**Prime Clerk**") as claims and noticing agent ("**Claims and Noticing Agent**") in the Debtors' chapter 11 cases, in accordance with the terms and conditions of that certain Engagement Agreement dated December 9, 2019 (the "**EA**"), by and between RentPath Holdings, Inc. and Prime Clerk effective as of the Petition Date.  Prime Clerk's duties will include preparing and serving required notices and documents in these chapter 11 cases in accordance with the Bankruptcy Code and the Bankruptcy Rules in the form and manner directed by the Debtors.  The terms of Prime Clerk's retention are set forth in the Engagement Agreement attached to, and filed contemporaneously with, the Prime Clerk Retention Application.

55.    I understand that Prime Clerk is comprised of leading industry professionals with significant experience in both the legal and administrative aspects of large, complex chapter 11 cases.  Prime Clerk's professionals have experience in noticing, claims administration,

solicitation, balloting and facilitating other administrative aspects of chapter 11 cases and experience in matters of this size and complexity.  I have been advised that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.  Moreover, I have been advised that, in light of the number of anticipated claimants and the complexity of the Debtors' businesses, the appointment of a claims and noticing agent is required by Local Rule 2002-1(f) and is otherwise in the best interests of both the Debtors' estates and their creditors. Based on the foregoing, I believe that the relief requested in the Prime Clerk Retention Application should be approved.

### 3. Motion to Seal

56.     Pursuant to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 107 and Fed. R. Bankr. P. 9018 for Entry of an Order Authorizing the Debtors to File Portions of the Creditor Matrix Under Seal* (the "**Motion to Seal**"), the Debtors request authority to file under seal and redact certain portions of their consolidated creditor mailing matrix (the "**Creditor Matrix**").  I understand that the information the Debtors seek to redact consists of confidential Commercial Information, including customer lists, and confidential Personal Information, including names and home addresses of individual employees, creditors, and stakeholders.  I believe that filing such Commercial Information under seal and redacted in the Creditor Matrix is necessary because, without such relief, the un-redacted Creditor Matrix would contain highly confidential Commercial Information, which could harm the Debtors' ability to retain customers during these chapter 11 cases.  I further believe that redacting Personal Information of the Debtors' individual creditors and interest holders—many of whom are current and former employees—is warranted because such information is sensitive and could be used to perpetuate identity theft.  Accordingly, I believe that the relief requested in the Motion to Seal should be approved.

RLF1 22899844V.1

### B.  Operational Motions Requesting Immediate Relief

#### 1.  Cash Management Motion

57.    Pursuant to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 345, 363, 364, 503, and 507 and Fed. R, Bankr. P. 6003 and 6004 for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Using Existing Cash Management Systems, Bank Accounts, and Check Stock, (B) Implement Ordinary Course Changes to Cash Management System, and (C) Honor Certain Related Prepetition Obligations, (II) Providing Administrative Expense Priority for Postpetition Intercompany Claims, (III) Extending Time to Comply with Requirements of 11 U.S.C. § 345(b), and (IV) Granting Related Relief* (the "**Cash Management Motion**"), the Debtors request (a) authority to (i) continue using their existing Cash Management System, Bank Accounts, and check stock, (ii) implement changes to their Cash Management System in the ordinary course of business, including, without limitation, opening new or closing existing Bank Accounts, and (iii) honor certain prepetition obligations related to the Cash Management System, (b) administrative expense priority for Intercompany Claims, (c) a waiver or an extension of time to comply with certain requirements of section 345(b) of the Bankruptcy Code, and (d) related relief.

58.    I understand that the Cash Management System is tailored to meet the Debtors' operating needs as a provider of digital marketing solutions for the residential rental housing industry. The Cash Management System is composed of nine (9) Bank Accounts and one (1) lockbox.  The Debtors maintain eight (8) accounts at PNC Bank, N.A. and one (1) account at Bank of America Merrill Lynch.  This Cash Management System enables the Debtors to collect and disburse cash generated by their business effectively and efficiently, pay their financial obligations, centrally control and monitor corporate funds and available cash, comply with the requirements of their financing agreements, reduce administrative expenses, and obtain accurate

account balances and other financial data. I thus believe that it is critical for the Cash Management System to remain intact during these chapter 11 cases to ensure seamless continuation of transactions and uninterrupted collection of revenues.

59.     I also understand that, in light of the Debtors' corporate structure, the Cash Management System relies in part on the Debtors' ability to engage in various Intercompany Transactions in the ordinary course of business. Although the Debtors historically do not track Intercompany Claims, the Debtors maintain detailed accounting of revenues and expenses and the Debtors have the ability to account for historical Intercompany Transactions. As of January 1, 2020, in anticipation of the filing of the chapter 11 cases, the Debtors have implemented a process to track Intercompany Transactions on a go-forward basis. I believe the ability of the Debtors to continue engaging in such Intercompany Transactions is crucial to their continued operations.

60.     If the Debtors are required to alter the way in which they collect and disburse cash throughout the Cash Management System, I believe their operations would experience severe disruptions, which ultimately would frustrate the Debtors' ability to effectuate their restructuring strategy and maximize the value of their estates. Based on the foregoing, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

### 2. Employee Wages Motion

61.     Pursuant to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 507(a) and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, (B) Maintain Employee Benefits Programs and Pay Related Obligations, and (C) Pay Prepetition Employee Expenses and (II) Granting Related Relief* (the "**Employee Wages Motion**"), the Debtors request (a) authority to (i) pay Employee Compensation Obligations and Employee

31

Benefit Obligations, related expenses, and fees and costs attendant to the foregoing, including amounts owed to third-party service providers and administrators and taxing authorities in an amount not to exceed $4,177,100 on an interim basis and $8,527,100 on a final basis, and (ii) maintain, continue to honor, and pay amounts with respect to the Debtors' business practices, programs, and policies for their employees as such were in effect as of the Petition Date and as such may be modified or supplemented from time to time in the ordinary course of business and (b) related relief.

62.    As described more fully in the Employee Wages Motion, compensation of the Debtors' approximately 770 Employees, and Supplemental Workforce of approximately 100 temporary employees and/or independent contractors, is critical to the Debtors' continued operations and successful restructuring.  I believe the Employees and Supplemental Workforce are critical to the success of the Debtors' business, given that they are responsible for ensuring, among other things, that the Debtors Internet Listing Services and Digital Marketing Solutions platforms continue running smoothly and customer satisfaction is met on a daily basis.  I believe that any delay in paying or failure to pay the prepetition Employee Compensation Obligations could irreparably impair the morale of the Debtors' workforce at the time when their dedication, confidence, retention, and cooperation are most crucial.   Failure to pay the Employee Compensation Obligations could also inflict a significant financial hardship on the Employees' and the Supplemental Workforce personnel's families.  The Debtors cannot risk such a substantial disruption to their business operations, especially at this critical juncture.  Without this relief, otherwise-loyal Employees may seek other employment opportunities, thereby putting at risk the Debtors' continued operation as a reorganized enterprise.

RLF1 22899844V.1

63.    I similarly believe that payment of prepetition amounts incurred in connection with the Debtors' Employee Expenses and Reimbursements is necessary because any other treatment of Employees would risk alienation of the Debtors' workforce.  Employees who have incurred expenses in reliance on the Debtors' historical practice of reimbursing Employees for such expenses should not be forced personally to bear the cost of such programs, especially because those Employees incurred such expenses for the Debtors' benefit, in the course of their employment by the Debtors, and with the understanding that they would not incur direct costs or be reimbursed for doing so.

64.    As part of the Employee Compensation Obligations, the Debtors also maintain, in the ordinary course, Employee Bonus Programs, which include the EICP, the Sales bonus Program, and certain *De Minimis* Incentive Programs.  As described more fully in the Employee Wages Motion, each of the Employee Bonus Programs is an incentive-based program. For example, the EICP provides eligible Employees with an annual bonus award during the first quarter of the following calendar year if the Debtors achieve certain key metrics as determined by the Board annually, including historically, a certain level of revenue and Modified EBITDA.  The Sales Bonus Program is tied to similar metrics and rewards district and regional sales managers across the country, as well as certain members of the internal sales team.  The *De Minimis* Incentive Programs reward individuals across the Company who have made exceptional contributions to the business throughout the year or have referred a candidate for employment who is hired by the Company.  I believe these incentive programs are critical to incentivize Employees and will lead to increased revenues for the Debtors by maximizing Employee productivity.

65.    I understand that, in the ordinary course of business, the Debtors make certain deductions from Employees' gross pay—in some cases because the deductions are required

by law—on account of certain things such as garnishments, child support, spousal support, public transportation and similar deductions, as well as other pre- and post-tax deductions payable pursuant to certain employee benefit plans discussed in the Employee Wages Motion.  In addition to these Deductions, I understand that certain laws require the Debtors to withhold amounts from the Employees' gross pay related to federal, state, and local income taxes, including Social Security and Medicare taxes, for remittance to the appropriate federal, state, or local taxing authority, which the Debtors must match, from their own funds, amounts for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance.

66.    The Debtors also make certain Employee Benefits available to eligible Employees.  The Employee Benefits Obligations fall within the following categories: (a) paid time off, including personal time off, sick leave, parental leave, and holidays; (b) medical, dental, vision, and prescription drug benefits, life insurance, accidental death and dismemberment insurance, short and long term disability insurance, certain voluntary insurance programs, certain mental health and wellness support services, and flexible spending accounts; (c) retirement savings plans, including a 401(k) plan; (d) severance; and (e) certain other benefits.  I believe that maintaining the Employee Benefits Obligations are critical for maintaining Employee morale during these chapter 11 cases, and to prevent Employees from seeking employment from other companies that offer similar benefits, including the Debtors' competitors.

67.    As described in the Employee Wages Motion, in certain instances the Debtors pay fees to third-party administrators and servicers of Employee Compensation Obligations and the Employee Benefit Obligations.  Third-party administrators assist the Debtors with, among other things, servicing the Health Benefits Plans, administering the Employee

34

Benefits, and payroll servicing and payroll transfer administration in connection with the Employee Compensation Obligations. I believe that continued payment to such third-party administrators is necessary, and without the continued service of these administrators, the Debtors would be unable to continue honoring their obligations to Employees in an efficient and cost-effective manner.

68.     With respect to the Supplemental Workforce, I believe the Debtors require the services provided by the Supplemental Workforce engaged through the Employment Agencies. The Supplemental Workforce includes individuals who have expertise related to the Debtors' operations and provide services in specific areas, including human resources, finance, performance marketing, product, and technology.

69.     For the reasons set forth above, I believe that the relief sought in the Employee Wages Motion is necessary to avoid immediate and irreparable harm to the Debtors, and is in the best interests of the Debtors, their estates, and all parties in interest.

### 3.  Critical Vendors Motion

70.     Pursuant to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(b) and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Claims of Critical Vendors and Foreign Vendors, (II) Confirming Administrative Expense Priority of Undisputed and Outstanding Prepetition Orders, and (III) Granting Related Relief* (the "**Critical Vendors Motion**"), the Debtors request (a) authority to pay non-priority, prepetition claims held by (i) vendors whose goods and services are essential to the Debtors' operations in an amount not to exceed $8,500,000 on an interim basis and $9,950,000 on a final basis, of which approximately $25,000 is for 503(b)(9) Claims, and (ii) certain suppliers, service providers, and other entities outside of the United States in an amount not to exceed $290,000 on an interim basis and $315,000 on a final basis; (b) authority to confirm

35

the administrative expense priority status of Outstanding Prepetition Orde**rs** and pay prepetition amounts related to the Outstanding Prepetition Orders; and (c) related relief.

71.     Additional support for the Critical Vendor Motion can be found in the *Declaration of Richard Martin in Support of Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(b) and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Claims of Critical Vendors and Foreign Vendors, (II) Confirming Administrative Expense Priority of Undisputed and Outstanding Prepetition Orders, and (III) Granting Related Relief* (the "**Martin Critical Vendor Declaration**"), filed contemporaneously herewith.

72.     For the reasons set forth in the Critical Vendor Motion and the Martin Critical Vendor Declaration, I believe that the relief requested by this Critical Vendors Motion represents a sound exercise of the Debtors' business judgment and is necessary to avoid immediate and irreparable harm to the Debtors' estates.

### 4.  Taxes Motion

73.     Pursuant to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a), and 541(d) and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees, and (II) Granting Related Relief* (the "**Taxes Motion**"), the Debtors request authority to satisfy, in the Debtors' sole discretion, all Taxes and Fees due and owing to various local, state, and federal Taxing Authorities that arose prior to the Petition Date, including all Taxes and Fees subsequently determined by audit or otherwise to be owed for periods prior to the Petition Date.

74.     As discussed in the Taxes Motion, in the ordinary course of business, the Debtors are obligated to pay certain taxes and governmental fees, which generally fall into the following categories: (a) franchise taxes, (b) property taxes, (c) sales and use taxes, (d) excise

taxes, (e) income taxes, and (f) governmental fees.  In the 12 months prior to the Petition Date, the Debtors paid approximately $850,000 in Taxes and Fees, and I understand that approximately $520,000 of the Taxes and Fees relating to the prepetition period will become due and payable after the Petition Date, with approximately $70,000 coming due within the 30 days following the Petition Date.

75.     I believe that the failure to pay the aforementioned Taxes may cause the Taxing Authorities to take actions that would interfere with the Debtors' continued operations and potentially impose significant costs on the Debtors' estates.  Additionally, I understand that failure to satisfy the prepetition Taxes and Fees may jeopardize the Debtors' maintenance of good standing to operate in the jurisdictions in which they do business.  Moreover, to the extent any prepetition Taxes and Fees remain unpaid by the Debtors, I understand that the Debtors' officers and directors may be subject to lawsuits or criminal prosecution.  Based on the foregoing, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

### 5.  Customer Programs Motion

76.     Pursuant to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 507(a) and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders (I) Authorizing Debtors to Honor Certain Prepetition Obligations to Customers and Continue Customer Programs in the Ordinary Course of Business and (II) Granting Related Relief* (the "**Customer Programs Motion**"), the Debtors request (a) authority to maintain and administer, in the ordinary course of business and consistent with past practice, customer-related programs, promotions, and practices, and pay and otherwise honor their obligations to customers relating thereto, whether arising prior to or after the Petition Date, as necessary and appropriate in the Debtors' business

RLF1 22899844V.1

judgment, and (b) related relief.  The Debtors request authority to pay an amount not to exceed $960,000 on an interim basis and $6,800,000 on a final basis related thereto.

77.     Because of the cyclical and repeat nature of the Debtors' business, the Debtors' success depends upon the support of their customers, as well as their ability to attract new customers.  To maximize value to customers, the Debtors have maintained and followed, in the ordinary course of business, certain practices and programs for the benefit of their customers, including Customer Promotions, Service Adjustments, and Refunds.  Many, if not all, of the Customer Programs are standard in the residential rental industry.  The ability to continue administering the Customer Programs without interruption is essential to the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all of the Debtors' stakeholders.  I believe that if the Debtors are unable to continue the Customer Programs postpetition or honor their prepetition Customer Program obligations, the Debtors risk alienating certain customer constituencies, which may then form relationships with the Debtors' competitors.  Such harm would amplify the negative effect of customer uncertainty that may arise from these chapter 11 filings, which could erode the Debtors' reputation.  Additionally, the Customer Programs are essential for attracting new customers and expanding the Debtors' business.  Accordingly, I believe the relief requested in the Customer Programs Motion is necessary to avoid immediate and irreparable harm to the Debtors' estates.

### 6. NOL Motion

78.     Pursuant to the *Motion of Debtors pursuant to 11 U.S.C. §§ 362 AND 105(a) for Interim and Final Orders Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests in the Debtors and Claiming a Worthless Stock Deduction* (the "**NOL Motion**"), the Debtors seek entry of interim and final orders authorizing the Debtors (a) to establish procedures (the "**Procedures**") to protect the potential value of the Debtors'

consolidated net operating loss carryforwards ("**NOLs**") and other tax benefits (collectively, the "**Tax Attributes**") for use in connection with these chapter 11 cases and thereafter in the event that the Debtors engage in a reorganization pursuant to these chapter 11 cases and (b) related relief. The Procedures would impose certain restrictions and notification requirements with respect to (x) the beneficial ownership of common stock of RentPath Holdings, Inc. (such entity's common stock, the "**Common Stock**"), and any options or similar rights (within the meaning of applicable Treasury Regulations) to acquire such stock or interest, (y) any claim (for income tax reporting purposes) of a worthless stock deduction under section 165(g) of Title 26 of the United States Code (the "**Tax Code**") with respect to the beneficial ownership of Common Stock by a majority stockholder, and (z) in the event of a reorganization of the Debtors, the claims against the Debtors (the "**Claims**").  Pursuant to the NOL Motion, the Procedures relating to Claims are the subject of only the requested final order and not the requested interim order.

79.     The Debtors possess certain Tax Attributes, including, as of the Petition Date, estimated NOLs in excess of $332 million and federal expense carryforwards under Section 163(j) of the Tax Code in excess of $87 million.  The Tax Attributes are valuable assets.  Absent any intervening limitations, the Tax Attributes could substantially reduce the Debtors' U.S. federal income tax liability for current and future periods, including during the pendency of these chapter 11 cases (depending on future operating results and whether the Debtors consummate taxable asset dispositions) or in the event of a reorganization of the Debtors.  In this regard, the bidding procedures established in connection with these chapter 11 cases provide that bidders may bid to acquire either all or substantially all of the Debtors' assets or the stock of RentPath Holdings, Inc. pursuant to a confirmed chapter 11 plan.

80. An ownership change ("**Ownership Change**") pursuant to section 382 of the Tax Code (which is described further in the NOL Motion) prior to the effective date of a chapter 11 plan could have an adverse effect on the Debtors' ability to use their Tax Attributes, thereby resulting in a significant loss of potential value to the Debtors' estates. Although the limitations imposed by Section 382 of the Tax Code may be significantly lessened when an Ownership Change occurs pursuant to a confirmed chapter 11 plan (or applicable court order), the benefits of a confirmed plan (or court order) would not be applied retroactively to reduce limitations on tax attributes imposed by a previous Ownership Change. Accordingly, the proposed Procedures seek authority to restrict trading or any claim of a worthless stock deduction by a majority stockholder that could result in an Ownership Change occurring before the effective date of a chapter 11 plan or any applicable bankruptcy court order. Such a restriction would protect the Debtors' ability to use the Tax Attributes during the pendency of these chapter 11 cases, and potentially thereafter.

81. The Procedures are necessary to preserve the Debtors' ability to use the Tax Attributes, while providing certain latitude for trading. The Debtors' ability to preserve the Tax Attributes may be seriously jeopardized unless procedures are established immediately and *nunc pro tunc* to the Petition Date to ensure that trading in certain interests is either precluded or closely monitored and made subject to Court approval.

### 7. Insurance Motion

82. Pursuant to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 362(d), 363(b), and 503(b) and Fed. R. Bankr. P. 4001, 6003, and 6004 for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Their Insurance Programs and Surety Bond Program and (B) Pay All Obligations with Respect Thereto, and (II) Granting Related Relief* (the "**Insurance Motion**"), the Debtors request (i) authority to (a) continue all Insurance Programs and the Surety Bond Program in accordance with the applicable programs and to perform with respect thereto in

40

the ordinary course of business, (b) pay any prepetition and postpetition obligations arising under the Insurance Programs and Surety Bond Program, and (c) modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Programs, and (ii) related relief.  I understand that approximately $3,000 of the Insurance Obligations relating to the prepetition period will become due and payable within the 30 days following the Petition Date.

83.     In the ordinary course of business, I understand that the Debtors maintain, through several Insurance Carriers, the following programs: Workers' Compensation Program, Liability, Property Insurance Programs, Cyber Insurance Program, and Professional Liability Programs.

84.     Under the laws of the various states in which they operate, I understand that the Debtors are legally and contractually required to maintain certain Insurance Programs, including under state laws mandating that the Debtors maintain workers' compensation coverage for their employees.

85.     I understand that Debtors maintain the Liability and Property Insurance Programs and Cyber Insurance Program to help manage the various risks associated with their businesses, including providing insurance coverage for liabilities relating to, among other things, property damage, commercial crime, employment practices, automobile liability, foreign liability, business travel accident, errors and omissions related to potential data and cyber breaches, and various other property-related and general liabilities.

86.     I also understand that the Debtors are party to four (4) Professional Liability Programs that provide the Debtors with insurance coverage for directors' and officers' liability, fiduciary liability, and professional liability.  The Debtors incur premiums under the Professional

41

Liability Programs based upon fixed rates established and billed by the applicable Insurance Carriers, in addition to various deductibles.

87.    I understand that the Debtors utilize two Insurance Brokers—Aon and CAC.  The Insurance Brokers assist the Debtors with the procurement and negotiation of the Insurance Programs and, in most circumstances, remittance of the premium payments to Insurance Carriers on behalf of the Debtors.  In exchange for their services, I understand that the Debtors pay Brokers' Fees to the Insurance Brokers, and such Brokers' Fees are primarily commission-based depending on the terms of the individual transaction.  As of the Petition Date, I believe that there are no outstanding prepetition amounts owed to Insurance Brokers on account of the Brokers' Fees.  Because the Insurance Brokers are familiar with the Debtors' Insurance Programs, I understand that the Debtors, in the Insurance Motion, request authority to continue utilizing the Insurance Brokers' services and to pay them any subsequent Brokers' Fees in the ordinary course of business.

88.    In light of the risks applicable to the Debtors' operations and the critical need for the Debtors to protect their assets from such risks, I believe it essential that the Debtors maintain the Insurance Programs and that they obtain authority to pay all Insurance Obligations related thereto.  I believe the Debtors' use of estate funds to pay the Insurance Obligations is justified because such obligations are necessary costs of preserving the Debtors' estates.  Without insurance coverage, the Debtors may violate applicable regulations and laws.  Based on the Debtors' current circumstances, I believe it is unlikely that the Debtors will be able to renew or replace their existing Insurance Programs on terms more favorable than those currently offered by the Insurance Carriers, and the process of establishing new programs would also be burdensome

and costly to the Debtors.  If the relief requested in the Insurance Motion is not granted, I believe it would cause immediate and irreparable harm to the Debtors and their estates.

89.    Accordingly, I believe the Insurance Programs are essential to the Debtors' operations, as the Debtors would be exposed to significant liability if the Insurance Programs were allowed to lapse or terminate, which exposure could detrimentally impact the Debtors' ability to reorganize successfully.  It is similarly critical that the Debtors have the authority to supplement, amend, extend, renew, or replace their Insurance Programs as needed, in their business judgement. Based on the foregoing, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

### 8.    Utilities Motion

90.    Pursuant to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 366 and Fed. R. Bankr. P. 6003 and 6004 for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service, and (IV) Granting Related Relief* (the "**Utilities Motion**"), the Debtors request (a) approval of the Debtors' proposed form of adequate assurance of payment to the Utility Companies, (b) establishment of procedures for resolving objections by the Utility Companies relating to the adequacy of the proposed adequate assurance, (c) prohibition of the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors on account of the commencement of these chapter 11 cases or outstanding prepetition invoices, and (d) related relief.

91.    As more fully described in the motion, in the ordinary course of business, the Debtors incur utility expenses, including on account of information technology, telephone, television, and other Utility Services from a number of Utility Companies, which the Debtors rely

43

on to provide necessary support to their employees, vendors, and customers.  I believe that preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and restructuring process.  I believe that any interruption in Utility Services—even for a brief period—would seriously disrupt the Debtors' ability to continue their lead generation and digital marketing businesses.  This disruption would adversely impact customer relationships and would result in a decline in the Debtors' revenues.  Such a result could seriously jeopardize the Debtors' restructuring efforts to the detriment of all parties in interest.  Therefore, I believe it is critical that Utility Services continue uninterrupted during these chapter 11 cases.

92.    My understanding is that the Debtors intend to pay postpetition obligations owed to the Utility Companies in a timely manner.  The Debtors expect that cash flows from operations and their DIP Financing will be sufficient to pay postpetition obligations related to their Utility Services in the ordinary course of businesses.  Based on a monthly average for the 12 months prior to the Petition Date, the Debtors estimate that their cost of Utility Services for the next 30 days will be approximately $150,000.  As of the Petition Date, the Debtors estimate that the total amount of the Adequate Assurance Deposit will be approximately $85,000.

93.    I believe the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future Utility Services in the ordinary course of business, constitutes sufficient adequate assurance to the Utility Companies.  Moreover, I believe the proposed Adequate Assurance Procedures are reasonable because they will ensure that the Utility Services continue while providing a streamlined process for Utility Companies to challenge the adequacy of the Proposed Adequate Assurance or seek an alternative form of adequate assurance.  As a result, I believe that the relief requested in the Utilities Motion should be granted.

**9. DIP Motion**

94.     Pursuant to the *Motion of Debtors for (I) Authorization (A) to Obtain Postpetition Financing, (B) to Use Cash Collateral, (C) to Grant Liens and Provide Superpriority Administrative Expense Status, (D) to Grant Adequate Protection, (E) to Modify the Automatic Stay and (F) to Schedule a Final Hearing and (II) Related Relief* (the "**DIP Motion**"), the Debtors request authority to, among other things, (a) enter into the DIP Facility and draw $27.0 million thereunder on an interim basis, (b) grant first-priority, perfected, priming liens and superpriority administrative expense claims to the DIP Lenders as security for the DIP Financing, (c) use Cash Collateral, (d) grant adequate protection to the Prepetition Secured Parties to the extent of any diminution of value of their interests in their collateral, (e) modify the automatic stay as necessary to effectuate the Debtors' entry into the DIP Facility, and (f) schedule a final hearing for consideration of the relief requested in the DIP Motion on a final basis.

95.     As discussed above, declining revenue, taken together with necessary increases in spending on performance marketing, has contributed to the Debtors' deteriorating cash position.  As of the Petition Date, the Debtors will only have approximately $2.1 million in cash on hand.  Without additional financing and the ability to use Cash Collateral, the Debtors will be in a negative cash position in the coming days.  Thus, from the outset of these chapter 11 cases, the Debtors require immediate access to the DIP Financing and authority to use Cash Collateral to ensure they have sufficient liquidity to operate their business as a going concern.

96.     In consultation with the Debtors' advisors, including the financial advisory team from Berkeley Research Group, LLC, the Debtors' management team reviewed and analyzed the Company's projected cash flows and prepared a preliminary budget outlining the Debtors' postpetition cash needs.  After determining the requisite amount of debtor-in-possession financing based on management's cash-flow forecast, the Debtors, in consultation with their advisors and

45

the management team, compiled an initial budget (the "**DIP Budget**").  The DIP Budget and the projections reflected therein provide an accurate reflection of the Debtors' expected funding requirements over the identified period and are reasonable and appropriate under the circumstances.  Based on the DIP Budget and other information made available to me, the liquidity provided under the proposed DIP Financing will enable the Debtors to preserve their value as a going concern, providing the Debtors with sufficient liquidity to meet their ongoing day-to-day obligations, fund operational and administrative costs of these chapter 11 cases, and satisfy working capital requirements and other operational expenses, all of which will preserve the value of the Debtors' estates for the benefit of their stakeholders.

97.     Further, the reality of search engine dominance in the Debtors' business means that the Debtors also require immediate access to the DIP Financing to continue increasing performance-marketing spend.  Importantly, the DIP Lenders are supportive of the Debtor's increased performance-marketing spend and have sized the DIP Financing in a size and manner that allows the Company to continue to pursue its business strategy.

98.     Absent authority to enter into and access the proceeds of the DIP Financing, even for a limited period of time, the Debtors will be unable to continue operating their business, resulting in a deterioration of value and immediate and irreparable harm to the Debtors' estates.  Thus, the Debtors and their advisors are in agreement that the Debtors require immediate access to the proceeds of the DIP Financing, as well as access to Cash Collateral, to finance their operations and continue operating as a going concern during the pendency of these chapter 11 cases.

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 12th day of February 2020

Respectfully submitted,

By:    */s/ Richard Martin*
       Richard Martin
       Chief Financial Officer

on behalf of

**RENTPATH HOLDINGS, INC.**
**RENTPATH LLC**
**CONSUMER SOURCE HOLDINGS, LLC**
**DISCOVER HOME NETWORK, LLC**
**EASY MEDIA, LLC**
**ELECTRONIC LEAD MANAGEMENT, INC.**
**ELECTRONIC LEAD MANAGEMENT MA, INC.**
**ELECTRONIC LEAD MANAGEMENT VA, INC.**
**LIVE RESPONSE SOLUTIONS HOLDINGS, LLC**
**LIVE RESPONSE SOLUTIONS, LLC**
**VIVA GROUP BROKERAGE, INC.**
**VIVA GROUP, LLC**

**<u>Exhibit A</u>**

**Restructuring Support Agreement**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, and incorporating any exhibits, schedules or annexes attached hereto, including, for the avoidance of doubt, the Restructuring Term Sheet and the DIP Term Sheet (each as defined below), this "**Agreement**"), dated as of February 11, 2020, is entered into by and among:

(a)        RentPath Holdings, Inc. ("**Holdings**"); RentPath, LLC; Viva Group, LLC; Viva Group Brokerage, Inc.; Live Response Solutions Holdings, LLC; Live Response Solutions, LLC; Discover Home Network, LLC; Easy Media, LLC; Consumer Source Holdings LLC; Electronic Lead Management, Inc.; Electronic Lead Management MA, Inc.; and Electronic Lead Management VA, Inc., each such entity a subsidiary of Holdings (collectively, with Holdings, the "**Company**" or the "**Debtors**" and, each, a "**Company Entity**" or "**Debtor**");

(b)        Pittsburgh Holdings, L.P. and Regal Holdco LP (collectively, the "**Consenting Sponsors**");

(c)        the undersigned lenders, or investment advisors or managers for the account of lenders, party to that certain First Lien Credit Agreement, dated as of December 17, 2014 (as amended, modified, or otherwise supplemented from time to time, the "**First Lien Credit Agreement**"), by and among Holdings, RentPath, LLC, as borrower, Royal Bank of Canada (the "**First Lien Agent**"), as administrative and collateral agent, and the lenders party thereto from time to time (the loans issued and outstanding under the First Lien Credit Agreement, the "**First Lien Loans**," the holders of First Lien Loans, the "**First Lien Lenders**" and, the undersigned First Lien Lenders, together with their respective successors and permitted assigns and any subsequent First Lien Lender that becomes party hereto in accordance with the terms hereof, the "**Consenting First Lien Creditors**") and/or that certain Second Lien Credit Agreement, dated as of December 17, 2014 (as amended, modified, or otherwise supplemented from time to time, the "**Second Lien Credit Agreement**"), by and among Holdings, RentPath, LLC, as borrower, Wilmington Savings Fund Society, FSB (the "**Second Lien Agent**"), as administrative and collateral agent, and the lenders party thereto from time to time (the loans issued and outstanding under the Second Lien Credit Agreement, the "**Second Lien Loans**," the holders of Second Lien Loans, the "**Second Lien Lenders**" and, the undersigned Second Lien Lenders, together with their respective successors and permitted assigns and any subsequent Second Lien Lender that becomes party hereto in accordance with the terms hereof, collectively, the "**Consenting Second Lien Creditors**"[1] and, the Consenting Second Lien Creditors together with the Consenting First Lien Creditors, the "**Consenting Creditors**" and, the Consenting Creditors together with the Consenting Sponsors, collectively, the "**Restructuring Support Parties**").

The Company, each Consenting Creditor, and each Consenting Sponsor, and any subsequent Person that becomes a party hereto in accordance with the terms hereof are referred to herein as the "**Parties**" and each individually as a "**Party**." Capitalized terms used but not defined herein shall have the meanings ascribed to them, as applicable, in the Restructuring Term Sheet.

---

[1]        For the avoidance of doubt, "Consenting Second Lien Creditors" does not include holders of Second Lien Claims to the extent that this Agreement is not effective as to such holders in accordance with Section 2(d).

When a reference is made in this Agreement to a Section, Exhibit, or Schedule, such reference shall be to a Section, Exhibit, or Schedule, respectively, of or attached to this Agreement unless otherwise indicated. Unless the context of this Agreement otherwise requires, (i) words using the singular or plural number also include the plural or singular number, respectively, (ii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement, (iii) the words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (iv) the word "or" shall not be exclusive and shall be read to mean "and/or." The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding, or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

## RECITALS

**WHEREAS**, the Parties have agreed to enter into certain transactions in furtherance of a financial restructuring of the Company, which is anticipated to be effectuated by the Company commencing voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") to (1) pursue a Sale Transaction (as defined below) in a manner consistent with this Agreement and (2) confirm the Plan (as defined below) on the terms set forth in this Agreement (the "**Restructuring**");

**WHEREAS**, as of the date hereof, the Consenting Sponsors, directly or indirectly, hold approximately 99.4% of the outstanding equity interests in Holdings;

**WHEREAS**, as of the date hereof, the Consenting Creditors hold, in the aggregate, approximately 72% of the aggregate outstanding principal amount of the First Lien Loans;

**WHEREAS**, as of the date hereof, the Consenting Creditors hold, in the aggregate, approximately 84% of the aggregate outstanding principal amount of the Second Lien Loans (as defined below);

**WHEREAS**, the Plan and the other Definitive Documents will provide for the consummation of the Restructuring in accordance with this Agreement and the Plan;

**WHEREAS**, the Consenting Creditors desire to consummate the Restructuring in accordance with the terms set forth in the form asset purchase agreement attached hereto as **Exhibit B** (the "**Credit Bid**") through, among other things, a credit bid by the First Lien Agent in the name of RP Lender Acquisition Corporation, a special purpose vehicle formed by the First Lien Agent, acting at the direction of Consenting First Lien Creditors holding no less than 50.01% of First Lien Claims, in accordance with the Implementation Steps (as defined below);

**WHEREAS**, certain of the Consenting Creditors (in such capacity, each a "**Commitment Party**") have agreed to commit to provide the DIP Facility and the New Money Exit Term Loan B (each, as defined below) and the Company and the Consenting Creditors have reached an agreement for the consensual use of Cash Collateral (as defined in section 363(a) of the Bankruptcy

2

Code), in accordance with and subject to the terms and conditions set forth in the DIP Term Sheet, the DIP Orders, and the DIP Credit Agreement (each, as defined below); and

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters set forth in the Restructuring Term Sheet and this Agreement.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.     **Certain Definitions.**

Capitalized terms used but not defined in this Restructuring Support Agreement shall have the meanings ascribed to them in the Restructuring Term Sheet.  As used in this Agreement, the following terms have the following meanings:

(a)     "**Additional Consenting Creditor**" has the meaning set forth in Section 3(d) to this Agreement.

(b)     "**Alternative Restructuring**" means any dissolution, winding up, liquidation, reorganization, recapitalization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership, sale, financing (debt or equity), plan proposal, or restructuring of the Company; provided, that, an Alternative Restructuring shall not include consummation of the Restructuring through a Sale Transaction.

(c)     "**Antitrust Authority**" means the Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States and any other Governmental Unit having jurisdiction with respect to the transactions contemplated hereby pursuant to applicable Antitrust Laws.

(d)     "**Antitrust Laws**" means any antitrust, competition or trade regulation laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening competition through merger or acquisition, including the HSR Act and the Clayton Act.

(e)     "**Assumption Order**" means the order of the Bankruptcy Court authorizing the Company to assume this Agreement pursuant to section 365 of the Bankruptcy Code.

(f)     "**Back-Up Bid**" means the next highest or otherwise best Qualified Bid(s) identified by the Company as back-up bid(s) pursuant to the Bidding Procedures Order.

(g)     "**Bidding Procedures Motion**" means a motion seeking entry of the Bidding Procedures Order.

(h)     "**Bidding Procedures Order**" means an order approving procedures governing the sale and marketing process for all or substantially all of the assets of the Company

WEIL:\97376996\1\69518.0004

(or equity Interests owning all or substantially all of the assets of the Company) and a stalking horse bid, which order shall approve, among other things, the Credit Bid Back-Up Bid Right.

(i)      "**Claim**" has the meaning set forth in the Restructuring Term Sheet.

(j)      "**Clayton Act**" means the Clayton Antitrust Act of 1914, as amended.

(k)      "**Communications Materials**" means any press release, communication with any news media, or comparable public filing relating to the Restructuring.

(l)      "**Confirmation Order**" has the meaning set forth in the Restructuring Term Sheet.

(m)      "**Consenting Creditor Counsel**" means the Consenting First Lien Creditor Counsel and the Consenting Second Lien Creditor Counsel.

(n)      "**Consenting First Lien Creditor Counsel**" means Milbank LLP, as counsel to the First Lien Ad Hoc Committee.

(o)      "**Consenting Second Lien Creditor Counsel**" means Akin Gump Strauss Hauer & Feld LLP, as counsel to the Second Lien Ad Hoc Committee.

(p)      "**Consenting Second Lien Creditor Consent Right**" means the right of the Requisite Consenting Second Lien Creditors to consent to any provision in any Definitive Document, which right shall apply solely to the extent such provision (i) adversely affects in any material respect any of the rights or benefits granted to or received by, or proposed to be granted to or received by, the Consenting Second Lien Creditors pursuant to this Agreement or the Plan, (ii) affects the treatment or releases in favor of the Consenting Second Lien Creditors provided, or proposed to be provided, under this Agreement or the Plan, or (iii) adversely affects in any material respect any obligation the Consenting Second Lien Creditors may have pursuant to this Agreement, the Plan, or any other Definitive Document in each case, which consent shall not be unreasonably withheld, conditioned, or delayed.

(q)      "**Consenting Sponsor Consent Right**" means the Consenting Sponsors' right to consent to any provision in any Definitive Document, which right shall apply solely to the extent such provision (i) adversely affects in any material respect any of the rights or benefits granted to or received by, or proposed to be granted to or received by, the Consenting Sponsors pursuant to this Agreement, the Restructuring Term Sheet, or the Plan, (ii) affects the releases in favor of the Consenting Sponsors provided, or proposed to be provided, under the Plan, or (iii) adversely affects in any material respect any obligation the Consenting Sponsors may have pursuant to this Agreement, the Restructuring Term Sheet, or the Plan, in each case, which consent shall not be unreasonably withheld, conditioned, or delayed.

(r)      "**Consenting Sponsor Counsel**" means Vinson & Elkins LLP, as counsel to the Consenting Sponsors.

(s)      "**Credit Bid Back-Up Bid Right**" means, if the Credit Bid is the Successful Bid, the right of the Requisite Consenting First Lien Creditors to withdraw the Successful Bid and

serve as a Back-Up Bid (which, for the avoidance of doubt, may be one of multiple Back-Up Bids as determined by the Debtors in their business judgement); provided, that, the Requisite Consenting First Lien Creditors must provide written notice of their election to exercise such right to the Debtors (with email from Consenting First Lien Creditor Counsel to Weil being sufficient) within two (2) business days after the date that the Debtors designate the Successful Bid following the Auction.

(t)    "**D&O Policy**" means any insurance policy that covers, among others, current or former directors, members, trustees, managers, and officers liability issued at any time to or providing coverage to the Debtors and, among others, the Debtors' directors and officers, and all agreements, documents or instruments relating thereto, including any runoff policies or tail coverage.

(u)    "**Definitive Documents**" means (i) this Agreement; (ii) the Plan; (iii) the Plan Supplement and the documents contained therein; (iv) the Credit Bid; (v) the Bidding Procedures Motion; (vi) the Bidding Procedures Order; (vii) the Disclosure Statement; (viii) the motion seeking approval by the Bankruptcy Court of the Disclosure Statement and the Solicitation Procedures; (ix) the Disclosure Statement Order and the Confirmation Order; (x) the motion seeking approval by the Bankruptcy Court of the use of cash collateral and of the DIP Facility and the DIP Orders; (xi) the DIP Credit Agreement; (xii) the New Corporate Governance Documents; (xiii) any documents related to the Exit Revolving Credit Facility, if any; (xiv) any documents related to the Exit Term Loan Facility; (xv) any key employee incentive program, key employee retention plan, or other similar program, plan, or agreement; (xvi) any Communications Materials; (xvii) the Management Incentive Plan Term Sheet; (xviii) any other documents, instruments, schedules, or exhibits described in, related to, contemplated in, or necessary to implement, each of the foregoing; and (xix) all other documents (including any related motions, orders, agreements, instruments, schedules, or exhibits) that are otherwise necessary to implement the Restructuring.

(v)    "**DIP Credit Agreement**" means the credit agreement evidencing the DIP Facility.

(w)    "**DIP Facility**" means the debtor-in-possession facility to be provided to the Company in accordance with the terms and conditions of the DIP Orders and the DIP Credit Agreement.

(x)    "**DIP Orders**" means, collectively, the Interim DIP Order and the Final DIP Order.

(y)    "**DIP Term Sheet**" means the term sheet describing the terms of the DIP Facility attached hereto as **Exhibit C**, which term sheet shall be documented in the DIP Credit Agreement.

(z)    "**Disclosure Statement**" means the disclosure statement in respect of the Plan, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

(aa)    "**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the Disclosure Statement and the Solicitation Procedures.

WEIL:\97376996\1\69518.0004

(bb)    "**Effective Date**" has the meaning set forth in the Restructuring Term Sheet.

(cc)    "**Exit Term Loan Facility Credit Agreement**" means, the credit agreement evidencing the Exit Term Loan Facility.

(dd)    "**Exit Revolving Credit Facility**" has the meaning ascribed to it in Annex III to the DIP Term Sheet.

(ee)    "**Exit Term Loan Facility**" has the meaning ascribed to it in Annex III to the DIP Term Sheet.

(ff)    "**Final DIP Order**" means the order of the Bankruptcy Court approving the motion pursuant to sections 363 and 364 of the Bankruptcy Code to authorize the Debtors to use cash collateral and enter into the DIP Facility on a final basis.

(gg)    "**Financing Commitment**" means the commitment of a Commitment Party to provide the DIP Facility and/or the Exit Term Loan Facility, as set forth in the Financing Commitment Letter in accordance with the terms set forth therein.

(hh)    "**Financing Commitment Letter**" means that certain letter annexed hereto as **Exhibit D**.

(ii)    "**First Lien Ad Hoc Committee**" means the *ad hoc* committee of Consenting First Lien Creditors represented by Milbank LLP.

(jj)    "**First Lien Claims**" has the meaning set forth in the Restructuring Term Sheet.

(kk)    "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

(ll)    "**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

(mm)    "**Implementation Steps**" has the meaning set forth in the Restructuring Term Sheet.

(nn)    "**Interest**" has the meaning set forth in the Restructuring Term Sheet.

(oo)    "**Interim DIP Order**" means the order of the Bankruptcy Court approving the motion pursuant to sections 363 and 364 of the Bankruptcy Code to authorize the Debtors to use cash collateral and enter into the DIP Facility, in each case, on an interim basis.

(pp)    "**Joinder Agreement**" has the meaning set forth in Section 3(b) of this Agreement, a form of which is attached hereto as **Exhibit F**.

(qq)    "**Key Employee Retention Agreements**" has the meaning set forth in the Restructuring Term Sheet.

(rr)    "**Loan Documents**" has the meaning set forth in the First Lien Credit Agreement and the Second Lien Credit Agreement, as applicable.

(ss)    "**Loans**" means the First Lien Loans and the Second Lien Loans, as applicable.

(tt)    "**Management Incentive Plan**" means a post-emergence management incentive plan to be provided on the terms and conditions set forth in the Management Incentive Plan Term Sheet.

(uu)    "**Management Incentive Plan Term Sheet**" means the term sheet annexed as **Exhibit E** hereto.

(vv)    "**Milestones**" shall have the meaning set forth in Section 2(e) to this Agreement.

(ww)    "**New Corporate Governance Documents**" means the new or amended, as applicable, organizational documents of the post-Effective Date Debtors or plan administrator, as applicable, and of the purchaser under the Credit Bid if the Credit Bid is the Successful Bid and the purchaser thereunder elects to consummate the transactions therein pursuant to Section 2.07 thereof, including any stockholders' agreement and/or registration rights agreement, and any other applicable material governance and/or organizational documents necessary to implement the Restructuring.

(xx)    "**New Money Exit Term Loan B**" has the meaning set forth in Annex III of the DIP Term Sheet.

(yy)    "**NY Courts**" has the meaning set forth in Section 13(b) to this Agreement.

(zz)    "**Person**" means any "person" as defined in section 101(41) of the Bankruptcy Code, including any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Unit, or any agency or other entity (as defined in section 101(15) of the Bankruptcy Code).

(aaa)    "**Petition Date**" shall have the meaning set forth in Section 2(d)(i) to this Agreement.

(bbb)    "**Plan**" means the chapter 11 plan of reorganization for the Debtors, filed in the Chapter 11 Cases, as it may be amended, restated, or supplemented from time to time, consistent with this Agreement, in form and substance consistent with this Agreement, pursuant to which the Sale Transaction shall be consummated.

(ccc)    "**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Company with the Bankruptcy Court.

WEIL:\97376996\1\69518.0004

(ddd)  "**Qualified Bid**" means a bid received by the Company by the bid deadline set forth in the Bidding Procedures Order that the Company designates as a "Qualified Bid" pursuant to the Bidding Procedures Order.

(eee)  "**Qualified Marketmaker**" means an entity that (i) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Claims against or Interests in the Company (or enter with customers into long and short positions in Claims against or Interests in the Company), in its capacity as a dealer or marketmaker in Claims against or Interests in the Company and (ii) is, in fact, regularly in the business of making a market in claims against or interests in issuers or borrowers (including debt securities or other debt).

(fff)  "**Released Parties**" means the Debtors, the reorganized Debtors, Wind Down Co. (as defined in the Restructuring Term Sheet), if applicable, the Consenting Sponsors, the Consenting First Lien Creditors, the Consenting Second Lien Creditors, the DIP Lenders (as defined in the DIP Term Sheet), the DIP Agent (as defined in the DIP Term Sheet), the Exit Lenders (as defined in the Exit Term Loan Facility Term Sheet), the Agent (as defined in the Exit Term Loan Facility Term Sheet) (and, in addition to each of the foregoing, where any of the foregoing is an investment manager or advisor for a beneficial holder, such beneficial holder), and such entities' predecessors, successors and assigns, parents, subsidiaries, affiliates, managed accounts or funds, (ii) with respect to each Released Party, all of their respective current and former officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly and any fund managers, fiduciaries, or other agents with any involvement related to the Debtors), members, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, in each case solely to the extent such persons and entities acted on the behalf of the Released Parties in connection with the matters as to which releases are provided in the Plan, and (iii) such persons' and entities' respective heirs, executors, estates, servants, and nominees, in the case of (i) – (iii), each in their capacity as such. Notwithstanding the foregoing, any person that opts out of the third-party releases set forth in the Plan shall not be deemed a Released Party.

(ggg)  "**Requisite Consenting First Lien Creditors**" means, as of the date of determination, Consenting First Lien Creditors that are Parties as of the Support Effective Date and hold in the aggregate at least 55% of the outstanding First Lien Loans held by such Consenting First Lien Creditors as of the date of determination.

(hhh)  "**Requisite Consenting Second Lien Creditors**" means, as of the date of determination, Consenting Second Lien Creditors that are Parties as of the Support Effective Date with respect to Consenting Second Lien Creditors and hold in the aggregate at least 50.1% of the outstanding Second Lien Loans held by such Consenting Second Lien Creditors as of the date of determination; provided, that such percentage includes at least two members from the Second Lien Ad Hoc Committee.

(iii)  "**Restructuring Expenses**" has the meaning set forth in Section 23 of this Agreement.

(jjj)    "**Restructuring Term Sheet**" means the term sheet (including any schedules and exhibits attached thereto), attached hereto as **Exhibit A**, which contains the material terms and provisions of the Restructuring agreed upon by the Parties that are to be incorporated into the Plan and the Definitive Documents.

(kkk)    "**Sale Transaction**" means a sale of all or substantially all of the assets of the Company (or equity Interests owning all or substantially all of the assets of the Company) to a Successful Bidder in accordance with the Bidding Procedures Order.

(lll)    "**Second Lien Ad Hoc Committee**" means the *ad hoc* committee of Consenting Second Lien Creditors represented by Akin Gump Strauss Hauer & Feld LLP.

(mmm) "**Second Lien Claims**" has the meaning set forth in the Restructuring Term Sheet.

(nnn)    "**Second Lien Credit Agreement**" has the meaning set forth in the Restructuring Term Sheet.

(ooo)    "**Second Lien Loans**" means the loans issued and outstanding under the Second Lien Credit Agreement.

(ppp)    "**Securities Act**" means the Securities Act of 1933, as amended.

(qqq)    "**Solicitation**" means the solicitation of votes on the Plan (including any non-voting election forms with respect to releases).

(rrr)    "**Solicitation Procedures**" means the procedures relating to the Solicitation.

(sss)    "**Specified Defaults**" means, collectively, (i) the Event of Default under the First Lien Credit Agreement as a result of the Company's failure to make a maturity payment on December 17, 2019 with respect to the Original Revolving Loans (each, as defined in the First Lien Credit Agreement) held by Senior Health Insurance Company of Pennsylvania; (ii) any Default or Event of Default that may result from a breach of the Financial Covenant under section 7.15 of the First Lien Credit Agreement for each Test Period commencing with the Test Period ending on March 31, 2019 through and including the last Test Period to occur (each, as defined in the First Lien Credit Agreement); (iii) failure to notify the First Lien Agent of the occurrence of such Default as required by Section 6.03(a) of the First Lien Credit Agreement; (iv) any defaults under the Loan Documents as a result of cross-defaults caused by the forgoing; and (v) any Events of Default or defaults under the Loan Documents as a result of the Solicitation, the commencement of the Chapter 11 Cases, the entry into the Definitive Documents, or the implementation of the Restructuring.

(ttt)    "**Successful Bid**" has the meaning set forth in the Restructuring Term Sheet.

(uuu)    "**Successful Bid Outside Date**" means the "Outside Date" as defined in the in the Successful Bid, as the same may be extended pursuant to the terms of the Successful Bid.

9

(vvv)   "**Successful Bidder**" has the meaning set forth in the Restructuring Term Sheet.

(www)  "**Support Effective Date**" has the meaning set forth in Section 2(d) of this Agreement.

(xxx)   "**Support Period**" means the period commencing on the Support Effective Date and ending on the earlier of the (i) date on which this Agreement is terminated in accordance with Section 7 hereof and (ii) the Effective Date.

(yyy)   "**Third Party Bid**" has the meaning set forth in the Restructuring Term Sheet.

(zzz)   "**Transfer**" has the meaning set forth in Section 3(b) of this Agreement.

(aaaa)  "**Voting Deadline**" means the deadline to deliver duly-authorized, executed, and completed ballots with respect to the Plan (including any non-voting election forms with respect to releases), as set forth in the Solicitation Procedures.

(bbbb)  "**Weil**" means Weil, Gotshal & Manges LLP, as counsel to the Company.

2.    **Bankruptcy Process; Milestones.**

(a)    <u>The Restructuring Term Sheet</u>.  The Restructuring Term Sheet is expressly incorporated herein and made a part of this Agreement.   The terms and conditions of the Restructuring are set forth in the Restructuring Term Sheet.  In the event of any inconsistencies between the terms of this Agreement (excluding the Restructuring Term Sheet) and the Restructuring Term Sheet, the terms of the Restructuring Term Sheet shall govern.

(b)    <u>Definitive Documents</u>.  Each of the Definitive Documents shall (i) contain terms and conditions consistent in all respects with this Agreement, the Restructuring Term Sheet, and the Plan and (ii) otherwise be in form and substance reasonably acceptable to (A) the Company, (B) the Requisite Consenting First Lien Creditors, (C) solely to the extent required under the Consenting Sponsor Consent Right, the Consenting Sponsors, and (D) solely to the extent required under the Consenting Second Lien Creditor Consent Right, the Consenting Second Lien Creditors.  The Bidding Procedures Order shall authorize the Credit Bid Back-Up Bid Right in accordance with the terms herein.

(c)    <u>Releases</u>.  The Plan shall contain releases in form and substance consistent with the Restructuring Term Sheet; <u>provided</u>, that if the Bankruptcy Court finds that any provision in such releases does not comply with applicable law, the Parties shall modify such provision as needed to bring such provision into compliance with applicable law and otherwise in a manner that is reasonably acceptable to (i) Company, (ii) the Requisite Consenting First Lien Creditors, (iii) solely to the extent required under the Consenting Sponsor Consent Right, the Consenting Sponsors, and (iv) solely to the extent required under the Consenting Second Lien Creditor Consent Right, the Consenting Second Lien Creditors.

(d)  Support Effective Date.  The "**Support Effective Date**" shall mean, with respect to the Company, the Consenting First Lien Lenders, and the Consenting Sponsors, the date on which (i) counterpart signature pages to this Agreement shall have been executed and delivered by (A) the Company, (B) Consenting First Lien Creditors holding at least 66.67% in aggregate principal amount outstanding of the First Lien Loans, and (C) the Consenting Sponsors; (ii) at least twenty-four (24) hours have lapsed since the Company delivered Schedules 3.10(a) and (b) to the Credit Bid to Consenting First Lien Creditor Counsel; and (iii) the Company has received an executed copy of the Credit Bid from the Buyer (as defined in the Credit Bid) at the direction of the Consenting First Lien Creditors and all conditions precedent to effectiveness of the Credit Bid required of the Buyer (as defined in the Credit Bid) shall have been satisfied (including delivery of the Direction Letter (as defined in the Credit Bid) to the Company); provided, that with respect to Consenting Second Lien Creditors that are not Consenting First Lien Creditors, the "Support Effective Date" shall mean the date on which the events in clauses (i) – (iii) of this definition have occurred and counterpart signature pages to this Agreement shall have been executed and delivered by Consenting Second Lien Creditors holding at least 66.67% in aggregate principal amount outstanding of Second Lien Loans.

(e)  Milestones.  The Company shall implement the Restructuring in accordance with the following milestones (the "**Milestones**"), as applicable, unless extended or waived in writing (which may be by electronic mail between applicable counsel) by the Company and the Requisite Consenting First Lien Creditors:

     i.  Commencement of the Chapter 11 Cases.  Provided that the Support Effective Date has occurred, the Company agrees that, as soon as reasonably practicable, but in no event later than four (4) days after the Support Effective Date (and the date on which such filing occurs, the "**Petition Date**"), each Company Entity shall file with the Bankruptcy Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Chapter 11 Cases.

     ii.  Entry of Interim DIP Order.  As soon as practicable, but in no event later than the date that is five (5) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order.

     iii.  Entry of Final DIP Order.  As soon as practicable, but in no event later than the date that is forty (40) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order.

     iv.  Entry of Assumption Order.  As soon as practicable, but in no event later than the date that is forty (40) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Assumption Order.

     v.  Approval of Bidding Procedures.  As soon as practicable, but in no event later than the date that is forty (40) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order.

vi.     <u>Entry of Disclosure Statement Order</u>.  As soon as practicable, but in no event later than the date that is sixty-five (65) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Disclosure Statement Order.

vii.     <u>Commencement of Solicitation</u>.  As soon as reasonably practicable, but in no event later than twenty-five (25) calendar days after entry by the Bankruptcy Court of the Disclosure Statement Order, the Company shall have commenced the Solicitation.

viii.     <u>Entry of Confirmation Order</u>.  As soon as practicable, but in no event later than the date that is sixty-five (65) calendar days after entry of the Disclosure Statement Order, the Bankruptcy Court shall have entered the Confirmation Order.

ix.     <u>Outside Date</u>.  The Effective Date shall occur as soon as practicable, but (A) if the Credit Bid is the Successful Bid, in no event later than the date that is fourteen (14) calendar days after entry of the Confirmation Order; <u>provided</u>, that such date may be extended through no later than August 31, 2020 (the "**Outside Date**") by delivering written notice from the Requisite Consenting First Lien Creditors to the Company (with electronic mail from Consenting First Lien Creditor Counsel to the Company's counsel being sufficient); and (B) if a Third Party Bid is the Successful Bid, the later of (x) August 31, 2020 and (y) the Successful Bid Outside Date as it may be extended pursuant to its terms; provided, that in no event shall such date be extended to a date that is later than twelve (12) months from the Petition Date.

3.     **Agreements of the Consenting Creditors.**

(a)     <u>Voting; Support</u>.  Each Consenting Creditor agrees, severally and not jointly, with respect to all Claims held, that, for the duration of the Support Period applicable to such Consenting Creditor, such Consenting Creditor shall:

i.     if solicited to do so, timely vote or cause to be voted its Claims (including First Lien Claims and Second Lien Claims) and Interests, as applicable, to accept the Plan by delivering or causing to be delivered its duly authorized, executed, and completed ballot or ballots and consent to and, if applicable, not opt out of, the releases set forth in the Plan against each Released Party;

ii.     not change or withdraw (or cause or direct to be changed or withdrawn) any such vote or release described in clause (i) above; <u>provided</u>, <u>however</u>, that notwithstanding anything in this Agreement to the contrary, a Consenting Creditor's vote and release shall be immediately and automatically without further action of any Consenting Creditor revoked (and, upon such revocation, deemed void *ab initio*) upon termination of this Agreement pursuant to the terms hereof with respect to such Consenting Creditor;

iii.     timely vote (or cause to be voted) its Claims (including First Lien Claims and Second Lien Claims) and Interests, as applicable, to reject any Alternative Restructuring;

iv.      negotiate in good faith with the Company the Definitive Documents and use commercially reasonable efforts to complete and execute such Definitive Documents;

v.      not directly or indirectly, through any Person (including any administrative agent or collateral agent), seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring;

vi.      not object to, or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede, the Solicitation, the approval of the DIP Orders, the approval of the Bidding Procedures Order, the approval of the Disclosure Statement, or the confirmation and consummation of the Plan or the Restructuring;

vii.      not direct (or cause to be directed) any administrative agent or collateral agent (as applicable) to take any action inconsistent with such Consenting Creditor's obligations under this Agreement or the Plan and, if any applicable administrative agent or collateral agent takes any action inconsistent with such Consenting Creditor's obligations under this Agreement or the Plan, such Consenting Creditor shall use its commercially reasonable efforts to direct such administrative agent or collateral agent to cease, withdraw, and refrain from taking any such action; provided, that, in no instance shall any Consenting Creditor be required to provide an indemnity to any administrative agent or collateral agent, as applicable, in connection with such efforts;

viii.      use its commercially reasonable efforts to support the Restructuring and take all commercially reasonable actions necessary or reasonably requested by the Company to facilitate the Solicitation, approval and entry of the DIP Orders, approval of the Bidding Procedures Order, approval of the Disclosure Statement, and confirmation and consummation of the Plan, including approval of the Exit Term Loan Facility and Exit Revolving Credit Facility, as applicable, and of the transactions contemplated thereby, within the timeframes contemplated by this Agreement;

ix.      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional, or alternative provisions to address any such impediment; and

x.      provide prompt written notice (with email from Consenting Creditor Counsel to the respective Consenting Creditor being sufficient to satisfy this notice requirement) to Weil during the Support Period of any of the following events in clauses (A) to (D) of this subsection, solely to the extent a Consenting Creditor has actual knowledge thereof: (A) any event that has occurred, which occurrence would cause any covenant of the Consenting Creditor under this Agreement not to be satisfied in any material respect; (B) a breach of this Agreement by a Consenting

13

Creditor; (C) any representation or statement made by a Consenting Creditor hereunder which is or proves to have been materially incorrect or misleading in any respect when made or deemed to be made; or (D) any event that has occurred that would give rise to a material impediment to the implementation or consummation of the Restructuring.

(b)    Transfers by Consenting Creditors.  Each Consenting Creditor agrees that for the duration of the Support Period applicable to such Consenting Creditor, such Consenting Creditor shall not sell, transfer, loan, issue, pledge, hypothecate, assign, or otherwise dispose of (each, a "**Transfer**"; provided, however, that the following shall not give rise to a "Transfer" under this Agreement: any financing under which a Consenting Creditor have pledged, encumbered, or granted liens or security interests in all or substantially all of the rights or interests that such Persons hold in loans or other securities, except that any exercise of remedies by such Persons holding such pledge, encumbrance, lien, or security interest shall constitute a Transfer), directly or indirectly, in whole or in part, any of its Claims or Interests or any option thereon or any right or interest therein (including grant any proxies, deposit any Claims against or Interests in the Company into a voting trust or entry into a voting agreement with respect to any such Claims or Interests), unless (i) the transferee thereof is a Consenting Creditor or  (ii) prior to such Transfer, such transferee agrees in writing for the benefit of the Parties to become a Consenting Creditor and to be bound by all of the terms of this Agreement applicable to Consenting Creditors (including with respect to any and all Claims, Interests, or other claims or interests it already may hold against or in the Company prior to such Transfer) by executing a joinder agreement, a form of which is attached hereto as **Exhibit F** (the "**Joinder Agreement**") and delivering an executed copy thereof within two (2) business days following such execution, to Weil and the Consenting Creditor Counsel, in which event (A) the transferee (including the Consenting Creditor transferee, if applicable) shall be deemed to be a Consenting Creditor hereunder to the extent of such transferred rights and obligations and (B) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations. Each Consenting Creditor agrees that any Transfer of any Claims or Interests that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Consenting Creditor shall have the right to enforce the voiding of such Transfer.  Notwithstanding anything to the contrary herein, a Consenting Creditor may Transfer its Claims or Interests, or any option thereon or right or interest therein, to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker become a Party; provided, however, that (x) such Qualified Marketmaker must Transfer such right, title, or interest by the earlier of seven (7) calendar days following its receipt thereof and the Voting Deadline, and (y) any subsequent Transfer by such Qualified Marketmaker of the right, title, or interest in such Claims or Interests is to a transferee that is or becomes a Consenting Creditor at the time of such transfer. If a Consenting Creditor, acting in its capacity as a Qualified Marketmaker, acquires any right, title, or interest in any Claims or Interests from any Person that is not a Consenting Creditor, it may Transfer such right, title, or interest without the requirement that the transferee be or become a Consenting Creditor.

(c)    Additional Claims or Interests.  This Agreement shall in no way be construed to preclude any Consenting Creditor from acquiring additional Claims or Interests.  To the extent any Consenting Creditor (i) acquires additional Claims or Interests, including any Claims or Interests solicited to vote on the Plan or (ii) Transfers any Claims or Interests, then, in

each case, each such Consenting Creditor shall promptly notify Weil (with email being sufficient) within three (3) business days following the consummation of such transaction. Each such Consenting Creditor agrees that such additional Claims and/or Interests shall be subject to this Agreement, and that, for the duration of the Support Period applicable to such Consenting Creditor, it shall vote (or cause to be voted) any such additional Claims and/or Interests solicited to vote on the Plan (to the extent still held by it or on its behalf at the time of such vote), in a manner consistent with Section 3 hereof.

(d)    _Additional Lenders_.  Any First Lien Lender or Second Lien Lender may, at any time after the Support Effective Date, become a Party to this Agreement as a Consenting First Lien Creditor and/or Consenting Second Lien Creditor, as applicable (an "**Additional Consenting Creditor**") by executing a Joinder Agreement pursuant to which such Additional Consenting Creditor shall be bound by the terms of this Agreement as a Consenting First Lien Creditor and/or Consenting Second Lien Creditor, as applicable, and shall be deemed a Consenting Creditor for all purposes hereunder.

(e)    _Forbearance_.  Each Consenting Creditor agrees that, solely for the duration of the Support Period applicable to such Consenting Creditor, and without prejudice to any right such Consenting Creditor has or may have under the Loan Documents (all of which are expressly reserved subject to the terms of this Agreement and the Definitive Documents), each Consenting Creditor agrees to forbear from the exercise of its rights (including any right of set-off) or remedies it may have under the Loan Documents and any agreement contemplated thereby, as applicable, and under applicable U.S. or foreign law or otherwise, in each case, with respect to the Specified Defaults.  Each Consenting Creditor further agrees that if any applicable administrative agent or collateral agent takes any action inconsistent with such Consenting Creditor's obligations under this Agreement or the Plan, such Consenting Creditor shall use commercially reasonable efforts to direct such administrative agent or collateral agent to cease, withdraw, and refrain from taking any such action; provided, that, in no instance shall any Consenting Creditor be required to provide an indemnity to any administrative agent or collateral agent, as applicable, in connection with such efforts.

(f)    _Financing Commitments_.  Subject to the conditions set forth in the DIP Term Sheet, the Exit Term Sheet, and the Financing Commitment Letter, each Commitment Party, severally and not jointly, agrees to provide (or cause any of its designees to provide) its allocable share of the Financing Commitments as set forth in **Exhibit D** attached hereto on terms and conditions substantially consistent with the DIP Term Sheet, the Exit Term Sheet, and the Financing Commitment Letter.  For the avoidance of doubt, upon termination or expiration of this Agreement in accordance with its terms, the commitment of the Commitment Parties made pursuant to this Section 3(f) to enter into the DIP Credit Agreement and Exit Term Loan Facility Credit Agreement, as applicable, and provide their allocable share of the Financing Commitment as set forth in **Exhibit D** shall terminate; provided, however, that upon the closing of the DIP Credit Agreement and Exit Term Loan Facility Credit Agreement, as applicable, the DIP Credit Agreement and Exit Term Loan Facility Credit Agreement, as applicable, shall govern the Financing Commitments and any termination thereof.

(g)    _Additional Provisions Regarding Consenting Creditor Commitments_. Notwithstanding anything to the contrary herein, nothing in this Agreement shall:

i.	subject to any confidentiality provisions in the Loan Documents or any confidentiality agreement in effect between the Company and any applicable Consenting Creditor, affect the ability of any Consenting Creditor to consult with any other Consenting Creditor, the Company, or any other party in interest in the Chapter 11 Cases;

ii.	prevent any Consenting Creditor from enforcing this Agreement or any other Definitive Document, or from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, such documents (including enforcing, or directing the enforcement of, any rights or remedies available to such Consenting Creditor under the DIP Credit Agreement, the DIP Orders, or any documents relating thereto);

iii.	require any Consenting Creditor to incur any financial or other liability, other than as expressly described in this Agreement;

iv.	obligate a Consenting Creditor to deliver a vote to support the Plan, or prohibit a Consenting Creditor from withdrawing such vote, upon a duly-exercised termination of this Agreement with respect to such Consenting Creditor (other than as a result of the occurrence of the Effective Date); provided, that upon the withdrawal of its vote on or after the date of such duly-exercised termination (other than as a result of the occurrence of the Effective Date), such vote shall be deemed void *ab initio* and such Consenting Creditor shall have the opportunity to change its vote; or

v.	prohibit any Consenting Creditor from taking any action that is not inconsistent with this Agreement or such Consenting Creditor's obligations hereunder.

4.	**Agreements of the Consenting First Lien Creditors.**

(a)	Credit Bid.

i.	Delivery of the executed Credit Bid by the Buyer (as defined in the Credit Bid) at the direction of the Consenting First Lien Creditors and satisfaction of all conditions precedent to effectiveness of the Credit Bid required of the Buyer (as defined in the Credit Bid) (including delivery of the Direction Letter (as defined in the Credit Bid)) is a condition precedent to the "Support Effective Date" of this Agreement. Notwithstanding anything herein or in the Credit Bid to the contrary, the Consenting First Lien Creditors acknowledge and agree that delivery of the executed Credit Bid to the Company pursuant to the terms of this Agreement shall constitute a binding and irrevocable offer of the Buyer to consummate the transactions specified in the Credit Bid, which offer shall remain open until the closing of the sale with the Successful Bidder or such earlier date as set forth in the Bidding Procedures Order. The Consenting First Lien Creditors shall not withdraw, revoke, modify, or amend the Credit Bid, except in accordance with the Bidding Procedures Order. Upon entry of the Bidding Procedures Order, the Credit

16

Bid shall be deemed a Qualified Bid and be subject to the terms and conditions of the Bidding Procedures Order.

ii.    If the Company does not receive additional binding bids to purchase the Company within a reasonable time prior to the commencement of the Chapter 11 Cases, the Credit Bid shall be designated as the stalking horse under the Bidding Procedures Order.  If the Company receives additional binding bids to purchase the Company within a reasonable time prior to the commencement of the Chapter 11 Cases and the Company determines, in its business judgment, that one of such alternative bids is a higher or otherwise better bid than the Credit Bid, the Company may designate such alternative bid as the "stalking horse" bid under the Bidding Procedures Order and the Credit Bid will be deemed a Back-Up Bid (which for the avoidance of doubt, may be one of multiple Back-Up Bids), in accordance with the terms of the Bidding Procedures Order.

5.    **Agreements of the Consenting Sponsors.**

(a)    <u>Voting; Support</u>.  Each Consenting Sponsor agrees that, for the duration of the Support Period applicable to such Consenting Sponsor, such Consenting Sponsor shall:

i.    if solicited, timely vote or cause to be voted its Claims (including First Lien Claims and Second Lien Claims) and Interests, as applicable, to accept the Plan by delivering or causing to be delivered its duly authorized, executed, and completed ballot or ballots and consent to and, if applicable, not opt out of, the releases set forth in the Plan against each Released Party on a timely basis, and, in any event, within three (3) business days following the commencement of the Solicitation;

ii.    not change or withdraw (or cause or direct to be changed or withdrawn) any such vote or release described in clause (i) above or vote described in clause (iii) below; <u>provided</u>, <u>however</u>, that notwithstanding anything in this Agreement to the contrary, a Consenting Sponsor's vote and release may, upon written notice to the Company and the other Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by a Consenting Sponsor at any time following the termination of this Agreement pursuant to the terms hereof with respect to such Consenting Sponsor;

iii.    if solicited, timely vote (or cause to be voted) its Claims (including First Lien Claims and Second Lien Claims) and Interests, as applicable, to reject any Alternative Restructuring;

iv.    negotiate in good faith with the Company the form of the Definitive Documents and (as applicable) execute the Definitive Documents;

v.    not directly or indirectly, through any Person (including any administrative agent or collateral agent), seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring;

WEIL:\97376996\1\69518.0004

vi.     not object to, or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede, the Solicitation, the approval of the DIP Orders, the approval of the Bidding Procedures Order, the approval of the Disclosure Statement, or the confirmation and consummation of the Plan or the Restructuring, including the Implementation Steps;

vii.     not direct any administrative agent or collateral agent (as applicable) to take any action inconsistent with such Consenting Sponsor's obligations under this Agreement or the Plan and, if any applicable administrative agent or collateral agent takes any action inconsistent with such Consenting Sponsor's obligations under this Agreement or the Plan, such Consenting Sponsor shall direct and use its commercially reasonable efforts to cause such administrative agent or collateral agent to cease, withdraw, and refrain from taking any such action;

viii.     use its commercially reasonable efforts to support the Restructuring and take all commercially reasonable actions necessary or reasonably requested by the Company to facilitate the Solicitation, approval and entry of the DIP Orders, approval of the Bidding Procedures Order, approval of the Disclosure Statement, and confirmation and consummation of the Plan, including approval of the transactions contemplated thereby, within the timeframes contemplated by this Agreement; and

ix.     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate, additional, or alternative provisions to address any such impediment.

(b)     Transfers by Consenting Sponsors.  Each Consenting Sponsor agrees that, for the duration of the Support Period and unless otherwise agreed in writing (which may be by electronic mail between applicable counsel) by the Company and the Requisite Consenting First Lien Creditors, it shall prevent the direct or indirect sale, transfer, assignment, or other disposition of any of its Claims against, or Interests in, the Company (or any option thereon or right or interest therein, including the grant to any proxy or deposit of any Claims against or Interests in the Company into a voting trust or entry into a voting agreement with respect thereto), including by taking a worthless stock deduction within the meaning of section 382(g)(4)(D) of the Internal Revenue Code of 1986, as amended, with respect to Interests in the Company (or otherwise treating any such Interests as worthless for U.S. federal income tax purposes).

6.     **Agreements of the Company.**

(a)     Covenants.  Holdings agrees that, for the duration of the Support Period, Holdings shall, and shall cause each other Company Entity, to:

i.     use commercially reasonable efforts to implement the Restructuring in accordance with the terms and conditions set forth herein, including obtaining

WEIL:\97376996\1\69518.0004

any and all required regulatory and/or third-party approvals, if any, to effectuate the Restructuring embodied in the Plan;

ii.      upon reasonable request of any of the Consenting Creditors or their advisors, inform the legal and financial advisors to the Consenting Creditors as to: (A) the material business and financial (including liquidity) performance of the Company; (B) the status and progress of the negotiations of the Definitive Documents; and (C) the status of obtaining any necessary or desirable authorizations (including consents) from any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body;

iii.      not, nor encourage any other Person to, take any action that is inconsistent with, or is intended or is reasonably likely to interfere with, consummation of the Restructuring; provided, however, that the Company shall not be obligated to agree to any modification of any document that is inconsistent with the Plan;

iv.      provide draft copies of all material motions or applications and other material documents related to the Restructuring (including all "first day" and "second day" motions and orders, the Plan, the Disclosure Statement, ballots, and other Solicitation materials in respect of the Plan and any proposed amended version of the Plan or the Disclosure Statement, and a proposed Disclosure Statement Order and Confirmation Order) the Company intends to file with the Bankruptcy Court to Consenting Creditor Counsel and Consenting Sponsor Counsel, if reasonably practicable, at least two (2) business days prior to the date when the Company intends to file any such pleading or other document (provided that if delivery of such motions, orders, or materials at least two (2) business days in advance is not reasonably practicable prior to filing, such motion, order, or material shall be delivered as soon as reasonably practicable prior to filing), and shall consult in good faith with the Consenting Creditor Counsel and Consenting Sponsor Counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court; provided, that, to the extent the materials delivered pursuant to this Section 6(a)(iv) are Definitive Documents, such documents shall be subject to the respective consent rights of the Parties set forth in Section 2(b);

v.      use commercially reasonable efforts to operate its business in the ordinary course in a manner consistent with past practice in all material respects (other than any changes in operations (A) resulting from or relating to this Agreement or the filing or prosecution of the Chapter 11 Cases or (B) imposed by the Bankruptcy Court);

vi.      provide prompt written notice (with email from Weil being sufficient to satisfy this requirement) to Consenting Creditor Counsel during the Support Period of any of the following events in clauses (A) to (D) of this subsection, solely to the extent the Company has actual knowledge thereof: (A) any event that has occurred, which occurrence would cause any covenant of the Company under this Agreement not to be satisfied in any material respect; (B) a

WEIL:\97376996\1\69518.0004

breach of this Agreement by the Company; (C) any representation or statement made by the Company hereunder which is or proves to have been materially incorrect or misleading in any respect when made or deemed to be made; or (D) any event that has occurred that would give rise to a material impediment to the implementation or consummation of the Restructuring;

vii.     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring contemplated herein, support and take all steps reasonably necessary and desirable to address any such impediment;

viii.     subject to professional responsibilities of counsel, timely file with the Bankruptcy Court a written objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (A) directing the appointment in any of the Chapter 11 Cases of a trustee with authority to operate all or a material portion of the Company's business or an examiner with expanded powers, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases, or (D) modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization;

ix.     in the event that a Third Party Bid is the Successful Bid, to the extent an employee who is offered employment from the Buyer (as defined in the Third Party Bid) asserts any Claim for severance that arises out of or relates to a severance agreement, employment agreement, or offer letter with any Company Entity, provide in the Confirmation Order that any payments due on account of such Claim will be offset against any remaining payments under the applicable Key Employee Retention Agreement; and

x.     not, without the prior written consent of the Requisite Consenting First Lien Creditors (with email from Consenting First Lien Creditor Counsel being sufficient) (which consent shall not be unreasonably withheld) from and after the Support Effective Date:

1.     enter into or amend, adopt, restate, supplement, or otherwise modify any Employee Benefit Plan (as defined in the Credit Bid), including those set forth on Schedule 3.10(a) of the Credit Bid, which for the avoidance of doubt, shall include any deferred compensation, incentive, retention, bonus, or other compensatory arrangements, policies, programs, practices, plans, or agreements, as well as offer letters, employment agreements, consulting agreements, severance arrangements, or change in control arrangements with or for the benefit of (or the material terms of employment of) any of the employees listed on the schedule provided by counsel to the Company to counsel to the Consenting First Lien Creditors on February 3, 2020 (the "**Employee Schedule**"); <u>provided</u>, that the Company may, in the ordinary course of business and consistent with past practice, provide such employees with an annual base salary increase in the

second quarter of 2020 (which shall not be more 3% on average in the aggregate across all participating employees) and provide severance and release agreements to such employees to the extent consistent with the practices described in the severance practice document provided by counsel to the Company to Consenting First Lien Creditor Counsel on February 3, 2020 (the "**RentPath Severance Practice**");

2.      enter into or amend, adopt, restate, supplement, or otherwise modify (x) any contracts, arrangements, commitments or understandings that entitle any current or former director, officer or employee to indemnification from the Company or (y) any D&O Policy; or

3.      enter into or amend, adopt, restate, supplement, or otherwise modify any Employee Benefit Plan (as defined in the Credit Bid), including those set forth on Schedule 3.10(a) of the Credit Bid, which for the avoidance of doubt, shall include any deferred compensation, incentive, retention, bonus, or other compensatory arrangements, policies, programs, practices, plans, or agreements, as well as offer letters, employment agreements, consulting agreements, severance arrangements, or change in control arrangements with or for the benefit of (or the material terms of employment of) any employees not listed on the Employee Schedule; provided, that the Company may, in the ordinary course of business and consistent with past practice (1) provide such employees with an annual base salary increase in the second quarter of 2020 (which shall not be more than 3% on average in the aggregate across all participating employees); (2) increase such employees' base salary compensation (in each case, on an annual basis, limited to the Employee Salary Increase Cap (as defined below)); (3) provide such employees with retention bonuses and make payments in accordance therewith (in each case, limited to the Employee Retention Bonus Cap (as defined below)); (4) provide such employees with severance and release agreements to the extent consistent with the RentPath Severance Practice; and (5) hire new employees and provide such new employees with compensation arrangements, provided that any such arrangement does not provide for base salary in excess of the Employee Threshold Amount or severance inconsistent with the RentPath Severance Practice.

Notwithstanding anything herein to the contrary, (x) nothing herein shall restrict or otherwise prohibit the Company's employees from entering into employment, compensation, and/or benefit arrangements and plans with a third-party (other than the Company); (y) the Company may, in the ordinary course and consistent with past practice, replace and renew any employee welfare benefit plans; and (z) the Company may not provide any discretionary severance beyond the guidelines provided under the RentPath Severance Practice to any employees without the prior written consent of the Requisite Consenting First Lien Creditors (with email from Consenting

First Lien Creditor Counsel being sufficient) (which consent shall not be unreasonably withheld).

As used in this Agreement, "**Employee Threshold Amount**" shall mean $200,000.

As used in this Agreement, "**Employee Salary Increase Cap**" shall mean, on an annual basis, per employee, the higher of $15,000 and 10% of base salary. For the avoidance of doubt, the Employee Increase Amount shall be in addition to the annual base salary increase is anticipated to be provided in the second quarter of 2020.

As used in this Agreement, "**Employee Retention Bonus Cap**" shall mean, on an annual basis, per employee, the higher of $25,000 and 25% of base salary.

(b)    <u>Limited Waiver of Automatic Stay</u>.  The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination of this Agreement by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the fullest extent permitted by law, the applicability of the automatic stay to the giving of such notice and its right to assert a contrary position in the Chapter 11 Cases, if any, with respect to the foregoing); <u>provided</u>, <u>however</u>, that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

7.    **<u>Termination of Agreement.</u>**

(a)    This Agreement shall terminate as to all Parties upon the delivery of written notice (in accordance with Section 21 hereof): (i) from the Requisite Consenting First Lien Creditors to the other Parties at any time after and during the continuance of any Creditor Termination Event (as defined below); (ii) from Holdings to the other Parties at any time after the occurrence and during the continuance of any Company Termination Event (as defined below); or (iii) from a Consenting Sponsor to the other Parties at any time after the occurrence and during the continuance of any Consenting Sponsor Termination Event (as defined below); <u>provided</u>, <u>however</u>, that termination by the Consenting Sponsors in accordance with this Section 7 shall only be effective as to such Consenting Sponsor and this Agreement shall continue in full force and effect in respect to all other Parties.  Notwithstanding any provision to the contrary in this Section 7, no Party may exercise any of its respective termination rights as set forth herein if such Party has failed to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's actions or inactions), with such failure to perform or comply causing, or resulting in, the occurrence of a Creditor Termination Event, Company Termination Event, or Consenting Sponsor Termination Event specified herein.  If not terminated on an earlier date, this Agreement shall automatically terminate on the Effective Date, without any further required action or notice.

WEIL:\97376996\1\69518.0004

(b)    A "<u>Creditor Termination Event</u>" shall mean any of the following:

i.    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and either (A) such ruling, judgment, or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment, or order has not been stayed, reversed, or vacated within fifteen (15) calendar days after such issuance; <u>provided</u>, this Section 7(b)(i) shall not apply to any statutory waiting period pursuant to the HSR Act;

ii.    any of the Milestones have not been achieved, extended, or waived, pursuant to the terms hereof, within one (1) business day after such Milestone;

iii.    the Company or any Consenting Sponsor files any motion, pleading, or related document with the Bankruptcy Court that is inconsistent with this Agreement or the Plan; <u>provided</u>, that, if the filing party provided a draft of such motion, pleading or document to Consenting First Lien Creditor Counsel at least two (2) business days before such filing and Consenting First Lien Creditor Counsel did not provide the Company with written notice of its opposition to such filing (with email from Consenting First Lien Creditor Counsel being sufficient) prior to such filing, such filing shall not trigger a Creditor Termination Event under this clause (iii) if the filing party withdraws such motion, pleading, or document before the earlier of (A) twenty-four (24) hours after the filing party receives written notice from the Requisite Consenting First Lien Creditors (in accordance with Section 21 hereof) that such motion, pleading, or document is inconsistent with this Agreement or the Plan and (B) entry of an order of the Bankruptcy Court approving such motion, pleading, or document; <u>provided</u>, <u>further</u>, that to the extent such termination is based on a filing (or support for another party's filing) by a Consenting Sponsor, the Requisite Consenting First Lien Creditors may only terminate this Agreement as to that Consenting Sponsor;

iv.    the Company or any Consenting Sponsor files or supports (or solely in the case of the Company, fails to timely object to) another party in filing (A) a motion or pleading challenging the amount, validity, or priority of any Claims held by any Consenting Creditor against the Company, (B) any plan of reorganization or liquidation other than the Plan, or (C) a motion or pleading asserting (or seeking standing to assert) any purported claims or causes of action against the Consenting Creditors; <u>provided</u>, that to the extent such termination is based on a filing (or support for another party's filing) by a Consenting Sponsor, the Requisite Consenting First Lien Creditors, or the Requisite Consenting Second Lien Creditors may only terminate this Agreement as to that Consenting Sponsor;

v.    the termination of the DIP Facility or the acceleration of any obligations thereunder or the termination of the Company's authorization for the Company to use cash collateral;

23

vi.      if the Company (A) withdraws the Plan, (B) publicly announces its intention not to pursue the Plan, (C) files a motion with the Bankruptcy Court seeking the approval of an Alternative Restructuring, or (D) agrees to pursue (including, for the avoidance of doubt, as may be evidenced by a term sheet, letter of intent, or similar document executed by the Company) or publicly announces its intent to pursue an Alternative Restructuring;

vii.      if the Company gives notice of termination of this Agreement pursuant to this Section 7;

viii.      any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable;

ix.      the Bankruptcy Court enters an order (A) directing the appointment in any of the Chapter 11 Cases of an examiner with expanded powers or a trustee with authority to operate all or a material portion of the Company's business, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases, or (D) terminating any Debtor's exclusive right to file and/or solicit acceptances of a plan of reorganization (including the Plan);

x.      any breach by the Company of the covenants set forth in Section 6(a)(ix)-(x);

xi.      the estimated amount of allowed general unsecured claims exceeds $4 million based on a good faith estimate by the Company that is authorized by the Special Committee (taking into account, among other things, proofs of claim filed against Company Entities) as of the day that is three (3) days before the Voting Deadline; or

xii.      any breach in any material respect by the Company or any Consenting Sponsor of any undertaking, representation, warranty, or covenant of this Agreement not otherwise listed in Section 7(b)(i) through Section 7(b)(xi), which remains uncured (to the extent curable) for a period of five (5) business days after the receipt of written notice of such breach pursuant to this Section 7 and in accordance with Section 21 (as applicable).

(c)      A "Company Termination Event" shall mean any of the following:

i.      the board of directors, managers, members, or partners, as applicable, of any Company Entity reasonably determines in good faith based upon the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; provided, however, that such Company Entity provides written notice of such determination to the Consenting First Lien Creditors, the Consenting Second Lien

24

Creditors, and the Consenting Sponsors within one (1) business day after the date thereof;

ii.     if, as of 11:59 p.m. prevailing Eastern Time on February 12, 2020, the Support Effective Date has not occurred;

iii.     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and such ruling, judgment, or order has not been stayed, reversed, or vacated within fifteen (15) calendar days after such issuance; provided, this Section 7(c)(iii) shall not apply to any statutory waiting period pursuant to the HSR Act;

iv.     if the Consenting First Lien Creditors give notice of termination of this Agreement pursuant to this Section 7;

v.     the Bankruptcy Court enters an order (A) directing the appointment in any of the Chapter 11 Cases of an examiner with expanded powers or a trustee with authority to operate all or a material portion of the Company's business, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

vi.     the occurrence of the Outside Date if the Effective Date has not occurred;

vii.     if the Credit Bid is withdrawn or terminated, other than in accordance with this Agreement or the Bidding Procedures Order; or

viii.     any breach in any material respect by one or more of the Consenting First Lien Creditors of any undertaking, representation, warranty, or covenant of this Agreement not otherwise listed in Section 7(c)(i) through Section 7(c)(vii), which remains uncured (to the extent curable) for a period of five (5) business days after the receipt of written notice of such breach pursuant to this Section 7 and in accordance with Section 21 (as applicable), but only if the non-breaching Consenting First Lien Creditors hold less than 66.67% of the aggregate principal amount of First Lien Claims.

(d)     A "Consenting Sponsor Termination Event" shall mean any the following:

i.     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and such ruling, judgment, or order has not been stayed, reversed, or vacated within fifteen (15) calendar days after such issuance; provided, Section 7(d)(i) shall not apply to any statutory waiting period pursuant to the HSR Act;

ii.     a Definitive Document modifies, removes, or impairs any of the rights or benefits proposed to be granted to a Consenting Sponsor under this

25

Agreement or the Plan and such Consenting Sponsor has not consented to such modification, removal, or impairment, in each case, subject to the Consenting Sponsor Consent Right;

iii.    the Company modifies the treatment of a Consenting Sponsor under the Plan or files any motion or pleading with the Bankruptcy Court that is inconsistent with this Agreement or the Plan, in each case, that materially adversely impacts or would reasonably be expected to materially adversely impact such Consenting Sponsor;

iv.    the occurrence of the Outside Date if the Effective Date has not occurred; or

v.    any breach in any material respect by any of the other Parties of any undertaking, representation, warranty, or covenant of this Agreement not otherwise listed in Section 7(d)(i) through Section 7(d)(iv), only if such breach adversely affects the treatment, rights, or obligations under this Agreement or the Plan of the Consenting Sponsor seeking such termination and remains uncured (to the extent curable) for a period of five (5) business days after the receipt of written notice of such breach pursuant to this Section 7 and in accordance with Section 21 (as applicable).

(e)    <u>Mutual Termination</u>.    This Agreement may be terminated by mutual agreement of the Company and the Requisite Consenting First Lien Creditors upon the receipt of written notice delivered in accordance with Section 21 hereof.

(f)    <u>Effect of Termination</u>.    Subject to the provisions contained in Section 7(a) and Section 15 hereof, upon the termination of this Agreement in accordance with this Section 7, this Agreement shall forthwith become null and void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement (including Section 7), be immediately released from its liabilities, obligations, commitments, undertakings, and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law; <u>provided</u>, <u>however</u>, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.  Notwithstanding anything herein to the contrary, following the commencement of the Chapter 11 Cases and unless and until there is an unstayed order of the Bankruptcy Court providing that the giving of notice under and/or termination of this Agreement in accordance with its terms is not prohibited by the automatic stay imposed by section 362 of the Bankruptcy Code, the occurrence of any Creditor Termination Event or Consenting Sponsor Termination Event shall result in automatic termination of this Agreement, to the extent any of the terminating Restructuring Support Parties would otherwise have the ability to terminate this Agreement in accordance therewith, five (5) calendar days following such occurrence unless waived in writing by (x) with respect to any Creditor Termination Event, the Requisite Consenting First Lien Creditors and (y) with respect to any Consenting Sponsor Termination Event, the Consenting Sponsors.

(g)        If the Restructuring is not consummated, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, and the Parties expressly reserve any and all of their respective rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

(h)        <u>Consenting Second Lien Creditor Termination</u>.  Notwithstanding anything to the contrary herein, any Consenting Second Lien Creditor may terminate this Agreement solely as to such Consenting Second Lien Creditor upon the delivery of written notice (in accordance with Section 21 hereof) to the other Parties if: (i) the treatment of Second Lien Claims under the Plan or this Agreement, or any recovery granted to such Consenting Second Lien Creditor, is modified in any manner adverse to such Consenting Second Lien Creditor; or (ii) a Creditor Termination Event occurs under Sections 7(b)(i), 7(b)(ii) (to the extent not waived or modified by the Requisite Consenting First Lien Creditors), 7(b)(iii) (to the extent not waived by the Requisite Consenting First Lien Creditors), 7(b)(iv)-7(b)(ix), and 7(b)(xii) (to the extent not waived by the Requisite Consenting First Lien Creditors).

8.        **Definitive Documents; Good Faith Cooperation; Further Assurances.**

Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, negotiation, execution, delivery, implementation, and consummation of the Plan and the Restructuring, as well as the negotiation, drafting, execution and delivery of the Definitive Documents.  Furthermore, subject to the terms hereof, each of the Parties shall (i) take such action as may be reasonably necessary or appropriate to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings, and (ii) refrain from taking any action that would frustrate the purposes and intent of this Agreement.

9.        **Representations and Warranties.**

(a)        Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct, and complete as of the date hereof (or as of the date a Consenting Creditor becomes a party hereto):

i.        such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company, or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

ii.        the execution, delivery, and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (B) conflict

27

with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party except, in the case of the Company, for the filing of the Chapter 11 Cases;

iii.    the execution, delivery, and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required by the U.S. Securities and Exchange Commission or other securities regulatory authorities under applicable securities laws; and

iv.    this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)    <u>Representations and Warranties of the Consenting Creditors</u>.    Each Consenting Creditor severally (and not jointly) represents and warrants to the other Parties that, as of the date hereof (or as of the date such Consenting Creditor becomes a party hereto), such Consenting Creditor (i) is the beneficial owner of the aggregate principal amount of the Loans set forth below its name on the signature page hereto (or below its name on the signature page of a Joinder Agreement for any Consenting Creditor that becomes a party hereto after the date hereof) and does not own any other Loans, and/or (ii) has, with respect to the beneficial owners of such Loans, (A) sole investment or voting discretion with respect thereto, (B) full power and authority to vote on and consent to matters concerning such Loans or to exchange, assign, and transfer such Loans, and (C) full power and authority to bind or act on the behalf of, such beneficial owners.

(c)    <u>Representations and Warranties of the Consenting Sponsors</u>.    Each Consenting Sponsor severally (and not jointly) represents and warrants to the other Parties that such Consenting Sponsor holds of record and owns beneficially outstanding equity interests in Holdings set forth below such Consenting Sponsor's name on its signature page to this Agreement, free and clear of any restrictions on transfer, liens or options, warrants, purchase rights, contracts, commitments, claims, and demands.

(d)    <u>Representations and Warranties of the Company</u>.    The Company represents and warrants to the Consenting First Lien Creditors that:

i.    Schedule 3.10(a) of the Credit Bid sets forth a true and complete list, as of the date of this Agreement, of each of the Company's Employee Benefit Plans (as defined in the Credit Bid), other than any immaterial Employee Benefit Plans that result in obligations in an amount less than $50,000 in the aggregate;

ii.    Schedule 3.10(b) of the Credit Bid sets forth a true and complete list of each (A) contract, arrangement, commitment or understanding that entitles any current or former director, officer or employee to indemnification from any

28

Company Entity and (B) executive liability insurance policy entered into by any Company Entity on behalf of any current or former director, officer or employee, in each case other than those set forth in the bylaws of any Company Entity, in each case, entered into from the date that is six (6) years prior to the date of this Agreement through and including the date of this Agreement, other than those set forth in any Company Entity's organization documents;

  iii.  the Company (through management) has advised each employee party to a severance agreement, employment agreement, or offer letter with any Company Entity that (A) in the event that the Third Party Bid is the Successful Bid and such employee is offered employment from the Buyer (as defined in the Third Party Bid) consistent with the terms of the Third Party Bid and any such Claim is ultimately allowed, the Company shall provide in the Confirmation Order that any payments due on account of such Claim will be offset against any remaining payments under the applicable Key Employee Retention Agreement, and (B) to the extent any such employee asserts a Claim for severance against any Company Entity in the event that the Third Party Bid is the Successful Bid and such Claim is allowed, the Consenting First Lien Lenders will not approve or consent to any budget or order that includes payment of such amounts; and

  iv.  no Company Entity is party to a labor, collective bargaining or similar agreement with any labor organization covering employees of the Company and no such agreement is currently being negotiated by any Company Entity.

10. **Disclosure; Publicity.**

  (a)  The Company shall submit drafts to the Consenting Creditor Counsel and Consenting Sponsor Counsel of any Communications Materials prepared by the Company at least one (1) business day in advance of their release; provided, that, to the extent the materials delivered pursuant to this Section 10(a) are Definitive Documents, such documents shall be subject to the respective consent rights of the Parties set forth in Section 2(b).

  (b)  Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Creditor, no Party or its advisors shall disclose to any Person (including, for the avoidance of doubt, any other Party), other than advisors to the Company, the principal amount or percentage of any Loans or any other Claims against the Company held by any Consenting Creditor, in each case, without such Consenting Creditor's consent; provided, however, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall, to the extent permitted by law, afford the relevant Consenting Creditor a reasonable opportunity to review and comment in advance of such disclosure and shall take commercially reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the relevant Consenting Creditor); and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Loans held by the Consenting Creditors, collectively, on a facility by facility basis. Any public filing of this Agreement, with the Bankruptcy Court or otherwise, that includes executed signature pages to this Agreement shall include such signature pages only in redacted form with respect to the principal amount or percentage of Loans or any other Claims held by each Consenting Creditor

(provided that the holdings disclosed in such signature pages may be filed in unredacted form with the Bankruptcy Court under seal). Notwithstanding the provisions in this Section 10, any Party may disclose, to the extent consented to in writing by a Consenting Creditor, such Consenting Creditor's individual holdings.

11. **Amendments and Waivers.**

(a) Other than as set forth in Section 11(b), this Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended, or supplemented except with the written consent of the Company, the Requisite Consenting First Lien Creditors (such consent not to be unreasonably withheld, conditioned, or delayed), the Consenting Sponsors (in the case of the Consenting Sponsors, such consent shall be limited solely to the Consenting Sponsor Consent Right), and the Consenting Second Lien Creditors (in the case of the Consenting Second Lien Creditors, such consent shall be limited to the Consenting Second Lien Creditor Right).

(b) Notwithstanding Section 11(a):

i. any waiver, modification, amendment, or supplement to this Section 11 shall require the written consent of all of the Parties;

ii. any modification, amendment, or change to the definition of "Requisite Consenting First Lien Creditors" shall require the written consent of (A) each Consenting First Lien Creditor that was a Consenting First Lien Creditor as of the Support Effective Date and continues to be a Consenting First Lien Creditor as of the date of such modification, amendment or change and (B) the Company;

iii. any change, modification, or amendment to this Agreement or the Plan that treats or affects any Consenting Creditor's First Lien Claims or Second Lien Claims in a manner that is materially and adversely disproportionate, on an economic or non-economic basis, to the manner in which any of the other Consenting Creditors' First Lien Claims or Second Lien Claims are treated (after taking into account the respective Claims arising under the Loan Documents of each Consenting Creditor and the recoveries contemplated by the Plan (as in effect on the date hereof) shall require the written consent of such materially adversely and disproportionately affected Consenting Creditor; and

iv. any modification, amendment, or change to the definition of "Requisite Consenting Second Lien Creditors" shall require the written consent of (A) each Consenting Second Lien Creditor that was a Consenting Second Lien Creditor as of the Support Effective Date, is a member of the Second Lien Ad Hoc Committee and continues to be a Consenting Second Lien Creditor as of the date of such modification, amendment or change and (B) the Company.

(c) In the event that a materially adversely and disproportionately affected Consenting First Lien Creditor (a "**Non-Consenting First Lien Creditor**") does not consent to a waiver, change, modification, or amendment to this Agreement requiring the consent of each Consenting First Lien Creditor, but such waiver, change, modification, or amendment receives the consent of the Requisite Consenting First Lien Creditors (i) owning at least 66.67% of the

WEIL:\97376996\1\69518.0004

outstanding relevant First Lien Claims and (ii) representing at least a majority in number of holders of First Lien Claims, this Agreement shall be deemed to have been terminated only as to such Non-Consenting Creditor, but this Agreement shall continue in full force and effect in respect to all other Consenting Creditors from time to time.

(d)　　In the event that a materially adversely and disproportionately affected Consenting Second Lien Creditor (a "**Non-Consenting Second Lien Creditor**") does not consent to a waiver, change, modification, or amendment to this Agreement requiring the consent of each Consenting Second Lien Creditor, but such waiver, change, modification, or amendment receives the consent of (i) the Consenting Second Lien Creditors (x) owning at least 66⅔% of the outstanding relevant Second Lien Claims and (y) representing at least a majority in number of holders of Second Lien Claims and (ii) the Requisite Consenting Second Lien Creditors, this Agreement shall be deemed to have been terminated only as to such Non-Consenting Second Lien Creditor, but this Agreement shall continue in full force and effect in respect to all other Consenting Second Lien Creditors from time to time.

(e)　　Any consent required to be provided pursuant to this Section 11 may be delivered by email from the applicable Party's counsel.

12.　　**Effectiveness.**

Subject to Section 2(d) of this Agreement, this Agreement shall become effective and binding upon each Party upon the execution and delivery by such Party of an executed signature page hereto and shall become effective and binding on all Parties on the Support Effective Date; provided, however, that signature pages executed by Consenting Creditors shall be delivered to (i) the Restructuring Support Parties in a redacted form that removes the details of such Consenting Creditors' holdings of the Loans and (ii) Weil, the Consenting Creditor Counsel, and the Consenting Sponsor Counsel in an unredacted form (to be held by Weil, the Consenting Creditor Counsel, and the Consenting Sponsor Counsel on a professionals' eyes only-basis) and by the Company.   For the avoidance of doubt, as provided in Section 2(d) of this Agreement, this Agreement shall not be effective as to any Second Lien Lender that executes a signature page to this Agreement unless (x) such Second Lien Lender is also a First Lien Lender or (y) counterpart signature pages to this Agreement shall have been executed and delivered by Second Lien Lenders holding at least 66.67% in aggregate principal amount outstanding of Second Lien Loans.

13.　　**GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.**

(a)　　This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York, without giving effect to the conflict of laws principles thereof.

(b)　　Each of the Parties irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to this Agreement brought by any Party shall be brought and determined in any federal or state court in the Borough of Manhattan in the City of New York ("**NY Courts**") and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring.

31

Each of the Parties agrees not to commence any proceeding relating to this Agreement or the Restructuring except in the NY Courts, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree, or award rendered by any NY Courts. Each of the Parties further agrees that notice as provided in Section 21 shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring, (i) any claim that it is not personally subject to the jurisdiction of the NY Courts for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment, or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper, or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts. Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this Section 13(b) shall be brought in the Bankruptcy Court.

(c)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE RESTRUCTURING CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

14.    **Specific Performance/Remedies.**

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder. Each Party also agrees that it will not seek, and will waive any requirement for, the securing or posting of a bond in connection with any Party seeking or obtaining such relief. Notwithstanding anything to the contrary in this Agreement, none of the Parties will be liable for, and none of the Parties shall claim or seek to recover, any punitive, special, indirect or consequential damages or damages for lost profits.

15.    **Survival.**

Notwithstanding the termination of this Agreement pursuant to Section 7 hereof, the agreements and obligations of the Parties in this Section 15 and Sections 3(g), 7(f), 7(g), 10,

32

13, 14, 15, 17, 18, 19, 20, 21, 22, and 23 hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

16.    **Headings.**

The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

17.    **Successors and Assigns; Severability; Several Obligations.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this Section 17 shall be deemed to permit Transfers of the Loans or Claims arising under the Loans other than in accordance with the express terms of this Agreement. If any provision of this Agreement, or the application of any such provision to any Person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible. The agreements, representations, and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

18.    **No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties hereto and no other Person shall be a third-party beneficiary hereof.

19.    **Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto (including the Plan), constitutes the entire agreement of the Parties and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Restructuring Support Party shall continue in full force and effect.

20.    **Counterparts.**

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement and executed counterpart signature pages hereto

33

may be delivered by electronic mail, or otherwise, which shall be deemed to be an original for the purposes of this Agreement.

21.    **Notices.**

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier, or by registered or certified mail (return receipt requested) to the following addresses:

(a)    If to the Company, to:

RentPath, LLC
950 East Paces Ferry Road NE, Suite 2600
Atlanta, GA 30326
Attention:    Marlon F. Starr
(mstarr@rentpath.com)

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:    Ray C. Schrock, P.C.
(Ray.Schrock@weil.com)
David N. Griffiths
(David.Griffiths@weil.com)
Andriana Georgallas
(Andriana.Georgallas@weil.com)

(b)    If to a Consenting First Lien Creditor, or a transferee thereof, to the addresses set forth below the Consenting First Lien Creditor's signature (or as directed by any transferee thereof), as the case may be, with copies to:

Milbank LLP
55 Hudson Yards
New York, NY 1001
Attention:    Evan R. Fleck
(efleck@milbank.com)
Nelly Almeida
(nalmeida@milbank.com)

(c)    If to the Consenting Second Lien Creditors, to the addresses set forth below the Consenting Second Lien Creditor's signature, with copies to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
Bank of America Tower

New York, NY 10036
Attention:  Philip C. Dublin
              (pdublin@akingump.com)
              Rachel Biblo Block
              (rbibloblock@akingump.com)

(d)      If to the Consenting Sponsors, to the addresses set forth below the Consenting Sponsor's signature, with copies to:

Vinson & Elkins LLP
666 Fifth Avenue, 26th Floor
New York, NY 10103
Attention:    David S. Meyer
              (dmeyer@velaw.com)

Any notice given by delivery, mail, or courier shall be effective when received. Any notice given by electronic mail shall be effective upon oral, machine, or electronic mail (as applicable) confirmation of transmission.

## 22.    <u>No Solicitation; Representation by Counsel; Adequate Information.</u>

(a)      This Agreement is not and shall not be deemed to be a solicitation of votes in favor of the Plan.  The votes of the Consenting Creditors with respect to the Plan will not be solicited until each Consenting Creditor has received the Disclosure Statement approved by the Bankruptcy Court and related ballots and solicitation materials.  In addition, this Agreement does not constitute an offer to issue or sell securities to any Person or the solicitation of an offer to acquire or buy securities in any jurisdiction where such offer or solicitation would be unlawful.

(b)      Each Restructuring Support Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

(c)      Each Restructuring Support Party acknowledges, agrees, and represents to the other Parties that it (i) is a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act, (ii) is an "accredited investor" as such term is defined in Rule 501 of Regulation D of the Securities Act, (iii) understands that if it is to acquire any securities, as defined in the Securities Act, pursuant to the Restructuring, such securities have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Restructuring Support Party's, as applicable, representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available, and (iv) has such knowledge and experience in financial and business matters that such Restructuring Support Party, as applicable, is capable of evaluating the merits and risks of the securities to be acquired by it (if

any) pursuant to the Restructuring and understands and is able to bear any economic risks with such investment.

23.    **Reimbursement of Fees and Expenses.**

The Company shall pay and reimburse promptly (a) all the reasonable and documented fees and expenses, to the extent invoiced and subject to and in accordance with the terms of any applicable engagement letter or fee letter, as the case may be, and any applicable law or orders of the Bankruptcy Court, of (1) Consenting First Lien Creditor Counsel; (2) Morris, Nichols, Arsht & Tunnel LLP, as local counsel to the First Lien Ad Hoc Committee; (3) Houlihan Lokey Capital, Inc., as financial advisor to the First Lien Ad Hoc Committee; and (4) Consenting Second Lien Creditors Counsel not to exceed $100,000 in the aggregate (the "**Second Lien Cap**"), provided, that the Requisite Consenting Second Lien Creditors reserve the right to request an increase to the Second Lien Cap in the event that there are unforeseen circumstances that would lead to a protracted litigation process; (5) Consenting Sponsor Counsel not to exceed $100,000 in the aggregate; and (b) any reasonable and documented out-of-pocket expenses incurred from time to time by any of the  member of the First Lien Ad Hoc Committee relating to the Restructuring, subject to an aggregate cap (among all members of the First Lien Ad Hoc Committee) not to exceed $200,000 (the fees and expenses set forth in the preceding clauses (a) and (b), collectively, the "**Restructuring Expenses**"); provided, that all Restructuring Expenses invoices received and outstanding as of two (2) business days prior to the Petition Date (which may include an estimate of Restructuring Expenses through the Petition Date) shall be paid in full on such date unless the applicable professional and the Company have agreed otherwise; provided, further, that to the extent that the Company terminates this Agreement under Section 7(c), the Company's reimbursement obligations under this Section 23 shall survive with respect to any and all Restructuring Expenses incurred on or prior to the date of termination.

24.    **Regulatory Efforts.**

(a)    The obligations of the Company and the Consenting First Lien Creditors (as Sellers and Buyer, respectively, each, as defined in the Credit Bid) with respect to any Antitrust Authority, Governmental Unit, and Antitrust Laws in connection with the pursuit or consummation of the Credit Bid shall be governed by Section 5.05(a) – (e) of the Credit Bid.

(b)    The obligations of the Company and the Consenting First Lien Creditors with respect to any Antitrust Authority, Governmental Unit, and Antitrust Laws in connection with the pursuit or consummation of any bid designated by the Company as a Qualified Bid other than the Credit Bid shall be governed by this Section 24(b).

i.    Subject to the terms and conditions set forth in this Agreement, the Company and the Consenting First Lien Creditors, as applicable, shall use reasonable best efforts to take promptly, or cause to be taken, all actions, and to do promptly, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary under applicable law to consummate and make effective any Qualified Bid that is selected as the Successful Bid and any other transactions contemplated by this Agreement, including (A) the obtaining of all necessary actions or nonactions, waivers, consents, clearances, approvals, and expirations or

36

terminations of waiting periods from Governmental Units and the making of all necessary registrations and filings and the taking of all steps as may be necessary to obtain an approval, clearance or waiver from, or to avoid an action or proceeding by, any Governmental Unit; (B) the obtaining of all consents, approvals or waivers from third parties required to be obtained in connection with such transactions; (C) the defending of any lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or the consummation of any such transactions; and (D) the execution and delivery of any additional instruments necessary to consummate the transactions contemplated by this Agreement (any of the actions or documents referenced in (A) to (D) of this clause (i) and described in clause (ii) immediately below, the "**Regulatory Documents and Actions**").

ii.      Subject to the terms and conditions herein provided and without limiting the foregoing, the Company and the Consenting First Lien Creditors, as applicable, shall (A) promptly, but in no event later than ten (10) business days after designation by the Company of a bid as a Qualified Bid pursuant to the notice provisions in the Bidding Procedures Order, file any and all required notification and report forms under the HSR Act, and file as promptly as practicable any other filings and/or notifications under other applicable Antitrust Laws, with respect to such Qualified Bid, and use reasonable best efforts to cause the expiration or termination of any applicable waiting periods under the HSR Act or any other Antitrust Law with respect to such Qualified Bid; (B) consult with each other (which, in the case of the Consenting First Lien Creditors, shall be the Requisite Consenting First Lien Creditors) (which may be through counsel) in (x) determining whether any filings are required to be made with, or consents, permits, authorizations, waivers, clearances, approvals, or expirations or terminations of waiting periods are required to be obtained from, any third parties or other Governmental Units in connection with a Qualified Bid and (y) making all such filings and obtaining all such consents, permits, authorizations or approvals; (C) supply to any Governmental Unit as promptly as practicable any additional information or documents that may be requested by such Governmental Unit in connection with a Qualified Bid; and (D) use reasonable best efforts to take, or cause to be taken, all other actions and do, or cause to be done, all other things necessary, proper or advisable to consummate and make effective the transactions contemplated by the Qualified Bid, including taking all such further reasonable action as may be necessary to resolve such objections, if any, as any Antitrust Authority may assert under any Antitrust Law with respect to such Qualified Bid so as to enable the Effective Date to occur as soon as reasonably practicable (and in any event no later than the Outside Date, as the same may be extended by the Parties in accordance with Section 2(e)(ix) of this Agreement). The Company shall obtain the consent of the Requisite Consenting First Lien Creditors (which may be through counsel and may not be unreasonably withheld) prior to agreeing to stay, toll or extend any applicable waiting period under any Antitrust Law, or withdrawing or refiling any filing under the HSR Act or any other Antitrust Law with respect to a Qualified Bid.  Notwithstanding anything contained herein to the contrary, the Consenting First Lien Creditors shall not be responsible for the

WEIL:\97376996\1\69518.0004

payment of any fees, expenses or other amounts associated with any of the actions contemplated by this Section 24(b)(ii).

iii.        Subject to applicable law, the terms of any existing or future confidentiality agreements that the Company is subject to, any orders of the Bankruptcy Court, and the instructions of any Governmental Unit, (A) each Company Entity and the Consenting First Lien Creditors shall use reasonable best efforts to cooperate with the other Party in connection with the making of all registrations, filings, notifications, communications, submissions, and any other material actions required pursuant to this Section 24, and apprising the other Party of the status of matters relating to the completion of the transactions contemplated by a Qualified Bid, including, as soon as reasonably practicable, furnishing the Requisite Consenting First Lien Creditors (which may be through counsel) with copies of notices or other material communications to a Governmental Unit from the Company, or to a Governmental Unit and received by the Company from the Qualified Bidder, any third party and/or any Governmental Unit with respect to such transactions and (B) the Company and the Consenting First Lien Creditors shall provide the other Party with a reasonable opportunity to consult on any material proposed notifications or filings and any material written communications or submissions to any Governmental Unit in connection with the transactions contemplated by a Qualified Bid.  The Company shall use reasonable best efforts to include the Consenting Creditors as a party to any future confidentiality agreement or other agreement with any Potential Bidder (as defined in the Bidding Procedures Order) as may be necessary for the Company to share materials as required pursuant to this Agreement with the Consenting Creditors.

iv.        Nothing contained in this Section 24(b) shall require the Company to dispose of, divest, hold separate, or license any portion of the assets or intellectual property of the Company.

[*Signature Pages Follow*]

38

# **EXHIBIT A**

## **RESTRUCTURING TERM SHEET**

**EXECUTION VERSION**

### RENTPATH HOLDINGS, INC.

---

**Restructuring Term Sheet**
**February 11, 2020**

---

This term sheet (including all exhibits and schedules hereto, as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, the "**Restructuring Term Sheet**") sets forth the principal terms of a proposed financial restructuring of RentPath Holdings, Inc. ("**Holdings**") and its subsidiaries identified below (collectively, the "**Company**" or the "**Debtors**" and, each, a "**Debtor**") to be effectuated by the Company commencing voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") to pursue a sale of the Company pursuant to a chapter 11 plan of reorganization (the "**Plan**") in a manner consistent with the Implementation Steps (as defined below) or such other transaction acceptable to the Company and the Requisite Consenting First Lien Creditors (the "**Restructuring**").

This is the Restructuring Term Sheet referred to in, and appended to, the Restructuring Support Agreement dated as of February 11, 2020, by and among the Company and the other parties signatory thereto (as amended, supplemented, or otherwise modified from time to time in accordance with the terms therein, the "**RSA**"). Capitalized terms used but not otherwise defined herein will have the meanings ascribed to such terms in **Annex 1** attached hereto or, if not defined therein, in the RSA.

THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL ONLY BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS. THIS RESTRUCTURING TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL RESTRUCTURING AND ENTRY INTO OR THE CREATION OF ANY BINDING AGREEMENT IS SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS RESTRUCTURING TERM SHEET.

THIS RESTRUCTURING TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES. THIS RESTRUCTURING TERM SHEET AND THE INFORMATION CONTAINED HEREIN IS STRICTLY CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY OTHER PARTY ABSENT THE PRIOR WRITTEN CONSENT OF THE COMPANY, EXCEPT AS REQUIRED BY LAW, OR AS PERMITTED UNDER AN EXISTING CONFIDENTIALITY AGREEMENT WITH THE COMPANY.

UNLESS OTHERWISE SET FORTH HEREIN, TO THE EXTENT THAT ANY PROVISION OF THIS RESTRUCTURING TERM SHEET IS INCONSISTENT WITH THE RSA, THE TERMS OF THE RESTRUCTURING TERM SHEET WITH RESPECT TO SUCH PROVISION SHALL CONTROL.

| Overview | |
|---|---|
| **Company / Debtors** | Holdings; RentPath, LLC; Viva Group, LLC; Viva Group Brokerage, Inc.; Live Response Solutions Holdings, LLC; Live Response Solutions, LLC; Discover Home Network, LLC; Easy Media, LLC; Consumer |

| | |
|---|---|
| | Source Holdings LLC, Electronic Lead Management, Inc.; Electronic Lead Management MA, Inc.; and Electronic Lead Management VA, Inc. |
| **Restructuring Overview** | |
| **Claims to be Restructured:** | First Lien Claims:  Claims in the aggregate principal amount of not less than approximately $517.70 million consisting of (i) approximately $479.75 million in aggregate outstanding principal amount of term loans, (ii) approximately $37.95 million in aggregate outstanding principal amount of revolving loans (including, approximately $600,000 in aggregate outstanding face amount of letters of credit issued), in each case, issued under that certain First Lien Credit Agreement, dated as of December 17, 2014, by and among Holdings, RentPath, LLC, as borrower, Royal Bank of Canada, as administrative agent and collateral agent (the "**First Lien Agent**"), and the lenders party thereto (the "**First Lien Lenders**") (as amended, restated, modified, or supplemented from time to time, the "**First Lien Credit Agreement**"), plus interest, fees, expenses and other amounts arising and payable under and in accordance with the First Lien Credit Agreement, solely to the extent permitted by the Bankruptcy Code (the "**First Lien Claims**").[1] |
| | Second Lien Claims:   Claims in the aggregate principal amount of approximately $170.0 million in term loans issued under that certain Second Lien Credit Agreement, dated as of December 17, 2014, by and among Holdings, RentPath, LLC, as borrower, Wilmington Savings Fund Society, FSB, as successor administrative agent and collateral agent, and the lenders party thereto (the "**Second Lien Lenders**") (as amended, restated, modified, or supplemented from time to time, the "**Second Lien Credit Agreement**"), plus interest, fees, expenses, and other amounts arising and payable under and in accordance with the Second Lien Credit Agreement, solely to the extent permitted by the Bankruptcy Code (the "**Second Lien Claims**"). |
| | General Unsecured Claims:  Consisting of any Claim against the Debtors (other than any Intercompany Claims and Section 510(b) Claims) as of the Petition Date that is neither secured by collateral nor entitled to priority under the Bankruptcy Code or any final order of the Bankruptcy Court (collectively, the "**General Unsecured Claims**"). |
| **Sale and Marketing Process** | Chapter 11 Cases:  Each Company entity shall commence the Chapter 11 Cases in the Bankruptcy Court no later than four (4) days after the Support Effective Date (as defined in the RSA) (the date of such filing, the "**Petition Date**") to pursue implementation of the Restructuring. |

---

[1] For the avoidance of doubt, as used herein, "**First Lien Claims**" shall include any Claims arising pursuant to that certain 2002 ISDA Master Agreement, dated as of April 4, 2017, between Royal Bank of Canada and RentPath, LLC, and any schedules thereto, and that certain 2002 ISDA Master Agreement, dated as of April 10, 2017, between Nomura Global Financial Products, Inc. and RentPath LLC, and any schedules thereto.

2

Sale Transaction:  The Plan will provide for the sale of all or substantially all of the assets of the Company (or equity interests owning all or substantially all of the assets of the Company) (the "**Sale Transaction**") pursuant to a purchase agreement (such agreement, the "**Purchase Agreement**") free and clear of all liens, Claims, and other encumbrances and other interests other than certain assumed liabilities and permitted encumbrances set forth in the Purchase Agreement.

Credit Bid:  As a condition to effectiveness of the RSA, RP Lender Acquisition Corp., a special purpose vehicle formed by the First Lien Agent ("**RentPath NewCo**"), acting at the direction of Consenting Creditors holding no less than 50.1% in principal amount of First Lien Claims, shall deliver an executed copy of the form of purchase agreement annexed to the RSA as **Exhibit B** (the "**Credit Bid**") to the Company and satisfy all conditions precedent to effectiveness of the Credit Bid required of the Buyer (as defined in the Credit Bid) (including delivery of the Direction Letter (as defined in the Credit Bid) to the Company).  The Credit Bid shall provide for the sale of substantially all of the assets of the Company (or equity interests owning all or substantially all of the assets of the Company) to the Buyer (as defined in the Credit Bid) or one or more designees of the Buyer (as defined in the Credit Bid) as ultimately set forth in the Implementation Steps, in satisfaction of all or a portion of the First Lien Claims.  Delivery of the executed Credit Bid to the Company pursuant to the terms of the RSA shall constitute a binding and irrevocable offer to acquire the property specified in the Credit Bid, which offer shall remain open until the closing of the sale with the Successful Bidder (as defined below) or such earlier date as set forth in accordance with the Bidding Procedures Order.  The Consenting First Lien Creditors will not withdraw, revoke, modify, or amend the Credit Bid except as provided under the Bidding Procedures Order.  Upon entry of the Bidding Procedures Order, the Credit Bid will be deemed a Qualified Bid and be subject to the terms and conditions of the Bidding Procedures Order.

If the Company does not receive additional binding bids to purchase the Company within a reasonable time prior to the commencement of the Chapter 11 Cases, the Credit Bid shall be designated as the "stalking horse" under the Bidding Procedures Order.  If the Company receives additional binding bids to purchase the Company within a reasonable time prior to the commencement of the Chapter 11 Cases and the Company determines, in its business judgment, that one of such alternative bids is a higher or otherwise better bid than the Credit Bid, the Company may designate such alternative bid as the "stalking horse" under the Bidding Procedures Order and the Credit Bid will be deemed a Back-Up Bid (which for the avoidance of doubt, may be one of multiple Back-Up Bids), in accordance with the terms of the Bidding Procedures Order.

Marketing Process:  Following the Petition Date, the Company will continue its prepetition marketing process and will conduct an auction in which the bid designated as the "stalking horse" under the Bidding Procedures Order will be subject to an overbid process in accordance with

3

| | |
|---|---|
| | the Bidding Procedures Order (the highest or otherwise best bid pursuant to the Bidding Procedures Order, the "**Successful Bid**"; the purchaser thereunder, the "**Successful Bidder**"). |
| | <u>Approval of the Sale Transaction</u>:  The special committee of the Board of Directors (the "**Special Committee**") will have the exclusive right to exercise the Company's authority to oversee and direct the sale process relating to any potential Sale Transaction. Any references to acts to be performed or determinations to be made by the Company with respect to any Sale Transaction will be deemed to refer to the acts to be performed or determinations to be made by the Special Committee. |
| **Backstop Commitment** | Prior to the Petition Date, the Company and certain of the Consenting Creditors shall execute a backstop commitment agreement on terms consistent with this Restructuring Term Sheet (the "**Backstop Commitment Agreement**" and the Consenting Creditors party thereto, the "**Backstop Parties**"), pursuant to which the Backstop Parties will backstop participation in the DIP Facility and New Money Exit Term Loan B (each as defined herein) on the terms and conditions set forth in the term sheet annexed as <u>**Exhibit C**</u> to the RSA (the "**DIP Term Sheet**") and the term sheet annexed as Annex 3 to the DIP Term Sheet (the "**Exit Term Loan Facility Term Sheet**"). |
| **DIP Facility** | The Debtors shall seek authority promptly upon commencement of the Chapter 11 Cases to obtain debtor-in-possession financing in the aggregate principal amount and on the terms and conditions set forth in the DIP Term Sheet (the "**DIP Facility**"). |
| **Exit Term Loan Facility** | If the Sale Transaction is consummated pursuant to the Credit Bid, including a Plan that implements the Credit Bid, the Company shall seek approval of the exit term loan facility comprised of the Exit Term Loan A and the New Money Exit Term Loan B (collectively, the "**Exit Term Loan Facility**") on the terms and conditions set forth in the Exit Term Loan Facility Term Sheet. |
| **Wind Down of the Company** | If the Sale Transaction is consummated pursuant to a Third-Party Bid, all Claims that are not assumed in connection with the Successful Bid and are required to be paid in cash under the Plan shall be satisfied first with cash on hand of the Debtors or Wind Down Co, as applicable, and, if cash on hand is insufficient, the Sale Transaction Proceeds, in accordance with the terms of the Plan. |
| | If the Sale Transaction is consummated pursuant to the Credit Bid, including a Plan that implements the Credit Bid, whereby acquired assets and assumed liabilities thereunder are transferred to RentPath NewCo or another entity designated by RentPath NewCo as set forth in the Implementation Steps (rather than the distribution of equity in Reorganized Holdings), all Claims that are not assumed in connection with such transaction and are required to be paid in cash under the Plan shall be satisfied first with cash on hand of the Debtors or Wind Down Co, as applicable, and, if cash on hand is insufficient, with the proceeds |

4

|  | from the New Money Exit Term Loan B, in accordance with the terms of the Plan.  For the avoidance of doubt, RentPath NewCo will manage and fund the prompt wind down of the Debtors' estates in accordance with the Plan. |
|---|---|
|  | If the Sale Transaction is consummated pursuant to the Credit Bid which would result in the distribution of equity in Reorganized Holdings to holders of Claims pursuant to the Plan (rather than the transfer of the acquired assets and assumed liabilities thereunder to RentPath NewCo (or other entity) and the distribution of equity in RentPath NewCo (or other entity) to holders of allowed First Lien Claims), all Claims required to be paid in cash under the Plan shall be satisfied by the Debtors or reorganized Debtors, as applicable, and, if cash on hand is insufficient, with the proceeds from the New Money Exit Term Loan B, in accordance with the terms of the Plan. |
| **Treatment of Claims** | |
| **DIP Claims** | On the Effective Date, in full and final satisfaction and settlement and in exchange of such claims, the claims under the DIP Facility shall be (i) if the Sale Transaction is consummated pursuant to a Third-Party Bid, paid in full in cash in accordance with the DIP Term Sheet, or (ii) in the event the Sale Transaction is consummated pursuant to the Credit Bid, converted into the Exit Term Loan A in accordance with the Exit Term Loan Facility Term Sheet. |
| **Administrative, Priority Tax, and Priority Non-Tax Claims** | The Plan shall provide that on or as soon as practicable after the Effective Date, allowed administrative Claims, priority tax Claims, and priority non-tax Claims shall be paid in full in cash or receive such other treatment that renders such claims unimpaired under the Bankruptcy Code. |
| **Other Secured Claims**<br><br>Unimpaired, Presumed to Accept | Except to the extent that a holder of an allowed Other Secured Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such allowed Other Secured Claim, at the option of the Debtors, reorganized Debtors, or Wind Down Co, as applicable, with the reasonable consent of the Requisite Consenting First Lien Creditors:  (i) such holder shall receive cash in an amount equal to the allowed amount of such Claim on the later of the Effective Date and the date that is ten (10) business days after the date such Other Secured Claim becomes an allowed Claim; (ii) such holder's allowed Other Secured Claim shall be reinstated; (iii) such holder shall receive such other treatment sufficient to render such holder's allowed Other Secured Claim unimpaired; or (iv) such holder shall receive delivery of the applicable collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code in satisfaction of the allowed amount of such Other Secured Claim. |

5

| | |
|---|---|
| **First Lien Claims**<br><br>Impaired, Entitled to Vote | On the Effective Date or as soon as practicable thereafter, except to the extent that a holder of an allowed First Lien Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such allowed First Lien Claim:<br><br>  a.  **If the Sale Transaction is consummated pursuant to a Third-Party Bid**, each such holder shall receive its pro rata share of (i) the Sale Proceeds Distributable Consideration until all allowed First Lien Claims are satisfied in full in cash, subject to the Second Lien Sale Distribution Recovery (as defined below) solely to the extent the Second Lien Condition is Satisfied (such recovery, the "**First Lien Sale Distribution Recovery**" and, such amount divided by the total Sale Proceeds Distributable Consideration, the "**First Lien Proportion**"), plus (ii) following release of the Holdback Amount (in accordance with the Stalking Horse APA), if any, the First Lien Proportion multiplied by the funds remaining on account of the Holdback Amount as of the date of such release.<br><br>  b.  **If the Sale Transaction is consummated pursuant to the Credit Bid**, each such holder shall (i) receive its pro rata share of sixty percent (60%) of the New Equity Interests (subject to dilution by shares issued or issuable pursuant to the Management Incentive Plan); (ii) receive its pro rata share of the cash proceeds of any of the Debtors' assets that are not acquired pursuant to the Credit Bid and that constitute collateral of the First Lien Claims pursuant to the First Lien Loan Documents; and (iii) be entitled to participate in the New Money Exit Term Loan B on the terms and conditions set forth in this Restructuring Term Sheet and the Exit Term Loan Facility Term Sheet.  Lenders under the New Money Exit Term Loan B shall be entitled to a pro rata share of forty percent (40%) of New Equity Interests (subject to dilution by shares issued or issuable pursuant to the Management Incentive Plan) in accordance with the terms and conditions set forth in the Exit Term Loan Facility Term Sheet. |
| **Second Lien Claims**<br><br>Impaired, Entitled to Vote | On the Effective Date or as soon as practicable thereafter, except to the extent that a holder of an allowed Second Lien Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such allowed Second Lien Claim:<br><br>  a.  If the Second Lien Condition[2] is satisfied |

---

[2]  "**Second Lien Condition**" means the satisfaction of each of the following: (i) holders of 66.67% in principal amount of Second Lien Claims shall have executed counterpart signature pages to the RSA prior to the Petition Date and (ii) the class of Second Lien Claims shall have voted to accept the Plan.

6

i. **If the Sale Transaction is consummated pursuant to a Third-Party Bid**, each holder of an allowed Second Lien Claim against the Debtors shall receive (i) its pro rata distribution from a pool of cash equal to $10 million in the aggregate to be funded from Sale Proceeds Distributable Consideration, plus

- with respect to Sale Proceeds Distributable Consideration greater than $460 million and less than or equal to $470 million, each holder of an allowed Second Lien Claim against the Debtors shall receive its pro rata share of 75% of such incremental Sale Proceeds Distributable Consideration and each holder of an allowed First Lien Claim against the Debtors shall receive its pro rata share of 25% of such incremental Sale Proceeds Distributable Consideration, plus

- with respect to Sale Proceeds Distributable Consideration greater than $470 million and less than or equal to $485 million, each holder of an allowed Second Lien Claim against the Debtors shall receive its pro rata share of 50% of such incremental Sale Proceeds Distributable Consideration and each holder of an allowed First Lien Claim against the Debtors shall receive its pro rata share of 50% of such incremental Sale Proceeds Distributable Consideration, plus

- with respect to Sale Proceeds Distributable Consideration greater than $485 million and less than or equal to $520 million, each holder of an allowed Second Lien Claim against the Debtors shall receive its pro rata share of 33.3% of such incremental Sale Proceeds Distributable Consideration and each holder of an allowed First Lien Claim against the Debtors shall receive its pro rata share of 66.7% of such incremental Sale Proceeds Distributable Consideration, plus

- with respect to Sale Proceeds Distributable Consideration greater than $520 million, each holder of an allowed Second Lien Claim against the Debtors shall receive its pro rata share of 25% of such incremental Sale Proceeds Distributable Consideration and each holder of an allowed First Lien Claim against the Debtors shall receive its pro rata share of 75% of such incremental Sale Proceeds Distributable Consideration.

(the foregoing, the "**Second Lien Sale Distribution Recovery**" and, such amount divided by the Sale Proceeds Distributable Consideration, the "**Second Lien Proportion**")); plus (ii) following release of the Holdback Amount (in accordance with the Stalking Horse APA), if any, its pro rata

7

<table>
<tr>
<td></td>
<td>

distribution of the Second Lien Proportion multiplied by the funds remaining on account of the Holdback Amount as of the date of such release.

    ii.   **If the Sale Transaction is consummated pursuant to the Credit Bid**, each such holder shall be entitled to participate in the New Money Exit Term Loan B on the terms and conditions set forth in this Restructuring Term Sheet and the Exit Term Loan Facility Term Sheet.

b.  If the Second Lien Condition is not satisfied:

    i.   **If the Sale Transaction is consummated pursuant to a Third-Party Bid,** each such holder shall receive its pro rata share of the Sale Proceeds Distributable Consideration, after all allowed First Lien Claims have been paid in full in cash, solely on account of allowed secured Second Lien Claims, if any.

    ii.   **If the Sale Transaction is consummated pursuant to the Credit Bid**, each such holder shall not receive or retain any distribution.

</td>
</tr>
<tr>
<td>

**General Unsecured Claims**

(Unimpaired, Presumed to Accept / Impaired, Deemed to Reject)

</td>
<td>

Except to the extent that a holder of an allowed General Unsecured Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such allowed General Unsecured Claim:

a.  **If the Second Lien Condition is satisfied**, each such holder shall (i) be paid in full in accordance with the terms and conditions of the particular transaction giving rise to such allowed General Unsecured Claim; or (ii) receive such other treatment so as to render such holder's allowed General Unsecured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code; *provided*, that, for the avoidance of doubt, if the Second Lien Condition is satisfied, General Unsecured Claims shall not include any Second Lien Deficiency Claims.

b.  **If the Second Lien Condition is not satisfied**:

    a.  **If the Sale Transaction is consummated pursuant to a Third-Party Bid**, each such holder shall receive its pro rata share of the Sale Proceeds Distributable Consideration after all allowed First Lien Claims and all allowed Second Lien Claims that are secured claims, if any, have been paid in full in cash.

    b.  **If the Sale Transaction is consummated pursuant to the Credit Bid**, each such holder shall not receive or retain any distribution.

</td>
</tr>
</table>

8

| | |
|---|---|
| **Intercompany Claims**<br><br>Impaired and Deemed to Reject / Unimpaired and Presumed to Accept | On or after the Effective Date:<br><br>a. **If the Sale Transaction is consummated pursuant to a Third-Party Bid**, all Intercompany Claims shall be adjusted, continued, settled, reinstated, discharged, or eliminated as determined by the Debtors or Wind Down Co, as applicable, in their respective reasonable discretion.<br><br>b. **If the Sale Transaction is consummated pursuant to the Credit Bid**, holders of Intercompany Claims shall be, at the option of the Debtors or Wind Down Co, as applicable, with the consent of the Requisite Consenting First Lien Lenders (such consent not to be unreasonably withheld), adjusted, reinstated, or compromised such that Intercompany Claims are treated in a tax-efficient manner to the extent reasonably practicable. |
| **Section 510(b) Claims**<br><br>Impaired, Deemed to Reject | Section 510(b) Claims will be canceled, released, discharged, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Section 510(b) Claims will not receive any distribution on account of such Claims. |
| **Intercompany Interests**<br><br>Impaired and Deemed to Reject / Unimpaired and Presumed to Accept | On or after the Effective Date:<br><br>a. **If the Sale Transaction is consummated pursuant to a Third-Party Bid**, all Intercompany Interests shall be cancelled, reinstated, or receive such other treatment as determined by the Debtors or Wind Down Co, as applicable.<br><br>b. **If the Sale Transaction is consummated pursuant to the Credit Bid**, holders of Intercompany Interests shall be, at the option of the Debtors or Wind Down Co, as applicable, with the consent of the Requisite Consenting First Lien Creditors (such consent not to be unreasonably withheld), reinstated, compromised, or cancelled such that Intercompany Interests are treated in a tax-efficient manner to the extent reasonably practicable. |
| **Parent Equity Interests**<br><br>Impaired, Deemed to Reject | On the Effective Date, holders of Parent Equity Interests shall be deemed cancelled and extinguished and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distributions under the Plan for holders of Parent Equity Interests on account of such Interests. |
| **Certain Other Material Provisions** | |
| **Certain Consent Rights** | Any and all consent rights of the Debtors, the Consenting Creditors, and the Consenting Sponsors as set forth in Section 2(b) of the RSA shall be incorporated herein by this reference and fully enforceable as if stated in full herein. |

9

| Employee Matters | If the Sale Transaction is consummated pursuant to the Credit Bid, all Assumed Employee Benefit Plans (as defined in the Credit Bid) shall be deemed assumed by the reorganized Debtors or assumed and assigned to RentPath NewCo (but not Wind Down Co) and continued and paid in the ordinary course consistent with the terms thereof.<br><br>If the Sale Transaction is consummated pursuant to the Credit Bid, notwithstanding anything herein to the contrary, on and after the date hereof and prior to the Effective Date, the Special Committee may modify or amend the applicable performance goals under the Company's Executive Incentive Compensation Plan for the calendar year 2020, payable in 2021 (the "**2020 EICP**"). The reorganized Debtors or RentPath NewCo shall assume or assume and assign, as applicable, all obligations thereunder; provided, that any payouts thereunder shall be subject to the discretion of the New Board.<br><br>Regardless of whether the Sale Transaction is consummated pursuant to a Third-Party Bid or Credit Bid, the post-Effective Date obligations due and owing under the Key Employee Retention Agreements shall be paid in accordance with the terms thereof, subject in all respects to the covenants and related termination rights set forth in the RSA.<br><br>For the avoidance of doubt, any provision relating to, or arrangement providing for, equity-based awards, including without limitation, any termination-related provisions with respect to equity-based awards, shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise. |
| Management Incentive Plan | The Plan shall provide that, if the Sale Transaction is consummated pursuant to the Credit Bid, a post-emergence management incentive plan (the "**Management Incentive Plan**") shall be implemented in accordance with the terms and conditions set forth in the Management Incentive Plan Term Sheet annexed to the RSA as **Exhibit E**. |
| Governance | If the Sale Transaction is consummated pursuant to the Credit Bid, the post-effective date new board of directors of Reorganized Holdings or RentPath NewCo, as applicable (the "**New Board**") shall consist of 5 directors, which shall be comprised of:<br><br>a. The Chief Executive Officer and President who shall be Marc Lefar on the Effective Date; and<br><br>b. The remaining directors shall be selected by the Requisite Consenting First Lien Creditors.<br><br>The organizational documents of RentPath NewCo or Reorganized Holdings, as applicable, and its subsidiaries (including any bylaws, certificates of incorporation or formation, charters, limited liability company agreements, other organizational or formation documents) shall be consistent with the RSA and otherwise in form and substance reasonably acceptable to the Requisite Consenting First Lien Creditors. |

WEIL:\97376998\1\69518.0004

| | |
|---|---|
| **Survival of Indemnification Obligations and D&O Liability Insurance Policies** | <u>Indemnification Obligations</u><br><br>Each of the Debtors' indemnification obligations (whether in charters, bylaws, limited liability company agreements, or other organizational documents) in place as of the Effective Date to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, agents, or employees based upon any act or omission for or on behalf of the Debtors (collectively, the "**Indemnification Obligations**") shall not be discharged, impaired, or otherwise affected by the Plan; <u>provided</u> <u>that</u> the Debtors shall not indemnify officers, directors, agents, or employees of the Debtors for any claims or causes of action for which indemnification is barred under applicable law, the Company's organizational documents, or applicable agreements governing the Company's indemnification obligations.<br><br>The Indemnification Obligations shall be deemed executory contracts assumed or assumed and assigned by the Debtors, reorganized Debtors, or Wind Down Co, as applicable, under the Plan unless such obligation (i) is specifically designated for assignment to the purchaser pursuant to the Sale Transaction on the assumption schedule filed with the Plan Supplement, (ii) was rejected by the Debtors pursuant to a Bankruptcy Court order, or (iii) is the subject of a motion to reject pending on the date of the confirmation hearing.<br><br><u>D&O Liability Insurance Policies</u><br><br>Each insurance policy, including director and officer liability insurance policies (collectively, the "**D&O Liability Insurance Policies**"), to which the Debtors are a party as of the Effective Date, shall be deemed an executory contract and shall be assumed or assumed and assigned by the Debtors, reorganized Debtors, or Wind Down Co, as applicable, on behalf of the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such insurance policy (i) is specifically designated for assignment to the purchaser pursuant to the Sale Transaction on the assumption schedule filed with the Plan Supplement,  (ii) was rejected by the Debtors pursuant to a Bankruptcy Court order, or (iii) is the subject of a motion to reject pending on the date of the confirmation hearing.  For the avoidance of doubt, coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in the D&O Liability Insurance Policies.  In addition, after the Effective Date, all officers, directors, agents, or employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Liability Insurance Policies (including any "tail" policy) in effect or purchased as of the Effective Date for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in the D&O Liability Insurance Policies; <u>provided</u>, <u>however</u>, Buyer (as defined in the Credit |

11

|  | Bid) shall not be obligated to extend or renew such D&O Liability Insurance Policies upon the expiration of the term of such D&O Liability Insurance Policies in accordance with the terms provided therein. |
|---|---|
| **Fiduciary Obligations** | Notwithstanding anything to the contrary herein, nothing herein requires the Company or any of its directors, members, or officers, each in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with its or their fiduciary obligations under applicable law. |

<table>
<tr><td colspan="2" align="center"><b>General Provisions</b></td></tr>
<tr>
<td><b>Conditions Precedent to Effective Date</b></td>
<td>

Effectiveness of the Plan will be subject to the satisfaction of customary conditions, including, without limitation, the following (as applicable):

a. The Definitive Documents (as defined in the RSA) shall be consistent with the RSA and otherwise approved by the parties thereto consistent with their respective consent and approval rights as set forth in Section 2(b) of the RSA.

b. The Bankruptcy Court shall have entered an order approving the Disclosure Statement, which order shall be in full force and effect and no stay thereof shall be in effect.

c. The Bankruptcy Court shall have entered the Confirmation Order, which order shall be in full force and effect and no stay thereof shall be in effect.

d. The conditions precedent to the consummation of the Purchase Agreement and the Exit Term Loan Facility, if applicable, (other than effectiveness of the Plan) shall have been satisfied or waived by the party or parties entitled to waive such conditions in accordance with the terms thereof, and the Purchase Agreement and Exit Term Loan Facility, if applicable, shall be in full force and effect; provided, that entry into the Exit Revolving Credit Facility (as defined in the Exit Term Loan Facility Term Sheet) shall not be a condition precedent to effectiveness of the Plan.

e. All governmental approvals, including Bankruptcy Court approval, necessary to effectuate the Restructuring shall have been obtained and all applicable waiting periods shall have expired.

f. All Restructuring Expenses (as defined in the RSA) and any other fees, expenses, and other amounts payable to the Restructuring Support Parties (as defined in the RSA) pursuant to an order of the Bankruptcy Court (the "**Restructuring Support Party Expenses**") shall have been paid in full.

</td>
</tr>
</table>

| | |
|---|---|
| | The conditions to effectiveness may be waived, in whole or in part, in writing by the Debtors and the Requisite Consenting First Lien Creditors, as applicable. |
| **Releases** | The Plan shall provide customary releases (including third party releases, which shall incorporate an opt-out mechanism to the extent parties do not wish to grant releases under the Plan) and exculpation provisions, in each case, to the fullest extent permitted by law and effective as of the Effective Date, for the benefit of the Debtors, the reorganized Debtors, and Wind Down Co, as applicable, and the Released Parties.  Such provisions shall contain customary carve outs for gross negligence, willful misconduct, and intentional fraud. |
| **Definitive Documentation** | This Restructuring Term Sheet is indicative, and any final agreement shall be subject to the Definitive Documents (as defined in the RSA).  The Definitive Documents shall contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein consistent with the terms of this Restructuring Term Sheet and shall be subject to the consent rights of the Debtors, the Consenting Creditors, and the Consenting Sponsors as set forth in Section 2(b) of the RSA. |
| **Tax Structure / Implementation** | The Restructuring contemplated by this Restructuring Term Sheet shall be structured in a tax efficient manner to the extent reasonably practicable. |
| | If the Sale Transaction is consummated pursuant to the Credit Bid, the Sale Transaction shall be implemented in a manner consistent with the steps set forth in the restructuring memorandum to be included in the Plan Supplement (the "**Implementation Steps**"), as selected by the Requisite Consenting First Lien Creditors in their sole discretion. |
| **Securities Exemption** | If there shall be any issuance and distribution of the New Equity Interests under the Plan, such issuance and distribution shall be structured to the extent possible to be issued pursuant to Section 1145(a) of the Bankruptcy Code and if 1145(a) is not available then otherwise exempt from registration under the Securities Act of 1933, as amended, and any other applicable securities laws. |
| **Amendments** | This Restructuring Term Sheet may be amended only as permitted pursuant to the RSA. |

13

## ANNEX 1

### Defined Terms

| Defined Terms | |
|---|---|
| **Administrative Claim** | A Claim for costs and expenses of administration of the Debtors' estates pursuant to sections 503(b), 507(b), and 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the estates and operating the businesses of the Debtors; (ii) Professional Fee Claims; (iii) Restructuring Support Party Expenses; (iv) any requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; (v) fees payable to the U.S. Trustee pursuant to Section 1930 of the Judicial Code; and (vi) DIP Claims. |
| **Claim** | Has the meaning set forth in section 101(5) of the Bankruptcy Code, as against any Debtor. |
| **Confirmation Order** | The order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall provide, among other things, that in the event a Third Party Bid is the Successful Bid, any Claim arising out of or relating to a severance agreement, employment agreement, or offer letter that is asserted by an employee who is offered employment from the Buyer (as defined in the Third Party Bid) shall either be disallowed or, if allowed by the Court, any amounts due shall be offset against the amounts received by the applicable employee under the applicable Key Employee Retention Agreement. |
| **Consenting Creditors** | Collectively, the First Lien Lenders and Second Lien Lenders that are or become party to the RSA together with their respective successors and permitted assigns.  For the avoidance of doubt, Consenting Creditors shall not include Second Lien Lenders to the extent the RSA is not effective with respect to such lenders. |
| **Consenting First Lien Creditors** | The First Lien Lenders that are or become party to the RSA together with their respective successors and permitted assigns. |
| **Consenting Second Lien Creditors** | The Second Lien Lenders that are or become party to the RSA together with their respective successors and permitted assigns; provided, that Consenting Second Lien Creditors does not include holders of Second Lien Claims to the extent the RSA is not effective as to such holders in accordance with the RSA. |
| **CoStar** | CoStar Group, Inc., any of its subsidiaries or affiliates, or any of their respective designees serving as a bidder in connection with the auction. |
| **Effective Date** | The date on which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with the terms of the Plan. |
| **Exit Term Loan A** | Has the meaning set forth in the Exit Term Loan Facility Term Sheet. |
| **New Money Exit Term Loan B** | Has the meaning set forth in the Exit Term Loan Facility Term Sheet. |
| **First Lien Deficiency Claim** | All First Lien Claims that are not First Lien Secured Claims. |

| Defined Terms | |
|---|---|
| **First Lien Loan Documents** | The First Lien Credit Agreement and all related agreements and documents executed by any of the Debtors in connection with the First Lien Credit Agreement. |
| **First Lien Secured Claims** | All First Lien Claims that are secured Claims. |
| **Holdback Amount** | The "Holdback Amount" as defined in Section 2.10 of the Stalking Horse APA. |
| **Intercompany Claim** | Any Claim held by a Debtor against another Debtor arising before the Petition Date. |
| **Intercompany Interest** | Any Interest in a Debtor held by another Debtor. For the avoidance of doubt, an Intercompany Interest shall exclude Parent Equity Interests. |
| **Interest** | Any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in any Debtor (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in such Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "*stock*" or a similar security, including any Claim against any Debtor subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing. |
| **Key Employee Retention Agreements** | The key employee retention agreements entered into by the Company and certain key employees on or about December 16, 2019 and the supplemental key employee retention agreements approved by the board of directors of the Company on February 10, 2020 (which may be entered into hereafter consistent with the terms approved by the board of directors on such date as set forth (x) in the form supplemental retention agreement received by counsel to the Company from counsel to the Consenting First Lien Creditors on February 9, 2020) and (y) the proposed supplemental retention award schedule received by counsel to the Consenting First Lien Creditors from counsel to the Company on February 9, 2020. |
| **New Equity Interests** | The equity interests in RentPath NewCo or Reorganized Holdings, or such other entity as set forth in the Implementation Steps. |
| **Other Secured Claim** | A secured Claim against the Debtors other than an Administrative Claim, a DIP Claim, a Priority Tax Claim, a First Lien Claim, or a Second Lien Claim. |
| **Parent Equity Interest** | Any Interest in Holdings as of the Petition Date. |
| **Plan Supplement** | Has the meaning set forth in the RSA. |
| **Priority Non-Tax Claim** | Any Claim against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than (i) an Administrative Claim and (ii) a Priority Tax Claim. |

WEIL:\97376998\1\69518.0004

| Defined Terms | |
|---|---|
| **Priority Tax Claim** | Any Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind specified in section 507(a)(8) of the Bankruptcy Code. |
| **Professional Fee Claim** | All Claims for fees and expenses (including transaction and success fees) incurred by professional persons retained by the Debtors by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code on or after the Petition Date through the Effective Date. |
| **Reinstatement or Reinstated** | With respect to Claims, means that the Claim shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. |
| **Released Parties** | Released Parties means (i) the Debtors, the reorganized Debtors, Wind Down Co., if applicable, the Consenting Sponsors (as defined in the RSA), the Consenting First Lien Creditors, the Consenting Second Lien Creditors, the DIP Lenders (as defined in the DIP Term Sheet), the DIP Agent (as defined in the DIP Term Sheet), the Exit Lenders (as defined in the Exit Term Loan Facility Term Sheet), the Exit Agent (as defined in the Exit Term Loan Facility Term Sheet) (and, in addition to each of the foregoing, where any of the foregoing is an investment manager or advisor for a beneficial holder, such beneficial holder), and such entities' predecessors, successors and assigns, parents, subsidiaries, affiliates, managed accounts or funds, (ii) with respect to each Released Party, all of their respective current and former officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly and any fund managers, fiduciaries, or other agents with any involvement related to the Debtors), members, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, solely to the extent such persons and entities acted on the behalf of the Released Parties in connection with the matters as to which releases are provided in the Plan, and (iii) such persons' and entities' respective heirs, executors, estates, servants, and nominees, in the case of (i) – (iii), each in their capacity as such. Notwithstanding the foregoing, any person that opts out of the third party releases set forth in the Plan shall not be deemed a Released Party. |
| **Reorganized Holdings** | Holdings as reorganized pursuant to the Plan. |
| **Requisite Consenting First Lien Creditors** | Has the meaning set forth in the RSA. |
| **RSA Effective Date** | Has the meaning set forth in the RSA. |
| **Sale Proceeds Distributable Consideration** | The excess, if any, of the sum of (i) cash on hand and (ii) any Sale Transaction Proceeds, less the amount of cash necessary to (a) fund the Wind Down Amount (if applicable), (b) fund the obligations due and owing under the Key Employee Retention Agreements (subject in all respects to the terms and conditions set forth in the RSA), (c) satisfy all Cure Costs, (d) satisfy any fees required to be paid in accordance with any order of the Bankruptcy Court (including in connection with the DIP and Exit Facilities), and (e) satisfy the following Claims to the extent allowed and required to be |

3

| Defined Terms | |
|---|---|
| | paid in cash under the Plan in accordance with the provisions of the RSA: Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims, and General Unsecured Claims (solely to the extent and subject to the conditions set forth herein); provided, that "Sale Proceeds Distributable Consideration" shall not include the Holdback Amount, if any. |
| **Sale Transaction Proceeds** | The cash proceeds received by the Debtors (or Wind Down Co, as applicable) pursuant to a Sale Transaction. |
| **Second Lien Deficiency Claim** | All Second Lien Claims that are not Second Lien Secured Claims. |
| **Second Lien Secured Claims** | All Second Lien Claims that are secured Claims, if any. |
| **Section 510(b) Claims** | Any Claim against any Debtor (i) arising from the rescission of a purchase or sale of a security of any Debtor or an affiliate of any Debtor; (ii) for damages arising from the purchase or sale of such a security; (iii) or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim; provided that a Section 510(b) Claim shall not include any Claims subject to subordination under section 510(b) of the Bankruptcy Code arising from or related to any Interest. |
| **Stalking Horse APA** | That certain asset purchase agreement between the Company, as sellers, and CoStar, as buyer, dated as of February 11, 2020. |
| **Third-Party Bid** | A bid submitted by an entity other than the First Lien Agent or RentPath NewCo in connection with the Sale Transaction. |
| **Wind Down Amount** | An amount to be agreed upon between the Debtors and Requisite Consenting First Lien Creditors for the purposes of effectuating the wind down of the Debtors' estates and the Chapter 11 Cases in the event that a Third-Party Bid is designated as the "stalking horse" under the Bidding Procedures Order. |
| **Wind Down Co** | The post-Effective Date Debtors, a corporation, limited liability company, or a liquidating trust to manage the wind down of the Debtors' estates and manage distributions in accordance with the Plan. |

4

**EXHIBIT B**

**CREDIT BID**

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**RENTPATH HOLDINGS, INC.,**

**RP LENDER ACQUISITION CORP.,**

**ROYAL BANK OF CANADA,**

**AS FIRST LIEN ADMINISTRATIVE AGENT**

**AND**

**THE OTHER SELLERS NAMED HEREIN**

**Dated as of February [●], 2020**

# TABLE OF CONTENTS

**Page**

Article I        Definitions, Terms and Interpretive Matters .......................................................... 1

    Section 1.01.    Certain Definitions ................................................................................... 1

    Section 1.02.    Other Terms ........................................................................................... 15

Article II        PURCHASE AND SALE ............................................................................... 16

    Section 2.01.    Purchase and Sale of the Acquired Assets ........................................... 16

    Section 2.02.    Assumed Liabilities .............................................................................. 16

    Section 2.03.    Closing .................................................................................................. 16

    Section 2.04.    Consideration ........................................................................................ 17

    Section 2.05.    Closing Payments and Deliveries ......................................................... 17

    Section 2.06.    Allocation ............................................................................................. 17

    Section 2.07.    Alternative Transaction ........................................................................ 18

Article III        Representations and Warranties of the SELLERS ....................................... 18

    Section 3.01.    Organization and Qualification; Subsidiaries ...................................... 19

    Section 3.02.    Authority/Binding Effect ...................................................................... 19

    Section 3.03.    Financial Statements ............................................................................. 19

    Section 3.04.    Absence of Certain Changes or Events ................................................ 20

    Section 3.05.    Consents and Approvals/No Violation ................................................. 20

    Section 3.06.    Absence of Litigation ........................................................................... 21

    Section 3.07.    Affiliate Transactions .......................................................................... 21

    Section 3.08.    Permits/Compliance with Laws ........................................................... 21

    Section 3.09.    No Undisclosed Liabilities ................................................................... 21

    Section 3.10.    Employee Benefit Plans/ERISA/Indemnification ............................... 22

    Section 3.11.    Material Contracts ................................................................................ 23

    Section 3.12.    Environmental Matters ......................................................................... 25

    Section 3.13.    Real Property ........................................................................................ 25

    Section 3.14.    Labor Matters ....................................................................................... 25

    Section 3.15.    Insurance ............................................................................................... 26

    Section 3.16.    Intellectual Property ............................................................................. 26

    Section 3.17.    Taxes .................................................................................................... 28

    Section 3.18.    Title to Acquired Assets ....................................................................... 28

# TABLE OF CONTENTS
(continued)

| | | |
|---|---|---|
| Section 3.19. | Brokers | 29 |
| Section 3.20. | No Other Representations and Warranties | 29 |
| Article IV | Representations and Warranties of THE BUYER | 29 |
| Section 4.01. | Organization | 29 |
| Section 4.02. | Authority/Binding Effect | 30 |
| Section 4.03. | Consents and Approvals/No Violation | 30 |
| Section 4.04. | Absence of Litigation | 30 |
| Section 4.05. | Financial Ability | 31 |
| Section 4.06. | Buyer Activities | 31 |
| Section 4.07. | Brokers | 31 |
| Article V | Covenants | 31 |
| Section 5.01. | Conduct of Business | 31 |
| Section 5.02. | Control of Operations | 33 |
| Section 5.03. | Reasonable Best Efforts/Cooperation | 33 |
| Section 5.04. | Consents | 33 |
| Section 5.05. | Antitrust Notifications and Other Regulatory Approvals | 33 |
| Section 5.06. | Bankruptcy Court Matters | 35 |
| Section 5.07. | Access to Information | 37 |
| Section 5.08. | Public Statements | 38 |
| Section 5.09. | Tax Matters | 38 |
| Section 5.10. | Transferred Employees | 38 |
| Section 5.11. | Employee Benefits | 39 |
| Article VI | Conditions to Closing | 41 |
| Section 6.01. | Mutual Conditions to the Obligations of the Parties | 41 |
| Section 6.02. | Conditions to the Obligations of the Buyer | 42 |
| Section 6.03. | Conditions to the Obligations of the Sellers | 43 |
| Section 6.04. | Frustration of Closing Conditions | 44 |
| Article VII | Survival; Termination | 44 |
| Section 7.01. | Survival | 44 |
| Section 7.02. | Termination | 44 |

# TABLE OF CONTENTS
(continued)

**Page**

Section 7.03.    Effect of Termination; Etc ........................................................ 46

Article VIII    Miscellaneous ............................................................................ 46

Section 8.01.    Notices ..................................................................................... 46

Section 8.02.    Amendment/Waiver, Etc .......................................................... 47

Section 8.03.    Assignment ............................................................................... 47

Section 8.04.    Entire Agreement ..................................................................... 47

Section 8.05.    Severability .............................................................................. 47

Section 8.06.    Fulfillment of Obligations ........................................................ 47

Section 8.07.    Parties in Interest ..................................................................... 48

Section 8.08.    Expenses .................................................................................. 48

Section 8.09.    Governing Law/Jurisdiction/Waiver of Jury Trial................... 48

Section 8.10.    Counterparts, Etc ..................................................................... 49

Section 8.11.    Headings, Etc ........................................................................... 49

Section 8.12.    Further Assurances ................................................................... 49

Section 8.13.    Specific Performance ............................................................... 50

Section 8.14.    Limitation on Liability ............................................................. 50

Section 8.15.    Non-Recourse .......................................................................... 50

Section 8.16.    Representation of the Sellers and Affiliates ............................. 51

Section 8.17.    DISCLAIMER .......................................................................... 51

Section 8.18.    Due Diligence Review .............................................................. 52

Section 8.20.    Credit Bid Direction................................................................. 53

Section 8.21.    Interpretation............................................................................ 53

## TABLE OF CONTENTS
(continued)

**Page**

### EXHIBITS

Exhibit A       Form of Bill of Sale
Exhibit B       Form of Assignment and Assumption Agreement
Exhibit C       Form of Lease Assignment and Assumption Agreement

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of February [●], 2020, by and among RentPath Holdings, Inc., a Delaware corporation (the "Company"), and the direct or indirect wholly-owned Subsidiaries of the Company set forth on Schedule A (together with the Company, each a "Seller" and collectively the "Sellers"), RP Lender Acquisition Corp., a Delaware corporation (the "Buyer"), and Royal Bank of Canada, in its capacity as administrative agent and collateral agent under the First Lien Credit Agreement (as defined herein) (the "First Lien Administrative Agent"). Each of the Buyer and each Seller is referred to herein as a "Party" and, collectively, as the "Parties".

W I T N E S S E T H:

WHEREAS, the Sellers and certain of their affiliates are contemplating filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on or about February [●], 2020 (the date of the filing of such petitions, the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, the Sellers are engaged in the operation of the Business (as defined below), or hold assets or are responsible for liabilities Related to the Business (as defined below); and

WHEREAS, subject to the terms and upon the conditions set forth herein, the Sellers desire to sell, transfer and assign to the Buyer, and the Buyer desires to purchase, acquire and assume, as applicable, from the Sellers all of the Acquired Assets (as defined below) and Assumed Liabilities (as defined below), all as more specifically provided herein.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements contained herein, the Parties agree as follows:

ARTICLE I

DEFINITIONS, TERMS AND INTERPRETIVE MATTERS

SECTION 1.01.   Certain Definitions.  As used in this Agreement, the following terms shall have the meanings set forth or as referenced below:

"Acquired Assets" means all of the Sellers' right, title, and interest in and to all of the assets of the Sellers as of the Closing Date that are Related to the Business, including, without duplication, all of the Sellers' right, title, and interest in and to all of the following assets of the Sellers as of the Closing Date:

(a)      all Furnishings and Equipment;

(b)      the Leases set forth on Schedule 1.01 under the heading "Assumed Leases", other than those leases that expire or that are terminated prior to Closing (the "Assumed Leases"), together with (to the extent of the Sellers' interest therein) the buildings, fixtures and improvements located on or attached to the real property subject to the Assumed Leases, and all rights arising therefrom, and all tenements, hereditaments, appurtenances and other real property

-1-

rights appertaining thereto, subject to the rights of the applicable landlords (including rights to ownership or use of such property);

(c)     all accounts receivable;

(d)     all rights under those Contracts set forth on Schedule 1.01 under the heading "Transferred Contracts", other than those Contracts that expire or that are terminated prior to the Closing (such Contracts, together with the Assumed Leases, the "Transferred Contracts");

(e)     all deposits, including customer deposits and security deposits for rent, electricity, telephone or otherwise, and prepaid charges and expenses of the Sellers (other than any deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets or adequate assurance deposits posted in accordance with section 366 of the Bankruptcy Code);

(f)     all of the Seller Intellectual Property, including the Marks and patents set forth on Schedule 3.16(a);

(g)     all documents that are used in, held for use in or intended to be used in, or that arise primarily out of, the Business, including documents relating to products, services, marketing, advertising, promotional materials, Seller Intellectual Property, personnel files for Transferred Employees and all files, customer files and documents (including credit information), supplier lists, records, literature and correspondence, but excluding (i) personnel files for Employees who are not Transferred Employees, (ii) such files as may be required under applicable Law regarding privacy, (iii) documents which the Sellers are not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party, and (iv) any documents primarily related to or are required to realize the benefits of any Excluded Assets; provided that Sellers shall have continued access to such documents as are necessary to administer the Bankruptcy Cases and Sellers may retain copies of any documents as necessary;

(h)     all warranties, representations, indemnities and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to the Sellers or to the extent affecting any Acquired Assets, to the extent assignable, other than any warranties, representations and guarantees pertaining to any Excluded Assets or rights and defenses pertaining to any Excluded Liabilities;

(i)     all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Sellers or with third parties to the extent Related to the Business or the Acquired Assets (or any portion thereof);

(j)     all Permits of the Sellers Related to the Business, to the extent requested by the Buyer and assignable to the Buyer under applicable Law (and, for the avoidance of doubt, solely to the extent the applicable Governmental Authority consents to or otherwise approves the assignment or transfer of the applicable Permit), (x) including the licenses set forth on Schedule 1.01 under the heading "Licenses" and (y) excluding the Permits listed on Schedule 1.01 under the heading "Excluded Permits";

(k)    all goodwill and other intangible assets associated with the Business, including customer and supplier lists and the goodwill associated with the Marks included in the Seller Intellectual Property;

(l)    all assets or other funding vehicle related to any Assumed Employee Benefit Plan;

(m)    the Third-Party Intellectual Property Licenses and all of Sellers' rights, title and interests in and to Software (whether proprietary or non-proprietary), information technology equipment and rights, servers, data storage devices, systems, networks and other computer assets, laptop computers and all technology underlying or enabling Internet sites, URLs, systems or networks, e-mail addresses, telephone numbers and fax numbers, in each case to the extent Related to the Business;

(n)    all supplies owned by the Sellers and used in connection with the Business;

(o)    consistent with the Restructuring Term Sheet in all respects, all insurance policies and binders (including all director and officer insurance policies and any tail insurance policies) and all rights thereunder, including all rights to recoveries, refunds and credits and to make claims thereunder; and

(p)    those items set forth on Schedule 1.01 under the heading "Acquired Assets";

provided, however, notwithstanding anything to the contrary set forth in this definition, the Acquired Assets shall not include any Excluded Assets.

"Action" means any claim, action, suit, corrective action plan, cause of action, arbitration, proceeding, litigation, audit, written notice of violation, administrative citation, summons, subpoena, inquiry or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity, before or by any Governmental Authority.

"Affiliate" shall mean, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such first Person.  The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership interest, by contract or otherwise; provided that in no event shall (i) any portfolio company of private equity funds managed by Providence Equity Partners L.L.C. or TPG Global, LLC that is not a Subsidiary of the Company or (ii) RentPath Gives Back Foundation, Inc., be an Affiliate of the Company or any of its Subsidiaries.

"Agreement" shall have the meaning set forth in the preamble hereto.

"Antitrust Laws" shall have the meaning set forth in Section 5.05(c).

"Assignment and Assumption Agreement" shall have the meaning set forth in Section 2.05(a)(ii).

"Assumed Employee Benefit Plan" means any Employee Benefit Plan set forth on Schedule 3.10(a) marked with an asterisk which, for the avoidance of doubt, shall include (i) the Executive Incentive Compensation Plan for the calendar year 2020, payable 2021, as modified or amended (solely with respect to applicable performance goals, financial or otherwise) by the Sellers prior to the Closing, and (ii) all employment and severance agreements with employees as in effect on the date hereof (each of clauses (i) and (ii) hereof, a "Designated Employee Benefit Plan").

"Assumed Leases" shall have the meaning set forth in the definition of Acquired Assets.

"Assumed Liabilities" means all of the following Liabilities of each of the Sellers as of the Closing Date:

(a)    all Liabilities of Sellers under the Transferred Contracts and Assumed Employee Benefit Plans (in the case of any Assumed Employee Benefit Plan that is a "welfare benefit plan" within the meaning of Section 3(1) of ERISA, solely with respect to any claims incurred with respect thereto after the Closing Date), excluding all Cure Costs, that (i) arise on or after the Closing Date or (ii) arise prior to the Closing Date but solely to the extent requiring performance after the Closing Date that, in each case, have not been satisfied or otherwise discharged pursuant to the Plan on the Effective Date;

(b)    all Liabilities arising from the sale of products in the ordinary course of business pursuant to product warranties, product returns and rebates;

(c)    all accounts payable incurred in the ordinary course of business existing on the Closing Date (including, for the avoidance of doubt, (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable);

(d)    all Indebtedness set forth on Schedule 1.01 under the heading "Assumed Liabilities";

(e)    all Taxes allocated to the Buyer pursuant to Section 5.09;

(f)    all Liabilities that have not been satisfied or otherwise discharged pursuant to the Plan on the Effective Date, including those relating to or arising under Environmental Laws, relating to or arising out of the ownership or operation of the Business or any Acquired Asset by the Buyer from and after the Closing Date; and

(g)    all other Liabilities with respect to the Business, the Acquired Assets or the Transferred Employees arising from and after the Closing;

provided, however, that notwithstanding anything to the contrary set forth in this definition, the Assumed Liabilities shall not include any Excluded Liabilities.

"Auction" shall have the meaning set forth in Section 5.06(b)(ii).

"Avoidance Actions" means any and all claims and causes of action arising under sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 553(b), or 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state-law equivalents.

"Back-up Bid Termination Date" means first to occur of (a) consummation of the transaction with the winning bidder announced at the Auction, (b) the Buyer's receipt of notice from the Sellers of the release by Sellers of Buyer's obligations under Section 5.06(c), and (c) the twelve (12) month anniversary of the Petition Date.

"Bankruptcy Cases" means the contemplated Chapter 11 cases of the Sellers and certain of their Affiliates.

"Bankruptcy Code" shall have the meaning set forth in the recitals.

"Bankruptcy Court" shall have the meaning set forth in the recitals.

"Bidding Procedures Order" means an order of the Bankruptcy Court that, among other things, approves (a) bidding procedures, (b) bid protections granted to stalking horse purchaser(s), (c) the form and manner of notice of Auction(s), sale transaction(s), and Confirmation Hearing(s), (d) the procedures for assumption and assignment of Contracts and Leases, (e) the date for Auction(s), if necessary, and Confirmation Hearing(s), and (f) the Stalking Horse Bid Right (as defined in the RSA).

"Bill of Sale" shall have the meaning set forth in Section 2.05(a)(i).

"Business" means the business of providing digital media services to clients in the residential real estate business (including internet listing services, digital marketing services and solutions, rental and property management software and products) as presently conducted by the Sellers, as a whole.

"Business Day" shall mean any day other than a Saturday, a Sunday or a day on which banks in New York, New York are authorized or obligated by Law or executive order to close.

"Buyer" shall have the meaning set forth in the preamble hereto.

"Buyer Material Adverse Effect" shall have the meaning set forth in Section 4.01.

"Buyer Plans" shall have the meaning set forth in Section 5.12(a).

"Buyer Related Party" shall mean any Related Party of the Buyer.

"Closing" shall have the meaning set forth in Section 2.03.

"Closing Date" shall have the meaning set forth in Section 2.03.

"Code" shall mean the U.S. Internal Revenue Code of 1986, as amended.

"Company" shall have the meaning set forth in the preamble hereto.

"Company Equityholders" shall mean, collectively, (a) the holders of all issued and outstanding shares of common stock of the Company, (b) the holders of options to purchase shares of common stock of the Company and (c) the holders of restricted stock units granted in respect of shares of common stock of the Company or with respect to which such shares are otherwise deliverable.

"Competing Bid" shall have the meaning set forth in Section 5.06(a).

"Confirmation Hearing" means a hearing before the Bankruptcy Court to consider confirmation of the Plan and approval of this Agreement, as such hearing may be adjourned or continued from time to time.

"Confirmation Order" means an order of the Bankruptcy Court confirming the Plan, which order shall contain the Sale Provisions and shall be reasonably acceptable, in form and substance, to the Sellers.

"Consents" shall have the meaning set forth in Section 3.05(a).

"Consenting Creditors" means the holders of First Lien Claims that are or become party to the RSA together with their respective successors and permitted assigns.

"Contract" shall mean a legally binding contract, agreement, arrangement, understanding, obligation, commitment, lease or license, whether or not in writing, which in each case is not an Employee Benefit Plan.

"Credit Bid Back-up Bid Right" shall have the meaning set forth in the RSA.

"Cure Costs" means all amounts payable in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code to effectuate the assumption by the applicable Seller and assignment to the Buyer of the Transferred Contracts pursuant to section 365 of the Bankruptcy Code.

"D&O Expenses" shall have the meaning set forth in Section 5.13.

"D&O Indemnifiable Claim" shall have the meaning set forth in Section 5.13.

"D&O Indemnified Person" shall have the meaning set forth in Section 5.13.

"D&O Indemnifying Party" shall have the meaning set forth in Section 5.13Section 5.13(b)(i).

"D&O Losses" shall have the meaning set forth in Section 5.13(b).

"DIP Agent" means Royal Bank of Canada, in its capacity as administrative agent under the DIP Credit Agreement, and its successors and assigns.

"DIP Credit Agreement" means that certain credit agreement entered into by the Company in connection with debtor-in-possession financing provided to the Company during the Bankruptcy Cases.

"DIP Obligations" means as of any date of determination, the principal, interest, premiums, fees, costs, and other amounts or obligations outstanding under the DIP Credit Agreement.

"Direction Letter" shall have the meaning set forth in Section 8.20.

"DOJ" shall mean the U.S. Department of Justice.

"Effective Date" shall have the meaning set forth in the Restructuring Term Sheet.

"Employee Benefit Plans" shall mean, collectively, each employment, consulting, executive compensation, bonus, deferred compensation, incentive compensation, stock purchase, stock option or other equity-based, retention, change-in-control, severance or termination pay, hospitalization or other medical, life or other insurance, supplemental unemployment benefits, profit-sharing, pension or retirement plan, program, agreement or arrangement, and each other fringe or other employee benefit plan, program, agreement or arrangement (including any "employee benefit plan", within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA), sponsored, maintained or contributed to or required to be contributed to by the Sellers.

"Employees" means all individuals, as of the date hereof, whether or not actively at work as of the date hereof, who are employed by the Sellers, together with individuals who are hired by the Sellers after the date hereof and prior to the Closing.

"Environmental Law" shall mean any Law relating to pollution or protection of the environment or natural resources, including the Release of or exposure to any Hazardous Materials.

"ERISA" shall mean the U.S. Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" shall mean each trade or business (whether or not incorporated) that, together with the Sellers, would be deemed to be a "single employer" within the meaning of Section 4001(b) of ERISA or Section 414 of the Code.

"Excluded Assets" means, without duplication, all assets of the Sellers as of the Closing that are not expressly included in the Acquired Assets, including:

(a)     all (i) organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other documents relating to the Sellers' organization, maintenance, existence, and operation and (ii) books and records related to any claims, obligations or liabilities not included in Assumed Liabilities;

(b)     all capital stock of the Sellers or any of their Subsidiaries;

-7-

(c)      all cash, cash equivalents, marketable securities, bank deposits or similar cash items;

(d)      all of the Sellers' rights under this Agreement or any Related Agreement;

(e)      all (i) books and records that Sellers are required by Law to retain or that the Sellers determine are necessary or advisable to retain; provided, however, that the Buyer shall have the right to make copies of any portions of such retained books and records Related to the Business, Acquired Assets or Assumed Liabilities; (ii) documents relating to proposals to acquire the Business by Persons other than the Buyer; and (iii) personnel files for Employees who are not Transferred Employees;

(f)      all assets or other funding vehicle related to any Excluded Employee Benefit Plan;

(g)      all Contracts other than the Transferred Contracts;

(h)      all claims, defenses, proceeds, causes of action, choses in action, rights of recovery and rights of set-off or recoupment against any Person arising out of or relating to the Bankruptcy Cases, the Acquired Assets or the Assumed Liabilities in connection with events occurring on or before the Closing, other than any Proceeds explicitly contemplated to be transferred to the Buyer hereunder;

(i)      all adequate assurance deposits posted in accordance with section 366 of the Bankruptcy Code;

(j)      all privileged (including attorney-client privileged) communications relating to the negotiation, documentation and consummation of the transactions contemplated by this Agreement;

(k)      all claims, proceeds, causes of action, choses in action, rights of recovery and rights of set-off of any kind against any Person arising out of or relating to the Bankruptcy Cases or the Acquired Assets in connection with events occurring on or before the Closing, including those arising under chapter 5 of the Bankruptcy Code; and

(l)      those items set forth on Schedule 1.01 under the heading "Excluded Assets".

"Excluded Employee Benefit Plan" means any Employee Benefit Plan set forth on Schedule 3.10(a) that is not marked with an asterisk.

"Excluded Liabilities" means all Liabilities of the Sellers other than the Assumed Liabilities, including, without duplication, the following Liabilities of the Sellers:

(a)      all Cure Costs;

(b)      all Liabilities arising out of or relating to the Excluded Assets;

-8-

(c)    all Liabilities relating to amounts required to be paid by the Sellers hereunder; and

(d)    all Liabilities arising out of, relating to or with respect to (i) the employment or performance of services, or termination of employment or services by the Sellers of any individual  on or before the Closing, (ii) workers' compensation claims against any Seller that relate to the period on or before the Closing, irrespective of whether such claims are made prior to or after the Closing, and (iii) Excluded Employee Benefit Plans and, in the case of any Assumed Employee Benefit Plan that is a "welfare benefit plan" within the meaning of Section 3(1) of ERISA , any claims incurred with respect thereto on or before the Closing Date.

"Exhibits" shall mean the exhibits to this Agreement.

"Exit Facility" means the exit term loan facilities contemplated by the Plan if the Buyer is the Successful Bidder (as defined in the Bidding Procedures Order).

"Final Order" means an Order of a court of competent jurisdiction (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing, motion for reconsideration or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; and (b) as to which the time for instituting or filing an appeal, motion for rehearing, motion for reconsideration or motion for new trial shall have expired, provided however that even if an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing, motion for reconsideration or motion for new trial are timely filed, an Order will be deemed a Final Order if it provides that it is effective immediately upon entry on the Bankruptcy Court's docket and not subject to any stay notwithstanding the provisions of FRBP 6004(h), 6006(d), 7062 and FRCP 62, and that no stay pending appeal has been obtained.

"Financial Statements" shall have the meaning set forth in Section 3.03.

"First Lien Administrative Agent" shall have the meaning set forth in the preamble hereto.

"First Lien Claims" means, as of any date of determination, Claims outstanding under the First Lien Credit Agreement.

"First Lien Credit Agreement" means that certain First Lien Credit Agreement, dated as of December 17, 2014 (as amended, restated, modified or supplemented from time to time), by and among, the Company, RentPath, LLC, as borrower, the First Lien Administrative Agent, and the lenders party thereto from time to time.

"Fraud" means common law fraud under Delaware law by a Party with the intent to deceive based on a representation or warranty in Article III or Article IV.

"FTC" shall mean the U.S. Federal Trade Commission.

"Furnishings and Equipment" means all fixtures, trade fixtures and shelving owned by the Sellers and located at the Leased Real Property, including those items listed on Schedule 1.01 under the heading "Furnishings and Equipment".

"GAAP" shall mean U.S. generally accepted accounting principles.

"Governmental Authority" shall have the meaning set forth in Section 3.05(a).

"Hazardous Materials" shall mean any pollutant, contaminant, waste, petroleum or any fraction thereof, asbestos or asbestos-containing material, polychlorinated biphenyls, and toxic or hazardous wastes, substances, materials or agents, including all substances defined as "Hazardous Substances," "Pollutants," or "Contaminants" pursuant to, or otherwise regulated under, any Environmental Law.

"HSR Act" shall mean the U.S. Hart-Scott-Rodino Antitrust Improvements Act of 1976, and the rules and regulations promulgated thereunder, as amended.

"Indebtedness" shall mean indebtedness for borrowed money, calculated in accordance with GAAP and the Sellers' books and records, including any Obligations related thereto.

"Intellectual Property" shall mean all of the following intellectual property rights available (including with respect to Software and technology) in any jurisdiction, whether registered or unregistered:  (a) trademarks, service marks, trade names, brand names, product names, corporate names, fictitious names, symbols, slogans, logos and trade dress (collectively, "Marks"), including the good will associated with the foregoing, (b) patents and patent applications, together with reissuances, divisionals, continuations, continuations-in-part, revisions, extensions and reexaminations thereof, (c) inventions and invention disclosures, processes, designs, techniques, developments and related improvements whether or not patentable, (d) Software and other works of authorship, copyrightable works, copyrights, (e) trade secrets, know-how and confidential business information, methods, processes, practices, formulas, and designs, (f) domain names and social media addresses and accounts, (g) any registrations of, applications to register, and renewals and extensions of, any of the foregoing with or by any Governmental Authority or other registrar in any jurisdiction, and (h) the right to sue for infringement and other remedies against infringement of any of the foregoing, including the right to sue and collect for past infringement.

"Intentional Breach" shall have the meaning set forth in Section 6.04.

"knowledge of the Sellers" shall mean the actual knowledge of the persons listed on Schedule 1.01 under the heading "Knowledge of the Sellers".

"Labor Laws" shall have the meaning set forth in Section 3.14(d).

"Latest Financial Statements" shall have the meaning set forth in Section 3.03.

"Laws" shall mean any federal, state, local or foreign law (including common law), statute, ordinance, code, rule, interpretation, regulation or other legal requirement of any Governmental Authority.

-10-

"Lease Assignment and Assumption Agreement" shall have the meaning set forth in Section 2.05(a)(iii).

"Leased Real Property" shall mean the real property leased, occupied or operated by the Sellers.

"Leases" shall have the meaning set forth in Section 3.13(b).

"Liability" means any liability or obligation of whatever kind or nature (whether direct or indirect, whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising.

"Liens" shall mean any lien, security interest, claim, lease, option, charge, right of first refusal, mortgage, deed of trust, pledge, hypothecation, easement, servitude or similar encumbrance.

"Marks" shall have the meaning set forth in the definition of Intellectual Property.

"Material Adverse Effect" shall mean any circumstance, condition, effect, event, development or change that, individually or in the aggregate with all other circumstances, conditions, effects, events, developments or changes, results in, or would reasonably be expected to result in, a material adverse effect on the Business, taken as a whole, or the business, results of operations or financial condition of the Sellers, taken as a whole, but excluding any such events, developments and changes to the extent resulting from or arising from (a) the execution of this Agreement, the filing of the Bankruptcy Cases, the consummation of the transactions contemplated by this Agreement or the announcement, pendency or existence thereof, the identity of the Buyer and its Affiliates or the compliance by the Sellers with any of the terms of this Agreement, including compliance with Section 5.01 and Section 5.05(c) (including, in each case, the impact thereof on relationships, contractual or otherwise, with any customers, suppliers, vendors, distributors, partners, employees, other Persons with whom any Seller has a business relationship or Governmental Authorities), (b) the Buyer's announcement or other disclosure of its plans or intentions with respect to the conduct of its business at any point in time or the conduct of the Business (or any portion thereof) after the Closing, (c) changes in global or United States or foreign national or regional economic, financial, regulatory or geopolitical conditions or events, (d) changes in the credit, debt, financial or capital markets or changes in interest or exchange rates, in each case, in the United States or elsewhere in the world, (e) changes or proposed changes in GAAP or any other generally accepted accounting principles or changes or proposed changes in Law or the interpretation of any of the foregoing, (f) changes in the Sellers' industries or the segments thereof in general or the markets they operate in, or changes in the general business or economic conditions affecting such industries or markets, (g) national or international disasters, calamities, emergencies or any military conflict, outbreak or escalation of hostilities or declared or undeclared war or act of foreign or domestic terrorism of any kind, (h) any action taken or omitted to be taken by, with the written consent of, or at the written request of, the Buyer, (i) any failure by the Sellers to meet internal or published budgets, metrics, projections, forecasts or estimates of the Sellers whether financial or nonfinancial (provided, however, that any event, development or change that caused such failure to meet budgets, metrics, projections, forecasts or

estimates shall not be excluded under this clause (i)) and (j) the resignation or termination of any Employee; provided that, with respect to a matter described in any of the foregoing clauses (c) through (g), such matter shall only be excluded to the extent such matter does not have a disproportionate effect on the Business, taken as a whole, relative to other comparable businesses operating in the same industry in which the Sellers operate (and then such matter shall be included only to the extent of such disproportionate impact).

"Material Contracts" shall have the meaning set forth in Section 3.11(a).

"Material Permits" shall have the meaning set forth in Section 3.08(b).

"Obligations" shall mean, with respect to any Indebtedness, any principal, accrued but unpaid interest, breakage costs, penalties (including prepayment penalties), fees, costs, and reimbursements payable under the documentation governing such Indebtedness.

"Open Source Software" means any Software that is subject to terms that, as a condition of use, copying, modification or redistribution, require such Software and/or derivative works thereof to be disclosed or distributed in source code form, to be licensed for the purpose of making derivative works, or to be redistributed free of charge, including software distributed under the GNU General Public License or GNU Lesser/Library GPL.

"Order" shall have the meaning set forth in Section 3.06.

"Outside Date" shall have the meaning set forth in Section 2(d)(ix) of the RSA.

"Party" or "Parties" shall have the meanings set forth in the preamble hereto.

"Permits" means registrations, licenses, exemptions, authorizations, consents, accreditations and permits of Governmental Authorities.

"Permitted Liens" shall mean (a) mechanics', carriers', workmen's, materialmen's, repairmen's or other similar Liens arising by operation of law in the ordinary course of business for amounts that are not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings or for which adequate reserves have been established on the Financial Statements (or any subsequent consolidated financial statements of the Sellers) in accordance with GAAP, (b) Liens for Taxes, assessments, or other governmental charges which are not due and payable, which may hereafter be paid without penalty or for which adequate reserves have been established therefor on the Financial Statements (or any subsequent consolidated financial statements of the Sellers) in accordance with GAAP, (c) imperfections in title, charges, easements, rights of way (whether recorded or unrecorded), restrictions, declarations, covenants, conditions, defects, exceptions, encumbrances and other similar matters which affect title to the property or assets of the Sellers but do not materially detract from the value or marketability of the property or asset to which it relates or materially impair the ability of the Sellers to use or operate the property or asset to which it relates, (d) any right, interest, lien or title of a licensor, sublicensor, licensee, sublicensee, lessor, sublessor or other person in title under any license, lease or other agreement or in the property being licensed, leased or occupied, (e) Liens securing any indebtedness reflected on the Financial Statements (or any subsequent consolidated

-12-

financial statements of the Sellers) in accordance with GAAP, (f) purchase money Liens and Liens securing rental payments under capital lease arrangements, (g) zoning, building codes and other land use Laws regulating the use or occupancy of real property or the activities conducted thereon, (h) matters that are disclosed on a survey or inspection of real property provided to the Buyer, (i) Liens arising under workmen's compensation, unemployment insurance, social security, retirement and similar Laws, other than as a result of a material breach of such Laws, (j) pledges and deposits to secure the performance of bids, trade contracts, leases, surety and appeal bonds, performance bonds and other obligations of a similar nature, in each case in the ordinary course of business, (k) non-exclusive licenses of Intellectual Property granted in the ordinary course of business, (l) Liens set forth on Schedule 1.01 under the heading "Permitted Liens" and (m) any Liens that will be removed at the Closing, including (x) those arising pursuant to a debtor-in-possession credit agreement and (y) by operation of the Plan or the Confirmation Order.

"Person" shall mean an individual, a corporation, a limited liability company, a partnership, an association, a trust or other entity or organization.

"Personal Information" shall mean all information from or about an individual person which is used or intended to be used by the Sellers to identify, contact or precisely locate the individual.

"Petition Date" shall have the meaning set forth in the recitals.

"Plan" means the chapter 11 plan of reorganization for the Debtors, filed in the Chapter 11 Cases, as it may be amended, restated, or supplemented from time to time, in form and substance reasonably acceptable to the Buyer, pursuant to which the sale transaction shall be consummated.

"Purchase Price" shall have the meaning set forth in Section 2.04.

"Related Agreements" means the Bill of Sale, the Assignment and Assumption Agreement and the Lease Assignment and Assumption Agreement.

"Related Orders" shall have the meaning set forth in Section 5.06(b)(ii).

"Related Parties" shall have the meaning set forth in Section 8.15.

"Related to the Business" means used or held for use in the operation of the Business by a Seller or, in the case of a Liability, to the extent accrued, reserved or incurred in connection with the operation of the Business by a Seller.

"Release" shall mean any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal or leaching of any Hazardous Materials into the environment.

"Representatives" means, as to any Person, such Person's Affiliates and its and their directors, officers, employees, agents, advisors and financing sources (including financial advisors, counsel and accountants).

"Requisite Consenting First Lien Creditors" shall have the meaning set forth in the RSA.

"Requisite DIP Lenders" means, as of the date of determination, holders of at least a majority in aggregate principal amount outstanding pursuant to the DIP Credit Agreement.

"Restraint" shall have the meaning set forth in Section 6.01(a).

"Restricted Business" means any business Related to the Business or any other business activity that otherwise competes with the Sellers in any jurisdiction in which the Business operates.

"Restructuring Term Sheet" means the term sheet (including any schedules and exhibits attached thereto), attached to the RSA as Exhibit A.

"RSA" means that certain Restructuring Support Agreement, dated as of February [●], by and among the Sellers, the Consenting Creditors, Pittsburgh Holdings, LP, and Regal Holdco LP (as may be amended, supplemented, or modified from time to time in accordance with the terms thereof).

"Sale Provisions" means those certain provisions to be included in the Confirmation Order, in form and substance reasonably acceptable to the Buyer and the Sellers that, among other things: (a) approves (i) this Agreement and the execution, delivery, and performance by the Sellers of this Agreement, the Related Agreements and the other instruments and agreements contemplated hereby, (ii) the sale of the Acquired Assets to the Buyer free and clear of all Liens to the maximum extent permitted by the Bankruptcy Code (other than any Permitted Liens), (iii) the assumption of the Assumed Liabilities by the Buyer on the terms set forth herein and (iv) the assumption of and assignment to the Buyer of the Transferred Contracts on the terms set forth herein; (b) contains the Court's findings that the Buyer is a good faith purchaser within the meaning of the Bankruptcy Code and has provided adequate assurance of future performance with respect to the Transferred Contracts; and (c) provides that the Sellers and their Affiliates and the Buyer and its Affiliates release one another from all claims relating to, among other things, the negotiation, execution and implementation of this Agreement, its termination and the transfer of rights to the Buyer and its Affiliates.

"Schedules" shall mean the schedules to this Agreement, including the disclosure schedules delivered by the Sellers to the Buyer concurrently with the execution and delivery of this Agreement.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Seller" or "Sellers" shall have the meanings set forth in the preamble hereto.

"Seller Group" shall have the meaning set forth in Section 8.16(a).

"Seller Intellectual Property" shall mean all Intellectual Property owned by the Sellers.

"Seller Related Party" shall mean any Related Party of any Seller.

"Software" shall mean all computer programs, applications, code (including any and all software implementation of algorithms, software as a service, open source software, models and

methodologies whether in source code, object code, development and design tools, application program interfaces, applets, or compilers and assemblers), databases and data compilations, descriptions, flow-charts, computations and documentation (including user manuals and training materials) relating to any of the foregoing.

"Specified Refunds" shall mean the items listed on Schedule 5.09.

"Subsidiary" of any Person shall mean any other Person of which such first Person (either alone or with any other Subsidiary) owns securities or other equity interests having the ordinary voting power to elect a majority of the board of directors or other governing body of such Person or, if no such governing body exists, the ownership of a majority of the outstanding voting securities of such Person.

 "Tax Law" shall mean any Law relating to Taxes.

"Tax Return" shall mean any return, declaration, report, information return or other similar document, including any schedule or attachment thereto or amendment thereof, filed or required to be filed with any Governmental Authority with respect to Taxes.

"Taxes" shall mean (a) any federal, state, local or foreign tax, assessment, fee, duty, levy or other charge of any kind whatsoever of any Governmental Authority whether or not disputed (including any income, franchise, branch profits, gross receipts, capital gains, license, value-added, sales, use, real or personal property, transfer, payroll, employment, social security (or similar), excise, environmental, customs duties, stamp, registration, alternative and add-on minimum tax, goods and services, harmonized sales, provincial sales, escheat and unclaimed property obligations, ad valorem, net worth, capital stock, profits, unemployment, disability, occupation, estimated, premium, windfall profits, production, business and occupation, fuel or withholding tax), (b) any fine, penalty, interest, additional taxes or addition to tax with respect thereto, imposed, assessed or collected by or under the authority of any Governmental Authority and (c) any liability in respect of any items described in clauses (a) or (b) payable by reason of Contract, assumption, transferee or successor liability, operation of Law, Treasury Regulations Section 1.1502-6(a) (or any similar provision of Law or any predecessor or successor thereof) or otherwise.

"Third-Party Intellectual Property Licenses" shall mean Contracts under which the Sellers receive a license to Intellectual Property from any Person other than another Seller.

"Transferred Contracts" shall have the meaning set forth in the definition of Acquired Assets.

"Transferred Employees" shall have the meaning set forth in Section 5.10.

"Waiving Parties" shall have the meaning set forth in Section 8.16(a).

"WARN" means the Worker Adjustment and Restructuring Notification Act of 1988, as amended.

SECTION 1.02.    Other Terms.  Other terms may be defined elsewhere in the text of this Agreement and, unless otherwise indicated, shall have such meaning throughout this Agreement.

-15-

ARTICLE II

PURCHASE AND SALE

SECTION 2.01.    Purchase and Sale of the Acquired Assets.

(a)    Acquired Assets. Upon the terms and subject to the conditions set forth in this Agreement and the Confirmation Order, at the Closing, the Buyer will purchase from the Sellers, and the Sellers will sell, transfer, assign, convey and deliver to the Buyer, all of the Acquired Assets, free and clear of all Liens to the maximum extent permitted by the Bankruptcy Code (other than the Permitted Liens).  Nothing contained herein shall be deemed to sell, transfer, assign, or convey any Excluded Assets to Buyer, and Sellers retain all right, title and interest in, to, and under the Excluded Assets.

(b)    Non-Assignment of Assets.    Notwithstanding anything in this Agreement to the contrary, (i) at any time prior to the date that is twenty-one (21) days prior to the Confirmation Hearing, the Buyer will be entitled, in its sole discretion, to designate any Contract or Employee Benefit Plan of Sellers as an Excluded Asset by providing written notice thereof to Sellers, and any Contract or Employee Benefit Plan so added will be deemed to be an "Excluded Asset" (and not a "Transferred Contract") for all purposes hereunder and (ii) at any time prior to the date that is twenty-one (21) days prior to the Confirmation Hearing, the Buyer will be entitled, in its sole discretion, to request Sellers to add to the list of Transferred Contracts any Contract Related to the Business to which any Seller is a party, and any Contract so added will constitute an Acquired Asset; provided, that in no event will the Buyer be entitled to designate any Designated Employee Benefit Plan (or, without consent of the Sellers, any Assumed Employee Benefit Plan that is not a Designated Employee Benefit Plan) as an Excluded Asset.  Sellers will give written notice to the Buyer prior to the submission by any Seller of any motion in the Bankruptcy Cases to reject any Contract Related to the Business; provided that in no event will any Seller reject or seek to reject any Contract Related to the Business prior to the Closing Date unless prior written approval has been obtained from the Buyer; and provided, further, that Sellers will not reject or seek to reject any Contract which is a Transferred Contract.

SECTION 2.02.    Assumed Liabilities.  Upon the terms and subject to the conditions set forth in this Agreement and the Confirmation Order, effective as of the Closing, as partial consideration for the Acquired Assets, the Buyer shall assume all Assumed Liabilities.  The Buyer agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms thereof.

SECTION 2.03.    Closing.  The closing of the transactions contemplated hereby (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York at 10:00 a.m. (Eastern time) on (a) the second (2nd) Business Day following the satisfaction or, to the extent permitted, waiver of the conditions set forth in Article VI (other than those conditions that require delivery of a document or certificate or the taking of an action at the Closing, but subject to the satisfaction or, to the extent permitted, waiver of those conditions at the Closing), or (b) such other date or at such other time or place as the Company and the Buyer may mutually agree in writing.  The date on which the Closing occurs is called the "Closing Date".

-16-

SECTION 2.04.    <u>Consideration</u>.    The aggregate consideration for the Acquired Assets shall be comprised of (i) an amount equal to $492,700,000.00 (the "<u>Purchase Price</u>"), which shall be effected by a discharge and release of First Lien Claims and the satisfaction of the same by way of a credit bid, or, if the Alternative Transaction (defined below) is invoked pursuant to the terms hereof, shall be effected in accordance with the terms of <u>Section 2.07</u>, and (ii) the assumption of the Assumed Liabilities.

SECTION 2.05.    <u>Closing Payments and Deliveries</u>.

(a)    At the Closing, the Sellers will deliver or cause to be delivered to the Buyer the following:

(i)    a duly executed Bill of Sale substantially in the form of <u>Exhibit A</u> (the "<u>Bill of Sale</u>");

(ii)    a duly executed Assignment and Assumption Agreement substantially in the form of <u>Exhibit B</u> (the "<u>Assignment and Assumption Agreement</u>");

(iii)    a duly executed Assignment and Assumption of Leases substantially in the form of <u>Exhibit C</u> (the "<u>Lease Assignment and Assumption Agreement</u>");

(iv)    an executed certificate of non-foreign status from each Seller in compliance with Treasury Regulations Section 1.1445-2; and

(v)    a duly executed certificate from an officer of the Sellers to the effect that each of the conditions specified in <u>Section 6.02(c)</u> and <u>Section 6.02(c)</u> is satisfied.

(b)    At the Closing, the Buyer will deliver or cause to be delivered to the Sellers the following:

(i)    evidence reasonably satisfactory to Sellers of the release and satisfaction of the First Lien Claims in an amount equal to the Purchase Price;

(ii)    the Bill of Sale duly executed by the Buyer;

(iii)    the Assignment and Assumption Agreement duly executed by the Buyer;

(iv)    the Lease Assignment and Assumption Agreement duly executed by the Buyer; and

(v)    a duly executed certificate from an officer of the Buyer to the effect that each of the conditions specified in <u>Section 6.03(a)</u> and <u>Section 6.03(b)</u> are satisfied.

SECTION 2.06.    <u>Allocation</u>.    The Buyer and the Sellers agree to allocate the Purchase Price and the Assumed Liabilities properly taken into account for Tax purposes among the Acquired Assets in a manner that is reasonable and in accordance with Section 1060 of the Code and the Treasury Regulations thereunder as more specifically determined by Buyer.  Buyer shall

notify Sellers of Buyer's determination pursuant to the preceding sentence promptly, but in no event later than thirty (30) days after Closing and such allocation shall be used by the Sellers and Buyer for all U.S. federal, state and local income tax purposes. Notwithstanding the foregoing, if an Alternative Transaction is pursued in accordance with Section 2.07, this Section 2.06 shall not apply.

SECTION 2.07.    Alternative Transaction.  Prior to the date that is at least seven (7) days before the date of the Confirmation Hearing, unless agreed to otherwise by both the Sellers and the Requisite Consenting First Lien Creditors, the Buyer or the Requisite Consenting First Lien Creditors may elect to consummate the transactions contemplated hereby by acquiring all of the equity interests of the Company or, subject to the consent of the Sellers (not to be unreasonably withheld, conditioned or delayed), such other transaction pursuant to the terms set forth in the RSA and the Plan or a supplemental filing each of which must be reasonably acceptable to the Sellers and the Buyer (such consent not to be unreasonably withheld, conditioned or delayed) (the "Alternative Transaction") as an alternative to the transactions set forth in Sections 2.01 and 2.02. In the event an Alternative Transaction is pursued as described herein, (i) the Sellers in their sole discretion may file a notice of such election with the Bankruptcy Court and (ii) to the extent not otherwise addressed in the Plan, the Buyer and Sellers shall negotiate in good faith to amend this Agreement as necessary to the extent not addressed in the Plan to reflect the Alternative Transaction. If the Alternative Transaction is pursued, the Parties shall cooperate and negotiate promptly, earnestly, and in good faith such amendments or modifications to this Agreement and the Plan as may be reasonably necessary to give effect to the Alternative Transaction and use commercially reasonable efforts to reach agreement on reasonable terms of any such amendments or modifications; provided, that, any such modification or amendment shall be reasonably acceptable to the Sellers and the Buyer (such consent not to be unreasonably withheld, conditioned or delayed).

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Contemporaneously with the execution and delivery of this Agreement, the Sellers are delivering to the Buyer the Schedules with numbered sections corresponding to the relevant sections in this Agreement.  Any exception, qualification, limitation, document or other item described in any provision, subprovision, section or subsection of any schedule of the Schedules with respect to a particular representation or warranty contained in this Agreement shall be deemed to be an exception or qualification with respect to all other representations, warranties and covenants contained in this Agreement to the extent that it is reasonably apparent on its face that such exception, qualification, limitation, document or other item is applicable to such other representations and warranties.  Nothing in the Schedules shall broaden the scope of any representation, warranty or covenant of the Sellers contained in this Agreement.  The inclusion of any information in the Schedules shall not be deemed to be an admission or acknowledgment, in and of itself, that such information is required by the terms hereof to be disclosed, is material to the Sellers, has resulted in or would result in a Material Adverse Effect or is outside the ordinary course of business.  Subject to the foregoing, except as disclosed in the Schedules, the Sellers

-18-

hereby represent and warrant to the Buyer, as of the date hereof (except where such representation and warranty speaks only as of an earlier date, in which case as of such earlier date), as follows:

SECTION 3.01.   <u>Organization and Qualification; Subsidiaries</u>.

(a)   Each Seller is duly organized, validly existing and in good standing under the laws of the state of its formation, incorporation or equivalent, and has, subject to the necessary authorization from the Bankruptcy Court, all requisite organizational power and authority to own, lease and operate its properties and assets and to conduct its business as it is currently being conducted.   Each Seller is duly qualified and in good standing to do business as a foreign corporation in each jurisdiction in which the nature of its business or the ownership, leasing or operation of its properties or assets makes such qualification necessary, except where the failure to be so qualified or in good standing has not had, and would not reasonably be expected to have, a Material Adverse Effect.

(b)   The Company or another Seller has made available to the Buyer true and complete copies of the certificate of incorporation and bylaws (or equivalent organizational and governing documents) of each Seller as currently in effect.

SECTION 3.02.   <u>Authority/Binding Effect</u>.   Subject to the Bankruptcy Court's entry of the Bidding Procedures Order, the Confirmation Order and any other Related Order authorizing the closing of the transactions contemplated hereby in accordance with this Agreement, each Seller has all requisite organizational power and organizational authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby.   The execution, delivery and performance of this Agreement by each Seller, and the consummation of the transactions contemplated hereby by such Seller, have been duly authorized by all necessary organizational action on the part of such Seller, and no other organizational action on the part of such Seller is required to authorize the execution, delivery and performance hereof, and the consummation of the transactions contemplated hereby by such Seller.   This Agreement has been duly executed and delivered by each Seller and, assuming that this Agreement has been duly authorized, executed and delivered by the other Parties and subject to the Bankruptcy Court's entry of the Bidding Procedures Order, the Confirmation Order or any other Related Order, to the extent necessary, constitutes the valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other Laws of general application affecting enforcement of creditors' rights or by principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

SECTION 3.03.   <u>Financial Statements</u>.   Attached hereto as <u>Schedule 3.03</u> are copies of (a) the unaudited consolidated balance sheet, as of December 31, 2019, of the Company and its Subsidiaries, and the unaudited consolidated statements of earnings and cash flows and changes in stockholders' equity of the Company and its Subsidiaries for the nine-month period then ended (such statements, the "<u>Latest Financial Statements</u>"), and (b) the audited consolidated balance sheet, as of December 31, 2018, of the Company and its Subsidiaries and the audited consolidated statements of earnings and cash flows and changes in stockholders' equity of the Company and its Subsidiaries, together with the notes thereto, for the fiscal year ended December 31, 2018 (such statements and notes, together with the Latest Financial Statements, the "<u>Financial Statements</u>").

-19-

The Financial Statements fairly present, in all material respects, the consolidated financial position of the Company and its Subsidiaries, as of the date thereof, and the consolidated statements of earnings and cash flows and changes in stockholders' equity of the Company and its Subsidiaries, for the periods set forth therein.  Each of the Financial Statements has been prepared in accordance with GAAP, consistently applied, except as otherwise noted therein, and subject, in the case of the Latest Financial Statements, to normal year-end adjustments which are not, individually or in the aggregate, material and the absence of footnote disclosures. Sellers maintain a standard system of accounting for the Business established and administered in accordance with GAAP as applied to the Financial Statements consistent with past practice.

SECTION 3.04.    Absence of Certain Changes or Events.    Except for the transactions contemplated hereby, since the date of the Latest Financial Statements and prior to the date of this Agreement, the Company and its Subsidiaries have conducted the Business in the ordinary course of business.  From the date of the Latest Financial Statements to the date hereof, there has not occurred any event or change that has had, or would reasonably be expected to have, a Material Adverse Effect.  Except for the transactions contemplated hereby, since the date of the Latest Financial Statements and prior to the date of this Agreement, no Seller has taken any action that, if taken during the period from the date of this Agreement through the Closing without the Buyer's consent, would constitute a breach of Section 5.1(a), (b), (c), (d), (e), (f) or (g).

SECTION 3.05.    Consents and Approvals/No Violation.

(a)    The execution and delivery of this Agreement by each Seller does not, and the performance by such Seller of this Agreement and the consummation of the transactions contemplated hereby will not, require such Seller to obtain any consent, approval, authorization or permit of, or to make any filing with or notification to ("Consents"), any federal, state or local court, legislature, executive or regulatory authority, agency or commission, or other governmental entity, authority or instrumentality, whether domestic or foreign ("Governmental Authority") or other third party (other than any such Consent that may be required from such other third party under any Contract), except (i) for compliance with the applicable requirements, if any, of the HSR Act and any other Antitrust Laws, (ii) as required or pursuant to the Bankruptcy Code, the Confirmation Order and any other Related Order, (iii) for the filing of appropriate documents with the relevant authorities of other states in which the Sellers conducts business, (iv) for Consents that may be required solely by reason of the Buyer's participation in the transactions contemplated hereby (which Consents shall be solely the responsibility of the Buyer), (v) for those Consents, the failure of which to be obtained or made has not been and would not reasonably be expected to be, individually or in the aggregate, materially adverse to the Sellers, taken as a whole.  The Buyer acknowledges and agrees that no Seller shall be deemed in breach of this Section 3.05(a) as a result of the breach of Section 4.03 by the Buyer.

(b)    The execution and delivery of this Agreement by such Seller does not, and the performance by such Seller of this Agreement and the consummation of the transactions contemplated hereby by such Seller will not, (i) conflict with, violate or result in any breach of the organizational documents of such Seller, (ii) assuming compliance with the matters referred to in Section 3.05(a), conflict with or violate any Law or Order applicable to such Seller as of the date hereof or (iii) result in any breach of, or constitute a default (or an event that with notice or lapse of time or both would constitute a default) under, any Material Contract to which such Seller is a

-20-

party, except (A) in each case, as set forth on Schedule 3.05(b), and (B) in the case of clauses (ii) and (iii) above, for such conflicts, violations, breaches or defaults that have not been and would not reasonably be expected to be materially adverse to the Sellers, taken as a whole.

SECTION 3.06.   Absence of Litigation.  (i) There is no, and since January 1, 2017 there has been no Action pending or, to the knowledge of the Sellers, threatened in writing against any Seller, the Acquired Assets or the Business and (ii) no Seller is a party to or subject to, or in default under, any judgment, order or decree of any Governmental Authority ("Order") to which any Seller is a party or is subject that, in the case of each of clauses (i) and (ii) above, which has had or would reasonably be expected to be materially adverse to the Sellers, taken as a whole.

SECTION 3.07.   Affiliate Transactions.  No executive officer or director of any Seller or any Person who beneficially owns one percent (1%) or more of the shares of common stock of the Company or any of their immediate family members or Affiliates is a party to any Contract with or binding upon any Seller or has any material interest in any material Acquired Asset or has engaged in any material transaction with any Seller within the twenty-four (24) months immediately preceding the date of this Agreement other than, in each case, employment arrangements between any such employee or independent director and the Sellers entered into in the ordinary course of business.

SECTION 3.08.   Permits/Compliance with Laws.

(a)     Each Seller is in material compliance, and since January 1, 2017 has been in material compliance, with all Material Permits (as defined below) and all Laws applicable to the Business.  No Seller nor any of its officers or directors has, since January 1, 2017, received any notice, Order, complaint, claim, investigation or other written communication from any Governmental Authority or any other Person regarding any actual or alleged material violation of any Law or Order applicable to it.

(b)     (i) Each Seller possess all material Permits (the "Material Permits") required under applicable Laws for operation of the Business as currently being conducted and to lease and own its respective properties and assets and (ii) all such Material Permits are in full force and effect and have not been revoked.  No event has occurred or circumstances exist that (with or without the lapse of time or the giving of notice, including as a result of the transactions contemplated by this Agreement) would reasonably be expected to constitute or result in any Seller's material failure, default or violation under any of its Material Permits, or that could reasonably be expected to result in any material loss, expiration, or termination of any such Permit, and there are no Actions pending or, to the knowledge of the Sellers, threatened in writing relating to the suspension, failure to renew, revocation, withdrawal, penalty, payment, fine or modification of any of the Material Permits.

SECTION 3.09.   No Undisclosed Liabilities.  Except (a) to the extent reflected in or reserved against in the Financial Statements, (b) for current liabilities incurred in the ordinary course of business since the date of the Latest Financial Statements, (c) for liabilities incurred under, or contemplated by, this Agreement or incurred in connection with the transactions contemplated hereby (excluding, for the avoidance of doubt, liabilities resulting from the breach

-21-

of this Agreement by the Sellers) or (d) as has not been, and would not reasonably be expected to be, materially adverse to the Sellers, taken as a whole, no Seller has any liabilities, obligations or commitments (whether accrued, absolute, contingent or otherwise) required by GAAP to be set forth on a consolidated balance sheet of the Sellers.

SECTION 3.10.    Employee Benefit Plans/ERISA/Indemnification.

(a)    Schedule 3.10(a) sets forth a true and complete list, as of the date of this Agreement, of each Employee Benefit Plan.  With respect to each material Employee Benefit Plan, the Sellers have made available to the Buyer true and complete copies of each of the following documents, as applicable:  (i) a copy of the Employee Benefit Plan (including all amendments thereto), (ii) a copy of the most recent annual report required under ERISA or the Code, (iii) a copy of the most recent summary plan description required under ERISA, (iv) if the Employee Benefit Plan is funded through a trust or any third-party funding vehicle, a copy of the trust or other funding agreement (including all amendments thereto) and (v) the most recent IRS determination, advisory or opinion letter.

(b)    Schedule 3.10(b) sets forth a true and complete list, as of the date of this Agreement, of each (i) written contract, arrangement, commitment or understanding that entitles any current or former director, officer or employee to indemnification from any Seller and (ii) executive liability insurance policy entered into by any Seller on behalf of any current or former director, officer or employee, in each case, entered into within the six (6) year period immediately prior to the date of this Agreement, through and including the date of this Agreement, other than those set forth in any Sellers' organizational documents.

(c)    Each Employee Benefit Plan was established and has been and is administered, in all material respects, in accordance with its terms and in compliance with applicable Laws, including ERISA and the Code. Each Employee Benefit Plan that is intended to be tax qualified under Section 401(a) of the Code has received, is covered by or has applied for a favorable determination letter from the IRS or utilizes a prototype or volume submitter plan document that is the subject of a favorable opinion or advisory letter issued by the IRS to the sponsor of such prototype or volume submitter plan document and, to the knowledge of the Sellers, nothing has occurred that would reasonably be expected to result in the loss of such qualification.

(d)    None of the Sellers or any of their respective ERISA Affiliates has in the past six (6) years sponsored, maintained, contributed to, been obligated to contribute to or had any Liability in respect of (i) any plan subject to Section 412 of the Code, Section 302 of ERISA or Title IV of ERISA or (ii) a "multiemployer plan," as defined in Section 3(37) of ERISA. None of the Employee Benefit Plans provide for post-employment life or health insurance benefits or coverage for any current or former employee or individual consultant or any beneficiary thereof, except (i) as may be required by applicable Law, including, Part 6 of the Subtitle B of Title I of ERISA, Section 4980B of the Code and similar state Laws, (ii) coverage through the end of the month of termination of employment or service, (iii) disability benefits attributable to disabilities occurring at or prior to termination of employment or service, and (iv) conversion rights at the sole expense of the converting individual.

(e)     There is no pending Action or, to the knowledge of the Sellers, any Action threatened in writing or audit by any Governmental Authority with respect to any Employee Benefit Plan, by any employee or beneficiary covered under any Employee Benefit Plan or otherwise involving any Employee Benefit Plan (other than routine benefit claims, administrative appeals of such claims and domestic relations order proceedings), which would reasonably be expected to result in a material liability to the Business, taken as a whole.

(f)     Except as set forth in this Agreement or as set forth on Schedule 3.10(f), neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby (alone or together with any other event which standing alone would not by itself trigger such entitlement or acceleration) will (i) entitle any current or former director, officer, employee or individual consultant of any Seller to severance pay or any other compensatory payment from such Seller or (ii) accelerate the time of payment, funding or vesting, or increase the amount of compensation or benefit due any current or former director, officer, employee or individual consultant of such Seller.

(g)     Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby (alone or together with any other event) will cause any amount to be nondeductible under Section 280G of the Code or subject to an excise tax under Section 4999 of the Code.

SECTION 3.11.    Material Contracts.

(a)     Schedule 3.11(a) sets forth a list of all Material Contracts.  As used in this Agreement, "Material Contracts" means all Transferred Contracts of the following types to which any Seller is a party as of the date hereof:

(i)     any Contract that contains a non-competition covenant that precludes any Seller from operating in any line of business or in any geographic location in any material respect;

(ii)     any Contract that creates, governs or controls any joint venture, partnership or limited liability company or other similar Contract for any similar venture or partnership;

(iii)     any indenture, loan or credit agreement or other Contract for or under which Indebtedness is incurred or granting to any Person material Liens (other than Permitted Liens);

(iv)     any consulting agreement or employment agreement that provides for annual base compensation exceeding $250,000 per year and which cannot be terminated by any Seller without penalty on notice of ninety (90) days or less;

(v)     any collective bargaining agreement with any labor union or other collective bargaining representative;

(vi)    any Contract that grants a third party any license rights with respect to Seller Intellectual Property (other than non-exclusive licenses granted in the ordinary course of business);

(vii)    any Contract that (A) has a term exceeding one (1) year and is not cancelable by a Seller on notice of ninety (90) or fewer days without any termination payment by such Seller and (B) pursuant to which any Seller paid in excess of $1,000,000 for the twelve (12) month period ended September 30, 2019;

(viii)    any Contract for the sale of any of the assets of any Seller (whether by merger, sale of stock, sale of assets or otherwise) for consideration in excess of $1,000,000 pursuant to which any Seller has continuing obligations that are material (other than (A) any Contract that is solely among the Sellers and (B) any Contract for the sale of obsolete or unused inventory, equipment or similar assets);

(ix)    any Contract with respect to the acquisition by any Seller of any Person (whether by merger, sale of stock, sale of assets or otherwise), any business or division of any Person of any material properties or assets of another Person, in each case, pursuant to which any Seller has (A) continuing indemnification obligations that are, individually or in the aggregate, material or (B) any "earn-out" or similar contingent purchase price payment obligations (other than, in each case, any Contract that is among the Sellers);

(x)    any Contract that contains exclusivity provisions that restrict or requires any Seller to provide "most favored status" (or similar status) to any other Person; and

(xi)    any Contract for capital expenditures or the acquisition or construction of fixed assets, in each case, in excess of $2,000,000.

(b)    The Sellers have made true and complete copies of each written Material Contract available to the Buyer.  Except as has not been, and would not reasonably be expected to be, materially adverse to the Sellers, taken as a whole, (i) each Material Contract is a valid and binding agreement of the Sellers, enforceable against the Sellers in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other Laws of general application affecting enforcement of creditors' rights or by principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity) and (ii) the consummation of the transactions contemplated by this Agreement will not result in (x) a default or an event of default under any Material Contract or (y) any counterpart to a Material Contract having a right to terminate, accelerate or assert any other similar right with respect to, such Material Contract pursuant to the express terms of such Material Contract.  Except as has not been, and would not reasonably be expected to be, materially adverse to the Sellers, taken as a whole, (i) no Seller is, or has received any notice since the date of the Latest Financial Statements that it or any other party is, in default under, any Material Contract, (ii) to the knowledge of the Sellers, there has not occurred any event that with the lapse of time or the giving of notice or both would constitute such a default under any Material Contract and (iii) since the date of the Latest Financial Statements, no Seller has received any written notice from any party to any Material Contract that such party intends to terminate or not renew such Material Contract.

-24-

SECTION 3.12.    Environmental Matters.

(a)    Except as has not been, and would not reasonably be expected to be, materially adverse to the Sellers, taken as a whole, each Seller has been since January 1, 2017 and is in compliance with all applicable Environmental Laws (which compliance includes, but is not limited to, the possession by such Seller of all Material Permits required under applicable Environmental Laws, and compliance with the terms and conditions thereof).

(b)    There is no Action or, to the knowledge of the Sellers, any investigation pursuant to any Environmental Law pending or, to the knowledge of the Sellers, threatened against any Seller or, any real property or facility owned by any Seller which have been or, if adversely determined, would reasonably be expected to be materially adverse to the Sellers, taken as a whole, and no Seller is a party to or subject to, or in default under, any Order issued pursuant to an Environmental Law that has been or would reasonably be expected to be materially adverse to the Sellers, taken as a whole.

(c)    Since January 1, 2017 and through the date hereof, no Seller has received any written notice of potential liability under the Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any other Environmental Law.

(d)    Except as has not been, and would not reasonably be expected to be, materially adverse to the Sellers, taken as a whole, there are no Hazardous Materials present in the environment associated with the Leased Real Property that require remedial action by the Sellers pursuant to any applicable Environmental Law.

SECTION 3.13.    Real Property.

(a)    No Seller owns any real property.

(b)    Schedule 3.13(b) sets forth a list of all material leases, together with any subleases and similar agreements under which the Sellers lease, use or occupy or have the right to use or occupy any real property (the "Leases").  Each Lease is the valid and binding obligation of the Seller party thereto, enforceable in accordance with its terms subject to proper authorization and execution of such Lease by the other party thereto and the Laws of general application relating to public policy, bankruptcy, insolvency and the relief of debtors and rules of Law governing specific performance, injunctive relief and other equitable remedies, and no Seller party thereto nor, to the knowledge of the Sellers, any other party to such Lease is in default under such Lease except for those defaults that will be cured in accordance with the Confirmation Order or waived in accordance with section 365 of the Bankruptcy Code (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Leases).

SECTION 3.14.    Labor Matters.

(a)    No Seller is a party to any collective bargaining agreement or similar agreement with any labor organization or employee association.

(b)        As of the date hereof, no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is pending, and, to the knowledge of the Sellers, no such grievance or arbitration proceeding is threatened in writing which has had, or if adversely determined would reasonably be expected to have a Material Adverse Effect.

(c)        As of the date hereof there is no pending or, to the knowledge of the Sellers, threatened in writing, (i) labor dispute between any Seller and any labor organization, or any material strike, slowdown, jurisdictional dispute, work stoppage or other similar organized labor activity involving any employee of the Sellers or affecting the Sellers or (ii) union organizing, or election activity involving, any employee of the Sellers, except, in the case of each of clause (i) and (ii), as has not had, and would not reasonably be expected to have a Material Adverse Effect.

(d)        Each Seller is in compliance in all respects with all applicable federal, state and local Laws regarding labor, employment and employment practices, conditions of employment, classification of labor, occupational safety and health, and wages and hours, including any bargaining or other obligations under the National Labor Relations Act (collectively, "Labor Laws"), except for such instances of noncompliance which have not had, and would not reasonably be expected to have a Material Adverse Effect.

SECTION 3.15.    Insurance.  All material insurance policies of the Sellers are in full force and effect, and no Seller is in breach of any such material insurance policies.  Since December 31, 2018 through the date hereof, no written notice of default or termination has been received by the Sellers in respect of any such material insurance policy and all premiums due on such material insurance policies have been paid.

SECTION 3.16.    Intellectual Property.

(a)        Schedule 3.16(a) contains a true and complete list of all patents, trademarks, service marks, Internet domain names and material copyrights included within the Seller Intellectual Property that is registered, issued or applied for under the authority of any Governmental Authority.  All such registrations and applications have been properly made and filed in all material respects, and all annuity, maintenance, renewal and other fees relating to such registrations or applications are current.

(b)        Schedule 3.16(b) separately contains a true and complete list of (i) all material Third-Party Intellectual Property Licenses (excluding Contracts for commercially available Software) and (ii) all material Contracts under which the Sellers have licensed to other Persons (other than a Seller) the right to use any Seller Intellectual Property (other than non-exclusive licenses granted in the ordinary course of business).  Except as set forth on Schedule 3.16(b), (i) no Seller is, or has since December 31, 2017 and prior to the date hereof received any written notice that it or any other party is, in material default under any of the agreements set forth on Schedule 3.16(b) and (ii) to the knowledge of the Sellers, there has not occurred any event that with the lapse of time or the giving of notice or both would constitute such a default under any of the agreements set forth on Schedule 3.16(b), and (iii) each of the agreements set forth on Schedule 3.16(b) is a valid and binding agreement of the Sellers, enforceable against the Sellers in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other Laws of general application affecting

-26-

enforcement of creditors' rights or by principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(c)     The Sellers are the sole and exclusive owner of all right, title and interest in and to all of the material Intellectual Property owned or purported to be owned by the Sellers, including any such Intellectual Property developed for the Sellers by employees or other Persons (including consultants or contractors) who performed such work by or on behalf of the Sellers. The Sellers either own or have a right to use all of the Intellectual Property used in the Business as currently conducted free and clear of any and all Liens, except for and subject to Permitted Liens. The Sellers have made commercially reasonable efforts to maintain and protect the Seller Intellectual Property, and all Seller Intellectual Property is, to the knowledge of the Sellers, valid, enforceable, has been duly maintained and is in full force and effect. The Seller Intellectual Property and the Intellectual Property licensed pursuant to the Third-Party Intellectual Property Licenses comprise all of the Intellectual Property necessary and sufficient for the conduct of the Business in the manner currently conducted. None of the Sellers is subject to any Action or Order restricting in any manner the use or transfer by the Sellers of the Seller Intellectual Property or the Intellectual Property licensed pursuant to the Third-Party Intellectual Property Licenses.

(d)     To the knowledge of the Sellers, no Person is infringing upon, misappropriating or violating any Seller Intellectual Property.

(e)     To the knowledge of the Sellers, the conduct of the Business and the use of Intellectual Property in the Businesses as currently conducted does not infringe upon, misappropriate or violate the Intellectual Property of any Person. Since December 31, 2017 and prior to the date hereof, no Seller has received any written notice or threat from any Person and there is no pending or, to the knowledge of the Sellers, threatened Action to which any Seller is a party challenging the ownership, validity or enforceability of any Seller Intellectual Property or asserting in writing that the Sellers' use of any Intellectual Property infringes upon, misappropriates or violates the Intellectual Property of any Person.

(f)     The Sellers have taken commercially reasonable steps to protect and preserve the confidentiality of all trade secrets and other proprietary or confidential information owned by the Sellers and material to the conduct of the Business. To the knowledge of the Sellers, no such trade secret or proprietary information has been authorized for disclosure or has been actually disclosed to any third party other than pursuant to a valid written confidentiality or non-disclosure agreement restricting the disclosure and use thereof.

(g)     To the knowledge of the Sellers, no material Software owned by the Sellers (or purported to be owned by the Sellers) has been or is being used or distributed by the Sellers in any manner that would require the Sellers to distribute or release any material Software owned by the Sellers (or purported to be owned by the Sellers) as Open Source Software. The material computer systems, networks, Software, databases, websites and related equipment currently used in the conduct of the Business are adequate and sufficient for the normal conduct of the Business and have not suffered any material malfunctions, failures, outages or security breaches since January 1, 2017 and through the date hereof. The Sellers have taken commercially reasonable steps to protect the material computer systems, networks, Software, databases, websites and related equipment currently used in the conduct of the Business from any other software code designed or

-27-

intended to disrupt or disable the operation of, or provide unauthorized access to, a computer system or network or other device on which such code is stored or installed.

(h)    Since January 1, 2017 and through the date hereof, (i) the Sellers have complied in all material respects with all applicable Laws, contractual and fiduciary obligations concerning data privacy, security and/or breach notification, and privacy policies, in the case of each of the foregoing, relating to Personal Information in the possession or control of the Sellers or maintained by third parties having authorized access to such information and (ii) there have been no material data breaches involving unauthorized access, use or disclosures of Personal Information and the Sellers have commercially reasonable safeguards in place to protect Personal Information in its possession or control from unauthorized access, use and disclosure. Since January 1, 2017 and through the date hereof, no privacy policy of any Seller has been materially inaccurate, misleading or deceptive in violation of any applicable Laws and each Seller is, and has been, in material compliance with its respective privacy policies relating to Personal Information in the possession or control of such Seller.  The execution, delivery and performance of this Agreement materially complies with  the Sellers' privacy policies and, to the knowledge of the Sellers, (i) all contractual obligations to third parties regarding Personal Information and (ii) all applicable Laws relating to privacy and data security.

SECTION 3.17.    <u>Taxes</u>.

(a)    Each Seller has (i) filed or caused to be filed with the appropriate Governmental Authorities all income, franchise and other material Tax Returns required to be filed by it (taking into account any extension of time within which to file) and all such Tax Returns are true and correct in all material respects and (ii) timely paid all material amounts of Taxes payable by it to the appropriate Governmental Authority.

(b)    (i) No federal, state, local or foreign audits or other administrative proceedings have been formally commenced or are presently pending with regard to any Taxes or Tax Returns of any Seller for which such Seller has not made adequate provisions (in accordance with GAAP), (ii) no written notification has been received by any Seller that such an audit or other proceeding has been proposed or threatened and (iii) no deficiencies for Taxes have been proposed or assessed in writing against or with respect to any Taxes due or Tax Returns of any Seller or with respect to the Acquired Assets (which deficiencies have not since been fully resolved).

(c)    The Sellers have complied with all material applicable Tax Laws relating to the payment, collection, withholding and remittance of Taxes (including information reporting requirements) with respect to payments made to any employee, creditor, independent contractor, stockholder, or other third party.

SECTION 3.18.    <u>Title to Acquired Assets</u>.  Other than the real property subject to the Leases, the Sellers own each of the Acquired Assets, and the Buyer will be vested with good title to such Acquired Assets, free and clear of all Liens, other than Permitted Liens, to the fullest extent permissible under applicable Law.  Subject to (i) any election of the Buyer pursuant to <u>Section 2.01(b)</u> and (ii) any actions taken by the Buyer after the Closing, the Acquired Assets constitute all of the properties used in or held for use in the Business and are sufficient in all material respects

for the Buyer to conduct the Business from and after the Closing Date without interruption and in the ordinary course of business as it has been conducted by Sellers.

SECTION 3.19.   Brokers.   No investment banker, broker or finder retained by or on behalf of the Sellers is entitled to receive any commission, brokerage, finder's fee or other similar compensation from any Seller in connection with the consummation of the transactions contemplated by this Agreement.

SECTION 3.20.   No Other Representations and Warranties.   EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III, AS QUALIFIED BY THE SCHEDULES, NO SELLER NOR ANY OTHER PERSON MAKES ANY EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES REGARDING THE SELLERS, AND THE SELLERS HEREBY DISCLAIM ANY SUCH REPRESENTATION OR WARRANTY WITH RESPECT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT AND THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  THE BUYER SHALL ACQUIRE THE BUSINESS WITHOUT ANY REPRESENTATION OR WARRANTY AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, IN AN "AS IS" CONDITION AND ON A "WHERE IS" BASIS, EXCEPT AS OTHERWISE EXPRESSLY REPRESENTED OR WARRANTED IN THIS ARTICLE III, AS QUALIFIED BY THE SCHEDULES.   NOTWITHSTANDING ANYTHING TO THE CONTRARY, NEITHER THE SELLERS NOR ANY OTHER PERSON SHALL BE DEEMED TO MAKE ANY REPRESENTATION OR WARRANTY WITH RESPECT TO (I) ANY PROJECTIONS, ESTIMATES OR BUDGETS HERETOFORE DELIVERED TO OR MADE AVAILABLE TO THE BUYER OR ITS COUNSEL, ACCOUNTANTS OR ADVISORS OF FUTURE REVENUES, EXPENSES OR EXPENDITURES OR FUTURE RESULTS OF OPERATIONS OF ANY SELLER OR THE GROUP AS A WHOLE OR (II) EXCEPT AS EXPRESSLY COVERED BY A SPECIFIC REPRESENTATION AND WARRANTY CONTAINED IN THIS ARTICLE III, ANY OTHER INFORMATION OR DOCUMENTS (FINANCIAL OR OTHERWISE) MADE AVAILABLE TO THE BUYER OR ITS COUNSEL, ACCOUNTANTS OR ADVISORS WITH RESPECT TO THE SELLERS.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer hereby represents and warrants to the Sellers as of the date hereof (except where such representation and warranty speaks only as of an earlier date, in which case as of such earlier date), as follows:

SECTION 4.01.   Organization.   The Buyer is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and has all requisite corporate or similar power and authority to own, lease and operate all of its properties and assets and to conduct its business as it is currently being conducted.   The Buyer is duly qualified and in good standing to do business as a foreign entity in each jurisdiction in which the nature of its business or the ownership, leasing and operation of its properties or assets makes such qualification necessary, except where the failure to be so qualified or in good standing has not had and would not

reasonably be expected to (i) have a material adverse effect on its ability to consummate the transactions contemplated hereby or (ii) cause a material delay in its ability to consummate the transactions contemplated hereby (clauses (i) and (ii) collectively, a "Buyer Material Adverse Effect").

SECTION 4.02.    Authority/Binding Effect.    The Buyer has all requisite corporate or similar power and corporate authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby.    The execution, delivery and performance of this Agreement by the Buyer, and the consummation of the transactions contemplated hereby by the Buyer, have been duly authorized by all necessary corporate or similar action on the part of the Buyer, and no other action, corporate or otherwise, on the part of the Buyer or its stockholders or equityholders is required to authorize the execution, delivery and performance hereof, and the consummation of the transactions contemplated hereby by the Buyer.    This Agreement has been duly executed and delivered by the Buyer and, assuming that this Agreement has been duly authorized, executed and delivered by the Sellers, constitutes the valid and binding obligation of the Buyer, enforceable against the Buyer in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other Laws of general application affecting enforcement of creditors' rights or by principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

SECTION 4.03.    Consents and Approvals/No Violation.

(a)    Assuming the truth and accuracy of the representations and warranties set forth in Section 3.05, the execution and delivery of this Agreement by the Buyer does not, and the performance by the Buyer of this Agreement and the consummation of the transactions contemplated hereby by the Buyer will not require the Buyer to obtain any Consent, except for compliance with the applicable requirements, if any, of the HSR Act.

(b)    The execution and delivery of this Agreement by the Buyer does not, and the performance of this Agreement by the Buyer and the consummation of the transactions contemplated hereby by the Buyer will not, (i) conflict with, violate or result in any breach of the certificate of incorporation or bylaws (or equivalent organization and governing documents) of the Buyer, (ii) assuming compliance with the matters referred to in Section 4.03(a), conflict with or violate any Law or Order applicable to the Buyer or (iii) result in any breach of, or constitute a default (or an event that with notice or lapse of time or both would constitute a default) under, any material Contract or Material Permit to which the Buyer is a party or by or to which the Buyer is bound or subject, except in the case of clauses (ii) and (iii) above, for such conflicts, violations, breaches or defaults that would not reasonably be expected to have a Buyer Material Adverse Effect.

SECTION 4.04.    Absence of Litigation.    As of the date hereof, there is no Action pending or, to the knowledge of the Buyer, threatened against the Buyer or any of its Affiliates which, if adversely determined, would reasonably be expected to have a Buyer Material Adverse Effect. Neither the Buyer nor any of its Affiliates is a party to or subject to, or in default under, any Order that would reasonably be expected to have a Buyer Material Adverse Effect.

-30-

SECTION 4.05.    <u>Financial Ability</u>.  The Buyer has sufficient assets to fully discharge all of its obligations under this Agreement.  At the Closing, the Buyer will have available sufficient assets to satisfy its obligation to pay in full all amounts contemplated by <u>Section 2.04</u>.  The obligations of the Buyer under this Agreement are not subject to any conditions regarding the Buyer's or its Affiliates' or any other Person's ability to obtain financing for the consummation of the transactions contemplated by this Agreement.

SECTION 4.06.    <u>Buyer Activities</u>.  The Buyer has not (a) engaged in any business activities or conducted any operations other than in connection with the transactions contemplated hereby or (b) incurred any liabilities other than in connection with its formation and the transactions contemplated hereby.

SECTION 4.07.    <u>Brokers</u>.  Except as set forth on <u>Schedule 4.07</u>, no investment banker, broker or finder retained by or authorized to act on behalf of the Buyer is entitled to receive any commission, brokerage, finder's fee or other compensation or payments from the Sellers or any of their Affiliates in connection with the consummation of the transactions contemplated by this Agreement.

ARTICLE V

COVENANTS

SECTION 5.01.    <u>Conduct of Business</u>.  Except (i) as set forth on <u>Schedule 5.01</u>, (ii) as required by Law or Order, including by order of the Bankruptcy Court (provided that, subject to professional responsibilities, no Seller shall petition, seek, request or move, or authorize, support or direct any other Person to petition, seek, request or move, for any order of the Bankruptcy Court, inconsistent with the obligations of Sellers set forth in this <u>Section 5.01</u> and the RSA), (iii) as permitted, required or expressly contemplated by this Agreement (including <u>Section 2.07</u>, if applicable), the Plan or the Confirmation Order or (iv) with the prior written consent of the Buyer (which consent shall not be unreasonably withheld, delayed or conditioned), during the period from the date of this Agreement to the earlier of the Closing and the date on which this Agreement is terminated in accordance with <u>Article VII</u>, the Sellers shall (A) conduct the Business in the ordinary course of business and (B) use their commercially reasonable efforts to (I) preserve the present business operations, organization and goodwill of the Business and (II) preserve in all material respects the present relationships with customers and suppliers of the Business, consistent with past practice.  Without limiting the generality of the foregoing, and except (i) as set forth on <u>Schedule 5.01</u>, (ii) as required by Law or Order, including by order of the Bankruptcy Court (provided that, subject to professional responsibilities, no Seller shall petition, seek, request or move, or authorize, support or direct any other Person to petition, seek, request or move, for any order of the Bankruptcy Court, inconsistent with the obligations of Sellers set forth in this <u>Section 5.01</u> and the RSA), or (iii) as required or expressly contemplated by this Agreement (including <u>Section 2.07</u>, if applicable) the Plan or the Confirmation Order, during the period from the date of this Agreement through the earlier of the Closing and the date on which this Agreement is terminated in accordance with <u>Article VII</u>, no Seller shall, without the prior written consent of the Buyer (which consent shall not be unreasonably withheld, delayed or conditioned); <u>provided</u>, <u>that</u>, if the Sellers provide a draft of any motion, proceeding or document to the Buyer at least two (2)

-31-

Business Days before such filing and Buyer does not provide written notice of its opposition to such filing, such filing shall not be deemed to violate this <u>Section 5.01</u>:

        (a)      (i) sell, lease, transfer, license, sublicense, abandon or otherwise dispose of any Acquired Assets other than sales, leases, licenses, sublicenses, abandonments, transfers or dispositions (x) by one Seller to another, (y) in the ordinary course of business and (z) of obsolete or unsalable inventory or equipment; or (ii) subject any material Acquired Asset to any Liens other than (x) Permitted Liens, and (y) Liens granted by a Seller in favor of another Seller;

        (b)      except as otherwise required by the terms of any Employee Benefit Plan as in effect on the date hereof, (i) establish, adopt, enter into, amend or terminate any Employee Benefit Plan or any plan, agreement, program, policy, trust, fund or other arrangement that would be an Employee Benefit Plan if it were in existence as of the date of this Agreement or (ii) grant any equity or equity-based awards;

        (c)      (i) except in the ordinary course of business, increase the annual level of compensation of any non-executive employee of a Seller or any of its Subsidiaries entitled to annual compensation less than $200,000 or (ii) increase the annual level of compensation payable or to become payable by a Seller or any of its Subsidiaries to any of their respective executive officers or any employee entitled to compensation in excess of $200,000;

        (d)      acquire by merging or consolidating with, or by purchasing all or substantially all of the assets or equity securities of, or by any other manner, any Person, other than (i) any transaction entered into with a purchase price not in excess of $5,000,000 or (ii) acquisitions or purchases by a Seller of another Seller;

        (e)      settle or compromise any material Tax liability; make, change or revoke any material election with respect to its Taxes; change (or request to any Governmental Authority to change) any material aspect of any method of accounting for Tax purposes; file any amended Tax Return; enter into any "closing agreement" as described in Section 7121 of the Code (or any similar provision of Law) with any Governmental Authority; or surrender any claim for a refund of Taxes;

        (f)      enter into any Contract that would be a Material Contract if in effect on the date hereof or amend or terminate (other than in respect of a breach by a counterparty thereto) any Material Contract, other than (i) any of the foregoing effected in the ordinary course of business or (ii) the renewal of existing Material Contracts in the ordinary course of business or expiration of existing Material Contracts;

        (g)      waive, release or assign in writing any material rights or claims that would otherwise constitute an Acquired Asset;

        (h)      except in the ordinary course of business, modify any existing rights under, or enter into any settlement regarding the breach, infringement, misappropriation or dilution of, any material Intellectual Property;

        (i)      pay, discharge, settle or compromise (or offer to settle or compromise) any pending or threatened suit, action or claim which (A) requires payment by any Seller (exclusive of

attorney's fees) in excess of $1,000,000 in the aggregate or (B) which imposes material restrictions on the operations of any Seller;

(j)    enter into any capital expenditures (as defined by the Sellers, consistent with past practice) other than in the ordinary course of business consistent with past practice in an amount not exceeding $2,000,000 in the aggregate; or

(k)    enter into any Contract to take any of the foregoing actions.

SECTION 5.02.    <u>Control of Operations</u>.  Nothing contained in this Agreement shall give the Buyer, directly or indirectly, the right to control or direct the operations of the Business prior to the Closing.  Prior to the Closing, the Sellers shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over their respective operations.

SECTION 5.03.    <u>Reasonable Best Efforts/Cooperation</u>.  From and after the date of this Agreement, and through the earlier of the Closing and the date on which this Agreement is terminated in accordance with <u>Article VII</u>, each of the Parties shall, and the Buyer shall cause each of its Affiliates to, use its respective reasonable best efforts (unless, with respect to any action, another standard of performance is expressly provided for herein) to take, or cause to be taken, all actions, and to do, or cause to be done all things, necessary, proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement on the terms set forth herein as promptly as practicable, including satisfaction, but not waiver, of the conditions to Closing set forth in <u>Article VI</u>.

SECTION 5.04.    <u>Consents</u>.

(a)    Without limiting the generality of <u>Section 5.03</u>, each of the Parties shall use their reasonable best efforts to obtain, and the Buyer shall cause its Affiliates to use their reasonable best efforts to obtain, all Consents of all Governmental Authorities and other Persons as may be necessary in connection with the consummation of the transactions contemplated by this Agreement prior to the Closing, including by timely making or causing to be made all filings and submissions under applicable Law as may be required to consummate the transactions contemplated hereby.  Notwithstanding the foregoing or any other provision of this Agreement to the contrary (other than as contemplated by <u>Section 5.04(b)</u>), none of the Sellers or the Buyer shall have any obligation to agree to amend or modify any Contract or pay any fee to any third party (including filing or other fees payable to Governmental Authorities) for the purpose of obtaining any such Consent, or any costs and expenses of any third party resulting from the process of obtaining such Consent, except to the extent expressly required by any such Contract or applicable Law.

(b)    The Buyer acknowledges that (i) certain Consents and waivers with respect to the transactions contemplated by this Agreement may be required from the parties to Contracts to which a Seller is a party and that obtaining such Consents is not a condition to the consummation of the transactions contemplated hereby and (ii) notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to transfer or assign any Transferred Contract or any claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment or transfer (in whole or, to the extent relevant, in part)

-33-

thereof, without the consent of a third party, would, after giving effect to the Confirmation Order and the Bankruptcy Code, constitute a breach or other contravention thereof or a violation of Law, or in any way adversely affect the rights of Sellers or, upon transfer, Buyer under such Transferred Contract, claim or right, in each case, that cannot be excused or rendered ineffective by operation of the Bankruptcy Code, the Confirmation Order (or another Related Order), or applicable non-bankruptcy Law.

SECTION 5.05.    Antitrust Notifications and Other Regulatory Approvals.

(a)    Each of the Parties shall, and the Buyer shall cause its Affiliates to, cooperate with each other and shall use, and the Buyer shall cause its Affiliates to use, their respective reasonable best efforts to prepare and file as soon as practicable following the date of this Agreement the required Notification and Report Forms under the HSR Act with the FTC and the DOJ (but in no event later than ten (10) Business Days after the date of this Agreement absent mutual agreement by the Parties). Each of the Parties shall make, and the Buyer shall cause its Affiliates to make, any other filings and submissions in other jurisdictions as are mutually agreed by the Parties, if any, as soon as practicable and shall promptly provide any supplemental information or documentation requested by any Governmental Authority relating thereto. The Buyer shall pay all required fees and expenses incurred in connection with the notifications, filings, registrations, submissions or other materials contemplated by this Section 5.04(b). Subject to applicable confidentiality obligations (including pursuant to the First Lien Credit Agreement), Laws or Orders, the Parties shall, and the Buyer shall cause its Affiliates to, coordinate and cooperate fully and promptly with each other in exchanging such information and providing such assistance as the other parties may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods under the HSR Act. Neither Party shall take any action to extend the HSR waiting period or otherwise extend the time period for review by any Governmental Authority or agree to delay closing (such as by entering into a timing agreement) without the prior written consent of the other Party (which may be provided via email).

(b)    Each Party shall promptly notify the other Parties of the substance of any submission, correspondence, communication, or meeting between it or its representatives and any Governmental Authority that relate to the subject matter of this Section 5.04(b) or the transactions contemplated by this Agreement (which shall be provided on an outside counsel basis to the extent that the information is competitively sensitive). To the extent practicable, each Party shall consult with the other Parties in advance regarding any such submission, correspondence, communication or meeting, shall consider in good faith the views and comments of such Party, and shall provide the other Parties with the opportunity to participate in any such communication or meeting unless prohibited by the Governmental Authority.

(c)    Notwithstanding anything in this Agreement to the contrary, the Parties shall, and the Buyer shall cause its Affiliates to, take any and all actions necessary or advisable to obtain expiration or termination of the required waiting periods and any consents, clearances or approvals required under or in connection with the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and any other federal or state law, regulation or decree designed or intended to prohibit, restrict or regulate actions or transactions having the purpose or effect of monopolization, restraint of trade or harm to competition (collectively, "Antitrust Laws") and to avoid or eliminate each and every impediment

-34-

under any Antitrust Law, in each case, to cause the Closing and the other transactions contemplated hereby to occur as soon as practicable following the date of this Agreement and, in any event, prior to the Outside Date, including (i) expeditiously complying with or modifying any requests or inquiries for additional information or documentation (including any second request) by any Governmental Authority, (ii) offering, negotiating, committing to and effecting, by consent decree, hold separate order or otherwise, the sale, divestiture, license or other disposition of any and all of the capital stock, assets, rights, products or businesses of the Buyer and its Affiliates and the Business, the entrance into, and the amendment, modification or termination of, any Contracts or other arrangements, and any other restrictions on the activities of the Buyer and its Affiliates or Company and its Subsidiaries and (iii) contesting, defending and appealing any threatened or pending Action or preliminary or permanent injunction or other Order that would adversely affect the ability of any party hereto to consummate, or otherwise delay the consummation of, the transactions contemplated hereby and taking any and all other actions to prevent the entry, enactment or promulgation thereof.

(d)     From the date of this Agreement through the date (i) of termination of the required waiting periods under the HSR Act and (ii) any Consents of any other applicable Governmental Authority are obtained, the Buyer and its Affiliates shall not directly or indirectly (A) effect or enter into any discussions or negotiations with respect to any transaction, including entering into any joint venture or acquiring or agreeing to acquire, by merging with or into or consolidating with, or purchasing a substantial portion of the assets of or any equity in, or by any other manner, any assets or Person, if such transaction is in a line of business that is related to the Restricted Business, or (B) take (or fail to take) any other action that would reasonably be expected to delay or make more difficult the obtaining of clearance or the expiration of the required waiting periods under the HSR Act, or the obtaining of such Consents from any applicable Governmental Authorities.

(e)     The Parties acknowledge and agree that the obligations set forth in this Section 5.04(b) shall be in addition to, and not in limitation of the generality of, the matters set forth in Section 5.03 and Section 5.04.

SECTION 5.06.    Bankruptcy Court Matters.

(a)     Competing Transaction. This Agreement is subject to approval of the procedures set forth in the Bidding Procedures Order, and the consideration by the Sellers of higher or better competing bids in respect of all or any part of the Acquired Assets (whether in combination with other assets of the Sellers or their Affiliates or otherwise) in accordance with the Bidding Procedures Order (each a "Competing Bid"). Until the transactions contemplated hereby are consummated, the Sellers are permitted to and to cause their Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to the Buyer and its Affiliates and Representatives) in connection with a Competing Bid, including, to (and to cause their Representatives and Affiliates to) respond to any inquiries or offers to purchase all or any part of the Acquired Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bidding Procedures Order, or other applicable Law (including supplying information relating to the Business and the assets of the Sellers to prospective purchasers).

(b)    <u>Bankruptcy Court Filings and Auction</u>.

(i)    As soon as reasonably practicable following the execution of this Agreement and the commencement of the Bankruptcy Cases, the Sellers shall file with the Bankruptcy Court a motion (in form and substance satisfactory to the Buyer) seeking entry of the Bidding Procedures Order and use commercially reasonable efforts to seek entry of such Bidding Procedures Order within thirty (30) days of the Petition Date; <u>provided</u>, that in no event will the order be entered after forty (40) days from the Petition Date. Sellers shall consult with Buyer concerning the Bidding Procedures Order and any other orders of the Bankruptcy Court relating to the transactions contemplated under this Agreement and the bankruptcy proceedings in connection therewith, and use commercially reasonable efforts to provide Buyer with copies of applications, pleadings, notices, proposed orders and other documents relating to such proceedings as soon as reasonably practicable prior to their filing. The Buyer agrees that it will promptly take such actions as are reasonably requested by the Sellers to assist in obtaining entry of the Bidding Procedures Order. In the event the entry of the Bidding Procedures Order shall be appealed, the Sellers and the Buyer shall use their respective commercially reasonable efforts to defend such appeal.

(ii)    Provided the Buyer is selected as the winning bidder in respect of the Acquired Assets at the auction, if any, undertaken in accordance with the Bidding Procedures Order (the "<u>Auction</u>"), or if no Competing Bid is submitted with respect to the Acquired Assets that constitutes a Qualified Bid (as defined in the Bidding Procedures Order), the Sellers shall seek entry of the Confirmation Order and any other orders of the Bankruptcy Court that may be necessary to close the sale of the Acquired Assets to the Buyer (the "<u>Related Orders</u>") in accordance with the terms and conditions of the Bidding Procedures Order. The Buyer and the Sellers acknowledge that this Agreement and the transactions contemplated hereby are subject to entry of the Confirmation Order and the Related Orders, if applicable, including a finding of adequate assurance of future performance by the Buyer. The Buyer agrees that it will promptly take such actions as are reasonably requested by the Sellers to assist in obtaining entry of the Confirmation Order and any Related Orders (if applicable), including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of future performance by the Buyer under the Transferred Contracts. In the event the entry of the Confirmation Order or any Related Orders (if applicable) shall be appealed, the Sellers and the Buyer shall use their respective commercially reasonable efforts to defend such appeal.

(iii)    Provided the Buyer is selected as the winning bidder at the Auction, if any, or if no Competing Bid that constitutes a Qualified Bid (as defined in the Bidding Procedures Order) is submitted with respect to the Acquired Assets, the Sellers shall file such motions or pleadings (in form and substance reasonably satisfactory to the Buyer) as may be appropriate or necessary to assume and assign the Transferred Contracts and to determine the amounts of the respective Cure Costs; <u>provided</u>, that nothing herein shall preclude the Sellers from filing any pleadings to reject any Contracts that are not Transferred Contracts.

(iv)    Sellers shall use commercially reasonable efforts to obtain entry of the Confirmation Order by the Bankruptcy Court as soon as practicable but in no event later than sixty-five (65) calendar days after entry of the Disclosure Statement Order (as defined in the RSA);

provided, that such deadline may be extended upon mutual agreement between the Sellers and the Buyer, and shall be extended as necessary to accommodate the availability of the Bankruptcy Court.

(c)    Back-up Bidder.    Except as otherwise provided in the RSA or Bidding Procedures Order, the Sellers and the Buyer agree that, in the event (i) that the Buyer is not the winning bidder at the Auction or (ii) if the Requisite Consenting First Lien Creditors exercise the Credit Bid Back-up Bid Right, if and only if (i) the Buyer's bid is designated as a Back-Up Bid (which, for the avoidance of doubt, may be one of multiple Back-Up Bids), and (ii) the Sellers give written notice to the Buyer on or before the Back-up Termination Date, stating that the Sellers (A) failed to consummate the sale of the Acquired Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder, the Buyer shall promptly consummate the transactions contemplated hereby upon the terms and conditions as set forth herein, including the Purchase Price (as they may have been improved at the Auction).

SECTION 5.07.    Access to Information.

(a)    Subject to applicable confidentiality obligations (including pursuant to the First Lien Credit Agreement), Laws and Orders, during the period from the execution and delivery of this Agreement by the Parties through the earlier of the Closing and the date on which this Agreement is terminated in accordance with Article VII, the Sellers shall permit the Buyer and its advisors, accountants, attorneys and authorized representatives to have reasonable access, during normal business hours and upon reasonable advance notice, to the offices, facilities, assets, properties, management-level employees and books and records of the Sellers, and shall furnish, or cause to be furnished, to the Buyer such financial and operating data and other information with respect to such entities and their respective offices, facilities, assets, properties, employees, businesses and operations, in each case, as the Buyer shall from time to time reasonably request in connection with the transactions contemplated hereby; provided, that nothing herein shall obligate the Sellers to produce any such information in connection with any Action commenced or threatened by or on behalf of the Buyer against any Seller or any Seller Related Party.  All access and investigation pursuant to this Section 5.07 shall be coordinated through the Sellers' counsel or the designee thereof and shall be conducted at the Buyer 's expense and in such a manner as not to unreasonably interfere with the normal operations of the Business. Notwithstanding anything to the contrary contained herein or otherwise, no Seller shall be required to provide access to or to disclose information where such access or disclosure would reasonably be expected to (i) jeopardize the attorney-client privilege or other immunity or protection from disclosure of the Sellers, (ii) contravene any Law, Contract or any other obligation of confidentiality, or (iii) result in the disclosure of competitively sensitive information, provided that in each of clauses (i) – (iii) that the Parties shall use commercially reasonable efforts to enter into reasonable and customary arrangements that would permit such access to be provided or information to be disclosed without jeopardizing such privilege, immunity or protection, contravening such Law, Contract or other obligation or resulting in the disclosure of such competitively sensitive information, as applicable. Notwithstanding anything to the contrary contained herein or otherwise, prior to the Closing, (i) without the prior written consent of the Sellers (which shall not be unreasonably withheld, conditioned or delayed), the Buyer shall not, and shall cause its Affiliates and its representatives not to, contact any vendor, customer, partner or other Person with whom the Sellers have a business

-37-

relationship regarding the business, operations, assets, financial condition or prospects of the Sellers or this Agreement or the transactions contemplated hereby and (ii) the Buyer shall have no right to perform invasive or subsurface investigations of the properties or facilities of the Sellers without the prior written consent of the Sellers.  Notwithstanding anything in this Agreement to the contrary, no access or information provided by or on behalf of the Sellers pursuant to this Section 5.06 will modify any of the representations or warranties of the Sellers contained in this Agreement or the conditions hereunder to the obligations of the Buyer.

(b)     The Buyer shall hold, and shall cause its Representatives to hold, any confidential information provided to them in connection with the transactions contemplated by this Agreement in confidence in accordance with all confidentiality obligations (including pursuant to the First Lien Credit Agreement) that the Buyer or any of its Affiliates may be subject in connection with the transactions contemplated hereby.

SECTION 5.08.   Public Statements.   Except for any press release as is mutually agreed to by the Parties that may be issued on the date hereof (or such other time as mutually agreed by the Parties), no press release or other public announcement, statement or comment relating to the transactions contemplated by this Agreement shall be issued, made or permitted to be issued or made by any Party or any of its Affiliates or representatives without the prior written consent of the other Parties unless, in the sole judgement of the Sellers or the Buyer, such disclosure is otherwise required by applicable Law or in connection with the filings to be made with the Bankruptcy Court; provided that the Party intending to make such release shall use its commercially reasonable efforts consistent with such applicable Law to consult with the other Party with respect to the text thereof. The Parties acknowledge that Sellers shall file this Agreement with the Bankruptcy Court in connection with obtaining the Confirmation Order (and other Related Orders, if applicable). Notwithstanding the foregoing, (i) the existing direct and indirect equityholders of the Sellers that are financial sponsors may disclose general information regarding the transactions contemplated by this Agreement solely to investors and potential investors subject to appropriate confidentiality protections (but not the public or any other third party) in connection with normal fundraising and reporting activities in the ordinary course  and (ii) nothing in this Section 5.08 shall prohibit any disclosure required under the DIP Credit Agreement.

SECTION 5.09.   Tax Matters.   Any and all Taxes of the Company that are required to be satisfied under the Plan shall be satisfied in accordance with the terms of the Plan and the Restructuring Term Sheet. For the avoidance of doubt, Buyer shall be responsible for any Taxes of the Company arising as a result of the sale transaction that are payable after the Closing Date. Any available refunds for Taxes shall be for Buyer's account.

SECTION 5.10.   Transferred Employees.   At least 15 days prior to the Closing, the Buyer may deliver, in writing, an offer of employment or offer to continue employment to some or all of the Employees who remain employed by any Seller as of such date to commence immediately following the Closing.  Each such offer of employment or continuation of employment shall include at least the same salary or hourly wage rate, opportunities and amount for commissions and ordinary course bonuses, position (including roles and responsibilities) and location as in effect immediately prior to the Closing.  Such individuals who accept such offer by the Closing Date are hereinafter referred to as the "Transferred Employees." For the avoidance of doubt, employees with employment or severance agreements that are Assumed Employee Benefit Plans

-38-

will be offered employment with the Buyer consistent with this Section 5.10 and their respective employment or severance agreements shall continue in full force and effect.

SECTION 5.11.    Excluded Employees.

(a)    Any Employee who is not offered employment by the Buyer prior to the Closing or who does not accept an offer of employment by the Buyer, in each case pursuant to Section 5.10, is hereinafter referred to as an "Excluded Employee," and Buyer and its Affiliates shall not assume any Liabilities relating to any Excluded Employee, including, (i) any employment-related liability, (ii) any liability relating to, arising under or in connection with any Employee Benefit Plan, including any liability under COBRA, whether arising prior to, on or after the Closing Date and (iii) any liability under WARN, in each case, except as otherwise required by applicable Law.

(b)    Except as otherwise required by applicable Law, the Buyer shall credit Transferred Employees for their accrued and unused vacation, sick days and personal days through the Closing Date to the extent such vacation, sick and personal days are not paid to such Transferred Employees, and the Transferred Employees will be entitled to use such vacation, sick and personal days in accordance with terms substantially similar to the terms of the Sellers' vacation policy for one full calendar year from and after the Closing Date.

SECTION 5.12.    Employee Benefits.

(a)    At least thirty (30) days prior to the Closing Date, Sellers shall provide to the Buyer an updated employee census that includes the following information for each Employee: name, title or position (including whether full or part time), location, date of hire, exempt or non-exempt status, active or inactive status, current base compensation (including annual base salary or hourly wage), commission, bonus or other incentive-based compensation for the current year.

(b)    For purposes of eligibility and vesting (but not benefit accrual under any plan) under the employee benefit plans of the Buyer providing benefits to Transferred Employees (the "Buyer Plans"), the Buyer shall credit each Transferred Employee with his or her years of service with the Sellers and any predecessor entities, to the same extent as such Transferred Employee was entitled immediately prior to the Closing to credit for such service under any similar Employee Benefit Plan. Buyer shall and shall cause its Affiliates to use commercially reasonable efforts to waive any actively-at-work requirements, limitations on benefits relating to any pre-existing conditions and exclusions and waiting periods for any Transferred Employees and their eligible spouses and dependents. Buyer shall and shall cause its Affiliates to use commercially reasonable efforts to credit such Transferred Employees for purposes of any deductibles, out-of-pocket limits, co-pays and co-insurance under any Buyer Plan for amounts paid in the year of initial participation in the Buyer Plans by Transferred Employees and their respective spouses and dependents under the health plans of the Sellers in such year. For the avoidance of doubt, when determining the amount of a bonus payment under the Company's Executive Incentive Compensation Plan for the calendar year 2020, the Buyer shall credit each Transferred Employee with his or her time of service with the Sellers prior to the Closing.

(c)     Nothing contained in this <u>Section 5.12</u> or elsewhere in this Agreement shall be construed to prevent the termination of employment of any individual Transferred Employee. Nothing in this <u>Section 5.12</u> shall be construed to confer on any Person not a Party any status as a third party beneficiary of this Agreement with the ability to enforce rights under this Agreement or to enforce the provisions of this <u>Section 5.12</u> as if it were a party to this Agreement. Nothing in this Agreement shall be construed to constitute an establishment of or amendment to or any other modification of any Employee Benefit Plan or other benefit or compensation plan, agreement, policy, program, contract or arrangement or limit the ability of the Buyer, the Company or any of its Subsidiaries, or any of their respective Affiliates, to amend, modify or terminate any benefit or compensation plan, program, agreement, policy, contract or arrangement at any time.

(d)     Notwithstanding anything herein to the contrary, on and after the date hereof and prior to the Closing Date, the board of directors of the Company, or its special committee, may modify or amend the applicable performance goals under the Company's Executive Incentive Compensation Plan for the calendar year 2020, payable in 2021, and all obligations thereunder shall be deemed Assumed Liabilities pursuant to the terms of this Agreement; <u>provided</u>, that all payments thereunder following the Closing shall be subject to the discretion of the Buyer.

SECTION 5.13.   <u>Indemnification of Directors and Officers</u>.

(a)     Following the Closing, the Buyer and its Affiliates shall assert and administer any claims and notices of circumstances permitted or required under any director and officer insurance policies, including any tail insurance policies, that are Acquired Assets, for the benefit of the individuals insured under such policies, including any D&O Indemnified Persons (as defined below), and the Buyer shall not permit any termination of any such policies, or any modification of any such policies that reduces or is detrimental to the existing coverage available to any individuals insured under such policies; provided, however, Buyer shall not be obligated to extend or renew such policies upon the expiration of the term of such policies in accordance with the terms provided therein.

(b)     The following provisions of this <u>Section 5.13</u> shall apply solely in the event that the Buyer exercises its right pursuant to <u>Section 2.7</u> to acquire all of the equity interests of the Company.

(i)     For a period of six (6) years from and after the Closing, the Company (the "<u>D&O Indemnifying Party</u>") shall, to the fullest extent permitted by applicable Law, (A) indemnify and hold harmless (and exculpate and release from any liability to the Company) the current and former directors, (including independent directors), members, officers, trustees and employees, or those persons serving in a functionally equivalent role, of Sellers (each, a "<u>D&O Indemnified Person</u>") against all D&O Expenses (as defined below) and all losses, claims, damages, judgments, fines, penalties and amounts paid in settlement ("<u>D&O Losses</u>") in respect of any threatened, pending or completed Action whether criminal, civil, administrative or investigative, based on, arising out of, relating to or in connection with the fact that such Person is or was a director, officer or employee of the Sellers arising out of or relating to acts or omissions occurring or existing (or alleged to have occurred or existed) at or prior to the Closing (including in respect of acts or omissions in connection with this Agreement or any of the transactions

-40-

contemplated hereby) (a "<u>D&O Indemnifiable Claim</u>") and (B) advance, interest-free, to such D&O Indemnified Persons all D&O Expenses incurred in connection with any D&O Indemnifiable Claim (including in circumstances where the D&O Indemnifying Party is otherwise entitled to assume the defense of such claim and has assumed such defense) promptly after receipt of statements therefor.  Advance payment of D&O Expenses in connection with any D&O Indemnifiable Claims shall continue until such D&O Indemnifiable Claim is disposed of or all judgments, orders, decrees or other rulings in connection with such D&O Indemnifiable Claim become final and nonappealable and are fully and finally satisfied.  For the purposes of this <u>Section 5.13</u>, "<u>D&O Expenses</u>" shall include reasonable and documented attorneys' fees, expert fees, arbitrator and mediator fees, and all other costs, charges and expenses paid or incurred in connection with investigating, defending, being a witness in or otherwise participating in (including on appeal), or preparing to defend, to be a witness in or participate in, any D&O Indemnifiable Claim, but shall exclude losses, claims, damages, judgments, fines, penalties and amounts paid in settlement (which items are included in the definition of D&O Losses).

(ii)     The D&O Indemnifying Party shall be a full indemnitor of first resort, shall be required to advance the full amount of all D&O Expenses incurred by a D&O Indemnified Person and shall be liable for the full amount of all D&O Losses to the extent legally permitted and as required, without regard to any rights a D&O Indemnified Person may have against any Seller or any of their respective Affiliates or otherwise or any insurer providing insurance coverage under an insurance policy issued to any Seller or any of their respective Affiliates.

(iii)     Notwithstanding anything to the contrary contained herein or otherwise, all of the Sellers' director and officer insurance policies and any tail insurance policies, as well as all related insurance benefits, including rights and proceeds, arising therefrom, shall be treated as Acquired Assets.

(c)     Notwithstanding anything to the contrary contained herein or otherwise, the rights and benefits of the D&O Indemnified Persons under this <u>Section 5.13</u> shall not be terminated or modified in any manner as to adversely affect any D&O Indemnified Person without the prior written consent of such D&O Indemnified Person.  The provisions of this <u>Section 5.13</u> are intended to be for the benefit of, and shall be enforceable by, each D&O Indemnified Person, his or her heirs and his or her executors, administrators and personal representatives, each of whom is an intended third-party beneficiary of this <u>Section 5.13</u>, and are in addition to, and not in substitution for, any other rights, including rights to indemnification or contribution that any such Person may have by Contract or otherwise.  The provisions of this <u>Section 5.13</u> shall survive the Closing.

ARTICLE VI

CONDITIONS TO CLOSING

SECTION 6.01.   <u>Mutual Conditions to the Obligations of the Parties</u>.  The respective obligations of each Party to consummate the transactions contemplated hereby shall be subject to the satisfaction or, to the extent permitted, waiver in writing by the Sellers and the Buyer at or prior to the Closing of each of the following conditions:

(a)     <u>No Injunctions or Legal Prohibitions</u>.  No temporary restraining order, preliminary or permanent injunction or other order issued by a court of competent jurisdiction which prevents the consummation of the transactions contemplated hereby shall have been issued and remain in effect, and no Law shall have been enacted or promulgated by any Governmental Authority of competent jurisdiction which prevents, or makes illegal, the sale of the Acquired Assets and consummation of the transactions contemplated hereby (each such order, injunction, Order or Law, a "<u>Restraint</u>").

(b)     <u>Antitrust Laws</u>.  Any applicable waiting period, together with any extensions thereof, under the HSR Act shall have expired or been terminated, any timing agreement (as applicable) shall have expired and any other required Antitrust approvals shall have been obtained.

(c)     <u>Orders</u>.  No order staying, reversing, vacating, or modifying the Confirmation Order shall be in effect on the Closing Date, and the Plan shall have become effective in accordance with its terms and the Confirmation Order (subject solely to the Closing occurring).

SECTION 6.02.   <u>Conditions to the Obligations of the Buyer</u>.  The obligations of the Buyer to consummate the transactions contemplated hereby shall be subject to the satisfaction or, to the extent permitted, waiver in writing at or prior to the Closing, of each of the following conditions:

(a)     <u>Credit Bid</u>.  To the extent the Buyer is the Successful Bidder (as defined in the Bidding Procedures Order), the Bankruptcy Court shall not have entered an order invalidating, disallowing, or otherwise prohibiting the discharge or release of the First Lien Claims as consideration for the Acquired Assets.

(b)     <u>Representations and Warranties</u>.  The representations and warranties of the Sellers (i) set forth in <u>Section 3.01(a)</u>, <u>Section 3.01(b)</u> and <u>Section 3.02</u>, shall be true and correct in all material respects in accordance with their respective terms as of the date of this Agreement and as of the Closing Date as if made on and as of the Closing Date (except to the extent expressly made as of an earlier date, in which case as of such date), and (ii) set forth in <u>Article III</u>, other than as specifically identified in clause (i) of this <u>Section 6.02(a)</u>, without giving effect to any materiality or "Material Adverse Effect" qualifications or exceptions therein (except that the word "material" in the defined term "Material Contract" shall not be disregarded for any of such purposes), shall be true and correct as of the date of this Agreement and as of the Closing Date as if made on and as of the Closing Date (except to the extent expressly made as of an earlier date, in which case as of such date), except, in the case of this clause (ii), where the failure to be true and correct has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)     <u>Performance</u>.  The Sellers shall have performed and complied, in all material respects, with all agreements, covenants and obligations required (i) by this Agreement to be performed or complied with by the Sellers on or prior to the Closing and (ii) by the Bidding Procedures Order.

(d)     <u>Officer's Certificate</u>.    The Sellers shall have delivered to the Buyer a certificate, dated as of the Closing Date, executed by a duly authorized officer of the Sellers, certifying the satisfaction of the conditions set forth in <u>Section 6.02(b)</u> and <u>Section 6.02(c)</u>.

(e)     <u>Bidding Procedures Order</u>.    The Bidding Procedures Order shall have been entered by the Bankruptcy Court.

(f)     <u>Confirmation Order</u>.    The Confirmation Order (including the Sale Provisions), in form and substance reasonably acceptable to the Buyer, shall have been entered by the Bankruptcy Court and not have been stayed reversed, revoked, modified or vacated.

(g)     <u>No Material Adverse Effect</u>.    Since the date of this Agreement, there shall not have occurred a Material Adverse Effect.

(h)     <u>RSA</u>.    The RSA shall not have been terminated and shall remain in full force and effect.

(i)     <u>DIP Obligations</u>.    The DIP Obligations shall not have been accelerated.

(j)     <u>Exit Facility</u>.    All conditions to effectiveness of the Exit Facility (other than effectiveness of the Plan) shall have been satisfied or waived in accordance with the definitive documents in connection therewith.

SECTION 6.03.    <u>Conditions to the Obligations of the Sellers</u>.    The obligations of the Sellers to consummate the transactions contemplated hereby shall be subject to the satisfaction or, to the extent permitted, waiver by the Sellers in writing at or prior to the Closing of each of the following conditions:

(a)     <u>Representations and Warranties</u>.    The representations and warranties of the Buyer contained herein which are qualified as to any materiality or "Buyer Material Adverse Effect" shall be true and correct in all respects, and such representations and warranties (other than the representations and warranties set forth in <u>Section 4.06</u>) as are not so qualified shall be true and correct in all respects, except where the failure of such representations and warranties as are not so qualified to be true and correct has not had and would not reasonably be expected to have a Buyer Material Adverse Effect, in each case, as of the date of this Agreement and as of the Closing Date as if made on and as of the Closing Date (except to the extent expressly made as of an earlier date, in which case as of such date). The representations and warranties set forth in <u>Section 4.06</u> shall be true and correct in all respects as of the date of this Agreement and as of the Closing Date as if made on and as of such Closing Date.

(b)     <u>Performance</u>.    The Buyer shall have performed and complied, in all material respects, with all agreements, covenants and obligations required (i) by this Agreement to be performed or complied with by it, as the case may be, on or prior to the Closing and (ii) by the Bidding Procedures Order.

(c)     <u>Officer's Certificate</u>.    The Buyer shall have delivered to the Sellers a certificate, dated as of the Closing Date, executed by a duly authorized officer of the Buyer,

certifying to the satisfaction of the conditions set forth in <u>Section 6.03(a)</u> and <u>Section 6.03(b)</u> hereof.

(d)    <u>Confirmation Order</u>.    The Confirmation Order (including the Sale Provisions), in form and substance reasonably acceptable to the Buyer, shall have been entered by the Bankruptcy Court.

SECTION 6.04.    <u>Frustration of Closing Conditions</u>.  No party may rely on the failure of any condition set forth in this <u>Article VI</u> to be satisfied if such failure was caused by such party's Intentional Breach of this Agreement, including failure to use its reasonable best efforts to cause the Closing to occur, as required by <u>Section 5.03</u>, or to satisfy its obligations under <u>Section 5.04</u> or <u>Section 5.04(b)</u>.  "<u>Intentional Breach</u>" shall mean, with respect to any representation, warranty, agreement or covenant, an action or omission (including a failure to cure circumstances) taken or omitted to be taken that the breaching Person intentionally or knowingly takes (or intentionally or knowingly fails to take) and would, or would reasonably be expected to, cause a material breach of such representation, warranty, agreement or covenant.

## ARTICLE VII

## SURVIVAL; TERMINATION

SECTION 7.01.    <u>Survival</u>.  The Parties, intending to modify any applicable statute of limitations, agree that (a)(i) the representations and warranties in this Agreement and in any certificate delivered pursuant hereto and (ii) the covenants and agreements in this Agreement to the extent such covenants and agreements only require performance prior to the Closing shall, in each case, terminate effective as of the Closing and shall not survive the Closing for any purpose, and thereafter there shall be no liability on the part of, nor shall any claim be made by, any party in respect thereof and (b) to the extent the covenants and agreements in this Agreement contemplate performance after the Closing or expressly by their terms survive the Closing, such covenants and agreements shall survive the Closing in accordance with their respective terms only to the extent and for such period as shall be required for the party required to perform under such covenant and agreement to complete the performance required thereby.

SECTION 7.02.    <u>Termination</u>.  This Agreement may be terminated, and the transactions contemplated hereby may be abandoned at any time prior to the Closing:

(a)    by mutual written agreement of the Sellers and the Buyer;

(b)    by the Sellers or the Buyer at any time after the Outside Date, if the Closing shall not have occurred on or prior to such time; <u>provided</u>, <u>however</u>, that if the Sellers' or the Buyer's failure to perform any covenants or agreements set forth in this Agreement has resulted in the failure of the Closing to occur prior to the Outside Date, then the breaching party shall not have the right to terminate this Agreement pursuant to this <u>Section 7.02(b)</u>;

(c)    by the Sellers or the Buyer, if any Restraint permanently prohibiting the consummation of the transactions contemplated hereby shall have become final and

non-appealable; it being agreed that the Parties will promptly appeal any adverse determination which is not non-appealable and pursue such appeal with reasonable diligence;

(d)        by the Buyer, if any representation or warranty of the Sellers set forth in Article III shall be or shall have become inaccurate or the Sellers shall have breached or failed to perform any of their covenants or other agreements set forth in this Agreement, which inaccuracy, breach or failure to perform would give rise to the failure of any of the conditions set forth in Section 6.02(b) or Section 6.02(c), and which inaccuracy, breach or failure to perform cannot be cured by the Sellers or, if capable of being cured, shall not have been cured prior to the earlier of (i) the Outside Date and (ii) the date that is thirty (30) calendar days after receipt by the Sellers of notice in writing from the Buyer specifying the nature of such inaccuracy, breach or failure to perform and requesting that it be cured; provided, however, that the Buyer shall provide such notice to the Sellers within three (3) Business Days of becoming aware of any such inaccuracy, breach or failure to perform that would be reasonably likely to give rise to the failure of any of the conditions set forth in Section 6.02(b) or Section 6.02(c); provided, further, that the Buyer shall not have the right to terminate this Agreement pursuant to this Section 7.02(d) if the Buyer is then in material breach of this Agreement;

(e)        by the Sellers, if any representation or warranty of the Buyer set forth in Article IV shall be or shall have become inaccurate or the Buyer shall have breached or failed to perform any of its covenants or other agreements set forth in this Agreement, which inaccuracy, breach or failure to perform would give rise to the failure of any of the conditions set forth in Section 6.03(a) or Section 6.03(b), and which inaccuracy, breach or failure to perform cannot be cured by the Buyer, as the case may be, or, if capable of being cured, shall not have been cured prior to the earlier of (i) the Business Day prior to the Outside Date and (ii) the date that is thirty (30) calendar days after receipt by the Buyer of notice in writing from the Sellers specifying the nature of such inaccuracy, breach or failure to perform and requesting that it be cured; provided, however, that the Sellers shall provide such notice to the Buyer within three (3) Business Days of becoming aware of any such inaccuracy, breach or failure to perform that would be reasonably likely to give rise to the failure of any of the conditions set forth in Section 6.03(a) or Section 6.03(b); provided, further, that the Sellers shall not have the right to terminate this Agreement pursuant to this Section 7.02(e) if they are then in material breach of this Agreement;

(f)        by the Sellers or Buyer, if (x) the Bankruptcy Court enters an order approving a Competing Bid and (z) if the Buyer's bid has been selected as the Back-Up Bid, the Back-Up Bid Termination Date has occurred; or

(g)        by the Sellers or the Buyer if the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement.

The Party desiring to terminate this Agreement pursuant to any of clause (b), (c), (d), (e), (f) or (g) of this Section 7.02 shall give written notice of such termination to the other party in accordance with Section 8.01 specifying the provision or provisions hereof pursuant to which such termination is effected.

SECTION 7.03.    Effect of Termination; Etc.    In the event of the termination of this Agreement in accordance with Section 7.02, (a) this Agreement shall thereafter become void and have no effect and the transactions contemplated hereby shall be abandoned, except that this Section 7.03, Section 5.08, and Article VIII shall survive termination of this Agreement and remain valid and binding obligations of each of the parties, and (b) subject to the terms and conditions of the surviving provisions of this Agreement, there shall be no liability or obligation on the part of the Buyer or the Sellers.  Notwithstanding anything in the immediately preceding sentence of this Section 7.03 to the contrary, termination of this Agreement pursuant to Section 7.02 shall not release any party hereto from any liability (i) pursuant to the sections specified in this Section 7.03 that survive such termination or (ii) for an Intentional Breach of this Agreement.

ARTICLE VIII

MISCELLANEOUS

SECTION 8.01.    Notices.    All notices, requests, demands, claims and other communications hereunder will be in writing.  Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (iii) if sent by electronic mail, when received if received before 5:00 p.m. local time of the recipient on a Business Day, and otherwise on the next following Business Day, in each case addressed to the intended recipient as set forth below:

To the Sellers:

      RentPath Holdings, Inc.
      950 East Paces Ferry Rd NE, Suite 2600
      Atlanta, Georgia 30326
      Attention:  Marlon F. Starr
      Email: mstarr@rentpath.com and generalcounsel@rentpath.com

with a copy (which shall not constitute notice) to:

      Weil, Gotshal & Manges LLP
      100 Federal Street, 34th Floor
      Boston, Massachusetts 02110
      Attention:  Kevin J. Sullivan and Matthew W. Goulding
      Email: kevin.sullivan@weil.com and matthew.goulding@weil.com

      Weil, Gotshal & Manges LLP
      767 Fifth Avenue
      New York, New York 10153
      Attention: Ray Schrock, P.C., Gavin Westerman, and David Griffiths
      Email: ray.schrock@weil.com, gavin.westerman@weil.com, and david.griffiths@weil.con

To the Buyer:

Milbank LLP
55 Hudson Yards
New York, NY 10001
Attention: Evan R. Fleck and Nelly Almeida
Email: efleck@milbank.com and nalmeida@milbank.com

SECTION 8.02.    Amendment/Waiver, Etc.  Any provision of this Agreement may be amended, modified, supplemented or waived if, and only if, such amendment, modification, supplement or waiver is in writing and signed, in the case of an amendment, modification or supplement, by the Buyer and the Sellers, or in the case of a waiver, by the Party against whom the waiver is to be effective.  No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

SECTION 8.03.    Assignment.  No Party may assign any of its rights or obligations under this Agreement without the prior written consent of the other Parties, and any attempt to assign this Agreement without such consent shall be void and of no effect, provided, however, that (i) the Sellers may assign this Agreement and any or all rights and obligations under this Agreement to a corporation, limited liability company, or a liquidating trust for the purpose of winding down the Bankruptcy Cases and (ii) the Buyer may assign this Agreement and any or all rights and obligations under this Agreement to any of its Affiliates upon prior written notice to the Sellers; provided, further, that no such assignment shall relieve the Buyer of any of its obligations under this Agreement.

SECTION 8.04.    Entire Agreement.  This Agreement (including all Schedules and Exhibits hereto) contains the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such matters. In the event of any conflict between the terms of this Agreement and the terms of the Confirmation Order or the Plan, as the case may be, the terms of the Confirmation Order or the Plan, as the case may be, shall govern.

SECTION 8.05.    Severability.  If any term or other provision of this Agreement is found invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effectuate the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the fullest extent possible.

SECTION 8.06.    Fulfillment of Obligations.  Any obligation of any Party under this Agreement, which obligation is performed, satisfied or fulfilled by an Affiliate of such Party, shall be deemed to have been performed, satisfied or fulfilled by such party.

SECTION 8.07.   Parties in Interest.  This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.  Nothing in this Agreement, other than, following the Closing, the provisions of (a) Section 5.13 to the extent it relates to the D&O Indemnified Persons, which shall be express third-party beneficiaries of, and shall be entitled to rely on, such section, (b) Section 8.14 to the extent it applies to Seller Related Parties and Buyer Related Parties, which Seller Related Parties and Buyer Related Parties shall be express third-party beneficiaries of, and shall be entitled to rely on, such respective sections, and (c) Section 8.16, to the extent it applies to Weil, Gotshal & Manges LLP and Ropes & Gray LLP, which shall be express third-party beneficiaries of, and shall be entitled to rely on, such section, express or implied, is intended to confer upon any Person other than the Buyer, the Sellers or their respective successors or permitted assigns, any rights or remedies under or by reason of this Agreement, except for the right of the Sellers, on behalf of the holders of equity interests in the Sellers, to pursue damages and other relief (including damages based on the loss of the economic benefits of the transactions contemplated hereby (including the loss of premium offered to such holders and taking into consideration all relevant matters, including other combination opportunities and the time value of money) and equitable relief, which damages and other relief shall also be available to such holders) in the event of any breach of this Agreement by the Buyer, which right is hereby acknowledged and agreed by the Buyer and which right may, for the avoidance of doubt, only be enforced prior to the Closing by the Sellers on behalf of such holders.

SECTION 8.08.   Expenses.  Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated by this Agreement are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the Party incurring such expenses; provided, in the event of litigation relating to an Intentional Breach and upon final determination of a court of competent jurisdiction in a final, non-appealable decision with respect thereto, the non-prevailing party in such litigation shall reimburse the prevailing party's reasonable and documented costs and expenses (including reasonable attorney's fees) incurred in connection with such litigation.

SECTION 8.09.   Governing Law/Jurisdiction/Waiver of Jury Trial.

(a)    This Agreement and any controversy, dispute or claim arising hereunder or related hereto (whether by contract, tort or otherwise) shall be governed by and construed and enforced in accordance with the domestic Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, except to the extent preempted by federal bankruptcy Law.

(b)    EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER AGREEMENTS CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE

IMPLICATIONS OF THIS WAIVER, (III) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (IV) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 8.09</u>.

(c)    The Parties submit to the exclusive jurisdiction of the Bankruptcy Court in respect of the interpretation and enforcement of the provisions of this Agreement, and any controversy, dispute or claim arising hereunder or related hereto (whether by contract, tort or otherwise), and any related agreement, certificate or other document delivered in connection herewith and waive, and agree not to assert, any defense in any action for the interpretation or enforcement of this Agreement, and any controversy, dispute or claim arising hereunder or related hereto (whether by contract, tort or otherwise), and any related agreement, certificate or other document delivered in connection herewith that they are not subject to such jurisdiction or that such action may not be brought or is not maintainable in such courts or that this Agreement may not be enforced in or by such courts, that the action is brought in an inconvenient forum, or that the venue of the action is improper; <u>provided</u>, however, that (x) if the Bankruptcy Cases have not been commenced or (y) upon the closing or dismissal of the Bankruptcy Cases, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Chancery Court of the State of Delaware and any state appellate court therefrom within the State of Delaware and any appellate court from any thereof, for the resolution of any such Proceeding. The Parties intend that all foreign jurisdictions will enforce any decree of the Bankruptcy Court in any Action arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

SECTION 8.10.    <u>Counterparts, Etc</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party.  Delivery of an executed counterpart of a signature page to this Agreement by email in "portable document format" (".pdf") form, or by other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing the original signature.

SECTION 8.11.    <u>Headings, Etc</u>.  The provision of the Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reading only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any Article, Section, subsection or clause are to the corresponding Article, Section, subsection or clause of this Agreement, unless otherwise specified.

SECTION 8.12.    <u>Further Assurances</u>.    Subject to the terms and conditions of this Agreement, from time to time, at the request of any Party or order of the Bankruptcy Court and, except as otherwise set forth herein, at the expense of the Party so requesting, each other Party shall execute and deliver to such requesting Party such documents and take such other action as such requesting Party or the Bankruptcy Court may reasonably request in order to consummate the transactions contemplated hereby.

SECTION 8.13.    Specific Performance.  The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by the Parties in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the Buyer, on the one hand, and the Sellers on the other hand, shall be entitled to an injunction or injunctions to prevent breaches of this Agreement by the other (as applicable) and to enforce specifically the terms and provisions of this Agreement and to thereafter cause the transactions contemplated by this Agreement to be consummated on the terms and subject to the conditions thereto set forth in this Agreement.  The foregoing rights are in addition to and without limitation of any other remedy to which the Parties may be entitled at law or in equity.  The parties further agree not to assert that a remedy of specific performance is unenforceable, invalid, contrary to law or inequitable for any reason, nor to assert that a remedy of monetary damages would provide an adequate remedy.  Each of the Parties hereby waives (a) any defenses in any action for specific performance, including the defense that a remedy at law would be adequate and (b) any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief.  If any party brings any action to enforce specifically the performance of the terms and provisions hereof by any other party, the Outside Date shall automatically be extended by (x) the amount of time during which such action is pending, plus twenty (20) Business Days or (y) such other later date established by the Delaware court presiding over such action.  The Parties further agree that (i) by seeking the remedies provided for in this Section 8.13, no Party shall in any respect waive its right to seek at any time any other form of relief that may be available to it under this Agreement or any other agreement or document entered into in connection herewith or the transactions contemplated hereby (including monetary damages) in the event that this Agreement has been terminated or in the event that the remedies provided for in this Section 8.13 are not available or otherwise are not granted, and (ii) nothing set forth in this Section 8.13 shall require any party hereto to institute any proceeding for (or limit any party's right to institute any proceeding for) specific performance under this Section 8.13 prior to or as a condition to exercising any termination right under Article VII, nor shall the commencement of any legal proceeding pursuant to this Section 8.13 or anything set forth in this Section 8.13 restrict or limit any party's right to terminate this Agreement in accordance with the terms of Article VII or pursue any other remedies under this Agreement or any other agreement or document entered into in connection herewith or the transactions contemplated hereby that may be available then or thereafter.

SECTION 8.14.    Limitation on Liability.  Notwithstanding anything in this Agreement to the contrary, (a) except in the event of Fraud or willful misconduct, the maximum aggregate Liability of the Sellers under this Agreement shall not exceed an amount equal to 1.5% of the Purchase Price; (b) in no event shall any Party have any Liability under this Agreement (including under this Article VIII) for any consequential, special, incidental, indirect damages or lost profits, or similar items (including loss of revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to a breach or alleged breach of this Agreement); and (c) in no event shall any Party have any liability for punitive damages, except to the extent payable to a third party; provided, that such limitation set forth in clause (b) of this Section shall not limit any Party's right to recover contract damages in connection with or resulting from such Party's failure to close in breach or violation of this Agreement.

SECTION 8.15.    Non-Recourse.  All claims or causes of action (whether in contract or in tort, in law or in equity) that may be based upon, arise out of or relate to this Agreement, or the

negotiation, execution or performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), may be made only against the entities that are expressly identified as Parties.  No Person who is not a named Party, including any past, present or future director, officer, employee, incorporator, member, partner, direct or indirect equityholder, Affiliate, agent, attorney, banker or other consultant or representative of any named Party ("Related Parties"), shall have any liability (whether in contract or in tort, in law or in equity, or based upon any theory that seeks to impose liability of an entity party against its owners or affiliates) for any obligations or liabilities arising under, in connection with or related to this Agreement or for any claim based on, in respect of, or by reason of this Agreement or its negotiation or execution; and each party hereto waives and releases all such liabilities, claims and obligations against any such Related Party.

SECTION 8.16.    Representation of the Sellers and Affiliates.

(a)    The Buyer, for itself and any of its respective officers, directors, employees, agents, representatives, successors and permitted assigns (together, the "Waiving Parties"), hereby irrevocably acknowledges and agrees that all communications pertaining to the Sellers or any of their respective Affiliates, or any of their respective officers, directors, employees, agents, representatives, successors and permitted assigns (together, the "Seller Group") and their counsel, including Weil, Gotshal & Manges LLP and Ropes & Gray LLP, made in connection with the negotiation, preparation, execution and delivery of this Agreement or relating to the process for the sale of the Acquired Assets are privileged communications between the Seller Group and such counsel and none of the Waiving Parties, nor any Person purporting to act on behalf of or through any of the Waiving Parties, will seek to obtain the same by any process.  From and after the Closing, each of the Waiving Parties waives and will not assert any attorney-client privilege with respect to any communication between Weil, Gotshal & Manges LLP or Ropes & Gray LLP and any Person in the Seller Group occurring during the representation in connection with the negotiation, preparation, execution and delivery of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby.

(b)    The Buyer hereby agrees, on its own behalf and on behalf of its Waiving Parties, that Weil, Gotshal & Manges LLP and Ropes & Gray LLP may serve as counsel to each and any Person of the Seller Group, on the one hand, and the Sellers, on the other hand, in connection with the negotiation, preparation, execution, deliver and performance of this Agreement and the transactions contemplated hereby and that, following the consummation of the transactions contemplated hereby, Weil, Gotshal & Manges LLP and Ropes & Gray LLP may serve as counsel to each and any Person in the Seller Group in connection with any dispute, litigation, claim, proceeding or obligation arising out of or relating to this Agreement notwithstanding such representation or any continued representation of the Sellers or in connection with any other matter relating to the process for the sale of the Acquired Assets.  The Buyer hereby consents to and irrevocably waives (individually and on behalf of any Waiving Party claiming by, through or on behalf of any of them) any conflicts that may arise in connection with such representation.

SECTION 8.17.  DISCLAIMER.    NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN OR OTHERWISE:  (a) THE REPRESENTATIONS AND WARRANTIES OF THE SELLERS EXPRESSLY SET FORTH IN ARTICLE III ARE AND

SHALL CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES MADE WITH RESPECT TO THE SELLERS AND THE BUSINESS IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, AND (b) EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES REFERRED TO IN CLAUSE (a) ABOVE, NONE OF THE SELLERS OR ANY SELLER RELATED PARTY OR ANY OTHER PERSON HAS MADE OR IS MAKING ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, STATUTORY OR OTHERWISE, OF ANY NATURE, INCLUDING WITH RESPECT TO ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, QUALITY, QUANTITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE BUSINESS OR THE ACQUIRED ASSETS.  NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN OR OTHERWISE, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE III, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, OF ANY NATURE, INCLUDING WITH RESPECT TO ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, QUALITY, QUANTITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE BUSINESS OR THE ACQUIRED ASSETS, ARE HEREBY EXPRESSLY DISCLAIMED. THE BUYER REPRESENTS, WARRANTS, COVENANTS AND AGREES, ON BEHALF OF ITSELF AND THE BUYER RELATED PARTIES, THAT IN DETERMINING TO ENTER INTO AND CONSUMMATE THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY, THEY ARE NOT RELYING UPON, AND HAVE NOT BEEN INDUCED BY, ANY REPRESENTATION OR WARRANTY MADE OR PURPORTEDLY MADE BY OR ON BEHALF OF ANY PERSON, OTHER THAN THOSE OF THE SELLERS EXPRESSLY SET FORTH IN ARTICLE III, AND EXCEPT WITH RESPECT TO THOSE REPRESENTATIONS AND WARRANTIES OF THE SELLERS EXPRESSLY SET FORTH IN ARTICLE III, THAT THE BUYER SHALL ACQUIRE THE ACQUIRED ASSETS WITHOUT ANY REPRESENTATION OR WARRANTY AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, IN AN "AS IS" CONDITION AND ON A "WHERE IS" BASIS AND "WITH ALL FAULTS".

Without limiting the generality of the immediately preceding paragraph, it is understood and agreed by the Buyer, on behalf of itself and the Buyer Related Parties, that any estimate, projection forecast, plan, budget or other prediction, any data, any financial information or any memoranda or offering materials or presentations, including any memoranda and materials provided by or on behalf of the Sellers or any Seller Related Party, are not and shall not be deemed to be or to include representations or warranties, except to the extent explicitly set forth in Article III hereof as a representation and warranty by (and only by) the Sellers.

SECTION 8.18.  Due Diligence Review.  The Buyer acknowledges, covenants and agrees, on behalf of itself and the Buyer Related Parties: (a) that it has completed to its satisfaction its own due diligence investigation, and based thereon, formed its own independent judgment with respect to the Sellers and the Acquired Assets; (b) that it has been furnished with or given full access to such documents and information about the Sellers, the Acquired Assets and the Business as it and its representatives and advisors have deemed necessary to enable it to make an informed decision with respect to the execution, delivery and performance of this Agreement and the

transactions contemplated hereby; (c) that in entering into this Agreement, it has relied solely upon its own investigation and analysis and the representations and warranties of the Sellers expressly contained in <u>Article III</u>; and (d) that (x) other than the representations and warranties of the Sellers expressly contained in <u>Article III</u>, no representation or warranty has been or is being made by the Sellers or any other Person as to the accuracy or completeness of any of the information provided or made available to the Buyer or any of its representatives and advisors and (y) there are uncertainties inherent in attempting to make estimates, projections, forecasts, plans, budgets and similar materials and information, the Buyer is familiar with such uncertainties, and subject to the representations and warranties of the Sellers expressly set forth in <u>Article III</u>, the Buyer is taking full responsibility for making its own evaluations of the adequacy and accuracy of any and all estimates, projections, forecasts, plans, budgets and other materials or information that may have been delivered or made available to it or any Buyer Related Party, neither the Buyer nor any Buyer Related Party has relied or will rely on such information, and the Buyer will not assert, and will cause its Buyer Related Parties not to assert, any claims against the Sellers or any Seller Related Party with respect thereto.

SECTION 8.19.    <u>Release</u>.  The Plan shall contain mutual releases reasonably acceptable to the Sellers and the Buyer, which shall be approved by the Confirmation Order.

SECTION 8.20.    <u>Credit Bid Direction</u>.  The Buyer has provided to the Sellers a true and correct copy of a direction letter signed by the Requisite Consenting First Lien Creditors and the First Lien Administrative Agent, as applicable, pursuant to which the Requisite Consenting First Lien Creditors have authorized the First Lien Administrative Agent, to, among other things, (i) cause the credit bid to be made in the name of the Buyer and (ii) cause the Buyer to acquire and assume from the Sellers all of the Acquired Assets in accordance with this Agreement (the "<u>Direction Letter</u>").  The Buyer shall provide copies of any amendments to the Direction Letter to the Sellers promptly after their execution and delivery.

SECTION 8.21.    <u>Interpretation</u>.  The words "hereof", "herein", "hereto", "hereunder" and "hereinafter" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, unless the context otherwise requires.  The terms defined in the singular shall have a comparable meaning when used in the plural, and vice versa.  The term "dollars" and character "$" shall mean United States dollars.  The term "including" shall mean including, without limitation, and the words "include" and "includes" shall have corresponding meanings and such words shall not be construed to limit any general statement that they follow to the specific or similar items or matters immediately following them.  The term "or" is not exclusive, unless the context otherwise requires.  Any references herein to notice being provided by the Sellers, or consent or waiver being obtained from or provided by the Sellers, shall be satisfied by receiving such notice from, or obtaining such consent or waiver from, the Company.  The term "ordinary course of business" shall mean the ordinary course of business consistent with the Sellers', taken as a whole, past practices in all material respects.  Any action referred to herein as "contemplated," "required" or "permitted" by this Agreement or similar statements refer to actions expressly contemplated, expressly required or expressly permitted by this Agreement, as applicable.  The Exhibits and Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set

forth in this Agreement.  Any reference in this Agreement to gender shall include all genders and the neuter.  The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.  Any agreement, instrument, statute, rule or regulation defined or referred to herein means such agreement, instrument, statute, rule or regulation as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver of consent and (in the case of statutes, rules or regulations) by succession or comparable successor statutes and references to all attachments thereto and instruments incorporated therein; provided, that for purposes of any representations and warranties contained in this Agreement that are made as of a specific date or dates, references to any statute, rule or regulation shall be deemed to refer to such statute, rule or regulation, as amended (and, in the case of statutes, any rules and regulations promulgated under such statutes), in each case, as of such date.  Any agreement referred to herein shall include reference to all exhibits, schedules and other documents or agreements attached thereto.  Neither the specification of any dollar amount in any representation or warranty contained in this Agreement nor the inclusion of any specific item in any Schedule hereto is intended to imply that such amount, or higher or lower amounts, or the item so included or other items, are or are not material, and no party shall use the fact of setting forth of any such amount or the inclusion of any such item in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in any Schedule is or is not material for purposes of this Agreement.  Neither the specification of any item or matter in any representation or warranty contained in this Agreement nor the inclusion of any specific item in any Schedule hereto is intended to imply that such item or matter, or other items or matters, are or are not in the ordinary course of business, and no party shall use the fact of the setting forth or the inclusion of any specific item or matter in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in any Schedule is or is not in the ordinary course of business for purposes of this Agreement.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed and delivered on its behalf by its officers thereunto duly authorized, all at or on the date and year first above written.

**COMPANY:**

RENTPATH HOLDINGS, INC.

By:    _____
           Name:
           Title:

**SELLERS**

RentPath, LLC

By:    _____
           Name:
           Title:

Consumer Source Holdings LLC

By:    _____
           Name:
           Title:

Electronic Lead Management, Inc.

By:    _____
           Name:
           Title:

[Signature Page to Asset Purchase Agreement]

Electronic Lead Management MA, Inc.


By:    _____
       Name:
       Title:


Electronic Lead Management VA, Inc.


By:    _____
       Name:
       Title:



Viva Group, LLC


By:    _____
       Name:
       Title:



Viva Group Brokerage, Inc.


By:    _____
       Name:
       Title:

Discover Home Network, LLC


By: _____
      Name:
      Title:




Live Response Solutions Holdings, LLC


By: _____
      Name:
      Title:


Live Response Solutions, LLC


By: _____
      Name:
      Title:


Easy Media, LLC


By: _____
      Name:
      Title:

**BUYER:**

RP LENDER ACQUISITION CORP.


By: _____
      Name:
      Title:


**FIRST LIEN ADMINISTRATIVE AGENT**:

ROYAL BANK OF CANADA


By: _____
      Name:
      Title:

## Schedule A

### Sellers

RentPath, LLC
Consumer Source Holdings LLC
Electronic Lead Management, Inc.
Electronic Lead Management MA, Inc.
Electronic Lead Management VA, Inc.
Viva Group, LLC
Viva Group Brokerage, Inc.
Discover Home Network, LLC
Live Response Solutions Holdings, LLC
Live Response Solutions, LLC
Easy Media, LLC

## **Exhibit A**

**Form of Bill of Sale**

See attached

## **Exhibit B**

**Form of Assignment and Assumption Agreement**

See attached

## **Exhibit C**

**Form of Lease Assignment and Assumption Agreement**

See attached

## **EXHIBIT C**

## **DIP TERM SHEET**

[EXECUTION VERSION]

## ANNEX A

## DIP TERM SHEET

Set forth below is a summary of the principal terms and conditions for the DIP Facility.  Capitalized terms used but not defined in this <u>Exhibit C</u> shall have the meanings set forth in the Restructuring Support Agreement, to which this <u>Exhibit C</u> is attached.

This term sheet (the "<u>DIP Term Sheet</u>") is intended for discussion purposes only and does not constitute a commitment to lend.  This DIP Term Sheet is non-binding and the proposals contained herein are subject to, among other things, the negotiation, documentation and execution of definitive documentation. Only execution and delivery of definitive documentation relating to the transactions shall result in any binding or enforceable obligations of any party relating to the transactions.

| Parties | **Debtors**: RentPath Holdings, Inc., a Delaware corporation ("<u>Holdings</u>"), and its subsidiaries, each as debtors-in-possession (collectively, the "<u>Debtors</u>") in the chapter 11 cases (the "<u>Chapter 11 Cases</u>") to be commenced in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"). |
|---|---|
| | **Borrower**: RentPath, LLC, a Delaware limited liability company, or any affiliated entity as determined by the Required DIP Lenders (as defined below) (the "<u>Borrower</u>"). |
| | **Guarantors**: All obligations under the DIP Facility and the other DIP Loan Documents (each as defined below) will be unconditionally guaranteed, jointly and severally, on a first priority secured basis by each Debtor other than the Borrower (collectively, the "<u>Guarantors</u>"). |
| | Borrower and the Guarantors are collectively referred to herein as the "<u>Loan Parties</u>".  Each Loan Party is identified in <u>Annex I</u> hereto. |
| | **DIP Lenders**: Certain Prepetition 1L Lenders and Prepetition 2L Lenders (each as defined below) that elect to participate in the DIP Facility (collectively, the "<u>DIP Lenders</u>") |
| | Participation in the DIP Facility will be offered as follows:  (i) 80% of the total DIP Facility to the Prepetition 1L Lenders (as defined below) in the amount of a pro rata share in proportion to the amount of each Prepetition 1L Lender's outstanding loans and  commitments under the First Lien Credit Agreement and (ii) 20% of the total DIP Facility to the Prepetition 2L Lenders (as defined below) in the amount of a pro rata share in proportion to the amount of each Prepetition 2L Lender's outstanding loans and  commitments under the Second Lien Credit Agreement; <u>provided</u>, <u>however</u>, that in the event that the Restructuring Support Agreement is not executed prior to the Petition Date, by Prepetition 2L Lenders (or investment managers or advisors to such lenders) holding at least 66-2/3% in aggregate principal amount of the loans outstanding under the Prepetition 2L Documents, participation in the DIP Facility will be offered solely to the Prepetition 1L Lenders (on a pro rata basis in proportion to the amount of each Prepetition 1L Lender's outstanding loans and commitments under the First Lien Credit Agreement) and the Prepetition 2L Lenders shall not be entitled to participate in the DIP Facility.  Each DIP Lender that elects to participate in the DIP Facility shall be required to participate in the New Money Exit Term Loan B (as defined in the Exit Term Loan Facility Term Sheet) in the same proportion |

as its commitments to the DIP Facility upon an Exit Conversion.

Certain members of the Ad Hoc Committee (the "<u>Backstop Lenders</u>") shall (on a several, but not joint, basis) backstop the full aggregate amount of the DIP Facility (and the Exit Term Loan Facility as set forth in Annex III) by providing the Commitments (as defined below) to participate in the DIP Facility (and the Exit Term Loan Facility) that are not assumed by the other Prepetition Lenders (as defined below). Prepetition Lenders wishing to participate in the funding of the DIP Facility will be required to execute a joinder to the credit agreement governing the DIP Facility by no later than five (5) business days after the Interim Order Entry Date (the "<u>Election Date</u>") and become party to the Restructuring Support Agreement. No affiliate of any Loan Party shall become a DIP Lender. Each Prepetition Lender shall be entitled to transfer its pro rata share of its Commitments to any other Prepetition Lender that (i) is party to the Restructuring Support Agreement and (ii) commits to participate in the DIP Facility on the same terms.

<u>**DIP Agent**</u>: Royal Bank of Canada will serve as the administrative agent and collateral agent under the DIP Facility (in such capacity, the "<u>DIP Agent</u>") and will perform duties customarily associated with such capacities.

| | |
|---|---|
| **Prepetition Facilities** | <u>**Prepetition Facilities**</u>: Borrower is party to each of the First Lien Credit Agreement and the Second Lien Credit Agreement (each, a "<u>Prepetition Facility</u>", and the lenders party to the First Lien Credit Agreement from time to time, the "<u>Prepetition 1L Lenders</u>", and the lenders party to the Second Lien Credit Agreement from time to time, the "<u>Prepetition 2L Lenders</u>", and together with the Prepetition 1L Lenders, the "<u>Prepetition Lenders</u>"), with Royal Bank of Canada, as administrative agent and as collateral agent (the "<u>Prepetition 1L Agent</u>") under the First Lien Credit Agreement, and Wilmington Savings Fund Society, FSB, as successor administrative agent and collateral agent (the "<u>Prepetition 2L Agent</u>", and together with the Prepetition 1L Agent, the "<u>Prepetition Agents</u>").<br><br>The Prepetition Lenders and the Prepetition Agents are collectively referred herein as the "<u>Prepetition Secured Parties</u>."<br><br>All instruments and documents executed at any time in connection with the First Lien Credit Agreement shall be referred to collectively as the "<u>Prepetition 1L Documents</u>", and all instruments and documents executed at any time in connection with the Second Lien Credit Agreement shall be referred collectively as the "<u>Prepetition 2L Documents</u>." |
| **DIP Facility; Use of Proceeds** | <u>**DIP Facility**</u>: The DIP Facility shall be comprised of superpriority priming term loans (the "<u>DIP Loans</u>") in an aggregate principal amount of $74,074,074.07 (the "<u>**Total Commitments**</u>", and each DIP Lender's portion thereof, a "<u>**Commitment**</u>"). Amounts paid or prepaid under the DIP Facility may not be reborrowed.<br><br><u>**DIP Loan Documents**</u>: The DIP Facility, and all instruments and documents executed at any time in connection therewith, shall be referred to collectively as the "<u>DIP Loan Documents</u>."<br><br><u>**DIP Loans**</u>: Subject to the terms and conditions herein, including the restrictions on Use of Proceeds set forth below, the proceeds of the DIP Facility (including the Interim Facility (as defined below)) will be used in accordance with the terms of the Budget (subject to Permitted Variances (as defined below)), including: (i) to pay (a) Professional Fees (as defined below) and other restructuring charges arising on account of the Chapter 11 Cases, including statutory fees of the United States Trustee and allowed professional fees and expenses of a Committee (as defined herein) (if any), and (b) all professional fees and expenses (including legal, financial |

advisor, appraisal, and valuation-related fees and expenses) incurred by the DIP Agent and/or the DIP Lenders as provided under the DIP Facility, including those incurred in connection with the preparation, negotiation, documentation, and court approval of the DIP Facility, (ii) to fund the Professional Fees Account (as defined below); and (iii) to provide working capital, and for other general corporate purposes of the Debtors, and to pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court.

"Professional Fees" shall mean, to the extent allowed at any time, whether by interim or final compensation order, all unpaid fees and expenses incurred by persons or firms retained by the Loan Parties pursuant to sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "Debtors' Professionals").

**Use of Proceeds**: No portion of the Company's "cash collateral" (as such term is defined in section 363(a) of the Bankruptcy Code) (the "Cash Collateral"), the proceeds of the DIP Facility, the Collateral (as defined below), or the Carve-Out (as defined below) may be used:

(a)    for any purpose that is prohibited under the Bankruptcy Code or the DIP Orders;

(b)    to finance in any way: (i) any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of any or all of the DIP Agent, the DIP Lenders, the Prepetition 1L Agent or the Prepetition 1L Lenders or their respective rights and remedies under DIP Loan Documents, the Interim Order (as defined below), the Final Order (as defined below), or the Prepetition 1L  Documents or (ii) any other action, which with the giving of notice or passing of time, would result in an Event of Default under the DIP Loan Documents;

(c)    for the payment of fees, expenses, interest, or principal under the Prepetition 1L Documents or Prepetition 2L Documents (in each case, other than adequate protection payments permitted under the DIP Order (as defined below));

(d)    unless the Exit Conversion (as defined below) occurs, to make any distribution under a plan of reorganization in the Chapter 11 Cases (a "Plan of Reorganization") that does not provide for the indefeasible payment of DIP Loans in full and in cash (including the Redemption Premium); and

(e)    except as permitted by the Budget (including Permitted Variances (as defined below)) to make any payment in settlement of any claim, action or proceeding in excess of $500,000 in the aggregate without the prior written consent of the DIP Agent, acting at the direction of the Required DIP Lenders (as defined below);

provided that, advisors to the Committee (as defined below), if one is appointed, may investigate the liens granted pursuant to, or any claims under or causes of action with respect to, the Prepetition Facilities at an aggregate expense for such investigation not to exceed $50,000 (the "Investigation Budget Cap"), provided that no portion of such amount may be used to prosecute any claims.

| | |
|---|---|
| **Availability** | **Interim Facility**: During the period commencing on the date (the "Interim Order Entry Date") of the Bankruptcy Court's entry of an interim order approving the DIP Facility ("Interim Order") but prior to the entry of a final order approving the DIP Facility ("Final Order", and together with the Interim Order, the "DIP Order", as applicable) or such earlier date upon the occurrence |

of a maturity event, the maximum amount available to be drawn under the DIP Facility shall be limited to $27.0 million (the "Interim Facility"), subject to compliance with the terms, conditions, and covenants set forth in the DIP Loan Documents.

**Full Availability**:  Upon the Bankruptcy Court's entry of the Final Order (the "Final Order Entry Date"), the full amount of the DIP Facility shall be available to the Debtors, subject to compliance with the terms, conditions, and covenants set forth in the DIP Loan Documents.  On the Final Order Entry Date, the Debtors shall draw $74,074,074.07 (less the amounts theretofore drawn pursuant to the Interim Order) under the DIP Facility.

**Withdrawals:**  Subject to the funding of the Professional Fees Account (as defined below) on the terms set forth below, the DIP Loans shall be funded into a blocked controlled segregated deposit account in the name of the DIP Agent (the "DIP Funding Account").  As part of the Budget, the Loan Parties shall set forth, for each week, the amount (if any) of proceeds from the DIP Facility that must be drawn in order for the Loan Parties to maintain liquidity of at least $5 million (the "DIP Withdrawal Amount").  On a weekly basis, the Loan Parties may draw no more than 110% of the DIP Withdrawal Amount.  In the event that the Loan Parties receive extension fees or breakup fees in connection with an asset sale purchase agreement (the "Extension Fees" and the "Breakup Fees," respectively), such amounts shall be deposited in the DIP Funding Account and shall be subject to the provisions of the DIP Loan Documents as if such proceeds were loans thereunder (i.e., Budget, Use of Proceeds, etc.).

In the event of any acceleration of the DIP Loans before the consummation of an Approved Plan (as defined below), the funds available in the DIP Funding Account will be used to pay down the outstanding DIP Loans.

Upon the occurrence of the Exit Conversion (as defined below), the DIP Agent shall transfer the amounts remaining in the DIP Funding Account (which amounts include any Extension Fees and any Breakup Fees deposited therein) to the Borrower, as reorganized, or RentPath NewCo (as defined in the Restructuring Term Sheet), as applicable; provided, that if the Borrower, as reorganized, or RentPath NewCo, as applicable, is projected to have, at the time immediately following the Exit Conversion, a pro forma cash balance in excess of $100 million (after giving effect to any transfer of amounts remaining in the DIP Funding Account to the Borrower, as reorganized, or RentPath NewCo, as applicable, and the receipt of cash proceeds from the Exit Term Loan Facility, as well as cash payments required to be made under the Plan of Reorganization and payment of any transaction or exit fees and costs, including, among other things, the payment of any incentive or retention payments), the Borrower shall, upon the occurrence of the Exit Conversion, mandatorily prepay an amount equal to the difference of (x) the Borrower's projected pro forma cash balance immediately following the Exit Conversion and (y) $100 million (the "Conversion Prepayment"), which amount shall be used to pay down the outstanding DIP Loans.  The Conversion Prepayment shall be subject to the payment of the Redemption Premium, as set forth in and in accordance with Annex II hereto.

**Professional Fees Account**:  Contemporaneously with the initial funding of the DIP Loans, the Loan Parties shall (i) transfer in an amount equal to the total budgeted weekly Professional Fees for the first two weekly periods set forth in the Budget and (ii) thereafter, on a weekly basis, transfer cash proceeds from the DIP Facility or cash on hand in an amount equal to the aggregate unpaid amount of Estimated Fees and Expenses (as defined below) included in all Weekly Statements (as defined below) timely received by the Debtors, which shall be reported to the DIP Agent (or, in the event of a DIP Repayment (as defined below), the Prepetition Agents), or if an estimate is not provided, the total budgeted weekly fees of Estate Professionals for the prior week

set forth in the Budget, in each case, into a segregated account not subject to the control, liens, security interests, or claims of the DIP Agent, any DIP Lender, or any Prepetition Secured Party (the "<u>Professional Fees Account</u>").

Starting with the third full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors a statement (each such statement, a "<u>Weekly Statement</u>") setting forth a good-faith estimate of the amount of unpaid fees and expenses incurred during the preceding week by such Professional Person (the "<u>Estimated Fees and Expenses</u>").  No later than one business day after the delivery of a Carve-Out Trigger Notice (as defined herein) (the "<u>Carve-Out Statement Date</u>"), each Professional Person shall deliver one additional statement to the Debtors setting forth a good-faith estimate of the amount of Estimated Fees and Expenses incurred on and during the period prior to the Carve-Out Statement Date to the extent not otherwise paid or included in a previous Weekly Statement, and the Debtors shall transfer such amounts to the Professional Fees Account.

The Debtors shall be authorized to use funds held in the Professional Fees Account (as defined below) to pay Professional Fees as they become allowed and payable pursuant to any interim or final orders of the Bankruptcy Court or otherwise; <u>provided</u>, that when all allowed Professional Fees have been paid in full (regardless of when such Professional Fees are allowed by the Bankruptcy Court), any funds remaining in the Professional Fees Account shall revert to the DIP Funding Account for use in a manner not inconsistent with this DIP Term Sheet; <u>provided</u>, <u>further</u>, that the Debtors' obligations to pay allowed Professional Fees shall in no way be limited or deemed limited to funds held in the Professional Fees Account.

Notwithstanding anything herein to the contrary, funds transferred to the Professional Fees Account shall be held in trust exclusively for the Professional Persons (as defined below), including with respect to obligations arising out of the Carve-Out.  Funds transferred to the Professional Fees Account shall not be subject to any liens or claims granted to the DIP Lenders herein or any liens or claims granted to the Prepetition Secured Parties as adequate protection, shall not constitute Collateral (as defined below), and shall not constitute Cash Collateral; <u>provided</u>, that the Collateral shall include a reversionary interest in funds held in the Professional Fees Account, if any, after all allowed Professional Fees have been paid in full (regardless of when such Professional Fees are allowed by the Bankruptcy Court).

| | |
|---|---|
| **Budget** | <u>**Initial Budget; Budget**</u>:  The 13-week statement of the Loan Parties' anticipated cash receipts and disbursements for the first 13 weeks of the Chapter 11 Cases, set forth on a weekly basis, including the anticipated uses of the DIP Facility for such period (the "<u>Initial Budget</u>").  On the first Thursday that is four (4) full weeks after the date on which the Chapter 11 Cases are commenced (the "<u>Petition Date</u>"), and on the Thursday of each fourth week thereafter, the Loan Parties shall provide to the DIP Agent and the legal and financial advisors of the Ad Hoc Committee with (i) an updated 13-week statement for the subsequent 13-week period (a "<u>Proposed Budget</u>"), which Proposed Budget shall modify and supersede any prior Budget upon the approval of the Required Lenders in their reasonable discretion (such approval not to be unreasonably withheld), and (ii) a report setting forth total organic and paid visitors, unique visits and leads to core for such four week period in addition to a report setting forth the beginning and ending property period, as well as a breakdown of gross new, dropped and adjusted properties for such four week period.   Until the Required Lenders approve the Proposed Budget in their reasonable discretion (such approval not to be unreasonably withheld) the then-current Budget shall remain the Budget.<br><br><u>**Incremental Performance Marketing**</u>:  Beginning on the second to last business day before the |

last full week in February, and continuing on a monthly basis thereafter on the second to last business day before the last full week of each month, the Loan Parties shall provide the Required Lenders (as defined herein) with a proposal for the incremental performance marketing expenditures for the subsequent month (a "<u>Monthly Incremental Marketing Proposal</u>") and host a pre-scheduled conference call with the Required Lenders to discuss such proposal. The Required Lenders shall have 48 hours after the conclusion of the pre-scheduled conference call to respond, and if such 48-hour period lapses, the Required Lenders will be deemed to have approved the Monthly Incremental Marketing Proposal.

Following delivery of a Monthly Incremental Marketing Proposal, the Company may request approval of additional incremental performance marketing expenditures. Approval of such requests shall be made in the Required Lenders' sole discretion.

Notwithstanding anything to the contrary contained herein, the Debtors may timely pay all obligations arising from incremental performance marketing expenditures incurred by the Debtors prior to the Petition Date and during the month of February (which postpetition obligations incurred during the month of February have previously been approved by the Required Lenders as of the date hereof).

The Debtors shall deliver to the Required Lenders a schedule (the "<u>Performance Marketing Schedule</u>") that sets forth (i) forecasted monthly incremental performance marketing expenditures for the duration of the Chapter 11 Cases; (ii) forecasted pre-approved incremental performance marketing expenditures (the "<u>Pre-Approved Incremental Marketing Expenditures</u>") (such Pre-Approved Incremental Marketing Expenditures included on the Performance Marketing Schedule delivered to the Required Lenders on February 10, 2020 having been approved by the Required Lenders as of the date hereof); and (iii) the dates on which the Debtors will provide each Monthly Incremental Marketing Proposal. Notwithstanding anything to the contrary contained herein, the Debtors shall be permitted to incur the Pre-Approved Incremental Marketing Expenditures without any further approval of the Required Lenders.

The total cash disbursements on account of incremental performance marketing expenditures for the duration of the Chapter 11 Cases shall not exceed the Incremental Performance Marketing Cap, as defined in the Performance Marketing Schedule.

**Budget Variance**: Commencing on the first Thursday that is two (2) full weeks after the Petition Date, and continuing weekly thereafter, the Loan Parties shall deliver to the DIP Agent a report (each, a "<u>Variance Report</u>") describing in reasonable detail the Debtors' aggregate cash receipts and aggregate cash disbursements during the preceding two-week period as compared to the projected, aggregate cash receipts and disbursements provided by the then-current Budget for such two-week period (such difference, a "<u>Variance</u>").

"Permitted Variance" means a Variance from the then-current Budget on a two-week trailing basis (the "<u>Testing Period</u>") that does not exceed the total aggregate amount in such Budget of disbursements (exclusive of (x) Professional Fees and restructuring charges arising on account of Chapter 11 Cases (including U.S. Trustee fees and professional fees and expenses incurred by the Committee (as defined herein) (if any) or the DIP Agent and/or DIP Lenders or paid by the Loan Parties as adequate protection) and (y) disbursements made on account of prepetition claims pursuant to any order of the Bankruptcy Court for the Testing Period) by more than 10%.

The Loan Parties hereby agree that during any Testing Period, the Variance from the then-current Budget shall not exceed the Permitted Variance.

| | |
|---|---|
| **Collateral; Priority** | <u>Collateral</u>:  All property of the Loan Parties (now or hereafter acquired and all proceeds thereof), including property or assets, if any, that do not secure the Existing Primed Secured Facilities (as defined below), and including, subject to entry of the Final Order, the proceeds of all claims and causes of action arising under sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 553(b), or 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state-law equivalents (the "<u>Avoidance Actions</u>") (the "<u>Collateral</u>").<br><br><u>Priority</u>:  All obligations of the Loan Parties to the DIP Lenders and the DIP Agent under the DIP Loan Documents, including all loans made under the DIP Facility, shall, subject in all respects to the Carve-Out, at all times:<br><br>(a)  pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority administrative expense claim status against each Debtor in the Chapter 11 Cases, which claims in respect of the DIP Facility shall be superior to all other claims;<br><br>(b)  pursuant to section 364(c) of the Bankruptcy Code, have first priority liens on all unencumbered assets of the Loan Parties (now or hereafter acquired and all proceeds thereof);<br><br>(c)  pursuant to section 364(c)(3) of the Bankruptcy Code, have junior liens on all encumbered assets of the Loan Parties (now or hereafter acquired and all proceeds thereof), other than as set forth in clause (d) immediately below; and<br><br>(d)  pursuant to section 364(d) of the Bankruptcy Code, have first priority priming liens on all assets of the Loan Parties (now or hereafter acquired and all proceeds thereof) that serve as collateral under the Existing Primed Secured Facilities (as defined below), which liens shall be senior to the liens on the Collateral securing the Exiting Primed Security Facilities and the adequate protection liens on the Collateral granted under the DIP Order.<br><br>It is understood and agreed that the priming liens described herein shall prime the liens securing each Prepetition Facility and other secured obligations, including foreign exchange, currency and interest rate hedged obligations (collectively, the "<u>Existing Primed Secured Facilities</u>"), but that the liens so created as described in clauses (b), (c), and (d) above shall be subject to "Permitted Liens" (as such term is defined under each Prepetition Facility) as of the Petition Date, except those securing the Existing Primed Secured Facilities.<br><br>All of the liens described herein with respect to the assets of the Loan Parties shall be effective and perfected as of the Interim Order Entry Date and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements.<br><br>Except to the extent expressly set forth in this DIP Term Sheet, each DIP Order shall contain provisions prohibiting each Loan Party from incurring any indebtedness which (x) ranks pari passu with or senior to the DIP Loans or (y) benefits from a first priority lien under section 364 of the Bankruptcy Code. |
| **Carve-Out** | ""<u>Carve-Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy and to the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate |

(without regard to the notice set forth in (iv) below); (ii) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iv) below); (iii) to the extent allowed at any time, whether by interim or final compensation order, all Professional Fees of the Debtors' Professionals and professional fees of any persons or firms (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") retained by any official committee of unsecured creditors (the "Committee") appointed in the Chapter 11 Cases pursuant to section 1103 of the Bankruptcy Code (collectively, the "Allowed Professional Fees") incurred at any time before or on the first business day after delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice and without regard to whether such fees and expenses are provided for in the Budget; and (iv) Allowed Professional Fees incurred after the first business day following delivery by the DIP Agent of the Carve-Out Trigger Notice (including transaction fees or success fees earned or payable to a Professional Person) in an aggregate amount not to exceed $1,500,000 with respect to Professional Persons (the amount set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap"). For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (or, following the indefeasible payment in cash in full of the obligations under the DIP Facility (a "DIP Repayment"), the Prepetition Agents) to the Loan Parties, their lead restructuring counsel, the U.S. Trustee, and lead counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the obligations under the DIP Facility (or, following a DIP Repayment, any occurrence that otherwise would have constituted an Event of Default under the DIP Facility) or the occurrence of the Maturity Date (as defined below), stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

On the day on which a Carve-Out Trigger Notice is received by the Loan Parties, the Carve-Out Trigger Notice shall constitute a demand to the Loan Parties to utilize all cash on hand (including cash contained in the DIP Funding Account) to transfer to the Professional Fees Account cash in an amount equal to all obligations benefitting from the Carve-Out.

For the avoidance of doubt, to the extent that professional fees and expenses of the Professional Persons have been incurred by the Debtors at any time before or on the first business day after delivery by the DIP Agent (or, following a DIP Repayment, the Prepetition Agents) of a Carve-Out Trigger Notice but have not yet been allowed by the Bankruptcy Court on the date that the DIP Agent (or, following a DIP Repayment, the Prepetition Agents) delivers a Carve-Out Trigger Notice, such professional fees and expenses of the Professional Persons shall constitute Allowed Professional Fees benefiting from the Carve-Out upon their allowance by the Bankruptcy Court, whether by interim or final compensation order and whether before or after delivery of the Carve-Out Trigger Notice, and the Loan Parties shall fund the Professional Fees Account in the amount of such professional fees and expenses.

The Interim Order shall provide that, following delivery of a Carve-Out Trigger Notice, the DIP Agent shall deposit into the Professional Fees Account any cash swept or foreclosed upon (including cash received as a result of the sale or other disposition of any assets) until the Professional Fees Account has been fully funded in an amount equal to all obligations benefiting from the Carve-Out. Notwithstanding anything to the contrary in the DIP Loan Documents or the Final Order, following delivery of a Carve-Out Trigger Notice, the DIP Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Loan Parties until the Professional Fees Account has been fully funded in an amount equal to all obligations benefiting from the Carve-Out.

Further, notwithstanding anything to the contrary herein, (i) disbursements by the Loan Parties

8

|  | from the Professional Fees Account shall not constitute DIP Loans, (ii) the failure of the Professional Fees Account to satisfy in full the Professional Fees shall not affect the priority of the Carve-Out, and (iii) in no way shall the Carve-Out, Professional Fees Account, a Budget, Weekly Statements, Estimated Fees and Expenses, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Loan Parties or that may be allowed by the Bankruptcy Court at any time (whether by interim order, final order, or otherwise). |
|---|---|
|  | Proceeds from the DIP Facility not to exceed the Investigation Budget Cap may be used on account of professional fees and expenses of Committee Professionals in connection with the Investigation, which obligations will benefit from the Carve-Out in an amount not to exceed the Investigation Budget Cap to the extent unpaid as of the delivery of a Carve-Out Trigger Notice. |
|  | For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Loan Documents, the Carve-Out shall be senior to all liens securing and all claims on account of the DIP Facility, any adequate protection liens, and superpriority claims (whether granted on account of the DIP Facility, as adequate protection, or otherwise), and any and all other liens and claims. |
|  | Subject to any of the DIP Agent's and/or the DIP Lenders' obligations with respect to the Carve-Out and the Professional Fees Account, the DIP Agent and the DIP Lenders shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Professional Persons incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code, and nothing in this DIP Term Sheet shall obligate the DIP Agent or the DIP Lenders to directly pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement. |
|  | For the avoidance of doubt, if a DIP Repayment occurs or the DIP Facility is otherwise terminated, the DIP Order shall remain in full force and effect, including with respect to the Debtors' use of Cash Collateral, the Carve-Out, the Professional Fees Account, and all related provisions in respect thereof, and the Prepetition Agents shall assume any rights and obligations that the DIP Agent previously had with respect to the Carve-Out and the Professional Fees Account. |
| **Adequate Protection** | Each Prepetition Agent under the Existing Primed Secured Facilities, for the benefit of itself, the Prepetition Lenders, and the holders of all other secured obligations thereunder (the "Prepetition Primed Obligations"), shall be granted the following as adequate protection, pursuant to sections 361, 507, 363(e), and 364(d)(1) of the Bankruptcy Code or otherwise, of its prepetition security interests for the consent of such Prepetition Agent to the grant of priming liens under the DIP Facility, consent to the use of its collateral (including Cash Collateral), consent to the transaction contemplated by the DIP Facility, and for the diminution in the value, if any, of such parties' interests in such collateral (each such diminution, a "Diminution in Value"), whether or not such Diminution in Value results from the sale, lease, or use by the Loan Parties of the collateral securing the Prepetition Primed Obligations (including Cash Collateral), the priming of the prepetition security interests of such lender, the stay of enforcement of any prepetition security interest arising from section 362 of the Bankruptcy Code, or otherwise: |
|  | (a) Adequate Protection Liens. Each Prepetition Agent under the Existing Primed Secured Facilities, on behalf of itself and the applicable secured creditors and holders, shall be granted for their benefit and the benefit of the applicable secured creditors, effective and perfected as of the Interim Order Entry Date and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other |

agreements, a security interest and lien on all assets of the Loan Parties except foreign equity assets subject to a material incremental tax liability under section 956 of the Internal Revenue Code (collectively, the "<u>Adequate Protection Liens</u>"), subject and subordinate only to (x) the Carve-Out and (y) the liens securing the DIP Facilities, which Adequate Protection Liens shall rank in the same relative priority and right as the liens securing the Existing Primed Secured Facilities, provided that the Adequate Protection Liens shall only encumber the proceeds of Avoidance Actions upon entry of the Final Order.

(b) <u>Fees and Expenses</u>. The Loan Parties shall (i) within two business days of the Closing Date (as defined below) (to the extent invoiced prior to such date), pay in cash all accrued and unpaid reasonable and documented prepetition fees and expenses of the legal and financial advisors to the Ad Hoc Committee and counsel to the Prepetition Agents and (ii) after entry of the Interim Order, pay in cash the reasonable and documented costs, fees and expenses of the legal and financial advisors to the Ad Hoc Committee (including fees and expenses of one primary counsel and one local counsel) and counsel to the Prepetition Agents, in each case, in accordance with the applicable fee letters entered into between any of the Loan Parties and such professionals.

(c) <u>Adequate Protection Claims</u>. Each Prepetition Agent under the Existing Primed Secured Facilities, on behalf of itself and the applicable secured creditors and holders, shall be granted, subject in all respects to the Carve-Out, a superpriority administrative expense claim against each of the Loan Parties with respect to the foregoing and to the extent of any Diminution Value, junior only to the claims under section 364(c)(1) of the Bankruptcy Code held by the DIP Agent and the DIP Lenders; <u>provided</u>, that neither the Prepetition Agents, nor the Prepetition Lenders, nor any other creditors under the Existing Primed Secured Facilities shall receive or retain any payments, property, or other amounts in respect of such superpriority claims unless and until the obligations under the DIP Facility have indefeasibly been paid in cash in full (the "<u>Adequate Protection Claims</u>").

(d) <u>Financial Reporting and Information</u>. The Loan Parties shall provide each Prepetition Agent and the legal and financial advisors to the Ad Hoc Committee with financial and other reporting substantially in compliance with each Prepetition Facility and any reporting described herein, including, as soon as internally available, but no later than the date that is 15 days following the calendar month-end, an unaudited consolidated income statement of the Loan Parties for such calendar month.

All intercompany liens of the Loan Parties, if any (other than any liens securing each Prepetition Facility), will be contractually subordinated to the DIP Facility and to the Adequate Protection Liens on terms satisfactory to the Required DIP Lenders (as defined below).

| | |
|---|---|
| **DIP Orders** | The DIP Orders shall (i) upon entry of the Final Order, provide that in no event shall the Prepetition Agents or the Prepetition Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral; (ii) upon entry of the Final Order, approve the Debtors' waiver of all section 506(c) claims and any "equities of the case" exception under section 552(b) of the Bankruptcy Code, (iii) contain stipulations by the Debtors ratifying the extent, validity, priority, perfection, enforceability and non-avoidance of the obligations under the Prepetition Facilities and (iv) otherwise be in form and substance satisfactory to the Required DIP Lenders (as defined below). |
| **Closing Date** | The closing date of the DIP Facility (the "<u>Closing Date</u>") shall occur within three (3) business |

| | days of the Interim DIP Order Entry Date and shall be the first business day on which the conditions precedent set forth in the DIP Loan Documents have been satisfied or waived by the Required DIP Lenders (as defined below). |
|---|---|
| **Maturity** | Borrowings shall be repaid in full and in cash, and the commitments shall terminate, on the earliest to occur (the "Maturity Date") of (i) August 31, 2020 (the "Initial Maturity Date") and (ii) the effective date and the date of the substantial consummation (as defined in section 1102(2) of the Bankruptcy Code) of a Plan of Reorganization that has been confirmed by an order of the Bankruptcy Court (the "Plan Effective Date"); provided, that the Initial Maturity may be extended two times, each in three month increments, at the request of the Borrower with the consent of the Required Lenders; provided further, that if the Exit Conversion (as defined below) occurs, the DIP Loans shall not be repaid in cash and shall convert into the Exit Term Loan Facility (as defined below) in accordance with the terms and conditions set forth herein.<br><br>Any confirmation order entered in the Chapter 11 Cases ("Confirmation Order") shall not discharge or otherwise affect in any way the joint and several obligations of the Loan Parties to the DIP Lenders under the DIP Facility and the DIP Loan Documents, other than after either (i) the payment in full and in cash (including the "Redemption Premium" (as defined in Annex II hereto)) to the DIP Lenders of all obligations under the DIP Facility and the DIP Loan Documents on or before the Plan Effective Date and the termination of the Commitments or (ii) the Exit Conversion. |
| **Interest; Discount; Premiums; Fees** | The interest rate, default rate, discount, premiums, and fees under the DIP Facility are set forth in Annex II hereto. |
| **Conditions Precedent** | **Conditions to the Closing Date**:<br><br>1.  Interim Order/Bankruptcy Matters.<br><br>    (a) The Chapter 11 Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" (including a cash management order (the "Cash Management Order")) and all related pleadings to be filed at the time of commencement of the Chapter 11 Cases shall have been provided to counsel to the Required DIP Lenders (as defined below) and shall be in form and substance reasonably acceptable to the Required DIP Lenders.<br><br>    (b) The Bankruptcy Court shall have entered an Interim Order that shall be in form and substance consistent with this DIP Term Sheet and otherwise in form and substance acceptable to the Required DIP Lenders and the Debtors, shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed, or subject to a stay pending appeal.  The Loan Parties shall be in compliance in all respects with the Interim Order.<br><br>    (c) The DIP Agent shall have received UCC, tax and judgment lien searches and other appropriate evidence in form and substance reasonably satisfactory to the Required DIP Lenders evidencing the absence of any other liens or mortgages on the Collateral, except the liens securing each Prepetition Facility, Permitted Liens, and other existing liens acceptable to the Required DIP Lenders.<br><br>2. Budgets and Financial Information.  The DIP Lenders shall have received the Initial Budget as of the Closing Date, which Initial Budget shall be in form and substance satisfactory |

to the Required Lenders; it being acknowledged and agreed that the budget set forth on Schedule 1 to this Exhibit C is in form and substance acceptable to the DIP Agent as a "Budget" (as the same may be modified or superseded by a Proposed Budget).

3.  Customary Closing Documents.

   (a) All costs, fees, expenses (including reasonable and documented legal fees and expenses) and other compensation contemplated by the DIP Loan Documents and this DIP Term Sheet shall have been paid or reimbursed to the extent invoiced prior to the Closing Date.

   (b) The Loan Parties shall have complied with all other customary closing conditions set forth in the DIP Loan Documents (which shall be consistent with this DIP Term Sheet), including:  (i) the delivery of corporate records and documents from public officials, secretary's certificates, and officer's certificates; (ii) evidence of authority; and (iii) obtaining of any material third-party and governmental consents necessary in connection with the DIP Facility, the financing thereunder, and related transactions.  The Loan Parties and the transactions contemplated by this DIP Term Sheet shall be in compliance with all applicable laws and regulations.

   (c) The DIP Lenders shall have received prior to the Closing Date all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Patriot Act, in each case satisfactory to each DIP Lender.

   (d) Execution and delivery by the Loan Parties of the DIP Loan Documents and promissory notes (if requested by any DIP Lender) evidencing the loans made and to be made under the DIP Facility.

   (e) The DIP Agent shall have received a borrowing notice.

   (f) Such other conditions customary for debtor-in-possession financings of this type.

**Conditions to All Loans and Withdrawals**:

   (a) With respect to borrowings and withdrawals that occur on or after the date that is 40 days following the Petition Date, the Final Order shall be in full force and effect and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed, or subject to a stay pending appeal.

   (b) The Loan Parties shall be in compliance with each order entered in the Chapter 11 Cases, including the DIP Orders and the Cash Management Order.

   (c) The Loan Parties shall be in compliance with their obligations in connection with the delivery of an Initial Budget, Proposed Budgets, and Variance Reports (as set forth herein, in the DIP Order, and the DIP Loan Documents), and the Loan Parties shall be in compliance with the Budget (subject to Permitted Variances).

   (d) Except as disclosed in the DIP Loan Documents, since September 31, 2019 no material adverse change in the operations, assets, revenues, financial condition, profits or prospects of the Loan Parties (other than by virtue of the Chapter 11 Cases) shall have occurred.

12

<table>
<tr>
<td></td>
<td>

(e)  The following statements shall be true and correct:  (i) the representations and warranties contained in the DIP Loan Documents are true and correct in all material respects (unless otherwise qualified by materiality, in which case such representations and warranties shall be true and correct in all respects) on and as of each date the Loan Parties request to borrow DIP Loans or withdraw funds from the DIP Funding Account, as though made on and as of such date, except to the extent that any such representation or warranty expressly relates to an earlier date (in which case such representation or warranty shall be true and correct in all material respects (unless otherwise qualified by materiality, in which case such representations and warranties shall be true and correct in all respects) on and as of such earlier date) and (ii) no Default or Event of Default shall have occurred and be continuing on such date.

(f)  Such other conditions customary in the context of the proposed DIP Facility.

Notwithstanding anything to the contrary contained herein, the conditions set forth above shall not apply to any withdrawals made by the Loan Parties to fund the Professional Fees Account, including any such withdrawal following the delivery of a Carve-Out Trigger Notice, in accordance with the terms and conditions set forth herein.
.

</td>
</tr>
<tr>
<td><strong>Covenants</strong></td>
<td>

Expected to be largely consistent with the covenant contained in the First Lien Credit Agreement but also to include covenants customary or appropriate in the context of the proposed DIP Facility, including:

<strong><u>Additional Information Covenants</u></strong>:

(a)  <u>Chapter 11 Cases Filings</u>.  The Debtors shall use commercially reasonable efforts to provide to the DIP Agent and the legal and financial advisors to the Ad Hoc Committee promptly after the same is available, copies of all pleadings, motions, applications and other documents filed by or on behalf of any other Loan Party with the Bankruptcy Court in the Chapter 11 Cases, including all motions for "first day" and "second day" relief.

(b)  <u>Conference Call</u>. The Loan Parties shall schedule weekly teleconferences between their financial advisors and the financial advisors of the Ad Hoc Committee.

<strong><u>Ratings Covenant</u></strong>:

Prior to the entry of the Final Order, the Loan Parties shall have obtained a public corporate credit rating from either Standard & Poor's ("<u>S&P</u>"), a division of S&P Global, Inc., or Moody's Investors Service, Inc. ("<u>Moody's</u>") in respect of the DIP Facility; <u>provided</u>, that if a DIP Lender provides the Loan Parties written notice at least two (2) weeks prior to the Final Order Entry Date that it requests a public corporate credit rating from each of S&P and Moody's in respect of the DIP Facility in order to fund its Commitment, then, prior to entry of the Final Order, the Loan Parties shall have obtained a public corporate credit rating from each of S&P and Moody's in respect of the DIP Facility.

<strong><u>Affirmative/Negative Covenants</u></strong>:

</td>
</tr>
</table>

|  | (a) Comply with each order entered by the Bankruptcy Court in the Chapter 11 Cases. |
|---|---|
|  | (b) Reasonable access to information (including historical information) and management and executive personnel regarding strategic planning, cash and liquidity management, and operational and restructuring activities (subject to the terms and conditions of the DIP Loan Documents, including the confidentiality provisions therein), except to the extent access to such information would compromise the Debtors' attorney-client privilege. |
|  | (c) Absent the consent of the Required DIP Lenders (as defined below), consent to termination or reduction of the "Exclusivity Period" or fail to object to any motion seeking to terminate or reduce the "Exclusivity Period". |
|  | (d) Modify or alter (i) in any material manner the nature and type of its business or the manner in which such business is conducted or (ii) in any manner materially adverse to the DIP Lenders, the Loan Parties' organizational documents, except as required by the Bankruptcy Code. |
|  | (e) Assert any right of subrogation or contribution against any other Loan Party until all borrowings under the DIP Facility are paid in full as provided herein (including the Redemption Premium set forth in <u>Annex II</u> hereto) and the commitments are terminated. |
|  | (f) Make any payment of principal or interest or otherwise on account of any prepetition indebtedness or payables, other than as contemplated as adequate protection herein or payments (i) agreed in writing by the Required DIP Lenders and authorized by the Bankruptcy Court or (ii) authorized by the Bankruptcy Court pursuant to "first day" or "second day" relief. |
| **Representations and Warranties** | The DIP Loan Documents shall contain representations and warranties substantially similar to those made by the Loan Parties under First Lien Credit Agreement, modified as necessary to reflect the commencement of the Chapter 11 Cases and otherwise as customary in the context of the proposed DIP Facility. |
| **Prepayments** | <u>**Voluntary Prepayment**</u>: The Loan Parties may, at any time, (i) repay the loans under the DIP Facility and/or (ii) reduce the DIP Facility commitments, in each case in full but not in part. Any voluntary prepayment shall be subject to the payment of the Redemption Premium set forth in <u>Annex II</u> hereto.<br><br><u>**Mandatory Prepayment**</u>: The DIP Loan Documents shall contain mandatory prepayment covenants substantially similar to those made by the Loan Parties under the First Lien Credit Agreement, modified as appropriate to reflect the commencement of the Chapter 11 Cases and otherwise as customary in the context of the proposed DIP Facility, including with respect to (i) asset sales, (ii) insurance proceeds, (iii) incurrence of indebtedness, (iv) issuance of equity, and (v) the Conversion Prepayment (if any). Any mandatory prepayment shall be subject to the payment of the Redemption Premium set forth in <u>Annex II</u> hereto. |
| **Events of Default** | The DIP Loan Documents will contain events of default ("Events of Default") substantially similar to those in the First Lien Credit Agreement (subject to modifications necessary to reflect customary debtor-in-possession financing provisions, this specific transaction and current market conditions) and other customary Events of Defaults in the context of the proposed DIP Facility, |

including:

(a) **Budget**. The proceeds of any DIP Loan shall have been expended in a manner, or a withdrawal from the DIP Funding Account shall be for a purpose, which is not in accordance with the Budget (subject to Permitted Variances).

(b) **Collateral Documents**.  The DIP Order shall cease to create valid and perfected liens on the Collateral with such priority required by this DIP Term Sheet, subject to Permitted Liens.

(c) **Entry of Order**.  The entry of the Final Order shall not have occurred within 40 calendar days after the Interim Order Entry Date.

(d) **Conversion to Chapter 7**. An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a Chapter 7 case.

(e) **Alternate Financing**. Any Loan Party shall file a motion in the Chapter 11 Cases, without the express written consent of Required DIP Lenders (as defined below), to obtain additional financing from a party other than DIP Lenders under section 364(d) of the Bankruptcy Code.

(f) **Prepetition Claims**. Any Loan Party shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any prepetition claim in excess of $500,000 in the aggregate other than (x) as provided for in the "first day" and "second day" orders and included in the Budget or (y) otherwise consented to by the Required DIP Lenders in writing; (ii) granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $500,000 in the aggregate; or (iii) except with respect to each Prepetition Facility as provided in the DIP Order, approving any settlement or other stipulation in excess of $500,000 in the aggregate not approved by the Required DIP Lenders and not included in the Budget with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor.

(g) **Appointment of Trustee or Examiner**. An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court appointing, or any Loan Party, any subsidiary of a Loan Party, or any affiliate of a Loan Party shall file an application for an order with respect to any Chapter 11 Case seeking the appointment of, (i) a trustee under section 1104 or (ii) an examiner with enlarged powers (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code.

(h) **Dismissal of Chapter 11**. An order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for termination of the Commitments and payment in full of all obligations of the Loan Parties under the DIP Facility.

(i) **Order With Respect to Chapter 11 Cases**. An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Required DIP Lenders (and, with respect to any provisions that materially

affect the rights or duties of the DIP Agent, the DIP Agent), (i) to revoke, reverse, stay, modify, supplement, or amend any of the DIP Orders in a manner inconsistent with this DIP Term Sheet that is not otherwise consented to by the Required DIP Lenders (and with respect to amendments, modifications, or supplements that affect the rights or duties of the DIP Agent, the DIP Agent); (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Loan Parties equal or superior to the priority of the DIP Loans (other than the Carve-Out) or the Adequate Protection Claims (other than the Carve-Out or the administrative expense claims on account of the DIP Facility) or (iii) to grant or permit the grant of a lien on the Collateral (other than a Permitted Lien) that is senior to the liens of the DIP Lenders.

(j) **Application for Order by Third Party**.  An application for any of the orders described in clauses (d), (f), (g) (h), (i)  and (k) of this section shall be made by a person other than the Loan Parties and such application is not contested by the Loan Parties in good faith or any person obtains a non-appealable final order charging any of the Collateral under section 506(c) of the Bankruptcy Code against the DIP Agent or the DIP Lenders or obtains a final order adverse to the DIP Agent or the DIP Lenders.

(k) **Right to file Chapter 11 Plan**.   The entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Loan Party to file a Plan of Reorganization pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the Required DIP Lenders.

(l) **Liens**.  (i) Any Loan Party shall attempt to invalidate, reduce, or otherwise impair the liens or security interests of the DIP Agent and/or the DIP Lenders or to subject any Collateral to assessment pursuant to section 506(c) of the Bankruptcy Code; (ii) any lien or security interest created by the DIP Loan Documents or the DIP Order with respect to Collateral shall, for any reason, cease to be valid; or (iii) any action is commenced by the Loan Parties that contests the validity, perfection, or enforceability of any of the liens and security interests of the DIP Agent and/or the DIP Lenders created by any of the Interim Order, the Final Order, or the DIP Loan Documents.

(m)**Invalidation of Claims**.  Any Loan Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Loan Parties) any other person's motion to disallow in whole or in part the DIP Lenders' claims in respect of the obligations under the DIP Facility or contest any material provision of any DIP Loan Document.

(n) **Modifications**. A joint Plan of Reorganization, pursuant to Chapter 11 of the Bankruptcy Code in form and substance reasonably satisfactory to the Required DIP Lenders and the DIP Agent (the "Approved Plan"), or the Confirmation Order, is amended, supplemented, or otherwise modified in a manner that materially affects the rights or duties of the DIP Lenders and/or the DIP Agent without the prior written consent of the Required DIP Lenders (and with respect to amendments, modifications, or supplements that affect the rights or duties of the DIP Agent, the DIP Agent).

(o) **Withdrawal or Termination of Approved Plan**.  The withdrawal or termination of the

|  | Approved Plan. |
|---|---|
|  | (p) **Payments**. Any Loan Party or any of their affiliates shall have filed a motion seeking the entry of, or the Bankruptcy Court shall have entered, an order approving a payment to any person that would be materially inconsistent with the treatment of any such person under the Approved Plan, without the prior written consent of the Required DIP Lenders.<br><br>(q) **Termination of the Restructuring Support Agreement**.  The termination of the Restructuring Support Agreement in accordance with its terms.<br><br>(r) **Other Events of Default**.  Such other usual and customary Events of Default that are customary for debtor-in-possession financings of this type. |
| **Exit Term Loan Facility** | Upon the consummation of the Approved Plan as contemplated by, and subject to the terms and conditions of, the Restructuring Support Agreement, the DIP Loans shall be repaid in full in cash (including the Redemption Premium) or converted by the Debtors into exit financing loans of the reorganized Debtors (the "Exit Conversion") having the terms and conditions consistent with those set forth on Annex III hereto, and otherwise in form and substance (and subject to documentation) reasonably acceptable to the Required DIP Lenders (as defined below) (the "Exit Term Loan Facility"). |
| **Indemnity** | The Loan Parties shall, jointly and severally, be obligated to indemnify and hold harmless the DIP Agent, each of the DIP Lenders, and each of their respective affiliates, officers, directors, fiduciaries, employees, agents, advisors, attorneys, and representatives from and against all losses, claims, liabilities, damages, and expenses (including out-of-pocket fees and disbursements of counsel) in connection with any investigation, litigation, or proceeding, or the preparation of any defense with respect thereto, arising out of or relating to the DIP Facility or the transactions contemplated in this DIP Term Sheet. |
| **Required DIP Lenders** | The vote of two or more un-affiliated (with respect to any other DIP Lender) DIP Lenders holding more than 50% of the aggregate undrawn Commitments and outstanding DIP Loans (the "Required DIP Lenders") shall be required to amend, waive, or modify the DIP Facility or the DIP Loan Documents. |
| **Credit Bidding** | The DIP Agent, upon the instruction of the Required DIP Lenders, shall have the right to credit bid up to the full amount of the obligations outstanding under the DIP Facility. |
| **Assignments and Participations** | The DIP Loan Documents shall include rights of assignment, subject to the Borrower's and the DIP Agent's consent under certain circumstances (such consent not to be unreasonably withheld or delayed) as set forth in the DIP Loan Documents and participation rights.  For the avoidance of doubt, Borrower shall not have consent rights upon the occurrence and continuation of an Event of Default. |
| **Governing Law** | The DIP Loan Documents will provide that the Loan Parties will submit to the non-exclusive jurisdiction and venue of the Bankruptcy Court or, in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the state, county, and city of New York, borough of Manhattan, and shall waive any right to trial by jury.  New York law shall govern the DIP Loan Documents (other than security documents to be governed by local law, to be determined by the DIP Agent). |

| | |
|---|---|
| **Release** | Subject to entry of the DIP Order, the Loan Parties will provide customary releases for any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, or obligations related to or arising out of the DIP Loans (the "<u>Release</u>"). |
| **Remedies** | Immediately upon the occurrence and during the continuation of an Event of Default, the DIP Agent may, and at the direction of the DIP Lenders shall, (i)(1) declare all obligations under the DIP Facility to be immediately due and payable, (2) declare the termination, reduction or restriction of any further Commitments, to the extent any such Commitments remain, and (3) terminate the DIP Facility as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the Loan Parties' obligations under the DIP Facility, the liens under the DIP Facility, or postpetition administrative superpriority claim status; and (ii) declare a termination, reduction, or restriction on the ability of the Loan Parties to use any Cash Collateral derived solely from the proceeds of Collateral; <u>provided</u>, that any such declaration shall be made to the Loan Parties, the Committee (if any), and the U.S. Trustee. |

[EXECUTION VERSION]

## Annex I

**Loan Parties**

| Legal Name |
| --- |
| RentPath Holdings, Inc. |
| RentPath, LLC |
| Consumer Source Holdings LLC |
| Discover Home Network, LLC |
| Viva Group, LLC |
| Viva Group Brokerage, Inc. |
| Easy Media, LLC |
| Electronic Lead Management, Inc. |
| Electronic Lead Management MA, Inc. |
| Electronic Lead Management VA, Inc. |
| Live Response Solutions Holdings, LLC |
| Live Response Solutions, LLC |

## Annex II

### Interest, Discount, Premiums, Fees

**Interest Rate**:  All amounts outstanding under the DIP Facility will bear interest at the rate of adjusted LIBOR plus 7.0% *per annum* and shall be paid monthly. LIBOR shall be subject to a floor of 1.0%.

**Default Interest**:  During the continuance of an Event of Default, the DIP Loans and all other outstanding obligations under the DIP Facility will bear interest at an additional 2.0% *per annum* above the interest rate otherwise applicable.

**Upfront Discount**:  An amount equal to 2.0% of the principal face amount of DIP Loans, which shall be payable to the DIP Lenders as an original issue discount on the date of funding.

**Redemption Premium**:  An amount equal to 19.6% on the outstanding principal amount of the DIP Loans, which shall be (i) added to the principal amount of the Exit Term Loan Facility in the event that the Exit Conversion occurs under an Approved Plan or (ii) otherwise paid in full in cash at the Maturity Date; provided, that in the event of a Conversion Prepayment or a sale of a material portion of the assets of the Loan Parties, or the equity interests of one or more Loan Parties, to a third party unaffiliated with the Prepetition 1L Lenders, such amount shall be reduced to (i) 3.5% for a Conversion Prepayment or sale occurring prior to 90 days from the Petition Date, (ii) 7.5% for a Conversion Prepayment or sale occurring on or after 90 days from the Petition Date, but prior to 180 days from the Petition Date, (iii) 15.0% for a Conversion Prepayment or sale occurring on or after 180 days from the Petition Date, but prior to 360 days from the Petition Date, and (iv) 19.6% for a Conversion Prepayment or sale occurring on or after 360 days from the Petition Date.

**Backstop Premium:**  An amount equal to 3.5% of the Total Commitments, payable to each Backstop Lender as an original issue discount on the Closing Date, according to its pro rata share of the Total Commitments.

**Agency Fees**:  As agreed with the DIP Agent.

**Nature of Interest, Discount, Premiums and Fees**:  Non-refundable under all circumstances.

**<u>Annex III</u>**

**Exit Term Loan Facility Term Sheet**

## Annex III

### EXIT TERM LOAN FACILITY TERM SHEET

Set forth below is a summary of the principal terms and conditions for the Exit Term Loan Facility (as defined below).  Unless otherwise noted below, capitalized terms used but not defined in this <u>Annex III</u> shall have the meanings set forth in the Restructuring Support Agreement or the DIP Term Sheet, to which this Annex III is attached.

This term sheet (the "<u>Exit Term Loan Facility Term Sheet</u>") is intended for discussion purposes only and does not constitute a commitment to lend.  This Exit Term Loan Facility Term Sheet is non-binding and the proposals contained herein are subject to, among other things, the negotiation, documentation and execution of definitive documentation. Only execution and delivery of definitive documentation relating to the transactions shall result in any binding or enforceable obligations of any party relating to the transactions.

### Summary of Principal Terms and Conditions[1]

| | |
|---|---|
| **Borrower** | A new entity formed at the direction of the Requisite Consenting First Lien Creditors (as defined in the Restructuring Support Agreement) or Reorganized RentPath, LLC, a Delaware limited liability company, formerly a debtor and debtor-in-possession in the Chapter 11 Cases (the "<u>Company</u>" or the "<u>Borrower</u>"). |
| **Guarantors** | RentPath Holdings, Inc., a Delaware corporation, and each of its wholly-owned subsidiaries other than the Borrower or such other entities formed at the direction of the Requisite Consenting First Lien Creditors (collectively, the "<u>Guarantors</u>" and, together with the Borrower, the "<u>Credit Parties</u>").  All obligations of the Borrower under the Exit Term Loan Facility (as defined below) will be unconditionally guaranteed on a joint and several basis by the Guarantors. |
| **Exit Term Loan Facility** | Secured term loan credit facility (the "<u>Exit Term Loan Facility</u>"), the holders thereof referred to as the "<u>Exit Lenders</u>", comprised of $159,630,843.96 of term loans consisting of (i) term loans pursuant to the DIP Facility converted on a dollar-for-dollar basis plus the Redemption Premium on the Exit Date (as defined below) in the amount of $88,592,592.59 (inclusive of the Redemption Premium) (the "<u>Exit Term Loan A</u>") and (ii) $71,038,251.37 of new money term loans ("<u>New Money Exit Term Loan B</u>"; the holders thereof referred to as the "<u>New Money Exit Lenders</u>"). |
| | The "<u>Plan</u>" means the Chapter 11 Plan of Reorganization and the related disclosure statement of the Debtors to be filed with the Bankruptcy Court, in form and substance reasonably satisfactory to the Required Lenders; <u>provided</u>, that the Approved Plan of Reorganization (as defined in the DIP Facility) shall be the Plan and be deemed to be satisfactory to the Required Lenders.  The reorganization contemplated by the Plan is referred to herein as the "<u>Reorganization</u>." |

---

[1] Capitalized terms used but not defined herein have the meaning ascribed to them in the DIP Term Sheet, to which this <u>Annex III</u> is attached.

| | |
|---|---|
| **Participation** | Participation in the New Money Exit Term Loan B will be offered as follows:  (i) 80.0% of the New Money Exit Term Loan B to the Prepetition 1L Lenders in the amount of a pro rata share in proportion to the amount of each Prepetition 1L Lender's outstanding loans and  commitments under the First Lien Credit Agreement and (ii) 20.0% of the New Money Exit Term Loan B to the Prepetition 2L Lenders in the amount of a pro rata share in proportion to the amount of each Prepetition 2L Lender's outstanding loans and  commitments under the Second Lien Credit Agreement; provided, however, that in the event that (i) the Restructuring Support Agreement is not executed prior to the Petition Date by Prepetition 2L Lenders holding at least 66-2/3% in aggregate principal amount of the loans outstanding under the Prepetition 2L Documents *and* (ii) the Class of holders of claims under the Prepetition 2L Facility does not vote to accept the Plan, participation in the New Money Exit Term Loan B will be offered solely to the Prepetition 1L Lenders (on a pro rata basis in proportion to the amount of each Prepetition 1L Lender's outstanding loans and commitments under the First Lien Credit Agreement) and the Prepetition 2L Lenders shall not be entitled to participate in the New Money Exit Term Loan B.  For avoidance of doubt, each DIP Lender that elected to participate in the DIP Facility was required, as part of such participation, to commit to participate in the New Money Exit Term Loan B in the same proportion as its commitment to participate in the DIP Facility. |
| **Backstop** | The Backstop Lenders (as defined in the DIP Term Sheet) shall (on a several, but not joint, basis) backstop the full aggregate amount of the Exit Term Loan Facility (and the DIP Facility) by providing the commitments to participate in the Exit Term Loan Facility (the "Exit Commitments") that are not assumed by the other Prepetition Lenders.  Prepetition Lenders wishing to participate in the funding of the Exit Term Loan Facility will be required to either (i) execute a joinder to the debtor-in-possession credit agreement by no later than five (5)  business days after the Election Date (as defined in the DIP Term Sheet) or (ii) execute a joinder to the credit agreement governing the Exit Term Loan Facility by no later than five (5) business days after the tabulation of votes on the Plan.  No affiliate of any Credit Party shall become an Exit Lender.  Each Prepetition Lender shall be entitled to transfer its pro rata share of its Exit Commitments to any other Prepetition Lender that (i) is party to the Restructuring Support Agreement and (ii) commits to participate in the Exit Term Loan Facility on the same terms. |
| **Use of Proceeds** | Proceeds of the New Money Exit Term Loan B will be used for working capital and general corporate purposes. |
| **Exit Date** | The date on which the Exit Term Loan A and New Money Exit Term Loan B are issued under the Exit Term Loan Facility and all Closing Conditions (as defined below) have been satisfied or waived by the Required Lenders (as defined below) (the "Exit Date"). |
| **Maturity** | The date that is 5 years after the Exit Date. |

| | |
|---|---|
| **Collateral** | The Exit Term Loan Facility will be secured by a perfected lien on, with the priority described below under "Priority," substantially all of the Credit Parties' tangible and intangible assets (collectively, the "<u>Collateral</u>"), including the equity interests of the Guarantors and all deposit and security accounts (which shall be subject to control agreements), with materiality thresholds and exceptions to be agreed. |
| **Priority** | A second priority lien on all Collateral, other than certain customary baskets to be agreed ("<u>Permitted Liens</u>").  The Exit Revolving Credit Facility (as defined below) will have a first priority lien on all Collateral, other than Permitted Liens. |
| **Conditions to Closing** | Usual and customary conditions to closing for facilities of this size, type, and purpose (collectively, the "<u>Closing Conditions</u>"), including the following: |

A. The negotiation, execution and delivery of customary definitive documentation in respect of the Exit Term Loan Facility, consistent with the terms set forth in this Exit Term Loan Facility Term Sheet and otherwise satisfactory to the Company, the Required Lenders, and the Agent (the "<u>Exit Financing Documentation</u>").

B. The following documents shall be reasonably satisfactory to the Company and the Required Lenders:

- the Plan;

- the terms of a new first lien revolving credit facility (the "<u>Exit Revolving Credit Facility</u>") in the principal amount of up to $40,000,000 (if any), and

- the confirmation order with respect to the Plan.

C. The Stalking Horse Credit Bid is the Successful Bid (each as defined in the Restructuring Support Agreement).

D. Substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of the Plan (all conditions precedent set forth therein having been satisfied or waived in accordance with the terms thereof), including the issuance to the New Money Exit Lenders of 40.0% of the new equity of RentPath NewCo or the reorganized equity issued under the Plan, as applicable, subject to dilution by shares issued and issuable pursuant to the management incentive plan, shall have occurred substantially contemporaneously with the closing of the Exit Term Loan Facility.

E. Immediately after the Exit Date, the Credit Parties and their subsidiaries shall have outstanding no indebtedness for borrowed money other than indebtedness outstanding under the Exit Term Loan Facility, the Exit Revolving Credit Facility (if any), and any additional indebtedness (including capital leases) on terms and conditions (including as to amount) reasonably satisfactory to the Required Lenders and, if secured, subject to intercreditor arrangements reasonably satisfactory to

the Required Lenders.

F.   Delivery of evidence that all required insurance has been maintained and that the Agent has been named as loss payee and additional insured, provided that to the extent the Borrower is not able to deliver the insurance certificates and endorsements pursuant to this clause (E) by the Exit Date after having used commercially reasonable efforts, such insurance certificates and endorsements shall be delivered within 30 days after the Exit Date (or such longer time as the Agent may agree).

G.   Accuracy of representations and warranties contained in the Exit Financing Documentation in all material respects (or, in the case of representations and warranties that are qualified by materiality, in all respects) on the Exit Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date) and absence of a default and event of default under the Exit Financing Documentation.

H.   Compliance with customary documentation conditions for a facility of this size, type, and purpose, including the delivery of customary legal opinions and closing certificates (including a customary solvency certificate), good standing certificates and certified organizational documents, in each case, in form and substance reasonably satisfactory to the Required Lenders.

I.   The Agent shall have a perfected lien on substantially all of the assets of the Credit Parties, other than Permitted Liens, junior in priority only to the liens granted to the Exit Revolving Credit Facility which shall be subject to ranking and intercreditor arrangements reasonably satisfactory to the Required Lenders and subject to any agreed post-closing perfection requirements.

J.   Receipt by the Agent of reasonably satisfactory results of customary lien searches.

K.   On the Exit Date, the Credit Parties shall have obtained a public corporate credit rating from either Standard & Poor's ("**S&P**"), a division of S&P Global, Inc., or Moody's Investors Service, Inc. ("**Moody's**") in respect of the Exit Term Loan Facility; <u>provided</u>, that if a New Money Exit Lender provides the Credit Parties written notice at least two (2) weeks prior to the Exit Date that it requests a public corporate credit rating from each of S&P and Moody's in respect of the Exit Term Loan Facility in order to fund its *pro rata* share of the original commitment to fund the New Money Exit Term Loan B, then, on the Exit Date, the Credit Parties shall have obtained a public corporate credit rating from each of S&P and Moody's in respect of the Exit Term Loan Facility.

L.   All requisite governmental and material third party approvals shall have been obtained, and there shall be no litigation, governmental, administrative or judicial action against the Credit Parties, in each case, the obtaining or existence of which would reasonably be expected to

restrain, prevent or impose materially burdensome restrictions on the substantial consummation of the Plan or the Exit Term Loan Facility; provided, that, the consummation of the Exit Revolving Credit Facility shall not be a condition precedent to effectiveness or consummation of the Plan or the Exit Term Loan Facility.

M. Delivery of all documentation and other information required by bank regulatory authorities under applicable "know-your-customer", anti-money laundering rules and regulations, and the Patriot Act.

N. Payment by the Borrower on the Exit Date of (i) the reasonable and documented out-of-pocket administrative and collateral agency fee and expenses (including the fees and expenses of one outside counsel to the Agent) due on such date to the extent invoiced prior to such date and (ii) the reasonable and documented fees and expenses of Milbank LLP, one local counsel to the Ad Hoc Committee, and Houlihan Lokey in connection with the transactions hereunder (subject to the terms and conditions of any engagement or fee letters with the Company).

| | |
|---|---|
| **Interest Rate** | LIBOR + 1.50% per annum paid in cash, payable quarterly (subject to a 1.00% LIBOR floor) plus, at the Company's election, either (x) so long as no Event of Default has occurred and is continuing, paid-in-kind interest of 6.50% per annum payable quarterly or (y) 6.0% per annum in cash, payable quarterly; provided, that beginning on the date that is six (6) months prior to the Maturity Date, all interest shall accrue and be payable only on the Maturity Date.  Any paid-in-kind interest so elected to be paid will be added to the principal amounts outstanding under the Exit Term Loan Facility.<br><br>During the continuance of an Event of Default, past due amounts under the Exit Term Loan Facility will bear interest at an additional 2.00% *per annum* above the interest rate otherwise applicable.<br><br>A customary alternate base rate option will be included as an alternative to the Adjusted LIBOR Rate, as well as customary LIBOR replacement provisions. |
| **New Money Original Issue Discount** | An amount equal to 5.0% of the aggregate principal amount of the New Money Exit Term Loans, which shall be payable to the New Money Exit Lenders on the Exit Date as an original issue discount. |
| **Backstop Premium** | An amount equal to 3.5% of the New Money Exit Term Loans, payable to each Backstop Lender (as defined in the DIP Facility) in cash on the Plan Effective Date (in the event an Exit Conversion does not occur) or as an original issue discount on the Exit Date, according to its *pro rata* share of the original commitment to fund the New Money Exit Term Loan B. The Loan Parties shall file a motion seeking approval of the Backstop Premium on the Petition Date; provided, that an order shall be entered by the Bankruptcy Court approving the Backstop Premium on or before the Final Order Entry Date. |
| **Agency Fees** | As agreed with the Agent. |
| **Scheduled** | None. |

**Amortization**

| | |
|---|---|
| **Call Protection** | None. |
| **Financial Covenant** | Minimum liquidity covenant of $10 million. |
| **Other Covenants** | 18,000 minimum property count measured bi-weekly. |
| **Required Lenders** | Two or more un-affiliated Exit Lenders holding a majority in principal amount of the Exit Term Loans as of the date of determination (the "Required Lenders"). |
| **Events of Default** | The Exit Term Loan Facility will contain events of default customary for term loan facilities of this size, type, and purpose (collectively, the "Events of Default"). |

**Mandatory Prepayments**

The Exit Term Loan Facility shall contain mandatory prepayment covenants substantially similar to those made by the Loan Parties under the First Lien Credit Agreement, modified as appropriate to reflect an exit facility and otherwise as customary in the context of the proposed exit facility, including with respect to (i) asset sales, (ii) insurance proceeds, (iii) incurrence of indebtedness, and (iv) issuance of equity.

To the extent that the Borrower obtains receipt of any Extension Fees and/or Breakup Fees on a date that is after the Exit Date (a "Fee Receipt Date"), such Extension Fees and/or Breakup Fees shall be deposited into an account subject to a control agreement, and, to the extent that the Borrower is projected to have a pro forma cash balance in excess of $100 million on the Fee Receipt Date after giving effect to the receipt of such Extension Fees and/or Breakup Fees, then the Borrower shall mandatorily prepay an amount equal to the difference between (x) the Borrower's projected pro forma cash balance on the Fee Receipt Date after giving effect to the receipt of such Extension Fees and/or Breakup Fees and (y) $100 million, which amount shall be used to pay down the amounts outstanding under Exit Term Loan A and New Money Exit Term Loan B on a *pro rata* basis.

**Exit Term Loan Facility Documentation**

The definitive documentation with respect to the Exit Term Loan Facility (the "Exit Term Loan Facility Documentation") shall contain representations and warranties, covenants and events of default consistent with this Exit Term Loan Facility Term Sheet and, to the extent any other terms are not expressly set forth in this Exit Term Loan Facility Term Sheet, will (i) be negotiated in good faith by the Company and the Requisite Consenting First Lien Creditors (as defined in the Restructuring Support Agreement) within a reasonable time period to be determined based on the expected Exit Date, (ii) contain such other terms as the Company and the Requisite Consenting First Lien Creditors shall reasonably agree (given due regard to the operations, size, industry (and risks and trends associated therewith), geographic locations and businesses of the Credit Parties); it being understood and agreed that the Prepetition First Lien Credit Agreement will be used as a starting point for the Exit Term Loan Facility Documentation.

| | |
|---|---|
| **Governing Law** | State of New York. |

| | |
|---|---|
| **Agent** | An agent to be selected by the Required Lenders will serve as the administrative agent and collateral agent under the Exit Term Loan Facility and will perform duties customarily associated with such capacities (the "<u>Agent</u>"). |
| **Expenses and Indemnification** | Usual and customary for facilities of this size, type, and purpose and substantially consistent with the Prepetition First Lien Credit Agreement. |

## Schedule I

**Budget**

(Intentionally Ommitted)

# **EXHIBIT D**

## **FINANCING COMMITMENT LETTER**

**CONFIDENTIAL**

February 11, 2020

RentPath Holdings, Inc.
RentPath, LLC
950 East Paces Ferry Road NE, Suite 2600
Atlanta, Georgia 30326

DIP and Exit Backstop Commitment Letter

Ladies and Gentlemen:

You have informed the undersigned (in such capacities, the "**_Backstop Term Lenders_**") that RentPath, LLC, a Delaware limited liability company ("**_you_**" or the "**_Company_**"), RentPath Holdings, Inc., a Delaware corporation ("**_Holdings_**") and certain of the Company's subsidiaries (collectively with Holdings and the Company, the "**_Debtors_**") are contemplating filing (the date of such filing, the "**_Petition Date_**") cases under chapter 11 (the "**_Chapter 11 Cases_**") of title 11 of the United States Code (the "**_Bankruptcy Code_**") in the United States Bankruptcy Court for the District of Delaware (the "**_Bankruptcy Court_**") and (i) wish to obtain $74,074,074.07 in senior secured superpriority debtor-in-possession financing (the "**_DIP Facility_**"), consisting of new money delayed draw term loans (the "**_DIP Loans_**"), which, upon satisfaction of the terms and conditions set forth in the credit agreement governing the DIP Facility (the "**_DIP Credit Agreement_**" and, together with all exhibits, finance documents, and other ancillary documentation in respect thereof, the "**_DIP Documents_**")) may convert on a dollar-for-dollar basis (together with the Redemption Premium (as defined in Annex A hereto) into an exit facility (the "**_Exit Conversion_**") in the amount of $88,592,592.59 (inclusive of the Redemption Premium, (the "**_Exit Term Loan A_**") and (ii) wish to obtain $71,038,251.37 of new money term loans ("**_New Money Exit Term Loan B_**" and, the financing provided pursuant to Exit Term Loan A and New Money Exit Term Loan B, collectively, the "**_Exit Term Loan Facility_**"), substantially on the terms set forth in this letter, as well as the DIP Term Sheet and the Exit Term Loan Facility Term Sheet attached hereto as Annex A and Annex B, respectively (collectively, the "**_Commitment Letter_**"), which terms will be memorialized in a credit agreement that will govern the Exit Term Loan Facility (the "**_Exit Term Loan Facility Credit Agreement_**" and, together with all exhibits, finance documents, and other ancillary documentation in respect thereof, the "**_Exit Term Loan Facility Documents_**").

We refer to that certain (i) First Lien Credit Agreement, dated as of December 17, 2014 (as amended, restated, modified, or supplemented from time to time, the "**_1L Credit Agreement_**" and, together with all exhibits, finance documents, and other ancillary documentation in respect thereof, the "**_1L Prepetition Facility_**"), by and among the Company, Holdings, certain of the Company's subsidiaries as guarantors, Royal Bank of Canada, as administrative agent and collateral agent (solely in such capacities, the "**_Prepetition 1L Agent_**"), and the lenders party thereto (the "**_Prepetition 1L Lenders_**"); (ii) Second Lien Credit Agreement, dated as of December 17, 2014 (as amended, restated, modified, or supplemented from time to time, the "**_2L Credit Agreement_**" and, together with all exhibits, finance documents, and other ancillary documentation in respect thereof, the "**_2L Prepetition Facility_**"), by and among the Company, Holdings, certain of the Company's subsidiaries as guarantors, Wilmington Savings Fund Society, FSB, as successor administrative agent and collateral agent (solely in such capacities, the "**_Prepetition 2L Agent_**"), and the lenders party thereto (the "**_Prepetition 2L Lenders_**" and, together with the Prepetition 1L Lenders, the "**_Prepetition Lenders_**"); and (iii) Restructuring Support Agreement, dated as of February 11, 2020 by and among the Debtors and the Consenting First Lien Creditors (as defined therein) (as amended, restated, modified, or supplemented from time to time, the "**_Restructuring Support Agreement_**").

Capitalized terms used and not defined in this Commitment Letter will have the meaning given thereto in <u>Annex A</u> or <u>Annex B</u> or, if not defined therein, in the Restructuring Support Agreement.

## 1.    Commitments: Titles and Roles.

Each of the Backstop Term Lenders is pleased to confirm its commitment to provide, severally but not jointly, to the Company the portion of the commitments under the DIP Facility and the portion of the commitments for the New Money Exit Term Loan B under the Exit Facility that are, as applicable, not funded by other Prepetition Lenders in accordance with Section 2 hereof ("***Unsubscribed Amounts***").  Such commitments shall be allocated to the Backstop Term Lenders in accordance with the percentages set forth in <u>Schedule I</u> and <u>Schedule II</u> hereof opposite each Backstop Lender's name as its "Backstop Commitment Percentage," on the terms and subject to the conditions set forth in this Commitment Letter, including, without limitation, Section 4 hereof and <u>Annex A</u> and <u>Annex B</u> attached hereto.

In addition, certain of the Backstop Term Lenders that are Prepetition 1L Lenders ("***ROFR Lenders***") have agreed to fund a portion of the Unsubscribed Amounts, in an amount up to such Prepetition 1L Lenders *pro rata* proportion of (w) the obligations under the 1L Credit Agreement owed to each such Prepetition 1L Lender to (x) the obligations owed to all ROFR Lenders electing to participate, or such lesser amount as such ROFR Lender elected.  Such commitments shall be allocated to the ROFR Lenders in accordance with the percentages set forth in Schedule III hereof opposite each ROFR Lenders name.

## 2.    Election Procedures

<u>DIP Facility</u>: The parties hereto agree that (i) each Prepetition 1L Lender that is a party to the Restructuring Support Agreement (in such capacity, each an "***Electing 1L DIP Term Lender***") may participate with the other Electing 1L DIP Term Lenders to provide up to 80.0% of the DIP Facility (the "***1L DIP Portion***") and (ii) each Prepetition 2L Lender that is a party to the Restructuring Support Agreement (in such capacity, each an "***Electing 2L DIP Term Lender***") may participate with the other Electing 2L DIP Term Lenders to provide up to 20.0% of the DIP Facility (the "***2L DIP Portion***") by executing a joinder (each, an "***Election Joinder***") to the DIP Credit Agreement no later than five (5) business days (the "***Election Deadline***") after the Interim Order Entry Date (as defined in <u>Annex A</u>).  Such participation shall be on a *pro rata* basis in accordance with the proportion of (i) (w) the obligations under the 1L Credit Agreement owed to each such Prepetition 1L Lender to (x) the obligations owed to all Prepetition 1L Lenders under the 1L Credit Agreement and (ii) (y) the obligations under the 2L Credit Agreement owed to each such Prepetition 2L Lender to (z) the obligations owed to all Prepetition 2L Lenders under the 2L Credit Agreement, respectively.  Notwithstanding anything to the contrary contained in this paragraph, in the event that the Prepetition 2L Lenders (or investment managers or advisors to such lenders) holding at least 66-2/3% in aggregate principal amount of the loans outstanding under the Prepetition 2L Documents have not executed joinder agreements to the Restructuring Support Agreement in accordance with the terms thereof prior to the Petition Date (the "***2L DIP Condition***"), the 2L DIP Portion will be allocated solely to the Prepetition 1L Lenders (on a *pro rata* basis in proportion to the amount of each Prepetition 1L Lender's outstanding loans and commitments under the 1L Credit Agreement), and the Prepetition 2L Lenders shall not be entitled to participate in the 2L DIP Portion.  Each Electing 1L DIP Lender that elected to participate in its 1L DIP Portion shall be required to participate in its ratable portion of the New Money Exit Term Loan B.  <u>Exit Term Loan Facility</u>:  The parties hereto agree that (i) each Prepetition 1L Lender (in such capacity, each an "***Electing 1L Exit Lender***") may participate with the other Electing 1L Exit Lenders to provide up to 80.0% of the New Money Exit Term Loan B (the "***1L Exit Portion***") and (ii) each Prepetition 2L Lender (in such capacity, each an "***Electing 2L Exit Lender***") may participate with the other Electing 2L Exit Lenders to provide up to 20.0% of the New Money Exit Term Loan B (the "***2L Exit Portion***") by

4850-1079-2882.15

executing either (i) an Election Joinder to the DIP Credit Agreement no later than the Election Deadline (as described above) or (ii) a joinder to the credit agreement governing the Exit Facility by no later than five (5) business days after the tabulation of votes on the Plan (as defined in Annex B) (the "***Second Election Deadline***").  Such participation shall be on a *pro rata* basis in accordance with the proportion of (i) (w) the obligations under the 1L Credit Agreement owed to each such Prepetition 1L Lender to (x) the obligations owed to all Prepetition 1L Lenders under the 1L Credit Agreement and (ii) (y) the obligations under the 2L Credit Agreement owed to each such Prepetition 2L Lender to (z) the obligations owed to all Prepetition 2L Lenders under the 2L Credit Agreement, respectively.  Notwithstanding anything to the contrary contained in this paragraph, in the event that (i) the Restructuring Support Agreement was not executed prior to the Petition Date by Prepetition 2L Lenders holding at least 66-2/3% in aggregate principal amount of the loans outstanding under the Prepetition 2L Documents and (ii) the Class of holders of claims under the 2L Prepetition Facility does not vote to accept the Plan (the "***2L Exit Condition***"), the 2L Exit Portion will be allocated solely to the Prepetition 1L Lenders (on a *pro rata* basis in proportion to the amount of each Prepetition 1L Lender's outstanding loans and commitments under the 1L Credit Agreement), and the Prepetition 2L Lenders shall not be entitled to participate in the 2L Exit Portion.  For avoidance of doubt, an Electing 1L DIP Lender shall have contemporaneously (with its election described under DIP Facility above) made an election to become an Electing 1 L Exit Lender.

On the first day following the Election Deadline, the DIP Credit Agreement commitment schedules will be revised to reflect each lender under the DIP Facility, and each Backstop Term Lender's commitment under the DIP Facility will be automatically reduced ratably to account for the commitments of the Electing 1L DIP Term Lenders and, if the 2L DIP Condition has been satisfied, the Electing 2L DIP Term Lenders.  On the first day following the Second Election Deadline, the commitments under the Exit Facility will be allocated to reflect the New Money Exit Term Loan B commitments of the Backstop Term Lenders, the Electing 1L Exit Lenders, and the Electing 2L Lenders, as applicable, and each Backstop Term Lender's New Money Exit Term Loan B commitments will be automatically reduced ratably to account for the commitments of the Electing 1L Exit Term Lenders and, if the 2L Exit Condition has been satisfied, the Electing 2L Exit Lenders.

**3.    Fees.**

As consideration for the services rendered by each of the Backstop Term Lenders in connection with the DIP Facility, the Debtors agree to pay to the Backstop Term Lenders a non-refundable fee as original issue discount of 3.5% of the aggregate amount of all DIP Loans on the initial funding of the DIP Facility, according to the percentages set forth in Schedule I hereof.

As consideration for the services rendered by each of the Backstop Term Lenders in connection with the Exit Facility, the Debtors agree to pay to the Backstop Term Lenders a non-refundable fee of 3.5% of the aggregate amount of the New Money Exit Term Loan B, which shall be due and payable in cash on the Effective Date (as defined in the Restructuring Support Agreement), in the event an Exit Conversion does not occur, or as an original issue discount, in the event an Exit Conversion does occur, according to the percentages set forth in Schedule II hereof.

Except as otherwise required by a final determination by an applicable taxing authority or change in applicable law: (A) each Backstop Term Lender and the Debtors hereto agree to treat, for U.S. federal income tax purposes, the entering into of the commitments pursuant to Section 1(a) of this letter as set forth on Schedules I and II hereto as the sale of a put option by the Backstop Term Lenders to the Debtors and the fees described in this Section 3 as the sale price for such put option; and (B) the Backstop Term Lenders and the Debtors shall not take any position on any tax return or otherwise take any action related to taxes inconsistent with such treatment.

For avoidance of doubt, ROFR Lenders shall not be entitled to the fees set forth in this Section 3 on account of such ROFR Lenders commitments on schedule III hereto.

**4.    Conditions Precedent.**

The Backstop Term Lenders' commitments and agreements hereunder (i) in respect of the DIP Facility are subject to the satisfaction or waiver of all conditions precedent set forth under the heading "Conditions Precedent" set forth in Annex A and (ii) in respect of the Exit Facility are subject to the satisfaction or waiver of the conditions precedent set forth under the heading "Conditions to Closing" set forth in Annex B.

**5.    Indemnification and Related Matters.**

(a)    In the event that any of the Backstop Term Lenders (or, in addition to the Backstop Term Lenders, where a Backstop Term Lender is an investment manager or advisor for a beneficial holder, such beneficial holder) becomes subject to any enforcement action, litigation, proceeding, or investigation brought by or against any person, including equity holders, partners, members, or other shareholders of the Debtors in connection with the transactions contemplated by this Commitment Letter, the Debtors agree to periodically reimburse each of the applicable Backstop Term Lenders (and, in addition to the Backstop Term Lenders, where a Backstop Term Lender is an investment manager or advisor for a beneficial holder, such beneficial holder) for the reasonable, documented, and invoiced expenses of any firm of counsel (including, without limitation, any local counsel in each relevant jurisdiction and any conflicts counsel) and any other independent advisors or consultants for the DIP Term Lenders (taken as a whole), and any other independent advisors or consultants for the DIP Term Loan Agent, and other reasonable, documented, and invoiced fees and expenses incurred in connection therewith, excluding the costs of internal counsel.   The Debtors also agree to indemnify and hold each of the Backstop Term Lenders (and, in addition to the Backstop Term Lenders, where a Backstop Term Lender is an investment manager or advisor for a beneficial holder, such beneficial holder), and each of their respective affiliates, officers, directors, fiduciaries, employees, agents, advisors, attorneys, and representatives, and the successors, heirs, and assigns of such Backstop Term Lender (and, in addition to the Backstop Term Lenders, where a Backstop Term Lender is an investment manager or advisor for a beneficial holder, such beneficial holder) and their affiliates (each such Backstop Term Lender and other person, an "Indemnified Person") harmless against any and all losses, claims, damages, or liabilities to any such Indemnified Person in connection with the transactions contemplated by this Commitment Letter or as a result of either this arrangement or any matter referred to in the Commitment Letter (whether or not such losses, claims, damages, or liabilities result from an investigation, litigation, claim, or proceeding that is brought by you, your equity holders, or creditors or an Indemnified Person and whether or not any such Indemnified Person is otherwise a party thereto), except to the extent that such loss, claim, damage, or liability has been found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from (i) the bad faith or willful misconduct of such Indemnified Person or its related Indemnified Persons in performing the services that are the subject of the Commitment Letter, (ii) a material breach of the funding obligations of such Indemnified Person or its related Indemnified Persons under this Commitment Letter or (iii) claims between or among the Backstop Term Lenders.  The foregoing obligations will be included in the DIP Facility as superpriority obligations.

(b)    If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless, the Debtors will contribute to the amount paid or payable by such Indemnified Person as a result of such loss, claim, damage, or liability in such proportion as is appropriate to reflect the relative economic interests of (i) the Debtors and their affiliates, shareholders, partners, members, or other equity holders on the one hand and (ii) such Indemnified

4

Person, on the other hand, in the matters contemplated by the Commitment Letter as well as the relative fault of (i) the Debtors and their affiliates, shareholders, partners, members, or other equity holders and (ii) such Indemnified Person with respect to such loss, claim, damage, or liability and any other relevant equitable considerations. The reimbursement, indemnity, and contribution obligations of the Debtors under this <u>Section 6</u> will be in addition to any liability which the Debtors may otherwise have to any Indemnified Person, will be binding upon any successors, assigns, heirs, or personal representatives of the Debtors, and will inure to the benefit of any successors, assigns, heirs, or personal representatives of any Indemnified Person. The Debtors also agree that no Indemnified Person will have any liability to the Debtors or any person asserting claims on behalf of or in right of the Debtors or any other person in connection with the transactions contemplated by this Commitment Letter, except in the case of the Debtors to the extent that any losses, claims, damages, liabilities, or expenses incurred by the Debtors or their affiliates, shareholders, partners, or other equity holders have been found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from (i) the bad faith or willful misconduct of such Indemnified Person or its related Indemnified Persons in performing the services that are the subject of the Commitment Letter, (ii) a material breach of the obligations of such Indemnified Person or its related Indemnified Persons under this Commitment Letter or the definitive documentation governing the DIP Facility, or (iii) claims between the Backstop Term Lender; <u>provided</u>, <u>however</u>, that in no event will such Indemnified Person have any liability for any indirect, consequential, special, or punitive damages in connection with or as a result of such Indemnified Person's activities related to the Commitment Letter.

(c)     The provisions of this <u>Section 6</u> will survive any termination or completion of the arrangement provided by the Commitment Letter and the occurrence of the effective date of any plan of reorganization and any discharge of claims against or interests in the Debtors.

**6.     Assignments.**   This Commitment Letter may not be assigned by any Debtor without the prior written consent of each of the Backstop Term Lenders (and any purported assignment without such consent will be null and void), is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto. Each Backstop Term Lender may assign its respective commitments and agreements hereunder, under the DIP Facility or under the Exit Facility, in whole or in part, to any affiliate thereof, or to any other Backstop Term Lender or Prepetition Lender (or, where a Backstop Term Lender is an investment manager or advisor for beneficial holders, to such beneficial holders); <u>provided</u> that, in the case of an assignment of the commitments and agreements under the DIP Facility to a party who is not a Backstop Term Lender, such assignment may only be undertaken after such assignee becomes a party to the Restructuring Support Agreement.

**7.     Confidentiality.**

Please note that this Commitment Letter and any written communications provided by, or oral discussions with, the Backstop Term Lenders in connection with this arrangement are exclusively for the information of the Debtors and may not be disclosed to any third party or circulated or referred to publicly without the prior written consent of the Backstop Term Lenders, except after providing written notice to the Backstop Term Lenders, pursuant to a subpoena or order issued by a court of competent jurisdiction or by a judicial, administrative, or legislative body or committee; <u>provided</u> that we hereby consent to your disclosure of (i) this Commitment Letter and such communications and discussions to the Company's officers, directors, agents, and other advisors who are directly involved in the consideration of the DIP Facility and the Exit Term Loan Facility and who have been informed by you of the confidential nature of such advice and the Commitment Letter and who have agreed to treat such information confidentially, (ii) this Commitment Letter after execution and delivery of this Commitment Letter by the Company, Holdings, and the Backstop

4850-1079-2882.15

Term Lenders (a) to the office of the U.S. Trustee, to any statutorily appointed committee of unsecured creditors, and to their respective representatives and professional advisors on a confidential and "need to know" basis, and (b) to the extent required in motions, in a redacted manner in form and substance reasonably satisfactory to the Backstop Term Lenders, to be filed with the Bankruptcy Court solely in connection with obtaining an order of the Bankruptcy Court approving the Company's execution, delivery, and performance of this Commitment Letter, the definitive DIP Documents, the definitive Exit Term Loan Facility Documents, the Restructuring Support Agreement, and the orders approving the DIP Facility on an interim and final basis, and (iii) this Commitment Letter as required by applicable law or compulsory legal process (in which case you agree to inform us promptly thereof).

**8.    Absence of Fiduciary Relationship; Affiliates; Etc.**

(a)    You acknowledge that the Backstop Term Lenders, together with their affiliates and related entities (each a "***Funding Entity***" and collectively, the "***Funding Entities***"), may be engaged, either directly or through affiliates in various activities, including securities trading, investment management, and principal investment activities. In the ordinary course of these activities, each Funding Entity may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and/or financial instruments (including bank loans) for their own account and for the accounts of their investors and may at any time hold long and short positions in such securities and/or instruments. Such investment and other activities may involve securities and instruments of the Debtors, as well as of other entities and persons and their affiliates which may (i) be involved in transactions arising from or relating to the engagement contemplated by this Commitment Letter, (ii) be customers or competitors of the Debtors, or (iii) have other relationships with the Debtors. In addition, each Funding Entity may provide services to such other entities and persons. Each Funding Entity may also co-invest with, make direct investments in, and invest or co-invest client monies in or with funds or other investment vehicles managed by other parties, and such funds or other investment vehicles may trade or make investments in securities of the Debtors or such other entities. The transactions contemplated by this Commitment Letter may have a direct or indirect impact on the investments, securities, or instruments referred to in this paragraph. Although the Funding Entities in the course of such other activities and relationships may acquire information about the transaction contemplated by this Commitment Letter or other entities and persons which may be the subject of the transactions contemplated by this Commitment Letter, the Funding Entities shall have no obligation to disclose such information, or the fact that the Funding Entities are in possession of such information, to the Debtors or to use such information on the Debtors' behalf.

(b)    Furthermore, you acknowledge that the Funding Entities nor any of their respective affiliates have an obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained or that may be obtained by them from any other person.

(c)    The Funding Entities may have economic interests that conflict with those of the Debtors, its equity holders, and/or its affiliates. You agree that each Funding Entity will act under this Commitment Letter as an individual independent contractor and that nothing in this Commitment Letter or otherwise will be deemed to create an advisory, fiduciary, or agency relationship or fiduciary or other implied duty between any of the Funding Entities and the Debtors, their equity holders, or their affiliates. You acknowledge and agree that the transactions contemplated by this Commitment Letter (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between each of the Funding Entities, on the one hand, and the Debtors, on the other, and in connection therewith and with the process leading thereto, (i) none of the Funding Entities has assumed an advisory or fiduciary responsibility in favor of the Debtors, their

equity holders, or their affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any of the Funding Entities has advised, is currently advising or will advise the Debtors, their equity holders or their affiliates on other matters) or any other obligation to the Debtors except the obligations expressly set forth in this Commitment Letter and (ii) each Funding Entity is acting solely as a principal and not as an agent or fiduciary of the Debtors, their management, equity holders, affiliates, creditors, or any other person.  The Debtors acknowledge and agree that the Debtors have consulted their own legal and financial advisors to the extent they deemed it appropriate and that they are responsible for making their own independent judgment with respect to such transactions and the process leading thereto.  The Debtors agree  that they will not claim that any of the Funding Entities have rendered advisory services of any nature or respect, or owe fiduciary or similar duties to the Debtors, in connection with such transactions or the process leading thereto.

(d)    In addition, please note that the Funding Entities do not provide accounting, tax, or legal advice.  Notwithstanding anything herein to the contrary, the Company (and each employee, representative or other agent of the Company) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the DIP Facility and all materials of any kind (including opinions or other tax analyses) that are provided to the Company relating to such tax treatment and tax structure.  However, any information relating to the tax treatment or tax structure will remain subject to the confidentiality provisions hereof (and the foregoing sentence will not apply) to the extent reasonably necessary to enable the parties hereto, their respective affiliates, and their respective affiliates' directors and employees to comply with applicable securities laws.  For this purpose, "tax treatment" means U.S. federal or state income tax treatment, and "tax structure" is limited to any facts relevant to the U.S. federal income tax treatment of the transactions contemplated by this Commitment Letter but does not include information relating to the identity of the parties hereto or any of their respective affiliates.

## 9.    Miscellaneous.

The Backstop Term Lenders' commitments and agreements hereunder (all of which are several, and not joint, in nature) will terminate upon (i) February 15, 2020, unless the Petition Date has occurred by such date or (ii) the date that is five (5) calendar days after the Petition Date, unless, prior to such time an order of the Bankruptcy Court approving the DIP Facility on an interim basis shall have been entered, in form and substance satisfactory to the Backstop Term Lenders, and, among other things, authorizing the Debtors to enter into, and perform under, the DIP Documents.  In the event of any termination pursuant to this paragraph, this Commitment Letter, and the Backstop Term Lenders' agreement to perform the services described herein, shall automatically terminate without further action or notice and without further obligation to the Debtors.  If the order approving the DIP Facility on a final basis shall at any time cease to be in full force and effect or shall be reversed, stayed, or modified in any manner inconsistent with the terms contained in Annex A hereto without the prior written consent of the Backstop Term Lenders, the Backstop Term Lenders may, in their own discretion, terminate this agreement.

The provisions set forth under Sections 5 and 7 hereof and this Section 9 (other than any provision therein that expressly terminates upon execution of the definitive DIP Documents and/or the Exit Term Loan Facility Documents) will remain in full force and effect regardless of whether definitive DIP Documents or Exit Term Loan Facility Documents are executed and delivered.  The provisions set forth under Sections 5 and 7 hereof and this Section 9 will remain in full force and effect notwithstanding the expiration or termination of this Commitment Letter or the Backstop Term Lenders' commitments and agreements hereunder.

4850-1079-2882.15

**The Debtors and their affiliates agree that any suit or proceeding arising in respect to this Commitment Letter or the Backstop Term Lenders' commitments or agreements hereunder will be tried in the Bankruptcy Court or, in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, in any Federal court of the United States of America sitting in the Borough of Manhattan or, if that court does not have subject matter jurisdiction, in any state court located in the City and County of New York, and the Debtors agree to submit to the exclusive jurisdiction of, and to venue in, such court.  Any right to trial by jury with respect to any action or proceeding arising in connection with or as a result of the Backstop Term Lenders' commitments or agreements or any matter referred to in this letter is hereby waived by the parties hereto.  The Debtors agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Service of any process, summons, notice, or document by registered mail or overnight courier addressed to any of the parties hereto at the addresses below shall be effective service of process against such party for any suit, action, or proceeding brought in any such court.  This Commitment Letter will be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws.**

The Backstop Term Lenders hereby notify the Debtors that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**"), the Backstop Term Lenders may be required to obtain, verify, and record information that identifies the Company, which information includes the name and address of the Company and other information that will allow the Backstop Term Lenders to identify the Company in accordance with the Patriot Act.  This notice is given in accordance with the requirements of the Patriot Act and is effective for the Backstop Term Lenders.

The DIP Documents and Exit Term Loan Facility Documents will include "Bail-In" language as required by the Bank Recovery and Resolution Directive of the European Union if requested by the Backstop Term Lenders.

This Commitment Letter may be executed in any number of counterparts, each of which when executed will be an original, and all of which, when taken together, will constitute one agreement.  Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission or electronic transmission (in .pdf format) will be effective as delivery of a manually executed counterpart hereof.  This Commitment Letter may not be amended or any term or provision hereof or thereof waived or otherwise modified except by an instrument in writing signed by each of the parties hereto or thereto, as applicable, and any term or provision hereof or thereof may be amended or waived only by a written agreement executed and delivered by all parties hereto and thereto.

All notices, requests, consents, demands, designations, directions, instructions, certificates, or other communications to be given hereunder will be duly given when delivered in writing or by facsimile transmission (with written confirmation of receipt, which confirmation may be facsimile transmission) to the intended recipient at the "Notice Information" specified in Annex C attached hereto or, as to any party, at such other address as shall be designated by such party in a notice to the other parties.

*[Remainder of page intentionally left blank.]*

We look forward to working with you on this transaction.

Very truly yours,

**BACKSTOP TERM LENDERS:**

**[REDACTED]**

**RENTPATH, LLC,**
**ON BEHALF OF ITSELF AND ITS SUBSIDIARIES**

By: _____
    Name: Marlon F. Starr
    Title: Senior Vice President, General Counsel and Secretary


**RENTPATH HOLDINGS, INC.**

By: _____
    Name: Marc Lefar
    Title: President and Chief Executive Officer

## Annex A - B and
## Schedule I

**(Intentionally Omitted)**

**ANNEX C**

**NOTICE INFORMATION**

Company

RentPath Holdings, Inc.
RentPath, LLC
950 East Paces Ferry Road NE, Suite 2600
Atlanta, Georgia 30326
Attn: Marlon F Starr
Email: mstarr@rentpath.com

With a copy (such copy not to constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn: Ray Schrock, David Griffiths and Andriana Georgallas
Email: Ray.Schrock@weil.com, David.Griffiths@weil.com, Andriana.Georgallas@weil.com

Backstop Term Lenders

**[REDACTED]**

SCHEDULE 1

**DIP COMMITMENTS**[1]

1. Backstop Term Lenders

| Backstop Term Lender | | Backstop Commitment Percentage of 1L DIP Portion (100%) assuming 2L Condition is not satisfied (reduced to 80% of listed percentage in the event the 2L Condition is satisfied) | Backstop Commitment Percentage of 2L DIP Portion (20%) if 2L DIP Condition is satisfied |
|---|---|---|---|
| Institution | Lender | | |
| **[REDACTED]** | | | |
| | Total | 100% (of 80% or 100%, as applicable) | 100% (of 20%) |

---

[1] Note, Backstop Term Lender shall backstop the DIP Facility and the Exit Facility in the same proportions.

**SCHEDULE II**

**EXIT COMMITMENTS**

1. Backstop Term Lenders

| Backstop Term Lender | | Backstop Commitment Percentage of 1L New Money Exit Term Loan B (100%) assuming 2L Condition is not satisfied (reduced to 80% of listed percentage in the event the 2L Condition is satisfied) | Backstop Commitment Percentage of New Money Exit Term Loan B (20%) if 2L DIP Condition is satisfied |
|---|---|---|---|
| Institution | Lender | | |
| **[REDACTED]** | | | |
| | Total | 100% (of 80% or 100%, as applicable) | 100% (of 20%) |

SCHEDULE III

**ROFR DIP AND EXIT COMMITMENTS OF UNSUBSCRIBED AMOUNTS**

| ROFR Lender (Prepetition 1L Lenders) | | DIP Commitment and Exit Commitments (calculated pro rata based on 1L Prepetition Facility holdings of all other electing ROFR Lenders) |
|---|---|---|
| Institution | Lender | |
| **[REDACTED]** | | |
| | | 100% |

**<u>EXHIBIT E</u>**

**MANAGEMENT INCENTIVE PLAN TERM SHEET**

**EXECUTION VERSION**

### Management Incentive Plan Term Sheet

The summary of the plan described herein sets forth the general terms of the Management Incentive Plan (the "**MIP**") to be adopted, if the Credit Bid[1] is the Successful Bid, by the initial board of directors (the "**New Board**") of RP Lender Acquisition Corporation (such entity, "**RentPath NewCo**"), a special purpose vehicle formed by the First Lien Agent, acting at the direction of Consenting Creditors holding no less than 50.01% in principal amount of First Lien Claims, to effectuate the transactions contemplated in the Plan or reorganized RentPath Holdings, Inc. ("**Reorganized Holdings**"), as applicable, in connection with the Chapter 11 Cases of the Debtors.

Promptly following the Effective Date (but no later than 30 days after the Effective Date), the New Board shall adopt the MIP, in a manner consistent with the terms set forth below and applicable law. This summary is qualified in all respects to the terms of the definitive documents memorializing the MIP.

The New Board will approve the MIP, which will be a standard equity incentive plan typical for a privately-held company to permit the issuance of outstanding equity shares (the "**New Equity Interests**"), as is determined by the New Board, with a share reserve to be the equivalent of 10% of the New Equity Interests on a fully diluted basis (including, without limitation, shares issuable under the MIP). The MIP will specify, among other things, any vesting acceleration provisions if an employee is terminated or resigns under certain specified circumstances and the effect of a change of control. The final terms and conditions of the MIP will be determined and approved by the New Board in its sole and absolute discretion. The New Board will determine, among other things, the form of award and number of shares applicable to the awards granted under the MIP for members of the management team of RentPath NewCo or Reorganized Holdings, as applicable, and others whom the New Board determines should participate in the MIP. The New Board will consult with the Chief Executive Officer of the Debtors, RentPath NewCo, or Reorganized Holdings, as applicable, regarding the participants and allocation of amounts to other members of the management team.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in that certain Restructuring Support Agreement to which this term sheet is annexed as an exhibit.

# **EXHIBIT F**

## **JOINDER AGREEMENT**

## FORM OF JOINDER AGREEMENT FOR CONSENTING CREDITORS

This Joinder Agreement to the Restructuring Support Agreement, dated as of February 11, 2020 (as amended, supplemented, or otherwise modified from time to time, the "**Agreement**"), by and among the Company, and, among others, the holders of certain principal amounts outstanding under the First Lien Credit Agreement and the Second Lien Credit Agreement (together with their respective successors and permitted assigns, the "**Consenting Creditors**" and each, a "**Consenting Creditor**") is executed and delivered by (the "**Joining Party**") as of [●].  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.  <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as <u>Annex I</u> (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Consenting [First Lien / Second Lien] Creditor" and a "Party" for all purposes under the Agreement and with respect to any and all Claims and Interests held by such Joining Party.

2.  <u>Representations and Warranties</u>.  With respect to the aggregate principal amount of the Loans, in each case, set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Creditors set forth in Section 9 of the Agreement to each other Party to the Agreement.

3.  <u>Governing Law</u>.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions that would require the application of the law of any other jurisdiction.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**CONSENTING CREDITOR**

[●]

By: _____

Name: _____

Title: _____

Principal Amount of First Lien Loans:  $_____

Principal Amount of Second Lien Loans:  $_____

Percentage of equity interests in Holdings:  _____

Notice Address:

_____

_____

_____

Fax: _____

Attention:_____

Email:_____

Acknowledged:

**RENTPATH, LLC**

By:_____
Name:
Title:

WEIL:\97376996\1\69518.0004