## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------- x
                                 :

In re                           :         **Chapter 11**
                                   :

**RENTPATH HOLDINGS, INC.**, *et al.*,      :         **Case No. 20– _____ (      )**
                                   :

            Debtors. [1]            :         **(Joint Administration Requested)**
                                   :

-------------------------------------------------------------- x

## MOTION OF DEBTORS FOR (I) AUTHORITY TO (A) OBTAIN POSTPETITION FINANCING, (B) USE CASH COLLATERAL, (C) GRANT LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (D) GRANT ADEQUATE PROTECTION, (E) MODIFY THE AUTOMATIC STAY, AND (F) SCHEDULE A FINAL HEARING AND (II) RELATED RELIEF

        RentPath Holdings, Inc. and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

### Preliminary Statement [2]

        1.       By this Motion, the Debtors seek authorization to obtain postpetition financing (the "**DIP Financing**") and approval of their entry into a superpriority senior secured debtor-in-possession credit facility in an aggregate principal amount of approximately $74.1 million (the "**DIP Facility**"), provided by certain of the Debtors' prepetition secured lenders

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: RentPath Holdings, Inc. (1735); RentPath, LLC (7573); Consumer Source Holdings LLC (8150); Discover Home Network, LLC (4311); Easy Media, LLC (5455); Electronic Lead Management, Inc. (4986); Electronic Lead Management MA, Inc. (3113); Electronic Lead Management VA, Inc. (7698); Live Response Solutions Holdings, LLC (0462); Live Response Solutions, LLC (5120); Viva Group Brokerage, Inc. (7156); and Viva Group, LLC (0789).  The Debtors' mailing address is 950 East Paces Ferry Road NE, Suite 2600, Atlanta, Georgia 30326.

[2]     Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Martin Declaration (as defined herein) and the Jamal Declaration (as defined herein), as applicable.

(solely in such capacity, the "**DIP Lenders**") and agented by Royal Bank of Canada (solely in such capacity, the "**DIP Agent**"), with an interim draw of $27.0 million under the proposed DIP Financing, subject to entry of the Interim Order (as defined herein).

2.       As described herein, the DIP Financing provides the Debtors with necessary liquidity on terms that are reasonable and appropriate, given the circumstances.  The relief sought in this Motion is critical for the Debtors to pay their ordinary-course operating expenses, finance these chapter 11 cases, and pursue the Sale Process (as defined herein).  In support of this Motion, the Debtors submit:

- the *Declaration of Zul Jamal in Support of Motion of Debtors for (I) Authorization (A) to Obtain Postpetition Financing, (B) to Use Cash Collateral, (C) to Grant Liens and Provide Superpriority Administrative Expense Status, (D) to Grant Adequate Protection, (E) to Modify the Automatic Stay and (F) to Schedule a Final Hearing and (II) Related Relief*, sworn to the date hereof (the "**Jamal Declaration**"), which has been filed contemporaneously herewith and is incorporated by reference herein; and

- the *Declaration of Richard Martin in Support of Debtors' Chapter 11 Petitions and First Day Relief*, sworn to on the date hereof (the "**Martin Declaration**"), which has been filed with the Court contemporaneously herewith and is incorporated by reference herein.

3.       The Debtors' initial budget (the "**Initial DIP Budget**" and, any budget thereafter, a "**Budget**") reflecting the anticipated cash receipts and anticipated disbursements for each calendar week during the period from the Petition Date (as defined herein) through and including the end of the thirteenth week following the Petition Date is annexed hereto as **Exhibit C**.

4.       The Debtors commenced these chapter 11 cases on a prearranged basis with the support of an ad hoc committee of crossholder first lien and second lien lenders holding approximately 72% of prepetition first lien loans and approximately 45% of prepetition second lien loans (the "**Crossholder Ad Hoc Committee**"), an ad hoc group of second lien lenders

2

holding approximately 39% of prepetition second lien loans (the "**Second Lien Ad Hoc Committee**" and, together with the Crossholder Ad Hoc Committee, the "**Consenting Creditors**"), and the Debtors' prepetition equity sponsors (the "**Consenting Sponsors**"), which own or control approximately 99% of the outstanding equity interests in RentPath Holdings, Inc. (which directly or indirectly owns or controls one hundred percent (100%) of the prepetition equity interests in the other Debtors). The Consenting Creditors and the Consenting Sponsors have committed to effectuate a chapter 11 plan that contemplates the going concern sale of substantially all of the Debtors' assets (collectively, the "**Acquired Assets**") pursuant to the terms set forth in that certain Restructuring Support Agreement, dated as of February 11, 2020 (the "**RSA**" and the parties thereto, the "**RSA Parties**").

       5.       Prior to the Petition Date, the Debtors began a robust marketing and sale process which resulted in the submission of two binding bids for the Acquired Assets. After constructive dialogue and extensive negotiations, the Debtors are pleased to report that they have entered into a stalking horse purchase agreement with CSGP Holdings, LLC, an affiliate of CoStar Group, Inc., a commercial real estate information company (the "**Stalking Horse Bid**"). The Stalking Horse Bid provides for the going concern sale of substantially all of the Debtors' assets for an aggregate purchase price equal to $587.5 million in cash, plus certain assumed liabilities. In addition, pursuant to the RSA, the Crossholder Ad Hoc Committee has agreed to backstop the Debtors' sale process by submitting a binding credit bid of the outstanding prepetition first lien claims in the amount of $492.7 million (the "**Credit Bid**").

       6.       The RSA provides for the postpetition continuation of the Debtors' prepetition marketing of the Debtors' assets to seek bids or proposals for potential transactions that, if representing a higher or otherwise better value for the Debtors' stakeholders than the

Stalking Horse Bid, will be pursued in lieu of the Stalking Horse Bid. The Credit Bid will serve as a back-up bid in the Debtors' postpetition sale process, while the Debtors pursue the Stalking Horse Bid or any other higher or otherwise better bid. Consistent with their obligations under the Restructuring Support Agreement, the Debtors are seeking to emerge from chapter 11 on an expedited basis.

7.    As of the Commencement Date, the Debtors have less than $2.1 million in cash on hand and thus require immediate access to the DIP Financing and authority to use Cash Collateral (as defined herein) to ensure that they have sufficient liquidity to operate their business and pursue the Sale Process, as contemplated by RSA. To finance these chapter 11 cases and support the Sale Process, the DIP Lenders have committed to provide the Debtors with DIP Financing in an aggregate amount of up to $74.1 million, with the members of the Crossholder Ad Hoc Committee backstopping the full $74.1 million commitment. The terms and conditions of the Crossholder Ad Hoc Committee's commitment to backstop the DIP Facility are set forth in that certain *DIP and Exit Backstop Commitment Letter*, dated as of February 11, 2020, by and between the Debtors and the members of the Crossholder Ad Hoc Committee party thereto (the "**Backstop Commitment Letter**"), a copy of which is annexed hereto as **Exhibit D**.

8.    Several reasons justify the relief requested herein:

- The Debtors are entering chapter 11 with limited cash on hand. Immediate access to DIP Financing is therefore critical to ensure (a) sufficient working capital to operate their business and to administer their estates, (b) the ability to timely pay administrative expenses incurred during these chapter 11 cases, and (c) the flexibility to continue to employ the performance-marketing spend necessary to keep pace in the current highly competitive landscape.

- The Debtors proposed interim draw of $27.0 is necessary for the Debtors to avoid immediate and irreparable harm to their estates.

- Negotiations with the proposed DIP Lenders were conducted in good faith and at arm's length. The Debtors believe the DIP Facility provides

4

sufficient liquidity at reasonable rates and, when taken together, appropriate fees under the circumstances. As confirmed by the Debtors' prepetition process to solicit proposals for third-party debtor-in-possession financing, there is no alternative financing available to the Debtors in the market.

- The Debtors expect that vendors, customers, and their employees will be highly focused on whether these chapter 11 cases are appropriately funded.

