# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x

|  |  |  |
|---|---|---|
| **In re** | : | **Chapter 11** |
|  | : |  |
| **RENTPATH HOLDINGS, INC.,** *et al.*, | : | **Case No. 20– 10312 (BLS)** |
|  | : |  |
| Debtors.[1] | : | **(Jointly Administered)** |
|  | : |  |
|  | : | Objection Deadline: March 5, 2020 at 4:00 p.m. (ET) |
|  | : | Hearing Date: March 12, 2020 at 10:00 a.m. (ET) |

---------------------------------------------------------- x

## MOTION OF DEBTORS FOR
## ENTRY OF AN ORDER (I) APPROVING (A)
## BIDDING PROCEDURES, (B) DESIGNATION OF
## STALKING HORSE BIDDER AND STALKING
## HORSE BID PROTECTIONS, (C) SCHEDULING AUCTION
## AND SALE HEARING, (D) FORM AND MANNER OF NOTICE
## OF SALE, AUCTION, AND SALE HEARING, AND (E) ASSUMPTION
## AND ASSIGNMENT PROCEDURES AND (II) GRANTING RELATED RELIEF

RentPath Holdings, Inc. and its debtor subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):[2]

### Preliminary Statement

1.      The Debtors are pleased to report that, after considerable deliberation, extensive negotiations, and multiple rounds of revisions of terms, the Debtors have entered into a

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: RentPath Holdings, Inc. (1735); RentPath, LLC (7573); Consumer Source Holdings LLC (8150); Discover Home Network, LLC (4311); Easy Media, LLC (5455); Electronic Lead Management, Inc. (4986); Electronic Lead Management MA, Inc. (3113); Electronic Lead Management VA, Inc. (7698); Live Response Solutions Holdings, LLC (0462); Live Response Solutions, LLC (5120); Viva Group Brokerage, Inc. (7156); and Viva Group, LLC (0789).  The Debtors' mailing address is 950 East Paces Ferry Road NE, Suite 2600, Atlanta, Georgia 30326.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration, the Stalking Horse Agreement and the Bidding Procedures, each as defined herein.

stalking horse purchase agreement (the "**Stalking Horse Agreement**") with CSGP Holdings, LLC (the "**Stalking Horse Bidder**"), an affiliate of CoStar Group, Inc., a commercial real estate information company.  The Stalking Horse Agreement is the result of the Debtors' extensive Prepetition Sale Process and contemplates a value-maximizing transaction pursuant to a going concern sale of the Debtors' assets (the "**Assets**") for an aggregate purchase price equal to $587.5 million in cash (the "**Stalking Horse Cash Consideration**"), plus certain assumed liabilities.  The Stalking Horse Agreement is attached hereto as **<u>Exhibit B</u>** and is subject to higher or otherwise better offers as described herein.

2.      Prior to the Petition Date, the Debtors also proactively engaged in constructive negotiations and discussions with an ad hoc committee of crossholder lenders holding first lien claims and second lien claims, an ad hoc group of lenders holding Second Lien Claims, and the Company's equity sponsors. Following months of good faith, arms'-length negotiations with such parties, on February 11, 2020, the Company executed a restructuring support agreement (the "**RSA**") with two groups of lenders, a crossholder ad hoc committee of first lien and second lien lenders (collectively, the "**Crossholder Ad Hoc Committee**") and an ad hoc committee of second lien lenders (the "**Second Lien Ad Hoc Committee**" and, together, with the Crossholder Ad Hoc Committee and other lenders that may sign joinders to the RSA, the "**Consenting Creditors**"), and the Company's equity sponsors, Regal Holdco LP (an affiliate of Providence Equity Partners LLC) and Pittsburgh Holdings, L.P. (an affiliate of TPG Partners VI, L.P.) (Regal Holdco LP and Pittsburgh Holdings, L.P., collectively, the "**Consenting Sponsors**", and together with the Consenting Creditors, the "**RSA Parties**").  Pursuant to the RSA, the Consenting Creditors have agreed to backstop the Debtors' Sale Process (as defined below) by submitting a binding credit bid in the amount of $492.7 million (the "**Credit Bid**").  The Credit Bid is binding and irrevocable

until (x) the Court enters an order approving a third-party bid and (y) if the Credit Bid is designated as the Back-Up Bid, the Back-Up Bid Termination Date (as defined in the Bidding Procedures) has occurred.

3. As set forth in greater detail in the Jimenez Declaration (as defined below), the Company conducted an extensive and robust prepetition marketing, solicitation, and sale process over seven (7) months, which commenced in July 2019 and ran through the commencement of these chapter 11 cases (the "**Prepetition Sale Process**"). With the prepetition marketing process in mind, and in an effort to maximize value for all stakeholders, the Debtors and their advisors have developed postpetition marketing, bidding and auction procedures (the "**Postpetition Sale Process**") for the orderly marketing and sale of the Debtors' business (the "**Bidding Procedures**"). The Bidding Procedures are designed to promote a competitive and robust bidding process, and are intended to generate the greatest level of interest in the Debtors' business—higher or otherwise better than the Stalking Horse Agreement.

4. The Bidding Procedures provide the Debtors with flexibility to solicit proposals, negotiate transactions, hold an auction, and, subject to the terms of the RSA, proceed to consummate a potential sale transaction (a "**Sale Transaction**"), all while protecting the due process rights of all interested parties and ensuring that there is a full and fair opportunity to review and consider proposed transactions. The Debtors propose to establish the following key dates and deadlines for the sale process:

3

| Key Event | Deadline |
|---|---|
| Deadline to Submit Bids | **March 25, 2020 at 4:00 p.m. (prevailing Eastern Time)** |
| Deadline for Debtors to Notify Bidders of Status as Qualified Bidders | **March 30, 2020 at 4:00 p.m. (prevailing Eastern Time)** |
| Auction to be held if the Debtors receive more than one Qualified Bid, to be conducted at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 | **March 31, 2020 at 10:00 a.m. (prevailing Eastern Time)** |
| Deadline to File Notice and Identities of Successful Bid(s) and Back-Up Bid(s) | **April 3, 2020 at 4:00 p.m. (prevailing Eastern Time)** |
| Deadline to file objections to (i) Sale Transaction, (ii) cure costs, and/or (iii) adequate assurance of future performance | **May 18, 2020 at 4:00 p.m. (prevailing Eastern Time)** |
| Deadline to reply to objections to (i) Sale Transaction, (ii) cure costs, and/or (iii) adequate assurance of future performance | **May 26, 2020 at 4:00 p.m. (prevailing Eastern Time)** |
| Sale Hearing[3] | **May 29, 2020 at [●] [a.m./p.m.] (prevailing Eastern Time)** |

5.      Given the exigencies of the Debtors' business operations and financial condition, it is vital that the Debtors exit chapter 11 in an efficient manner.  Accordingly, the Debtors request approval of a comprehensive set of procedures that will facilitate a potential Sale Transaction in a timely and efficient manner.