For those reasons and the reasons set forth below, the Debtors respectfully request that the Court grant the relief requested herein.

## Background

9.     On the date hereof (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

10.     Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

11.     Information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the Martin Declaration.

## Jurisdiction

12.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States

District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

13.    Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

### Relief Requested

14.    By this Motion, pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e)  of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003(b), 6004(a), 6004(h), and 9014, and Local Rule 4001-2, the Debtors request (i) entry of an interim order, substantially in the form annexed hereto as **Exhibit A** (the "**Interim Order**") and, (ii) following the Final Hearing (as defined herein), entry of a final order granting the relief requested herein (the "**Final Order**" and, together with the Interim DIP Order, the "**DIP Orders**") and the relief as provided therein, including:

(a)    authority to enter into the DIP Credit Agreement (as defined herein) and related documents (collectively, the "**DIP Documents**"), which provide for a DIP Facility that will be drawn in an amount equal to $27.0 million on an interim basis (the "**Initial Draw**") with an additional $47.1 million to be drawn on a final basis (together with the Initial Draw, the "**DIP Loans**");

(b)    authority to pay the following interest and fees:  (a) cash interest at a rate of LIBOR + 7.0% *per annum* and (b) certain fees, including (i) a upfront original issue discount of 2.0% (the "**Upfront Discount**"), which shall be payable as original issue discount on the aggregate amount of DIP Loans; (ii) pursuant to the Backstop Commitment Letter, a backstop premium of 3.5% (the "**Backstop Premium**"), which shall be payable as original issue discount on the aggregate amount of DIP Loans; (iii) a redemption premium, on the terms set forth in more detail below (the "**Redemption Premium**"), which shall be payable on the aggregate amount of

RLF1 22900921v.1

outstanding DIP Loans; and (iv) agency fees, as described in that certain *Fee Letter* by and between the Debtors and the DIP Agent (the "**Fee Letter**");[3]

(c)    granting, in each case subject to the Carve Out (as defined below) and certain other exceptions set forth in the Interim Order, a first-priority, perfected, priming security interest and liens (the "**DIP Liens**") on all prepetition and postpetition assets of each Debtors' estate and all proceeds thereof (other than avoidance actions, but including, subject to and effective upon entry of the Final Order, any proceeds of such avoidance actions), not including any Excluded Assets (as defined in the DIP Documents) (collectively, the "**DIP Collateral**"), and superpriority claims over all other administrative expenses;

(d)    authority to use Cash Collateral within the meaning of sections 363(a) and 363(c) of the Bankruptcy Code;

(e)    approval of the form and manner of adequate protection to be provided to the Prepetition Secured Parties (as defined below), including (a) adequate protection liens and superpriority claims; (b) payment of the reasonable and documented costs and expenses of the Prepetition First Lien Secured Parties (as defined below) and the Prepetition Second Lien Agent (as defined below); (c) section 506(c) and section 552(b) waivers (in each case subject to entry of the Final Order); (d) stipulations as to the liens and claims held by such parties; and (e) certain financial reporting requirements;

(f)    modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the DIP Orders, subject to the Remedies Notice Period (as defined in the DIP Orders), as applicable, and to permit the cash collateralization of the First Lien Letter of Credit (as defined below);

(g)    waiver of any applicable stay, including (to the extent applicable) under Bankruptcy Rule 6004, to provide for immediate effectiveness of the Interim Order; and

(h)    scheduling a date for a hearing on this Motion to consider entry of the Final Order (the "**Final Hearing**") no later than forty (40) days after entry of the Interim Order.

---

[3] The Fee Letter will be provided to the Court, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"), and any professionals retained by an official committee appointed in these chapter 11 cases, subject to the confidentiality provisions set forth therein.

## Summary of Terms of DIP Financing[4]

15.    In accordance with Bankruptcy Rules 4001(b)–(d) and Local Rule 4001-2(a), the below chart summarizes the significant terms of the proposed Interim Order and the DIP Documents.

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | RentPath, LLC (the "**Borrower**"). | DIP Credit Agreement, Preamble. |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Each Debtor other than the DIP Borrower (together with the DIP Borrower, the "**Loan Parties**"). | DIP Credit Agreement, Preamble. |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Certain members of the Crossholder Ad Hoc Committee (the "**Backstop Lenders**") and certain other Consenting Creditors (collectively, the "**DIP Lenders**"). | Backstop Commitment Letter, ¶ 2. |
| **DIP Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Royal Bank of Canada (the "**DIP Agent**") | DIP Credit Agreement, Preamble. |
| **DIP Facility**<br>Bankruptcy Rule 4001(c)(1)(B) | A superpriority priming term loan facility in an aggregate principal amount of $74.1 million (the "**Total Commitments**"). | DIP Credit Agreement, § 2.01. |
| **Borrowing Limits**<br>Bankruptcy Rule 4001(c)(1)(B) | Subject to limitations on borrowing under the DIP Documents, the Borrower may draw (x) $27.0 million of DIP Loans upon entry of the Interim Order and (y) $47.1 million of DIP Loans upon entry of the Final Order | DIP Credit Agreement, § 2.01. |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B) | The Initial DIP Budget is attached as **Exhibit C**. | **Exhibit C**. |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B) | Applicable Rate:  LIBOR + 7.0% *per annum*, subject to a LIBOR floor of 1.0%<br><br>Default Interest Rate:  Additional 2.00% *per annum* above the otherwise applicable rate. | DIP Credit Agreement, § 2.08. |
| **Expenses and Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | Upfront Discount:  An amount equal to 2.0% of the principal face amount of DIP Loans, which shall be payable to the DIP Lenders as an original issue discount on the date of funding.<br><br>Backstop Premium:    An amount equal to 3.5% of the Total Commitments, payable to each Backstop Lender as an original issue discount on the closing date of the DIP Facility (the "**Closing Date**"), according to its pro rata share of the Total Commitments. | DIP Credit Agreement, §§ 2.05, 2.09. |

---

[4]    This summary is qualified in its entirety by reference to the applicable provisions of the DIP Documents.  To the extent there exists any inconsistency between this summary and the provisions of the DIP Documents or the DIP Orders, the provisions of the DIP Documents or the DIP Orders, as applicable, shall control.