### Background

6.      On the date hereof, each Debtor commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

---

[3]     Subject to the Court's approval.

4

7.      The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**") and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

8.      Contemporaneously herewith, the Debtors are seeking approximately $74.1 million of debtor-in-possession financing to support the Debtors' operations throughout the pendency of these chapter 11 cases.

9.      Information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the Declaration of Richard Martin in Support of Debtors' Chapter 11 Petitions and First Day Relief, sworn to on the date hereof (the "**Martin Declaration**"), which has been filed with the Court contemporaneously herewith and is incorporated by reference herein.

## Jurisdiction

10.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

11.      Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

RLF1 22910658v.1

## Relief Requested

12.    By this Motion, pursuant to sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014, and Local Rules 2002-1, 6004-1, and 9006-1, the Debtors seek entry of the "**Bidding Procedures Order**," substantially in the form attached hereto as **Exhibit A**:

    i.    authorizing and approving the Bidding Procedures substantially in the form attached to the Bidding Procedures Order as **Exhibit 1**;

    ii.    designating and approving the Stalking Horse Bidder and the Stalking Horse Bid Protections (as defined herein) for the Stalking Horse Bidder in accordance with the terms and conditions set forth in the Stalking Horse Agreement and the Bidding Procedures;

    iii.    setting the deadline for potential bidders to submit a proposal to purchase the Debtors' business (the "**Bid Deadline**"), authorizing and scheduling an auction (the "**Auction**"), and scheduling a hearing with respect to the approval of a proposed sale transaction (which shall be a joint hearing to confirm the Debtors' plan of reorganization) (the "**Sale Hearing**");

    iv.    authorizing and approving the form and manner of notice of the sale of the Debtors' business, the Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "**Sale Notice**");

    v.    approving the procedures set forth in the Bidding Procedures Order (the "**Assumption and Assignment Procedures**") for the assumption and assignment of the Debtors' executory contracts and unexpired leases (the "**Assigned Contracts**") and the determination of the amount necessary to cure any defaults thereunder (the "**Cure Costs**");

    vi.    authorizing and approving the form and manner of notice to each relevant non-Debtor counterparty to an executory contract or unexpired lease (collectively, the "**Contract Counterparties**") regarding the Debtors' potential assumption and assignment of certain executory contracts and unexpired leases of the Debtors and of the Debtors' calculation of the Cure Costs, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "**Cure Notice**"); and

    vii.    granting related relief.

6

**Prepetition Marketing Process**

13.     In 2017 and 2018, a shifting competitive landscape and increased competition from numerous sources resulted in declining revenues and necessitated an increase in marketing spend and promotions to maintain the flow of leads, leaving the Debtors with limited liquidity and at the risk of default under its debt documents by early 2020.  In 2019, it became apparent to the Debtors that their revenue and cash flow generating capacity would not be sufficient to service their outstanding debt, comply with their secured loan financial covenants, and maintain the liquidity necessary to operate their business and preserve their long-term viability and enterprise value.  The Debtors, with the assistance of Weil, Gotshal & Manges LLP ("**Weil**") and Moelis & Company LLC ("**Moelis**"), began its formal review of strategic alternatives with respect to its capital structure and diminishing near-term liquidity, exploring various ways to inject new capital into its business and restructure its debt obligations with minimal disruption to its day-to-day operations.

14.     As described in the declaration of Carlos Jimenez, a Managing Director at Moelis, where he focuses on digital media, entertainment, and technology industries, filed concurrently herewith, in support of this Motion (the "**Jimenez Declaration**"), in July 2019, the Debtors and their advisors commenced a prepetition sale process (the "**Prepetition Sale Process**").  Moelis, on behalf of the Debtors, contacted over forty-three (43) potential investors, including strategic and financial buyers.  During this process, several interested investors executed confidentiality agreements and were provided with diligence.  In addition, many of the interested parties submitted due diligence question lists to Moelis and scheduled conference calls and in-person meetings with Moelis and the Company's management team.  Over the course of these discussions, Moelis and the Company continued negotiating with various bidders with the aim of

7

increasing the value of the bids received.  The deadline to submit initial bids was extended several times to continue negotiations with interested investors.  This Prepetition Sale Process culminated in the Stalking Horse Bid and the Credit Bid which provide the Debtors with the opportunity to pursue other higher or otherwise better offers while maintaining a path to emergence from chapter 11.

### Need for a Timely Sale Process

15.    The Debtors believe that the time periods set forth in the Bidding Procedures are reasonable and will provide parties with sufficient time and information to submit a bid for the Debtors' business.  In formulating the Bidding Procedures and time periods set forth therein, the Debtors balanced the need to provide adequate and appropriate notice to parties in interest and potential bidders with the need to quickly and efficiently run a sale process to maximize value.  To that end, the Bidding Procedures are designed to encourage all prospective bidders to submit bids at the outset of these chapter 11 cases to provide the highest or otherwise best available recoveries to the Debtors' stakeholders.

16.    The Debtors' formulation of the Bidding Procedures was also informed by the Prepetition Marketing Process.  Potential bidders have had, and will, in accordance with the Bidding Procedures, continue to have access to comprehensive information prepared by the Debtors and their advisors that is compiled in an electronic data room.  In light of the foregoing, the Debtors have determined that pursuing the Bidding Procedures is in the best interests of the Debtors' estates, will establish whether and to what extent a market exists for the Debtors' business, and provides interested parties with sufficient opportunity to participate.

## The Bidding Procedures

**A.      Overview**

17.      The Bidding Procedures are designed to promote a competitive and robust sale process for the Debtors' business.  If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids from potential bidders that constitute the highest or otherwise best offers for the Debtors' business on a timeline that is consistent with the milestones in the RSA, debtor-in-possession financing and Stalking Horse Agreement.  The Debtors believe that the time periods set forth in the Bidding, Procedures are reasonable and appropriate.  Under the proposed timeline, there will be approximately 42 days and 96 days, respectively, between the filing of this Motion and the Bid Deadline and between the filing of this Motion and service of process letters and the Sale Objection Deadline (each, as defined in the Bidding Procedures).  Potential bidders who have not previously conducted diligence on the Company's business will have immediate access, subject to the execution of an appropriate confidentiality agreement, to a substantial body of information regarding the Assets, including information gathered based upon specific due diligence requests of various petition bidders who participated in the prepetition sales process.

18.      The Bidding Procedures are attached to the Bidding Procedures Order and therefore are not restated herein in their entirety.  The Debtors will have the ability to alter the Bidding Procedures based upon the exigencies of a given situation if the Debtors determine, in their business judgment, in a manner consistent with their fiduciary duties and applicable law, and in consultation with certain parties as provided in the Bidding Procedures.  Pursuant to Local Rule 6004-1(c), certain of the key terms of the Bidding Procedures are highlighted in the chart below.[4]

---

[4]      To the extent that there is any inconsistency between the terms of the Bidding Procedures and the summary of such terms in this Motion, the terms of the Bidding Procedures shall control.