RLF1 22900921v.1

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | Redemption Premium: An amount equal to 19.6% on the outstanding principal amount of the DIP Loans, which shall be (i) added to the principal amount of the Exit Term Loan Facility (as defined below) in the event that the Exit Conversion (as defined below) occurs under an plan of reorganization or (ii) otherwise paid in full in cash at the Maturity Date (as defined below); provided, that in the event of a Conversion Prepayment (as defined below) or a sale of a material portion of the assets of the Loan Parties, or the equity interests of one or more Loan Parties, to a third party unaffiliated with the Prepetition First Lien Lenders (as defined below), such amount shall be reduced to (i) 3.5% for a Conversion Prepayment (as defined below) or sale occurring prior to 90 days from the Petition Date, (ii) 7.5% for a Conversion Prepayment (as defined below) or sale occurring on or after 90 days from the Petition Date, but prior to 180 days from the Petition Date, (iii) 15.0% for a Conversion Prepayment (as defined below) or sale occurring on or after 180 days from the Petition Date, but prior to 360 days from the Petition Date, and (iv) 19.6% for a Conversion Prepayment (as defined below) or sale occurring on or after 360 days from the Petition Date.<br><br>Fees and Expenses: The Debtors shall pay all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the DIP Agent and the DIP Lenders in connection with the DIP Facility. | |
| **Maturity Date**<br>Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(ii) | Borrowings shall be repaid in full and in cash, and the commitments shall terminate, on the earliest to occur (the "**Maturity Date**") of (i) August 31, 2020 (the "**Initial Maturity Date**") and (ii) the effective date and the date of the substantial consummation (as defined in section 1102(2) of the Bankruptcy Code) of a plan of reorganization that has been confirmed by an order of the Court; provided, that the Initial Maturity may be extended two times, each in three month increments, at the request of the Borrower with the consent of the two or more un-affiliated (with respect to any other DIP Lender) DIP Lenders holding more than 50% of the aggregate undrawn amount of the Total Commitments and outstanding DIP Loans (the "**Required Lenders**"); provided further, that if the Exit Conversion (as defined below) occurs, the DIP Loans shall not be repaid in cash and shall convert into the Exit Term Loan Facility (as defined below). | DIP Credit Agreement, § 1.01. |
| **Collateral and Priority**<br>Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | All obligations of the Loan Parties to the DIP Lenders and the DIP Agent under the DIP Documents, including all DIP Loans, shall, subject in all respects to the Carve Out, at all times:<br><br>(a)  pursuant to section 364(c) of the Bankruptcy Code, have first priority liens on all unencumbered assets of the Loan Parties (now or hereafter acquired and all proceeds thereof);<br><br>(b)  pursuant to section 364(c)(3) of the Bankruptcy Code, have junior liens on all encumbered assets of the Loan Parties (now or hereafter acquired and all proceeds thereof), other than as set forth in clause (c) immediately below; and<br><br>(c)  pursuant to section 364(d) of the Bankruptcy Code, have first priority priming liens on all assets of the Loan Parties (now or hereafter acquired and all proceeds thereof) that serve as collateral under the Prepetition Secured Facilities (as defined | Interim Order ¶¶ 6–7. |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | below), which liens shall be senior to the liens on the collateral securing the Prepetition Secured Facilities and the adequate protection liens on such collateral granted under the Interim Order. | |
| **Covenants**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>Affirmative and Negative Covenants</u>: Usual and customary covenants for debtor-in-possession financings of this type.<br><br><u>Financial Covenants</u>:<br>• The Loan Parties shall be required to adhere to the Budget, subject to the below reporting and variance requirements:<br><br>(a) commencing on the first Thursday that is two (2) full weeks after the Petition Date, and continuing weekly thereafter, the Loan Parties shall deliver to the DIP Agent a report (each, a "**Variance Report**") describing in reasonable detail the Debtors' aggregate cash receipts and aggregate cash disbursements during the preceding two-week period as compared to the projected, aggregate cash receipts and disbursements provided by the then-current Budget for such two-week period (such difference, a "**Variance**");<br><br>(b) "**Permitted Variance**" means a Variance from the then-current Budget on a two-week trailing basis (the "**Testing Period**") that does not exceed the total aggregate amount in such Budget of disbursements (exclusive of (x) professional fees and restructuring charges arising on account of the chapter 11 cases (including U.S. Trustee fees and professional fees and expenses incurred by the Debtors and an official committee of unsecured creditors appointed in these chapter 11 cases (a "**Committee**") (if any) or the DIP Secured Parties (as defined below) or paid by the Loan Parties as adequate protection) and (y) disbursements made on account of prepetition claims pursuant to any order of the Bankruptcy Court for the Testing Period) by more than 10%; and<br><br>(c) during any Testing Period, the Variance from the then-current Budget shall not exceed the Permitted Variance. | DIP Credit Agreement, § 6.01. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B) | Usual and customary events of default for financings of this type. | DIP Credit Agreement, § 8.01.<br><br>Interim Order ¶ 27. |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Milestones**<br>Bankruptcy Rule<br>4001(c)(1)(B)(vi) | • As soon as practicable, but in no event later than the date that is forty (40) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final Order;<br><br>• As soon as practicable, but in no event later than the date that is sixty-five (65) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order approving a disclosure statement for a chapter 11 plan (the "**Disclosure Statement Order**"); and<br><br>• As soon as practicable, but in no event later than the date that is sixty-five (65) calendar days after entry of the Disclosure Statement Order, the Bankruptcy Court shall have entered an order confirming a chapter 11 plan. | Interim Order ¶ 28. |
| **Carve-Out**<br>Bankruptcy Rule<br>4001(b)(1)(B)(iii) | The "**Carve-Out**" includes (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate (without regard to the notice set forth in clause (iv) below); (ii) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iv) below); (iii) to the extent allowed at any time, whether by interim or final compensation order, all professional fees of persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (such persons or firms, the "**Debtor Professionals**") and any persons or firms retained by any Committee (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") (such fees, collectively, the "**Allowed Professional Fees**") incurred at any time before or on the first business day after delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice (as defined below) and without regard to whether such fees and expenses are provided for in the Budget; and (iv) Allowed Professional Fees incurred after the first business day following delivery by the DIP Agent of the Carve-Out Trigger Notice (as defined below) (including transaction fees or success fees earned or payable to a Professional Person) in an aggregate amount not to exceed $1,500,000 with respect to Professional Persons (the amount set forth in this clause (iv) being the "**Post-Carve-Out Trigger Notice Cap**").<br><br>For purposes of the foregoing, "**Carve-Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (or, following the indefeasible payment in full in cash (a "**DIP Repayment**") of the all obligations arising from the DIP Facility (the "**DIP Obligations**"), the Prepetition Agents) to the Debtors, their lead restructuring counsel (Weil, Gotshal & Manges LLP), the U.S. Trustee, and lead counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations (or, following a DIP Repayment, any occurrence that would constitute an Event of Default under the Interim Order) or the occurrence of the Maturity Date, stating that the Post-Carve-Out Trigger Notice Cap has been invoked. | Interim Order ¶ 36. |