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| **Provisions Governing Qualification of Bidders and Qualified Bids**<br>Local Rule 6004-1(c)(i)(A)-(B) | **A.  Bid Deadline** – the deadline to submit a binding and irrevocable offer to acquire the Assets is **March 25, 2020 at 4:00 p.m. prevailing Eastern Time**<br><br>**B.  Potential Bidder Requirements** – To access the dataroom of the Debtors' material documents, a potential bidder (a "**Potential Bidder**") must submit:<br><br>    1. <u>Confidentiality Agreement</u>. An executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors (unless such party is already a party to an existing confidentiality agreement with the Debtors that is acceptable to the Debtors for this due diligence process, in which case such agreement shall govern).<br><br>    2. <u>Financial Wherewithal</u>. Sufficient information, as reasonably determined by the Debtors, to allow the Debtors to determine that the interested party (i) has the financial wherewithal to consummate the applicable Sale Transaction and (ii) intends to access the dataroom for a purpose consistent with the Bidding Procedures.<br><br>**C.  Qualified Bid Requirements** – The Debtors, in their reasonable judgment, will determine whether such bids may qualify as Qualified Bids.<br><br>    1. <u>Identity of Bidder</u>. A Qualified Bid must fully disclose, by their legal names, the identity of the Potential Bidder and each entity that will be participating in its bid, and the complete terms of any such participation.<br><br>    2. <u>Acquired Property</u>. A Qualified Bid must clearly identify in writing the particular Assets the Potential Bidder seeks to acquire from the Debtors, which Qualified Bid may include less than all or substantially all of the Assets.<br><br>    3. <u>Purchase Price</u>. A Qualified Bid must specify the price (the "**Purchase Price**") proposed to be paid for the Assets, which Purchase Price must include the sum of the Termination Payment.<br><br>    4. <u>Assumed Liabilities</u>.  A Qualified must clearly identify the particular liabilities, if any, the Bidder seeks to assume.<br><br>    5. <u>Form of Consideration</u>. Each Bid must indicate (a) whether it is an all-cash offer (including confirmation that the cash component of the Bid is based in U.S. Dollars) or consists of certain non-cash components, such as a credit bid and/or the assumption of liabilities and  (b) the allocation of the Purchase Price among the Assets to be acquired and the liabilities to be assumed, if applicable.<br><br>    6. <u>Credit Bid</u>. Persons or entities holding a perfected security interest in the Assets may, pursuant to section 363(k) of the Bankruptcy Code, seek to submit a credit bid on such Assets, to the extent permitted by applicable law, any Bankruptcy Court orders, and the documentation governing the Debtors' prepetition or postpetition secured credit facilities, and subject to any applicable limitations set forth in the Prepetition Intercreditor Agreement.[5]<br><br>        a.  <u>Direction Letter</u>.  To the extent applicable, a credit bid must include a copy of the direction by the applicable lenders to the applicable agent to authorize the submission of such credit bid.<br><br>        b.  <u>Cash Requirements</u>.  If the credit bid is submitted for any portion of the Assets, such Bid shall include an amount sufficient to pay the Termination Payment in cash.  Each |

---

[5]      "**Prepetition Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of December 17, 2014, among Royal Bank of Canada, as first lien representative, and Wilmington Savings Fund Society FSB, as successor second lien representative.

credit bid must include a commitment to provide cash consideration sufficient to pay in full all costs associated with winding down the Debtors' chapter 11 cases.

7. <u>Joint Bids</u>. The Debtors will be authorized to approve joint Bids, including joint credit bids, in their reasonable discretion on a case-by-case basis.

8. <u>Deposit</u>. A Qualified Bid must be accompanied by a good faith deposit in the form of cash in an amount equal to ten percent (10%) of the Purchase Price.

    a. A deposit is not required for the credit bid portion of Qualified Bid.

    b. To the extent a Qualified Bidder increases the Purchase Price before, during, or after the Auction, the Debtors reserve the right to require that such Qualified Bidder adjust its Deposit so that it equals ten percent (10%) of the increased Purchase Price.

    c. Each Successful Bidder's deposit (if any) shall be applied against the portion of the Purchase Price of its Successful Bid upon the consummation of the applicable Sale Transaction.

    d. A deposit of any Qualified Bidder will be forfeited to the Debtors if (a) the Qualified Bidder attempts to modify, amend, or withdraw its Qualified Bid, except as permitted herein or with the Debtors' written consent, during the time the Qualified Bid remains binding and irrevocable or (b) the Qualified Bidder is selected as a Successful Bidder and fails to enter into the required definitive documentation or to consummate the applicable Sale Transaction in accordance with the Bidding Procedures.

9. <u>Proposed Asset Purchase Agreement</u>. A Qualified Bid must include, in both PDF and MS-WORD format, an executed purchase agreement (the "**Proposed Purchase Agreement**"), together with a copy of the same that has been marked against the Stalking Horse Agreement, a copy of which is located in the dataroom.

10. <u>Employee Obligations</u>. A Qualified Bid must specify (i) whether the Qualified Bidder intends to hire all of the Debtors' employees and (ii) expressly propose the treatment of the Debtors' prepetition compensation, incentive, retention, bonus or other compensatory arrangements, plans, or agreements, including, offer letters, employment agreements, consulting agreements,

severance arrangements, retention bonus agreements, change in control arrangements, retiree benefits, and any other employment related agreements.

11.  Designation of Contracts and Leases.  A Qualified Bid must identify with particularity each executory contract and unexpired lease, the assumption and assignment of which is a condition to closing the applicable Sale Transaction.

12.  Financial Information. A Qualified bid must include the following:

   a.  A Qualified Bid must contain such financial and other information that allows the Debtors to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the applicable Sale Transaction, including:

      (i)   without limitation, such financial and other information setting forth the Potential Bidder's willingness to perform under any contracts that are assumed and assigned to such party,

      (ii)  current financial statements or similar financial information certified to be true and correct as of the date thereof,

      (iii) proof of financing commitments (if needed) to close the applicable Sale Transaction (not subject to, in the Debtors' sole discretion, any unreasonable conditions),

      (iv)  contact information for verification of such information, including any financing sources, and

      (v)   any other information reasonably requested by the Debtors necessary to demonstrate that the Potential Bidder has the ability to close the applicable Sale Transaction in a timely manner.

13.  Representations and Warranties. A Qualified Bid must include the following representations and warranties:

   a.  Statement that Potential Bidder had opportunity to conduct all due diligence regarding the applicable Assets prior to submitting bid,

   b.  Statement that Potential Bidder relied solely upon its own due diligence in making its bid,

   c.  Statement that the Potential Bidder agrees to serve as Back-Up Bidder, if its bid is selected as the second or third highest or best bid after the Successful Bid with respect to the applicable Assets,

   d.  Statement that the Potential Bidder has not engaged in any collusion with respect to the submission of its bid,

   e.  Statement that all proof of financial ability to consummate the applicable Sale Transaction in a timely manner and all information provided to support adequate assurance of future performance is true and correct, and

   f.  Statement that the Potential Bidder agrees to be bound by the terms of the Bidding Procedures.