RLF1 22900921v.1

| | | |
|---|---|---|
| **SUMMARY OF MATERIAL TERMS OF DIP FACILITY** | | |
| **Prepayments**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>Voluntary Prepayments</u>: The Loan Parties may, at any time, (i) repay the loans under the DIP Facility and/or (ii) reduce the DIP Facility commitments, in each case in full but not in part.  Any voluntary prepayment shall be subject to the payment of the Redemption Premium.<br><br><u>Mandatory Prepayments</u>: The DIP Documents contain mandatory prepayment covenants substantially similar to those made by the Loan Parties under the First Lien Credit Agreement (as defined below), modified as appropriate to reflect the commencement of the chapter 11 cases and otherwise as customary in the context of the proposed DIP Facility, including with respect to (i) asset sales, (ii) insurance proceeds, (iii) incurrence of indebtedness, (iv) issuance of equity, and (v) the Conversion Prepayment (as defined below) (if any).  Any mandatory prepayment shall be subject to the payment of the Redemption Premium.<br><br><u>Conversion Prepayment</u>: If the Borrower, as reorganized, or RentPath NewCo (as defined in the RSA), as applicable, is projected to have, at the time immediately following the Exit Conversion (as defined below), a pro forma cash balance in excess of $100 million (after giving effect to any transfer of amounts remaining in the blocked controlled segregated deposit account in the name of the DIP Agent to the Borrower, as reorganized, or RentPath NewCo (as defined in the RSA), as applicable, and the receipt of cash proceeds from the Exit Term Loan Facility (as defined below), as well as cash payments required to be made under a plan of reorganization, payment of any transaction or exit fees and costs, including, among other things, the payment of any incentive or retention payments, and funding the segregated account used to disburse payments on account of professional fees of Professional Persons (including with respect to the Carve Out)), the Borrower shall, upon the occurrence of the Exit Conversion (as defined below), mandatorily prepay an amount equal to the difference of (x) the Borrower's projected pro forma cash balance immediately following the Exit Conversion (as defined below) and (y) $100 million (the "**Conversion Prepayment**"), which amount shall be used to pay down the outstanding DIP Loans.  The Conversion Prepayment shall be subject to the payment of the Redemption Premium as if a sale of a material portion of the assets of the Loan Parties, or the equity interests of one or more Loan Parties, had occurred. | DIP Credit Agreement, § 2.05. |
| **Conditions to Closing**<br>Bankruptcy Rule 4001(c)(1)(B) | Usual and customary for financings of this type including, among other things (a) execution and delivery of the DIP Credit Agreement and the other DIP Documents; (b) occurrence of the Petition Date, (c) entry of the "first day" orders, (d) entry of the Interim Order, and (e) delivery of the Initial DIP Budget. | DIP Credit Agreement, § 4.01. |
| **Superpriority Expense Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(i) | Subject to the Carve Out in all respects, the DIP Agent and DIP Lenders are granted superpriority administrative expense claim status against each Debtor in the chapter 11 cases, which claims (the "**DIP Superpriority Claims**") in respect of the DIP Facility shall be superior to all other claims. | Interim Order ¶ 8. |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Parties with an Interest in Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(i) | Prepetition Secured Parties | Interim Order ¶ 12–13. |
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(iv) | "<u>**First Lien Adequate Protection Liens**</u>":  A valid, perfected replacement security interest in and lien on all of the DIP Collateral, including, subject to entry of the Final Order, proceeds of avoidance actions, subject and subordinate only to (i) the Carve Out, (ii) the DIP Liens, and (iii) the Non-Primed Liens, subject to the terms of the Intercreditor Agreement (as defined below).<br><br>"<u>**First Lien Section 507(b) Claims**</u>":  Superpriority claims as provided in section 507(b) of the Bankruptcy Code with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, subject and subordinate only to (i) the Carve Out and (ii) the DIP Superpriority Claims granted in respect of the DIP Obligations.<br><br>"<u>**Second Lien Adequate Protection Liens**</u>":  A valid, perfected replacement security interest in and lien on all of the DIP Collateral, including, subject to entry of the Final Order, proceeds of avoidance actions, subject and subordinate only to (i) the Carve Out, (ii) the DIP Liens, (iii) the First Lien Adequate Protection Liens, (iv) the Prepetition Senior Liens, and (v) the Non-Primed Liens, in each case, subject to the terms of the Intercreditor Agreement (as defined below).<br><br>"<u>**Second Lien Section 507(b) Claims**</u>":  Superpriority claims as provided in section 507(b) of the Bankruptcy Code with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, subject and subordinate only to (i) the Carve-Out, (ii) the DIP Superpriority Claims granted in respect of the DIP Obligations, and (iii) the First Lien 507(b) Claims.<br><br><u>Fees and Expenses</u>:  Payment of all accrued and unpaid fees and reasonable and documented disbursements incurred by the Prepetition First Lien Secured Parties (as defined below) and the Prepetition Second Lien Agent (as defined below), whether accrued before, on, or after the Petition Date.<br><br><u>Information</u>:  Delivery to the Prepetition Agents (as defined below) and the legal and financial advisors to the Crossholder Ad Hoc Committee, on a "Professional Eyes Only" basis, all information, reports, documents, and other materials that the Debtors provide to the DIP Secured Parties pursuant to the DIP Documents, the Interim Order, and the Final Order. | Interim Order, ¶ 12–13. |
| **Determination Regarding Prepetition Claims** Bankruptcy Rule 4001(c)(1)(B)(iii) | The Interim Order contains stipulations of fact by the Debtors, including those related to the validity and enforceability of the Debtors' Prepetition Secured Obligations (as defined below). | Interim Order, ¶ F. |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Liens on Avoidance Actions**<br>Bankruptcy Rule 4001(c)(1)(B)(xi) | Subject to entry of the Final Order, the DIP Secured Parties (as defined below) will receive a lien on the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code. | Interim Order, ¶ 6. |
| **Effect of Debtors' Stipulations on Third Parties**<br>Bankruptcy Rule 4001(c)(1)(B)(iii), (viii) | Subject to the Challenge Deadline (as defined below), the stipulations and admissions contained in the Interim Order shall be binding on any person, entity, or party in interest in the chapter 11 cases, as well as their successors and assigns, and in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the chapter 11 cases.<br><br>The "**Challenge Deadline**" shall be (a) 60 days from the date of formation of a Committee (if appointed) or (b) 75 days following the entry of the Interim Order, in the case that no Committee is appointed. | Interim Order, ¶ 40. |
| **Waiver or Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay is modified solely to the extent necessary:<br><br>• permit the Debtors to grant the DIP Liens, the First Lien Adequate Protection Liens, the Second Lien Adequate Protection Liens, the DIP Superpriority Claims, and the First Lien 507(b) Claims, and Second Lien 507(b) Claims;<br><br>• permit the Debtors to perform such acts as the DIP Agent, the Prepetition First Lien Agent (as defined below), and the Prepetition Second Lien Agent (as defined below) each may reasonably request to assure the perfection and priority of the liens granted herein;<br><br>• permit the Debtors to incur all liabilities and obligations to the DIP Agent, DIP Lenders, and Prepetition Secured Parties (as defined below) under the DIP Documents, the DIP Facility, and the Interim Order, as applicable;<br><br>• authorize the Debtors to pay, and the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties (as defined below) to retain and apply, payments made in accordance with the terms of the Interim Order; and<br><br>• permit the First Lien Letter of Credit Issuer (as defined below) to cash collateralize the First Lien Letter of Credit (as defined below), in accordance with the terms of the First Lien Credit Agreement. | Interim Order, ¶ 19. |
| **Waiver or Modification of Authority to File a Plan, Extend Time to File Plan, Request Use of Cash Collateral, or Request Authority to Obtain Credit**<br>Bankruptcy Rule 4001(c)(1)(B)(v) | Events of Default:<br><br>• entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Loan Party to file a chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders; and<br><br>• Filing a motion in the chapter 11 cases without the express written consent of Required Lenders to obtain additional financing from a party other than the DIP Lenders under section 364(d) of the Bankruptcy Code that does not provide for the payment of the DIP Obligations in full and in cash, including the Redemption Premium, upon the incurrence of such additional financing. | DIP Credit Agreement, § 8.01(o), § 8.01(u). |

14

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** Bankruptcy Rule 4001(c)(1)(B)(vii) | The Debtors stipulate that the liens and security interests granted to the Prepetition Secured Parties (as defined below) are valid, binding, enforceable, non-avoidable, and properly perfected. The DIP Liens are valid, binding, enforceable, non-avoidable, and automatically and properly perfected. | Interim Order, ¶¶ F, 6, 40. |
| **Release, Waivers or Limitation on any Claim or Cause of Action** Bankruptcy Rule 4001(c)(1)(B)(viii) | The Debtors stipulate and agree that they forever and irrevocably release, discharge, and acquit the DIP Agent, the Prepetition Secured Parties (as defined below), all current and future DIP Lenders, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys, and agents, past, present, and future, and their respective heirs, predecessors, successors, and assigns, each solely in their capacities as such of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions, and causes of action of any and every nature whatsoever relating to, as applicable, the DIP Facility, the DIP Documents, the Prepetition Secured Facilities (as defined below), the Prepetition Documents (as defined below), and/or the transactions contemplated by the DIP Documents or under the Prepetition Documents. | Interim Order, ¶ F(vii). |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors shall indemnify and hold harmless the DIP Agent and the DIP Lenders in accordance with the terms and conditions of the DIP Credit Agreement. | Interim Order ¶ 33. |
| **Section 506(c) Waiver** Bankruptcy Rule 4001(c)(1)(B)(x) | Subject to entry of the Final Order, except to the extent of the Carve Out, no costs or expenses of administration that have been or may be incurred in the chapter 11 cases at any time shall be charged against the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent (as defined below), the Prepetition First Lien Lenders (as defined below), the Prepetition Second Lien Agent (as defined below), or the Prepetition Second Lien Lenders (as defined below), the DIP Collateral, or the Prepetition Collateral (as defined below) pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Agent, the Prepetition First Lien Agent (as defined below), or the Prepetition Second Lien Agent (as defined below), as applicable | Interim Order, ¶ 42. |
| **Section 552(b) Waiver** Bankruptcy Rule 4001(c)(1)(B) | Subject to entry of the Final Order, the Prepetition First Lien Agent (as defined below), the Prepetition First Lien Lenders (as defined below), the Prepetition Second Lien Agent (as defined below), and the Prepetition Second Lien Lenders (as defined below) shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception thereunder shall not apply to any of them. | Interim Order, ¶ 44. |