14.  Required Approvals.

   a.  If applicable, statement that Potential Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and pay any related fees.

   b.  If applicable, explanation or evidence of Potential Bidder's plan and ability to obtain all governmental and regulatory approvals to operate or own the Assets, including, an explanation from the bidder's legal counsel to the Debtors' legal counsel such Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as

12

|  | | |
|---|---|---|
|  |  | soon as reasonably practicable, and in no event later than the time period contemplated in the Proposed Purchase Agreement. |
|  | c. | Bid is reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors in consultation with the professionals to the Crossholder Ad Hoc Committee. |
|  | 15. | **Authorization.** A Qualified Bid must include evidence of corporate authorization with respect to the submission, execution, and delivery of a bid, participation in the Auction, and closing the Sale Transaction(s) contemplated by the applicable Proposed Purchase Agreement. |
|  | 16. | **Other Requirements.** |
|  | a. | A Qualified Bidder must agree to serve as a back-up bidder if such bidder's Qualified Bid is selected as the second or third highest or best bid after the Successful Bid with respect to the applicable Assets. |
|  | b. | A Qualified Bid must be binding, unconditional, and irrevocable until the first business day following the close of any Sale Transaction(s) with the Successful Bidder(s) for the applicable Assets. |
|  | c. | Statement that the bid does not entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement, and a waiver of any substantial contribution administrative expense claims under section 503(b) of the Bankruptcy Code related to the bidding process. |
|  | d. | Provide contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the Bid submitted by the Potential Bidder. |
|  | e. | Written evidence of available cash, a commitment for financing (not subject to any conditions other than those expressly set forth in the Proposed Purchase Agreement) and such other evidence of ability to consummate the transaction contemplated by the Proposed Purchase Agreement, the Bidding Procedures Order, and the Bidding Procedures, as acceptable in the Debtors' business judgment. |
|  | f. | Provide the identity of each entity that will be participating in connection with such Bid and taking ownership of the and a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed and to consummate the transaction contemplated by the Proposed Purchase Agreement |
|  | g. | Covenant to cooperate with the Debtors to provide pertinent factual information regarding the Potential Bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements. |
|  | h. | Detailed analysis of the value of any non-cash component of the bid, if any, and back-up documentation to support such value. |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder** Local Rule 6004-1(c)(i)(C) | 1. | **Termination Payment.** The Stalking Horse Bidder shall be entitled to payment of a break-up fee in the amount of 2.0% of the Stalking Horse Cash Consideration ($11.75mm). |

13

| | |
|---|---|
| **Modification of Bidding and Auction Procedures**<br>Local Rule 6004-1(c)(i)(D) | 1. The Debtors may extend the Bid Deadline without further order of the Bankruptcy Court in consultation with the Stalking Horse Bidder and counsel to the Crossholder Ad Hoc Committee.<br><br>2. The Debtors reserve the right to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualified Bid.<br><br>3. The Debtors reserve the right to and may increase or decrease the Minimum Overbid Amount at any time during the Auction.<br><br>4. The Debtors may, in the exercise of their business judgment, adopt rules for the Auction consistent with the Bidding Procedures and the Bidding Procedures Order that the Debtors, in consultation with the professionals of the Crossholder Ad Hoc Committee, reasonably determine to be appropriate to promote a competitive auction.<br><br>5. The Sale Hearing may be adjourned or continued to a later date by the Debtors, after consultation with the Stalking Horse Bidder and counsel to the Crossholder Ad Hoc Committee, by sending notice prior to or making an announcement at the Sale Hearing. No further notice of any such adjournment or continuance will be required to be provided to any party.<br><br>6. The Debtors may elect to seek approval of a Sale Transaction in advance of the joint confirmation and Sale Hearing.  To the extent the Debtors determine to do so, notice will be provided for alternative hearing dates and related timelines.<br><br>7. To the extent the Debtors seek to pursue any Sale Transactions outside of a Plan, the Debtors shall file a notice of a hearing to approve the applicable Sale Transaction and parties in interest shall be provided at least ten (10) calendar days to object to such sale; provided, that, the Debtors may seek an adjournment of such hearing as the Debtors deem appropriate in the exercise of their reasonable business judgment.<br><br>8. The Debtors may extend the Sale Objection deadline, as the Debtors deem appropriate in the exercise of their reasonable business judgment. |
| **Closing with Alternative Backup Bidders**<br>Local Rule 6004-1(c)(i)(E) | 1. The Debtors may identify which Qualified Bid(s) constitute the second highest or otherwise best bid(s) and, if applicable, the third highest or otherwise best bid(s) and deem such second and third highest or otherwise best bid(s) each a Back-Up Bid.<br><br>2. Back-Up Bid(s) shall remain open and irrevocable until the earliest to occur of:<br><br>   a. applicable "outside date" for consummation of the Sale Transaction set forth in the Back-Up Bid,<br><br>   b. consummation of the Sale Transaction with a Successful Bidder, and<br><br>   c. release of such Back-Up Bid by the Debtors in writing (such date, the "**Back-Up Bid Expiration Date**").<br><br>3. If a Sale Transaction with a Successful Bidder is terminated prior to the Back-Up Bid Expiration Date, the Back-Up Bidder shall be deemed a Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were a Successful Bid.<br><br>4. If an Auction is held, the Debtors may determine, in their business judgment, to change the designation of the Credit Bid as a Back-Up Bid in accordance with the Bidding Procedures. |

14

|  | 5. If the Debtors designate the Credit Bid as the Successful Bid, the Requisite Consenting First Lien Creditors (as defined in the Credit Bid) may withdraw the Successful Bid and instead serve as a Back-Up Bid; provided, that, the Requisite Consenting First Lien Creditors must provide written notice of their election to exercise such right to the Debtors (with email from counsel to the Crossholder Ad Hoc Committee to counsel to the Debtors being sufficient) within two business days after the date that the Debtors designate the Credit Bid as the Successful Bid following the Auction. |
|---|---|
| **Provisions Governing the Auction** Local Rule 6004-1(c)(ii) | If the Debtors do not receive any Qualified Bids (other than the Stalking Horse Bid) for any of the Assets on the same or better terms as provided in the Stalking Horse Bid by the Bid Deadline, the Debtors will not conduct the Auction and shall file a notice with the Bankruptcy Court by March 30, 2020 at 4:00 p.m. (prevailing Eastern Time) indicating that the Auction has been cancelled.  The Debtors shall also publish such notice on the website of their claims and noticing agent, Prime Clerk, LLC. If no other Qualified Bid is received, (i) the Stalking Horse Bidder shall be deemed the Successful Bidder and the Stalking Horse Bid shall be deemed a Successful Bid and (ii) the Credit Bidder shall be deemed a Back-Up Bidder and the Credit Bid shall be deemed a Back-Up Bid.