**Prepetition Indebtedness**

16.     The following table provides a summary of the Company's prepetition funded debt obligations (the "**Prepetition Secured Obligations**") under its prepetition credit facilities (the "**Prepetition Secured Facilities**"):

|                                    | Outstanding Principal |
|------------------------------------|:---------------------:|
| First Lien Revolving Facility      | $37.95 million        |
| First Lien Term Loan               | $479.75 million       |
| **Total First Lien Debt**          | **$517.70 million**   |
| Second Lien Term Loan              | $170.00 million       |
| **Total Funded Debt**              | **$687.70 million**   |

17.     *First Lien Credit Agreement*.   The Debtors have outstanding first-lien secured debt obligations under that certain First Lien Credit Agreement, dated as of December 17, 2014 (as amended, supplemented, amended and restated or modified from time to time, the "**First Lien Credit Agreement**" and the claims thereunder or related thereto, the "**First Lien Claims**"), among RentPath Holdings, Inc., RentPath, LLC, as borrower, Royal Bank of Canada, as administrative agent (in such capacity, the "**Prepetition First Lien Agent**"), and the lenders party thereto from time to time (the "**Prepetition First Lien Lenders**" and, together with the Prepetition First Lien Agent, the "**Prepetition First Lien Secured Parties**").   As of the Petition Date, the aggregate principal amount outstanding under the First Lien Credit Agreement is approximately $517.7 million, which amount consists of the following, each secured by the same collateral with *pari passu* lien priority:  (a) approximately $479.8 million in term loans (the "**First Lien Term Loans**") and (b) approximately $37.9 million in revolving loans (the "**First Lien Revolving Loans**" or "**First Lien Revolving Facility**").   The First Lien Revolving Loans are comprised of three loans:  (a) a $2.2 million loan that matured on December 17, 2019, (b) a $27.3 million loan

16

maturing on September 17, 2021, and (c) a $7.8 million loan maturing on December 17, 2020. The First Lien Revolving Facility also includes a letter of credit expiring on January 15, 2021 in the amount of $600,000 (the "**First Lien Letter of Credit**" and, the issuer thereof, the "**First Lien Letter of Credit Issuer**").   In addition, the Debtors have outstanding interest rate hedge agreements with certain of the Prepetition First Lien Lenders pursuant to two separate hedging agreements.  As of the Petition Date, the mark-to-market value of the Company's obligations under such hedging agreements, using standard industry valuation processes, was approximately $4.7 million (the "**Secured Hedge Obligations**").  The Secured Hedge Obligations are secured *pari passu* with the Debtors' obligations under the First Lien Credit Agreement (collectively, the "**Prepetition First Lien Secured Obligations**").   The Prepetition First Lien Secured Obligations are secured by a first lien on substantially all of the Debtors' tangible and intangible property (subject to certain specified liens in Section 7.01 of the First Lien Credit Agreement and certain excluded assets as set forth in the Loan Documents (as defined in the First Lien Credit Agreement, the "**First Lien Documents**") (collectively, the "**Prepetition Collateral**").

18.    *Second Lien Credit Agreement*.  The Debtors have outstanding second-lien term loan obligations under that certain Second Lien Credit Agreement, dated as of December 17, 2014 (as amended, supplemented, amended and restated or modified from time to time, the "**Second Lien Credit Agreement**" and the claims thereunder or related thereto, the "**Second Lien Claims**"), among RentPath Holdings, Inc., RentPath, LLC, as borrower, Royal Bank of Canada, as administrative agent (the "**Prepetition Second Lien Agent**" and, together with the Prepetition First Lien Agent, the "**Prepetition Agents**"), and the lenders party thereto from time to time (the "**Prepetition Second Lien Lenders**" and, together with the Prepetition Second Lien Agent, the "**Prepetition Second Lien Secured Parties**" and, together with the Prepetition First

Lien Secured Parties, the "**Prepetition Secured Parties**").  As of the Petition Date, the aggregate principal amount outstanding under the Second Lien Credit Agreement is approximately $170.0 million.  Obligations under the Second Lien Credit Agreement (the "**Prepetition Second Lien Secured Obligations**") are secured by a second lien on the Prepetition Collateral, subject to the Prepetition First Lien Secured Obligations and certain specified liens in Section 7.01 of the Second Lien Credit Agreement and certain excluded assets as set forth in the Loan Documents (as defined in the Second Lien Credit Agreement, the "Second Lien Documents" and, together with the First Lien Documents, the "**Prepetition Documents**").

19.     *Intercreditor Agreement*.  The relative contractual rights of the Prepetition Secured Parties are governed by that certain Intercreditor Agreement, dated as of December 17, 2014 (as may be amended, restated, supplemented, or otherwise modified from time to time, the "**Intercreditor Agreement**"), among Royal Bank of Canada, in its capacity as the first lien representative, and Royal Bank of Canada, in its capacity as the second lien representative.  The Intercreditor Agreement governs the respective rights and obligations of the Prepetition Secured Parties with respect to, among other things, priority, matters of debtor-in-possession financing, the use of cash collateral, and adequate protection.

**Debtors' Immediate Need for DIP Financing and Access to Cash Collateral**

20.     As stated in the Martin Declaration, the Debtors require immediate access to debtor-in-possession financing and Cash Collateral (as defined below) to ensure (a) sufficient working capital to operate their business and to administer their estates, (b) the ability to timely pay administrative expenses incurred during these chapter 11 cases, and (c) the flexibility to continue to employ the performance-marketing spend necessary to keep pace in the current highly competitive landscape.  As of the Petition Date, the Debtors will only have approximately $2.1 million in cash on hand.  Without additional financing and the ability to use Cash Collateral, the

18

Debtors will be in a negative cash position in the coming days.  Thus, the Debtors require immediate access to the proceeds of the DIP Financing and authority to use Cash Collateral to ensure they have sufficient liquidity to operate their business as a going concern and to avoid immediate and irreparable harm to their estates.

21.     In consultation with their advisors, the Debtors reviewed and analyzed the Company's projected cash flows to determine the requisite amount of debtor-in-possession financing.  Based on management's cash-flow forecast, the Debtors, in consultation with their advisors and the management team, compiled the Initial Budget.  Based on the forecasted funding requirements reflected in the Initial Budget, the liquidity provided under the proposed DIP Financing will enable the Debtors to preserve their value as a going concern, providing the Debtors with sufficient liquidity to meet their ongoing day-to-day obligations, fund the operational and administrative costs of these chapter 11 cases, and satisfy working capital requirements and other operational expenses, all of which will preserve the value of the Debtors' estates for the benefit of their stakeholders.

## Debtors' Efforts to Obtain Postpetition Financing

22.     As stated in the Martin Declaration, the Debtors operate in a competitive industry, which is especially challenging for a company like RentPath, which has an implied leverage of approximately 14.7x EBITDA.  The Debtors began experiencing a surge of increased competition in late 2015, which has resulted in declining revenues and has mandated additional investments in performance marketing, each of which has had a corresponding impact on the Debtors' liquidity.  Thus, in 2019, the Debtors, with the assistance of their restructuring advisors, began a formal review of strategic alternatives and engaged with their stakeholders, with the goal of building consensus around a deleveraging transaction.  Leading up to the Petition Date, as part of their broader restructuring process, the Debtors, with the assistance of their restructuring

19

advisors, sought potential sources of postpetition financing that could provide the Debtors with sufficient liquidity to fund their business operations during the chapter 11 cases.

23.     As stated in the Jamal Declaration, in early January 2020, the Debtors, with the assistance of Moelis & Company LLC ("**Moelis**"), began contacting third parties regarding the terms of potential debtor-in-possession financing, with the goal of obtaining debtor-in-possession financing with terms more favorable than those of the DIP Facility.  As part of that process, Moelis contacted approximately ten (10) market participants in an effort to solicit proposals.  Of the ten (10) parties that Moelis contacted, two (2) parties entered into nondisclosure agreements with the Debtors to conduct further diligence into the opportunity to provide debtor-in-possession financing.