If the Debtors receive any Qualified Bids (other than the Stalking Horse Bid and the Credit Bid), the Debtors will conduct the Auction on March 31, 2020 beginning at 10:00 a.m. (prevailing Eastern Time) at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, or such other date as may be determined by the Debtors in consultation with the Stalking Horse Bidder and counsel to the Crossholder Ad Hoc Committee.  The Auction will be conducted openly and shall be transcribed or recorded.

**Participants and Attendees**:
  A.  Only Qualified Bidders eligible to participate in Auction.

  B.  Professionals and/or other representatives of the Debtors and of any official committee of unsecured creditors shall be permitted to attend and observe the Auction.

  C.  Any creditor of the Debtors may attend and observe the Auction; provided, that such creditor provides the Debtors with written notice of its intention to attend the Auction on or before one (1) business day prior to the Auction, which written notice shall be sent to proposed counsel for the Debtors via electronic mail.

  D.  Qualified Bidder(s) must confirm on record that have not engaged in any collusion and that its Qualified Bid represents a binding, good faith, bona fide offer.

**Auction Procedures**:
  A.  Open Auction. The Auction will be conducted openly and shall be transcribed or recorded.

  B.  Baseline Bids.  Bidding for the Assets will start with the highest or otherwise best Purchase Price and/or terms received as determined by the Debtors in their sole discretion.

  C.  Minimum Overbid.  Bidding shall begin in the amount of the Minimum Overbid Amount.  The Debtors have the right to increase or decrease the Minimum Overbid Amount at any time during the Auction.

  D.  Disclosure of Bids. All material terms of each Qualified Bid submitted in response to any successive bids made at the Auction will be disclosed to all other bidders. |

**B.**    <u>**The Stalking Horse Bid and Stalking Horse Bid Protections**</u>

19.    The Debtors request approval (i) of the designation of the Stalking Horse Bidder and Stalking Horse Bid on the terms provided in the Stalking Horse Agreement and (ii) of standard stalking horse protections, in particular, the payment of a break-up fee in an amount equal to two percent (2%) of the Stalking Horse Cash Consideration (*i.e.*, $11,750,000) (the "**Termination Payment**") as an administrative expense in the event that the Stalking Horse Bid is not selected as the winning bidder or the Debtors consummates one or more sale transactions for the Assets with one or more other bidders and  and any initial or subsequent overbid amounts (collectively, the "**Stalking Horse Bid Protections**").

20.    In the event the Stalking Horse Bidder is not the winning bidder at the Auction (a "**Successful Bidder**"), as described in more detail below, the Stalking Horse Bid will terminate and the Stalking Horse Bidder will not be obligated to serve as a "back-up" bidder (a "**Back-Up Bidder**").

21.    Given the Debtors' need to maximize value for creditors through a timely and efficient marketing and sale process, the ability to designate a Stalking Horse Bidder and offer such bidder Stalking Horse Bid Protections is justified, appropriate, and essential.

22.    In accordance with Local Rule 6004-1(b), the chart below summarizes the significant terms of the Stalking Horse Agreement.

| MATERIAL TERMS OF THE STALKING HORSE AGREEMENT[6] | |
|---|---|
| **Purchase Price** | The consideration is $587,500,000.00 in cash (the "**Stalking Horse Cash Consideration**") and the assumption of the Assumed Liabilities. *See* Stalking Horse Agreement § 2.04(a) |

---

[6] All references to sections or schedules in this summary refer to the Stalking Horse Agreement, unless otherwise specified.

| | |
|---|---|
| **Acquired Assets** | The Acquired Assets are:<br><br>(a)    all Furnishings and Equipment;<br><br>(b)    the Leases set forth on Schedule 1.01 under the heading "Assumed Leases", other than those leases that expire or that are terminated prior to Closing (the "**Assumed Leases**"), together with (to the extent of the Sellers' interest therein) the buildings, fixtures and improvements located on or attached to such real property, and all rights arising therefrom, and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto, subject to the rights of the applicable landlord (including rights to ownership or use of such property) under the Assumed Leases, subject to the approval of the Bankruptcy Court of the assignment and assumption thereof;<br><br>(c)    all accounts or notes (if such exist) receivable, and any security, claim, remedy or right related to any of the foregoing, if applicable;<br><br>(d)    all rights under those Contracts set forth on Schedule 1.01 under the heading "Transferred Contracts", other than those Contracts that expire or that are terminated prior to the Closing (such Contracts, together with the Assumed Leases, the "**Transferred Contracts**"), subject to the approval of the Bankruptcy Court of the assignment and assumption thereof;<br><br>(e)    all deposits, including customer deposits and security deposits for rent, electricity, telephone or otherwise, and prepaid charges, expenses, advance payments, claims, refunds, rights of recovery, rights of set-off, rights of recoupment, charges, sums and fees (other than any deposits, prepaid charges, expenses, advance payments, claims, refunds, rights of recovery, rights of set-off, rights of recoupment, charges, sums and fees paid to the extent relating to any Excluded Assets and adequate assurance deposits posted in accordance with section 366 of the Bankruptcy Code), including rebates, payments, reimbursements or refunds to the extent relating to Taxes that are not Excluded Taxes;<br><br>(f)    all of the Seller Intellectual Property;<br><br>(g)    all documents and information that are related to the Business, including documents and information relating to products, services, marketing, advertising, promotional materials, Seller Intellectual Property, personnel files for Transferred Employees and all files, customer files and documents (including credit information), supplier lists, records, literature and correspondence, all Tax Returns and other Tax records of Reorganized RentPath, but excluding (i) personnel files for Employees who are not Transferred Employees, (ii) such files as may be required under applicable Law regarding privacy and (iii) any documents to the extent related to or required to realize the benefits of any Excluded Assets; <u>provided</u>, that Sellers shall have continued access to such documents as |

are necessary to administer the Bankruptcy Case and Sellers may retain copies of any documents as necessary;

(h)    all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to the Sellers or to the extent affecting any Acquired Assets, to the extent assignable, other than any warranties, representations and guarantees to the extent pertaining to any Excluded Assets or rights and defenses to the extent pertaining to any Excluded Liabilities;

(i)    all Permits of the Sellers Related to the Business and assignable to the Buyer under applicable Law (and, for the avoidance of doubt, solely to the extent the applicable Governmental Authority consents to or otherwise approves the assignment or transfer of the applicable Permit, if such consent or approval is required), (x) including the licenses set forth on Schedule 1.01 under the heading "Licenses" and (y) excluding the Permits listed on Schedule 1.01 under the heading "Excluded Permits";