24.     The Debtors have few, if any, unencumbered assets, and thus junior financing was essentially unobtainable.  Indeed, only one party indicated its willingness to submit a proposal to provide debtor-in-possession financing, which proposal was conditioned on the Crossholder Ad Hoc Committee's consent to priming liens, which the Crossholder Ad Hoc Committee declined to provide.  Given that potential lenders likely would require priming liens as a condition to advancing debtor-in-possession financing to the Debtors and that the Crossholder Ad Hoc Committee indicated that its members would not consent to being primed by third-party debtor-in-possession financing, the Debtors were unable to obtain third-party debtor-in-possession financing.

### DIP Financing Was Negotiated in Good Faith and at Arms' Length

25.     Over the course of multiple weeks, the Debtors, the Crossholder Ad Hoc Committee, and their respective legal and financial advisors negotiated the terms and provisions of the DIP Facility.  During that time, the parties exchanged numerous term sheets and mark-ups and participated in several calls and an in-person negotiation.   Over the course of these

negotiations, the terms of the DIP Financing improved to the benefit of the Debtors.  Throughout

the negotiation process, the Debtors' restructuring professionals held numerous calls and briefings

with the Debtors' management team, the Company's board of directors (the "**Board**"), and the

special committee of the Board, each of which provided feedback and direction with respect to the

terms of the DIP Financing.

26.     This process culminated in the DIP Facility, which was negotiated in good

faith and at arms' length.  As stated in the Jamal Declaration, given the arm's-length negotiations

that took place between the Debtors and the DIP Lenders, as well as the lack of alternatives, the

DIP Financing represents the best terms currently available to the Debtors in the market under the

circumstances.

<u>**Relief Requested Should be Granted**</u>

A.     **Entry into the DIP Facility is an Exercise of the Debtors' Sound Business Judgment**

27.     The Court should authorize the Debtors, as an exercise of their sound

business judgment, to enter into the DIP Documents, obtain access to the proceeds of the DIP

Facility, and use Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to

obtain secured or superpriority financing under certain circumstances discussed in detail below.

Courts grant debtors considerable deference in acting in accordance with their business judgment

in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not

run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re L.A.

Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the

business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, No.

08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that

courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage

the bankruptcy process' and unfairly cede control of the reorganization to one party in interest");

*In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of

postpetition financing requires, among other things, an exercise of "sound and reasonable business

judgment"); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving

a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent

business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)

("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy

Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be

exercised so long as the financing agreement does not contain terms that leverage the bankruptcy

process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-

interest.").

28.    Bankruptcy courts generally will not second-guess a debtor's business

decisions when those decisions involve "a business judgment made in good faith, upon a

reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code."  *In re

Curlew Valley Assocs.*, 14 B.R. 506, 513-514 (Bankr. D. Utah.  Oct 8, 1981) (noting that courts

should not second guess a debtor's business decision when that decision involves "a business

judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's]

authority under the [Bankruptcy] Code").  To determine whether the business judgment test is met,

"the court 'is required to examine whether a reasonable business person would make a similar

decision under similar circumstances.'"  *In re Dura Auto.  Sys.  Inc*., No. 06-11202 (KJC), 2007

WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).

29.    In determining whether the Debtors have exercised sound business

judgment in entering into the DIP Documents, the Court should consider the economic terms of

the DIP Financing under the totality of circumstances.  *See* Hr'g Tr. at 734-35:24, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. February 27, 2009) (recognizing that "the terms that are now available for DIP financing in the current economic environment aren't as desirable" as they once were previously); *In re Elingsen McLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).  Moreover, the Court may appropriately take into consideration noneconomic benefits to the Debtors offered under the proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125 (JMP), 2009 WL 2902568, at \*4 (Bankr. S.D.N.Y. July 6, 2009).

30.     The Debtors' decision to enter into the DIP Facility is an exercise of their sound business judgment.  As further discussed in the Jamal Declaration, the DIP Financing was market tested and was the product of arm's-length negotiations.  Keeping in mind the advantages and disadvantages of the proposed DIP Financing, the Debtors ultimately decided that moving forward with the proposed DIP Financing was appropriate and in the Debtors' best interests.  Put simply, the DIP Financing represents the only financing available to the Debtors, and given the Debtors' current cash position and the lack of alternatives, the only alternative path available to the Debtors is liquidation, which would be detrimental to all stakeholders.  Thus, in light of the

above, the Debtors and their advisors determined that entry into the DIP Facility was the best path forward under the totality of circumstances, and the Debtors believe that they have obtained the best terms currently available under the circumstances.

31.    Further, the DIP Financing provides the Debtors with a potential path to emergence.  As detailed in the Jamal Declaration, in the event that the Credit Bid is the successful bid, all amounts outstanding under the DIP Financing will convert (the "**Exit Conversion**") into an exit term loan facility (the "**Exit Term Loan Facility**"), under which the DIP Lenders (as well as other participating lenders) would issue additional term loans in an aggregate principle amount of $71.0 million to provide the reorganized Company with sufficient working capital.  Thus, regardless of the ultimate outcome of the Sale Process, the DIP Facility provides the Debtors with a path forward—the Crossholder Ad Hoc Committee is backstopping the Sale Process with the Credit Bid, and the DIP Lenders are committing additional financing with a view to the Debtors' emergence from chapter 11.

32.    Accordingly, the Debtors submit that entry into the DIP Facility is in the best interests of the Debtors' estates and is necessary to preserve the value of estate assets and is a reasonable exercise of their business judgment.

**B.    Debtors Should Be Authorized to Grant Liens and Superpriority Claims**

33.    The Debtors propose to obtain DIP Financing by providing security interests and liens as set forth in the DIP Documents and described above.  The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to incur secured or superpriority debt under certain circumstances.  Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court,

24

after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

34.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (finding that secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon a showing that unsecured credit cannot be obtained). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (finding that superpriority administrative expenses should be authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (finding that credit was unavailable absent a senior priming lien because the debtor had made unsuccessful contact with other financial institutions in the relevant geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (finding that the fact that two national banks refused

25

to grant unsecured loans was sufficient to support the conclusion that the requirements of section 364 were met); *In re Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and finding that debtor made reasonable efforts to satisfy the requirements of section 364(c) by approaching four lending institutions, two of which refused to provide financing, and selecting the most favorable of the two offers it received).

        35.    Courts have articulated a three-part test to determine whether a debtor is entitled to enter into financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

- the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code (i.e., by allowing an administrative claim);

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); *In re Ames Dep't Stores*, 115 B.R. at 37–40; *In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

        36.    In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c). As described above, the Debtors are unable to obtain unsecured credit due to their lack of unencumbered assets. Thus, the Debtors determined that the DIP Facility provided the best— and, in fact, the *only*—opportunity available to the Debtors under the circumstances to fund these

26

chapter 11 cases.  Therefore, approving superpriority claims in favor of the DIP Lenders is reasonable and appropriate.

37.    Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).  Consent of the secured creditors to liens priming their interests in collateral obviates the need to show adequate protection.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Secured Parties consent to the priming or (b) the Prepetition Secured Parties' interests in collateral are adequately protected.

38.    Most importantly, here, the priming is consensual.  Pursuant to the RSA, which over 66-2/3% of each of the Prepetition First Lien Lenders and the Prepetition Second Lien Lenders has executed, the Prepetition Secured Parties support, or are deemed to support, the priming of their prepetition liens in exchange for an adequate protection package.  Further, the Debtors are not aware of any available financing on equal or better terms from the DIP Lenders absent the granting of first-priority priming liens on the Prepetition Collateral.  Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code—that alternative credit on more favorable terms be unavailable to the Debtors—is satisfied.