(j)    all goodwill and other intangible assets associated with the Business, including customer and supplier lists and the goodwill associated with the Marks included in the Seller Intellectual Property;

(k)    those items set forth on Schedule 1.01 under the heading "Acquired Assets";

(l)    all avoidance, fraudulent transfer, preference, or similar claims, causes of action, rights, or proceedings of any Seller (including, under chapter 5 of the Bankruptcy Code, the Uniform Fraudulent Transfer Act or the Uniform Fraudulent Conveyance Act) enacted by any state, or any other similar state or Federal law against any contract counterparties to Transferred Contracts and vendors solely to the extent related or attributable to the Acquired Assets (including any Transferred Contracts); and

(m)    to the extent transferable, all insurance policies and binders (including all director and officer insurance policies and any tail insurance policies), as well as all related insurance benefits, including rights and proceeds, arising from or relating to the Business, the Acquired Assets or the Assumed Liabilities, but excluding (x) claims pending under any insurance policies to the extent relating to any Excluded Assets and (y) any directors and officers insurance policies (including tail policies);

*See* Stalking Horse Agreement § 2.01

| | |
|---|---|
| **Assumed Liabilities** | The Stalking Horse Bidder will assume the following liabilities:<br><br>(a)    all Liabilities under the Transferred Contracts to the extent arising on or after the Closing Date, except to the extent such Liabilities are Cure Costs, accrue or relate to the operation of the Business prior to the Closing Date or relate to any failure to perform, improper performance, warranty |

18

or other breach, default or violation by any Seller prior to the Closing Date;

(b)    all post-petition accounts payable (other than Cure Costs) incurred in the ordinary course of business existing on the Closing Date and Related to the Business (including, for the avoidance of doubt, (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable) that (x) have arisen in the ordinary course of business and (y) remain unpaid;

(c)    all Indebtedness set forth on Schedule 1.01 under the heading "Assumed Liabilities";

(d)    all Liabilities for any and all Taxes of Reorganized RentPath or with respect to the Acquired Assets for taxable periods (or portions thereof) beginning on the day after the Closing Date, determined as if the taxable year of Reorganized RentPath ended as of the end of the day on the Closing Date;

(e)    all Liabilities relating to or arising out of the ownership or operation of the Business or any Acquired Asset by the Buyer from and after the Closing Date to the extent relating to or arising out of the ownership or operation of the Business or any Acquired Asset prior to the Closing (whether or not such Liabilities arise from Claims first asserted after the Closing) that are not discharged, released and/or exculpated (and enjoined pursuant to the Plan and/or Confirmation Order

(f)    all Liabilities relating to or arising out of any Employee ceasing to be employed (i) by the Sellers at any time prior to the Closing Date at the written request of Buyer to the extent permissible under the Law or (ii) as a result of such Employee not receiving an offer of employment from the Buyer pursuant to and in accordance with Section 5.10(b).

*See* Stalking Horse Agreement § 2.02

| | |
|---|---|
| **Agreements with Management or Key Employees** Local Rule 6004-1(b)(iv)(B) | At least ten (10) days prior to the Closing Date (or no later than two days following an Employee's hire date if such date is less than ten days prior to the Closing Date), the Buyer shall deliver, in writing, an offer of employment to each Employee subject to such Employee's continued employment immediately prior to the Closing to commence immediately following the Closing Date. <br><br> The Buyer shall provide to each Transferred Employee for one year following the Closing Date (i) compensation substantially comparable to compensation provided to such Transferred Employees prior to the Closing Date and (ii) employee benefits that are substantially comparable to those provided to similarly situated employees of the Buyer. <br><br> In addition, the Buyer agrees to provide severance to certain members of senior management during the one (1) year period following the Closing Date. <br><br> *See* Stalking Horse Agreement §§ 5.10-5.11 |
| **Releases** Local Rule 6004-1(b)(iv)(C) | The Confirmation Order shall contain (a) mutual releases from the Seller and their Affiliates and the Buyer and its Affiliates, to the fullest extent permitted by law, from all claims relating to, among other things, the negotiation, execution, and implementation of this Agreement and (b) customary release, exculpation and injunction provisions, and such provisions shall apply to the Buyer and Buyer's Representatives to the fullest extent permitted under applicable Law. <br><br> *See* Stalking Horse Agreement § 8.16 |
| **Private Sale/No Competitive Bidding** Local Rule 6004-1(b)(iv)(D) | This Motion and the Stalking Horse Agreement contemplate an auction. <br><br> *See* Stalking Horse Agreement § 5.06(c)(ii) |
| **Closing and Other Deadlines** Local Rule 6004-1(b)(iv)(E) | The closing shall take place at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York at 10:00 a.m. (Eastern time) on (a) the second business day following the satisfaction or, to the extent permitted, waiver of the conditions set forth in Article VI (other than those conditions that require delivery of a document or certificate or the taking of an action at the Closing, but subject to the satisfaction or, to the extent permitted, waiver of those conditions at the Closing), or (b) such other date or at such other time or place as the Company and the Buyer may mutually agree in writing. <br><br> *See* Stalking Horse Agreement § 4.1 |
| **Good Faith Deposit** Local Rule 6004-1(b)(iv)(F) | Upon execution, to account of a reverse antitrust fee, the Buyer shall deposit $58.75 million in cash into an escrow account.  The fee is payable to the Seller if the Stalking Horse Agreement is terminated in either scenario: <br><br> (a)    termination by the Buyer or the Sellers following the Outside Date (6 months from the date of signing, subject to two potential three-month |

| | |
|---|---|
| | extensions) due to an antitrust related restraint or if the applicable waiting period under the HSR Act has not expired or been terminated.<br><br>   (b)   termination by the Buyer or the Sellers upon the imposition of a final, non-appealable antitrust restraint permanently prohibiting the transaction.<br><br>Upon closing of the transaction, the Break-Up Fee will be credited towards payment by the Buyer of the Purchase Price.<br><br>*See* Stalking Horse Agreement § 7.04 |
| **Interim Arrangements with Stalking Horse Bidder**<br>Local Rule 6004-1(b)(iv)(G) | None. |
| **Use of Proceeds**<br>Local Rule 6004-1(b)(iv)(H) | None. |
| **Tax Exemption**<br>Local Rule 6004-1(b)(iv)(I) | The corporation, limited liability, or liquidating trust for the purposes of winding down the chapter 11 cases (the "**Wind Down Co.**") will be responsible for and pay all documentary, stamp, transfer (including real property transfer), motor vehicle registration, sales, use, value added, excise and other similar non-income Taxes and all filing and recording fees (and any interest, penalties and additions with respect to such Taxes and fees) arising from or relating to the consummation of the transactions contemplated by the Stalking Horse Agreement (collectively, "**Transfer Taxes**"), regardless of the Party on whom liability is imposed under the provisions of applicable Tax Laws relating to such Transfer Taxes.<br><br>The Parties will consult and cooperate on a reasonable basis in preparing and timely filing all Tax Returns with respect to any Transfer Taxes and obtaining any available exemptions from or reductions in such Transfer Taxes.<br><br>To the extent the Buyer or any Affiliate of Buyer (including, after the Closing, Reorganized RentPath) is required by applicable Tax Laws to pay any Transfer Taxes to a Governmental Authority, Wind Down Co. will remit an amount equal to such Transfer Taxes to the Buyer not less than five Business Days prior to the due date for such payment.<br><br>*See* Stalking Horse Agreement § 5.09 |
| **Record Retention**<br>Local Rule 6004-1(b)(iv)(J) | The books and records remaining with the Seller include:<br><br>   (a)   books and records that Sellers are required by Law to retain or to the extent such books and records relate to Excluded Assets or Excluded Liabilities; |