### C.    Interests of Prepetition Secured Parties Are Adequately Protected

39.    Parties with an interest in cash collateral are entitled to adequate protection.  *See* 11 U.S.C. § 363(e).  Adequate protection may be provided in various forms, including, among

27

other things, payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims.  Thus, what constitutes adequate protection is decided on a case-by-case basis.  *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

40.     The adequate protection package provided to the Prepetition Secured Parties, as described above, is consensual and appropriately safeguards the Prepetition Secured Parties from the diminution in the value (if any) of their interests in the Prepetition Collateral.  The Debtors submit that their provision of adequate protection to the Prepetition Secured Parties is fair and reasonable and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

**D.     Debtors Should Be Authorized to Use Cash Collateral**

41.     For the reasons set forth herein, the Debtors require use of the Cash Collateral for working capital and to fund their chapter 11 cases.  Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale,
or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).

42.    Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  Section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

43.    As noted above, the Prepetition Secured Parties have, or are deemed to have, consented to the use of Cash Collateral, and the Debtors are providing the Prepetition Secured Parties with adequate protection that (i) is fair and reasonable and (ii) adequately protects the Prepetition Secured Parties' interests in the Prepetition Collateral.  Accordingly, the Court should authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

### E.    The Carve-Out is Appropriate

44.    The liens granted pursuant to the DIP Facility, replacement liens on account of adequate protection, and the superpriority claims of all secured lenders are subject and subordinate to the Carve Out.  The Carve Out contains similar terms to others that have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel.  *See In re Claire's Stores, Inc.*, 18-10584 (MFW) (Bankr. D. Del. 2018); *In re Avaya,* Case No. 17-10089 (SMB) (Bankr. S.D.N.Y. Jan. 23, 2017) [D.I. 61]; *In re Ames Dep't Stores*, 115 B.R. at 40–41; *In re Halcón Res. Corp.*, No. 16-11724 (BLS) (Bankr. D. Del. Aug. 19, 2016) [D.I. 130]; *In re Aéropostale, Inc.*, No. 16-11275 (SHL) (Bankr. S.D.N.Y. May 6, 2016) [D.I. 99]; *In re American Apparel, Inc.*, No. 15-12055 (BLS) (Bankr. D. Del. Nov. 2, 2015) [D.I. 248]; *In re Reichold Holdings US, Inc.*, No. 14-12237 (MFW) (Bankr. D. Del. Oct. 2, 2014) [D.I. 54]; *In re Bear Island Paper Co., LLC*, No. 10-31202 (DOT) (Bankr. E.D. Va. Feb. 26, 2010) [D.I. 66]; *In re The Great Atl. & Pac. Tea Co., Inc.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Dec. 13, 2010) [D.I. 43].

45.    Without the Carve Out, the Debtors' estates may be deprived of possible rights and powers if the services for which professionals may be compensated is restricted.  *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve Out protects against administrative insolvency during the course of these cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees, notwithstanding the grant of superpriority claims and replacement liens as part of the adequate protection of the Prepetition Secured Parties' interests in the Prepetition Collateral.

**F.      Debtors Should Be Authorized to Pay Fees Required by DIP Documents**

46.      As described herein, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lenders and the DIP Agent (collectively, the "**DIP Fees**") in exchange for their providing, agenting, and/or backstopping the DIP Facility.  As set forth in the Jamal Declaration, when taken together, the terms of the DIP Documents, including the fees imposed thereunder, constitute the best terms on which the Debtors could obtain the postpetition financing necessary to maintain their ongoing business operations and to fund their chapter 11 cases.

47.      The Upfront Discount and the Agent Fees are customary and usual for debtor-in-possession financings of this kind.  Additionally, as set forth in the Jamal Declaration, the Redemption Premium represents a reasonable term under the circumstances, when taken together with the terms of the DIP Financing as a whole.  In the event of an Exit Conversion, a Redemption Premium in an amount equal to 19.6% of the outstanding principal amount of DIP Loans will be added to the principal amount of loans that will be converted into the Exit Term Loan Facility.  Thus, in the event of an Exit Conversion, the Redemption Premium does not represent a cash obligation.  If an Exit Conversion does not occur and the DIP Financing otherwise matures, a Redemption Premium in an amount equal to 19.6% of the outstanding principal amount of DIP Loans will be payable in cash, but if the Debtors consummate a sale of a material portion of their assets (by, for example, consummating a sale in connection with the Stalking Horse Bid), the amount of the Redemption Premium will be reduced based on the timing of such sale as follows:

- 3.5% if a sale is consummated prior to 90 days from the Petition Date;

- 7.5% if a sale is consummated between 90 and 179 days from the Petition Date;

- 15.0% if a sale is consummated between 180 and 359 days from the Petition Date; and

31

- 19.6% if a sale is consummated on or after 360 days from the Petition Date.

As set forth in the Jamal Declaration, when taken together with the terms of the DIP Financing as a whole, the Redemption premium represents a reasonable term of the DIP Financing under the particular facts of these chapter 11 cases. First, due to the fact that (a) the Company has very few hard assets and that the DIP Lenders thus have limited downside protection, (b) the Company generates limited EBITDA and operates in a highly competitive industry, and (c) the DIP Facility may convert to the Exit Term Loan Facility, which features a five-year maturity and a low cash interest rate, the DIP Lenders are assuming a significant amount of risk by providing the DIP Financing. Second, the DIP Lenders are providing the Debtors, as well as all of the Debtors' stakeholders, a level of certainty in these chapter 11 cases by backstopping the Sale Process with the Credit Bid and providing a potential path to emergence by virtue of the Exit Term Loan Facility. Third, the Redemption Premium reflects the level of risk that the DIP Lenders are assuming, insofar as the amount of the Redemption Premium payable to the DIP Lenders increases with the amount of time that the DIP Lenders' commitments under the DIP Financing and the Exit Term Loan Facility are outstanding. Finally, if the Debtors consummate a sale of a material portion of their assets, the amount of the Redemption Premium payable to the DIP Lenders is reasonable in light of the overall value that the Debtors would receive from such sale, given the indicative value associated with the Stalking Horse Bid. In any event, the DIP Lenders insisted that the Debtors agree to the inclusion of the Redemption Premium as a condition to extending the DIP Financing, and thus, given the lack of alternative sources of financing, the DIP Financing, inclusive of the Redemption Premium, nonetheless represents the only terms on which the Debtors can obtain debtor-in-possession financing. Indeed, the DIP Lenders have represented that they will refuse to fund any DIP Loans if the Debtors do not obtain approval of the Redemption Premium pursuant to the Interim Order.

32

48.     The Debtors considered the DIP Fees when determining in their sound business judgment whether entry into the DIP Facility constituted the best path forward for the Company, and the Debtors determined that paying these fees in order to obtain the DIP Financing is in the best interests of the Debtors' estates.  Accordingly, the Court should authorize the Debtors to pay the DIP Fees.

**G.      DIP Lenders Should Be Deemed Good Faith Lenders under Section 364(e)**

49.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or to grant such liens is later reversed or modified on appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

50.     Here, the Debtors believe the DIP Financing embodies the most favorable terms on which the Debtors could obtain postpetition financing.  As described in the Jamal Declaration, the negotiations of the terms of the DIP Financing with the DIP Lenders were conducted in good faith and at arms' length.  Under the circumstances, the terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the DIP Orders and the DIP Documents and in accordance with the Budget (subject to the Permitted Variance).  Further, no consideration is being provided to any party to the DIP Documents other

than as described herein and in the Jamal Declaration.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and that the DIP Lenders thus are entitled to all of the protections afforded by that section.

**H.     Modification of Automatic Stay is Warranted**

51.     The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to, among other things, (a) grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (b) upon the occurrence of an Event of Default (as defined in the DIP Documents), subject to the "Remedies Notice Period" as set forth in the proposed DIP Orders, for the DIP Agent and/or DIP Lenders to exercise any remedies available to them; and (c) implement the terms of the proposed DIP Orders, including payment of all amounts referred to in the DIP Documents.