| | |
|---|---|
| | (b)    documents relating to proposals to acquire the Business by Persons other than the Buyer; and<br><br>(c)    personnel files for Employees who are not Transferred Employees.<br><br>*See* Stalking Horse Agreement § 2.09 |
| **Sale of Avoidance Actions**<br>Local Rule 6004-1(b)(iv)(K) | Buyer is acquiring all avoidance, fraudulent transfer, preference, or similar claims, causes of action, rights, or proceedings of any Seller (including, under chapter 5 of the Bankruptcy Code, the Uniform Fraudulent Transfer Act or the Uniform Fraudulent Conveyance Act).<br><br>*See* Stalking Horse Agreement § 2.01 |
| **Requested Findings as to Successor Liability**<br>Local Rule 6004-1(b)(iv)(L) | None. |
| **Sale Free and Clear of Unexpired Leases**<br>Local Rule 6004-1(b)(iv)(M) | None. |
| **Credit Bid**<br>Local Rule 6004-1(b)(iv)(N) | None. |
| **Relief from Bankruptcy Rule 6004(h)**<br>Local Rule 6004-1(b)(iv)(O) | None. |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder**<br>Local Rule 6004-1(c)(i)(C) | Subject to entry of the Bidding Procedures Order and those conditions specified in the Stalking Horse Agreement, including those conditions contained in Section 5.6 thereof, the Stalking Horse Bidder shall be entitled to payment of a break-up fee in the amount of 2% of the Stalking Horse Cash Consideration ($11.75 million).<br><br>*See* Stalking Horse Agreement § 5.06. |

## Assumption and Assignment Procedures

23.     The Assumption and Assignment Procedures set forth in the Bidding Procedures Order will, among other things, govern the Debtors' provision of notice to all Contract Counterparties of Cure Costs in the event the Debtors decide to transfer the Assigned Contracts in connection with a Sale Transaction.  The Debtors will file the Cure Notice with the Court and serve the Cure Notice on the Contract Counterparties at least ten (10) days before the Sale Objection Deadline.

24.      Objections to the Cure Costs set forth on the Cure Notice (a "**Cure Objection**") and provision of adequate assurance of future performance (an "**Adequate Assurance Objection**") must:  (i) be in writing; (ii) state the name and address of the objecting party and the amount and nature of the claim or interest of such party; (iii) state with particularity the basis and nature of any objection, and provide proposed language that, if accepted and incorporated by the Debtors, would obviate such objection; (iv) conform to the Bankruptcy Rules and the Local Rules; (v) be filed with the Court and be served on the Objection Notice Parties (as defined in the Cure Notice) by the deadline provided in the applicable Cure Notice.

### Approval of the Relief Requested Is Warranted and in the Best Interests of the Debtors and Their Economic Stakeholders

#### A.      The Bidding Procedures are Fair and Reasonable

25.      The Bidding Procedures are designed to promote the paramount goal of any proposed sale of property of a debtor's estate: maximizing the value of sale proceeds received by the estate.  *See Burtch v. Ganz, et al. (In re Mushroom Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor had fiduciary duty to maximize and protect value of estate's assets); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (recognizing that main goal of any proposed sale of property of a debtor's estate is to maximize value).  Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing value of a debtor's estate.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),* 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing that sale procedures "encourage bidding and . . . maximize the value of the debtor's assets").

23

26.     The Bidding Procedures provide for an orderly, uniform, and competitive process through which interested parties may submit offers to purchase the Debtors' business. The Debtors, with the assistance of their advisors, have structured the Bidding Procedures to promote active bidding by interested parties and to reach the highest or otherwise best offer reasonably available for the Debtors' business. Additionally, the Bidding Procedures will allow the Debtors to conduct the Auction, if necessary, in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to timely consummate a Sale Transaction. The Bidding Procedures provide the Debtors with an adequate opportunity to consider competing bids and to select the highest or otherwise best offers for the completion of a Sale Transaction.

27.     Moreover, an orderly and expeditious sale process is critical to preserve and realize the Debtors' going concern value and maximize recoveries for the Debtors' stakeholders. In formulating the Bidding Procedures, the Debtors balanced the need to provide adequate and appropriate notice to parties in interest and potential bidders with the need to quickly and efficiently run a sale process in parallel with a solicitation process. The Bidding Procedures provide for the marketing of the Debtors' business and for the consummation of a Sale Transaction.

**B.     The Stalking Horse Bid Protections are Reasonable and Appropriate**

28.     The Bidding Procedures allow the Debtors to provide Stalking Horse Bid Protections to the Stalking Horse Bidder, such as the Termination Payment. Bidding incentives such as these Stalking Horse Bid Protections have become commonplace in connection with sales under chapter 11. Moreover, approval of break-up fees as administrative expense claims as a form of bidder protections in connection with a sale has become a recognized practice in chapter 11 cases because it enables a debtor to ensure a sale to a contractually committed buyer at a price the

24

debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process.

29.     Approval of the Stalking Horse Protections is governed by standards for determining the appropriateness of bid protections in the bankruptcy context.  Courts have identified at least two instances in which bid protections may benefit the estate.  First, a break-up fee may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 533.  Second, if the availability of break-up fees were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth.  *See id.*; *see also In re Reliant Energy Channel View LP*, 594 F.3d 200, 206-08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

30.     In *O'Brien*, the Third Circuit reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee:

   a.     the presence of self-dealing or manipulation in negotiating the break-up fee;

   b.     whether the fee harms, rather than encourages, bidding;

   c.     the reasonableness of the break-up fee relative to the purchase price;

   d.     whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

   e.     the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

25

f.      the correlation of the fee to a maximum value of the debtor's estate;

g.      the support of the principal secured creditors and creditors' committees of the break-up fee;

h.      the benefits of the safeguards to the debtor's estate; and

i.      the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See In re O'Brien Envtl. Energy, Inc*., 181 F.3d at 536.