52.     The relief requested herein further contemplates a modification of the automatic stay to permit the First Lien Letter of Credit Issuer to cash collateralize the First Lien Letter of Credit, in accordance with the terms of the First Lien Credit Agreement.  In the Debtors' business judgment, such relief is reasonable and fair under the present circumstances.

53.     Stay modifications of this kind are ordinary and standard features of postpetition financing facilities and, in the Debtors' business judgment, are appropriate under the present circumstances.  *See, e.g.*, *In re Checkout Holding Corp.*, No. 18-12794 (KG) (Bankr. D. Del. January 17, 2019) [D.I. 222]; *In re Mattress Firm, Inc.*, No. 18-12241 (CSS) (Bankr. D. Del. Oct. 9, 2018) [D.I. 184]; *In re The NORDAM Grp., Inc.*, No. 18-11699 (MFW) (Bankr. D. Del. July 25, 2018) [D.I. 85]; *In re Claire's Stores, Inc.*, No. 18-10584 (MFW) (Bankr. D. Del. Mar. 20, 2018) [D.I. 130]; *In re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 13, 2017) [D.I. 93].

RLF1 22900921v.1

## I.    Debtors Require Immediate Access to Cash Collateral and DIP Financing

54.    The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code if, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2), (c)(2).  In examining requests for interim relief under this rule, Courts generally apply the same business judgment standard applicable to other business decisions.  *See Ames Dep't Stores*, 115 B.R. at 36.

55.    The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district in similar circumstances.  *See, e.g.*, *In re Halcón Res. Corp.*, No. 16-11724 (BLS) (Bankr. D. Del. July 29, 2016) [D.I. 46] (authorizing debtors to obtain postpetition financing on an interim basis); *In re Aspect Software Parent, Inc.*, No. 16-10597 (MFW) (Bankr D. Del. Mar. 11, 2016) [D.I. 65] (same); *In re Allied Nev. Gold Corp.*, No. 15-10503 (MFW) (Bankr.  D. Del. Mar. 12, 2015) [D.I. 70] (same); *In re QCE Finance LLC*, No. 14-10543 (PJW) (Bankr.  D. Del. Mar. 17, 2014) [D.I. 39] (same); *In re AbitbiBowater, Inc.*, No. 09-11296 (KJC) (Bankr.  D. Del. Apr. 17, 2009) [D.I. 64] (same); *In re Dura Auto.  Sys., Inc.*, No. 06-11202 (KJC) (Bankr.  D. Del. Oct. 31, 2006) [D.I. 88] (same).

56.    As described in the Martin Declaration, as of the Petition Date, the Debtors will only have approximately $2.1 million in cash on hand.  Absent authority to enter into and access the proceeds of the DIP Financing, even for a limited period of time, the Debtors will be unable to continue operating their business, resulting in a deterioration of value and immediate and irreparable harm to the Debtors' estates.  Thus, the Debtors require immediate access to the proceeds of the DIP Financing, as well as access to Cash Collateral, to finance their operations and continue operating as a going concern during the pendency of these chapter 11 cases.

35

J.       **The "Equities of the Case" Waiver is Appropriate**

57.      The Prepetition Secured Parties are consenting, subject to the terms of the Interim Order, to the priming of their liens by the DIP Facility and to the Debtors' use of Cash Collateral, thereby permitting the Debtors to obtain sufficient funds to continue to operate their business and providing a substantial benefit to the Debtors' estates. As a condition to providing such consent, the Prepetition Secured Parties required the Debtors to waive the "equities of the case" exception under section 552(b) of the Bankruptcy Code, subject to and effective upon entry of the Final Order. Absent the Prepetition Secured Parties' consent, the Debtors would have been required to seek to prime the Prepetition Secured Parties' liens and to use Cash Collateral on a non-consensual basis, which would have proven costly to the Debtors were they unable to prevail in such a priming fight. In addition, the Debtors are seeking approval of the "equities of the case" waiver only upon entry of the Final Order, thereby allowing parties in interest an opportunity to be heard in connection therewith. Therefore, the Debtors submit that the proposed "equities of the case" waiver is appropriate.

K.       **Request for Final Hearing**

58.      As stated above, the Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code if, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). The Debtors request a date which is no later than forty (40) days after entry of the Interim Order to hold a hearing to consider the relief requested herein on a final basis.

**Bankruptcy Rule 6003(b) Has Been Satisfied**

59.      Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion

to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" prior to 21 days after the Petition Date.  Fed. R. Bankr. P. 6003(b).  As explained above and in the Martin Declaration, the Debtors would suffer immediate and irreparable harm if the relief sought herein were not promptly granted and if the Debtors were therefore unable to access the proceeds of the DIP Financing or use Cash Collateral.  Absent immediate access to the proceeds of the DIP Financing and Cash Collateral, the Debtors would lack, among other things, (a) sufficient working capital to operate their business and to administer their estates, (b) the ability to timely pay administrative expenses incurred during these chapter 11 cases, and (c) the flexibility to continue to employ the performance-marketing spend necessary to keep pace in the current highly competitive landscape. Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

### Request for Bankruptcy Rule 6004(a) and (h) Waivers

60.     To implement the foregoing successfully, the Debtors seek waivers of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above and in the Martin Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

### Reservation of Rights

61.     Nothing contained herein is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors or any liens satisfied pursuant to this Motion, (b) an agreement or obligation to pay any claims, (c) a waiver of any claims or causes of

action that may exist against any creditor or interest holder, (d) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (e) an approval, assumption, or rejection of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## Notice

62.    Notice of this Motion will be provided to (a) the Office of the United States Trustee for the District of Delaware (Attn: Benjamin Hackman, Esq.); (b) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (c) the Internal Revenue Service; (d) the United States Attorney's Office for the District of Delaware; (e) Milbank LLP, 55 Hudson Yards, New York, New York 10001 (Attn: Evan Fleck, Esq. and Nelly Almeida, Esq.) and Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, Wilmington, DE 19801 (Attn: Robert Dehney, Esq. and Joseph Barsalona II, Esq.), as counsel to the Crossholder Ad Hoc Committee; (f) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036 (Attn: Philip Dublin, Esq.), as counsel to the Second Lien Ad Hoc Committee; (g) Paul Hastings LLP, 200 Park Avenue, New York, New York 10166 (Attn: Michael Baker, Esq. and Shekhar Kumar, Esq.), as counsel to the DIP Agent and First Lien Agent; (h) Pryor Cashman LLP, 7 Times Square, New York, New York 10036 (Attn: Seth Lieberman, Esq.), as counsel to the successor Second Lien Agent; (i) Vinson & Elkins LLP, 1114 Avenue of the Americas, 32nd Floor, New York, New York 10036 (Attn: David Meyer, Esq.), as counsel to the Consenting Sponsors; and (j) the Banks (collectively, the "**Notice Parties**").  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).

63.     The Debtors respectfully submit that no further notice is required.   No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of the Interim and Final

Orders granting the relief requested herein and such other and further relief as the Court may deem

just and appropriate.

Dated:  February 12, 2020
        Wilmington, Delaware

                              /s/ Zachary I. Shapiro
                              RICHARDS, LAYTON & FINGER, P.A.
                              Daniel J. DeFranceschi (No. 2732)
                              Zachary I. Shapiro (No. 5103)
                              One Rodney Square
                              920 N. King Street
                              Wilmington, Delaware 19801
                              Telephone: (302) 651-7700
                              Facsimile:  (302) 651-7701

                              -and-

                              WEIL, GOTSHAL & MANGES LLP
                              Ray C. Schrock, P.C. (*pro hac vice* pending)
                              David N. Griffiths (*pro hac vice* pending)
                              Andriana Georgallas (*pro hac vice* pending)
                              767 Fifth Avenue
                              New York, New York  10153
                              Telephone:  (212) 310-8000
                              Facsimile: (212) 310-8007

                              *Proposed Attorneys for Debtors*
                              *and Debtors in Possession*