31.      While none of the factors are dispositive, an application of the facts to several of such factors supports the approval of the Stalking Horse Bid Protections.  First, the Stalking Horse Bidder would not enter into the Stalking Horse Agreement without the Stalking Horse Bid Protections.  In addition, the Stalking Horse Bid attracts additional bidders because, among other things, additional bidders will be able to save considerable time and expense because they can use many of the documents that the Stalking Horse Bidder heavily negotiated, including, among other things, the non-disclosure agreement and the Stalking Horse Agreement and the schedules thereto, in making their bid.  In sum, if the Acquired Assets are sold to a Successful Bidder other than the Stalking Horse Bidder (or the Credit Bidder), the Sale Transaction likely will be the result of the Stalking Horse Bidder's crucial role as an initial bidder generating interest in the Acquired Assets and establishing an acceptable price and offer against which other parties can bid.

### C.      Assumption and Assignment of Assigned Contracts Should be Approved

32.      Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code.  *See, e.g., In re Market*

26

*Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject executory contract is governed by business judgment standard and may only be overturned if decision is product of bad faith, whim, or caprice). The "business judgment" test in this context only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989).

33.     The assumption of the Purchased Contracts in connection with a Sale Transaction is an exercise of the Debtors' sound business judgment because the Purchased Contracts are necessary to operate the Debtors' business and, as such, are essential to obtaining the highest or otherwise best offer for the Debtors' business. Moreover, the Purchased Contracts will be assumed and assigned in accordance with the Assumption and Assignment Procedures approved by the Court pursuant to the Bidding Procedures Order, which will be reviewed by the Debtors' key stakeholders. Accordingly, the Debtors' assumption of the Assigned Contracts is an exercise of sound business judgment and should be approved.

34.     The consummation of a Sale Transaction, which will involve the assignment of the Assigned Contracts, will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code. Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assigned Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured. As set forth above, the Debtors propose to file with the Court and serve on each Contract Counterparty, the Cure Notice indicating the Debtors' calculation of the Cure Cost for each such contract. The

27

Contract Counterparties will have the opportunity to file objections to the proposed assumption and assignment of the Assigned Contracts to the Successful Bidder, including the proposed Cure Costs.

35.      Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."   11 U.S.C. § 365(f)(2)(B).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

36.      As set forth in the Bidding Procedures, for a bid to qualify as a "Qualified Bid," a Potential Bidder must information regarding its ability (and the ability of its designated assignee, if applicable) to perform under the Assigned Contracts (the "**Adequate Assurance Information**").  The Debtors will provide Adequate Assurance Information to all counterparties

to the Purchased Contracts and counterparties will have an opportunity to file an Adequate Assurance Objection in advance of the Sale Hearing.  Based on the foregoing, the Debtors' assumption and assignment of the Purchased Contracts satisfy the requirements under section 365 of the Bankruptcy Code and should be approved.

37.     In addition, to facilitate the assumption and assignment of the Purchased Contracts, the Debtors further request that the Court find that all anti-assignment provisions in the Purchased Contracts, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such contract or lease, to be unenforceable under section 365(f) of the Bankruptcy Code.[7]

## **Notice**

38.     Notice of this Motion has been provided to (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (c) the Securities and Exchange Commission; (d) the Internal Revenue Service; (e) the United States Attorney's Office for the District of Delaware; (f) the United States Attorney General/Antitrust Division of the Department of Justice; (g) all persons and entities known by the Debtors to have expressed an interest to the Debtors in a transaction involving any material portion of the Assets during the past twelve (12) months, including any person or entity that has submitted a bid for any material portion of the Assets; (h) Milbank LLP, 55 Hudson Yards, New York, New York 10001 (Attn: Evan Fleck. Esq. and Nelly Almeida, Esq.)

---

[7]     Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease[.]"  11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that, "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

and Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, Wilmington, DE 19801 (Attn: Robert Dehney, Esq. and Joseph Barsalona II, Esq.), as counsel to the Credit Bidder and Crossholder Ad Hoc First Lien Committee; (i) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036 (Attn: Philip Dublin, Esq.), as counsel to the Second Lien Ad Hoc Committee; (j) Paul Hastings LLP, 200 Park Avenue, New York, New York 10166 (Attn: Michael Baker, Esq. and Shekhar Kumar, Esq.), as counsel to the DIP Agent and First Lien Agent; (k) counsel to the successor second lien agent, Pryor Cashman LLP, 7 Times Square, New York, New York 10036 (Attn: Seth Lieberman, Esq.); (l) Vinson & Elkins LLP, 1114 Avenue of the Americas, 32nd Floor, New York, NY 10036 (Attn: David Meyer, Esq.), as counsel to the Consenting Sponsors; (m) counsel to the Stalking Horse Bidder, (1) Jones Day, (x) 51 Louisiana Avenue, N.W., Washington, D.C. 20001 (Attn: Dan T. Moss, Esq.) and (y) 250 Vesey Street, New York, NY 10281 (Attn: Nicholas J. Morin, Esq.) and (2) Potter Anderson & Corroon LLP, 1313 N. Market Street, 6th Floor, Wilmington, DE 19801 (Attn: Jeremy W. Ryan, Esq. and R. Stephen McNeill, Esq.); (n) counsel to the Stalking Horse Bidder; (o) counsel to any statutory committee appointed in the Chapter 11 Cases; (p) all persons and entities known or reasonably believed to have asserted a lien, claim, interest, or encumbrance with respect to any of the Assets; (q) all equity holders; (r) all applicable state and local taxing authorities; (s) the U.S. Environmental Protection Agency; (t) the offices of the attorneys general for the states in which the Debtors operate; (u) the Banks; and (u) all parties that have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002 (the "**Sale Notice Parties**").  The Debtors respectfully submit that no further notice is required.

39.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

30

RLF1 22910658v.1

WHEREFORE the Debtors respectfully request entry of an order granting the relief

requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: February 13, 2020
   Wilmington, Delaware

        */s/ Travis J. Cuomo*
        RICHARDS, LAYTON & FINGER, P.A.
        Daniel J. DeFranceschi (No. 2732)
        Zachary I. Shapiro (No. 5103)
        Megan E. Kenney (No. 6426)
        Travis J. Cuomo (No. 6501)
        One Rodney Square
        920 N. King Street
        Wilmington, Delaware 19801
        Telephone: (302) 651-7700
        Facsimile:  (302) 651-7701
        E-mail: defranceschi@rlf.com
          shapiro@rlf.com
          kenney@rlf.com
          cuomo@rlf.com

        -and-

        WEIL, GOTSHAL & MANGES LLP
        Ray C. Schrock, P.C. (admitted *pro hac vice*)
        David N. Griffiths (admitted *pro hac vice*)
        Andriana Georgallas (admitted *pro hac vice*)
        767 Fifth Avenue
        New York, New York  10153
        Telephone:  (212) 310-8000
        Facsimile: (212) 310-8007
        E-mail: ray.schrock@weil.com
          david.griffiths@weil.com
          andriana.georgallas@weil.com

        *Proposed Attorneys for Debtors*
        *and Debtors in Possession*

RLF1 22910658v.1